No. 23-50885

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA, ET AL.,

*Plaintiffs-Appellees,*

*v.*

WARREN KENNETH PAXTON, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## DEFENDANTS' EMERGENCY MOTION TO STAY DISTRICT COURT ORDER AND PERMANENT INJUNCTION PENDING APPEAL AND FOR A TEMPORARY ADMINISTRATIVE STAY

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

LANORA C. PETTIT
Principal Deputy Solicitor General

ALLISON M. COLLINS
Assistant Attorney General

Counsel for State Defendants-Appellants

# Certificate of Interested Persons

No. 23-50885

## United States of America, et al.,
*Plaintiffs-Appellees,*

*v.*

## Warren Kenneth Paxton, et al.,
*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, State Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Aaron L. Nielson
Aaron L. Nielson
*Counsel of Record for*
*State Defendants-Appellants*

i

## Introduction and Nature of Emergency

The U.S. Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) (citing *Frank v. Walker*, 574 U.S. 929 (2014); *Veasey v. Perry*, 135 S. Ct. 9 (2014); *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). Nevertheless, in the middle of a hotly contested election cycle with runoffs in multiple localities across the State,[1] the district court enjoined the "State Defendants," which were initially defined to include Texas as well as its Attorney General and Secretary of State ("the Secretary"), from enforcing a state-law requirement that voters seeking to vote by mail must provide a form of identification that matches the State's voter-registration records.[2] The district court also enjoined Harris County from enforcing that same law during a runoff in Houston on December 9, 2023. Houston, however, spans not just Harris County but also Fort Bend and Montgomery Counties—both of which *are not subject to the injunction.* As a result, absent an emergency stay by this Court, the Houston runoff election will be administered using different voting rules, contrary to basic principles of electoral fairness and in direct contravention of Texas law.

---

[1] For a non-exhaustive list of ongoing runoff elections, see Appendix C.

[2] The district court subsequently modified the injunction to exclude the Attorney General when it was pointed out that he was not named as a defendant in the only claim at issue in this appeal. ECF No. 830 at 2 n.1

The injunction here is "patently wrong." *In re Abbott*, 954 F.3d 772, 795 (5th Cir. 2020); *see also In re Abbott*, No. 20-50296, 2020 WL 1866010 (5th Cir. Apr. 13, 2020); *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020). The U.S. Supreme Court has allowed States to impose identification requirements to vote because "[w]hile the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear." *Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. 181, 196 (2008). And this Court has explained that "[t]he potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting." *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (en banc). If a voter were to vote in person, he would have to show an identification that proved that he was the person who registered to vote. Tex. Elec. Code § 63.001. Yet the district court enjoined a provision that extends that principle to voters who seek to vote by mail on the grounds that such a requirements violates section 1971 of the Civil Rights Act of 1964, now codified under 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision"). The district court also enjoined the Secretary even though this Court is currently considering whether *any* plaintiff in this massive litigation has standing to sue the Secretary, who does not enforce any of the dozens of challenged provisions.

Given that **(i)** active campaigning is ongoing in Houston and elsewhere in connection with runoff elections on December 9, 2023, for which early voting has already concluded; **(ii)** other counties are currently accepting mail-in ballot applications for January 30, 2024 elections;[3] **(iii)** the Texas House District 2 runoff

---

[3] Gov. Greg Abbott, Proclamation of Nov. 20, 2023, *at* https://www.sos. state.tx.us/elections/forms/proclamation-hd-2-special-runoff-election.pdf.

election is also scheduled for next month; and **(iii)** the time to apply to vote by mail in the 2024 presidential election is rapidly approaching,[4] the district court's injunction will—absent a stay in this Court—prevent the uniform enforcement of the State's election laws across Texas's 254 counties. Absent a stay, the injunction will also undermine the State's interests in election integrity while also sowing confusion for voters and election officials alike. Each of these irreparable injuries warrants this Court's immediate intervention. Appellants thus respectfully urge the Court to enter a stay pending appeal, or, in the alternative, to immediately enter a temporary administrative stay while it considers this motion.

### Background

#### I. Senate Bill 1.

As the Court is now well aware, notwithstanding the Texas Secretary of State's sobriquet as the State's "chief election officer," charged with maintaining "uniformity in the application, operation, and interpretation" of the Texas Election Code, Tex. Elec. Code §§ 31.001(a), 31.003, Texas elections are primarily administered by local officials, *see, e.g.*, *Tex. All. for Retired Ams. ("TARA") v. Scott*, 28 F.4th 669, 674 (5th Cir. 2022); *Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022).

Because this case addresses mail-in ballots, the primary relevant local official is the "early[-]voting clerk"—generally the county clerk, Tex. Elec. Code § 83.002—who "has the same duties and authority with respect to early voting as a presiding

---

[4] Under Texas law, the window to apply to vote by mail for 2024 opens on January 1. Tex. Elec. Code §§ 84.001(e), 84.007.

election judge has with respect to regular voting." *Id.* § 83.001(c).[5] In addition to being charged with overseeing early, in-person voting, *e.g.*, *id.* §§ 85.031-85.033, the early-voting clerk is tasked with "review[ing] each application for a ballot to be voted by mail," *id.* § 86.001(a). If the early-voting clerk determines that an applicant is not eligible to vote by mail, the clerk must reject the application and deliver written notice to the applicant. *Id.* § 86.001(c). Otherwise, the early-voting clerk will mail the voter "an official ballot," *id.* § 86.001(b), along with the official ballot envelope and the mail-in-ballot carrier envelope, *id.* § 86.002(a).

As the Court is also doubtless aware, the 2020 election proved to be a stress test of sorts for the above-described Election Code procedures and the local officials who administer them. Because of the COVID-19 pandemic, Governor Greg Abbott extended statewide the early-voting period ahead of the November 2020 general election and allowed counties to accept hand delivery of mail-in ballots before election day. *See* Tex. Gov. Proclamation No. 41-3752, 45 Tex. Reg. 5449, 5456 (2020). The Secretary also provided detailed guidance to local officials regarding the administration of the election during the pandemic. *See Election Advisory No. 2020-14*, Tex. Sec'y of State (April 6, 2020), https://tinyurl.com/mr9kmxpk. Nevertheless, local officials throughout the State began creating their own voting rules, leading to disuniformity, widespread uncertainty, and extensive litigation both here and in state court. *See, e.g.*, *TARA v. Hughes*, 976 F.3d 564 (5th Cir. 2020) (per

---

[5] In order "to process early[-]voting results from the territory served by the early[-]voting clerk," the Election Code also requires the creation of an early-voting ballot board, Tex. Elec. Code § 87.001, and allows for a signature verification committee to assist with processing mail-in ballots, *id.* § 87.027(a).

curiam); *State v. Hollins*, 620 S.W.3d 400 (Tex. 2020) (per curiam); *In re Hotze*, 610 S.W.3d 909 (Tex. 2020) (orig. proceeding) (Devine, J., dissenting from denial of mandamus relief and emergency stay).

In the aftermath of that chaotic election cycle, the Texas Legislature enacted the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as "S.B. 1." *See* Tex. Leg., An Act Relating to Election Integrity and Security, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). As relevant here, S.B. 1 requires voters to provide the number from a government-issued ID on any application to vote by mail ("ABBM"), as well as on the carrier envelope by which the ballot itself is returned. Tex. Elec. Code §§ 84.002, 86.002. That is, a qualified voter seeking to vote by mail must submit a signed ABBM to their county's early-voting clerk, and that ABBM must include a number from a government-issued ID (or partial social security number or a statement that the applicant does not possess such ID number). *Id.* § 84.002. The early-voting clerk must evaluate the application and determine whether the application is deficient, including for failure to provide the necessary ID number or if it does not match the relevant voter's registration records. *Id.* § 86.001. Furthermore, as part of mail-in voting, the ID number must also appear on the ballot envelope. *Id.* § 87.041. Verification of that requirement is performed by Early Voting Ballot Boards ("EVBBs"), which open and evaluate mail-in ballots to determine whether they should be accepted. *Id.* § 87.041(b). Only if the application satisfies Texas law will the voter receive a mail-in ballot.

S.B. 1 requires that the voter be notified if either his application or ballot has been flagged for rejection, including for noncompliance with S.B. 1's number-

matching requirement; the law also provides the voter with an opportunity to add or correct the information. *Id.* §§ 86.008, 87.0431.

## II.    Plaintiffs' Claims and Procedural History.

Shortly after S.B. 1's enactment, multiple lawsuits were filed challenging dozens of its provisions and naming a variety of defendants. That litigation was ultimately consolidated into the present action. Appeals asserting sovereign immunity on behalf of, and lack of standing to sue, the Secretary (among others) are pending in this Court, *see LUPE v. Scott*, No. 22-50778; *Mi Familia Vota v. Scott*, No. 22-50778; *OCA-Greater Hous. v. Nelson*, No. 22-50778, and were argued on July 12, 2023. While those appeals have been pending, the district court allowed litigation to proceed through discovery and ultimately to trial.

On May 26, 2023, the United States as well as OCA-Greater Houston, League of Women Voters of Texas, REVUP-Texas, and the Workers Defense Action Fund (collectively, the "OCA Plaintiffs"), moved for partial summary judgment, arguing that various provisions of S.B. 1 violate the Materiality Provision. Specifically, the United States challenges sections 5.07 (Tex. Elec. Code § 86.001(f)) and 5.13 (Tex. Elec. Code § 87.041(b)(8)), which require an election official to reject applications to vote by mail and mail-in ballots if the ID number provided does not match an ID number included with that voter's registration records.  The OCA Plaintiffs further challenge S.B. 1's entire number-matching framework, including S.B. 1 sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14 (codified at Tex. Elec. Code §§ 84.002(1-a),    84.011(a)(3-a),    § 86.001(f),    86.002(g),    86.015(c)(4),    87.021, 87.041(b)(8), 87.0411). In brief, their theory is that these sections violate the

Materiality Provision by requiring the rejection of applications and mail-ballot carrier envelopes based on errors or omissions that allegedly are not material to determining whether a person is qualified to vote.

On November 29, 2023, the district court granted the United States' motion for summary judgment, ECF No. 609; granted in part the OCA Plaintiffs' motion for summary judgment solely as to S.B. 1 section 5.07, ECF No. 611; and enjoined State Defendants, the now-defunct Harris County Elections Administrator, and the Travis County Clerk from enforcing the requirements of S.B. 1 sections 5.07 and 5.13. App. A. In doing so, the district court noted that its order would not present a problem under *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), because the 2023 election cycle was over, and the 2024 election cycle would not begin for months. App. A at 51. The district court did not enjoin election officials in any of the States' other 252 counties from enforcing S.B. 1 as written.[6]

On December 1, 2023, State Defendants filed a notice of appeal. ECF No. 823. Noting that local runoff elections—some of them quite consequential—are ongoing, and the actual tally in those elections is imminent, the State Defendants also immediately sought a stay pending appeal or, alternatively, a seven-day administrative stay of the district court's order. ECF No. 824. The district court denied State Defendants' requested stay on December 4, 2023. ECF No. 830.

---

[6] For the reasons discussed in the pending appeals, *supra* p. 6, extending that injunction to state officials does not close the gap because state officials like the Secretary do not enforce the relevant election provisions.

### III.    Houston's Run-off Election.

The district court mistakenly believed that its ruling could be implemented without disruption to any elections because no national elections will occur until March 2024. As demonstrated in Appendix C, however, campaigns for at least twelve runoffs in local elections across the State are happening right now. Most crucially, the City of Houston has announced a runoff Election for December 9, 2023, for various city official positions, including mayor. Appendix B.[7] The City of Houston is contained within three counties, each of which will be administering the election, and only one of which (Harris County) is subject to the district court's injunction. In addition, the district court's order came down after EVVBs would have started meeting to process ballots for the local runoff elections. *See* Tex. Elec. Code § 87.0222.Thus, even in Harris County, the injunction would have changed the standard governing mail ballots midstream, after ballots had already been accepted or rejected.

## STATEMENT OF JURISDICTION

The Court has jurisdiction to review a final judgment and grant of a permanent injunction under 28 U.S.C. § 1292.

## ARGUMENT

"An appellate court's power to hold an order in abeyance while it assesses the legality of the order has been described as 'inherent.'" *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). All four factors relevant to a stay are met here:

---

[7] This public record is also available at https://houstontx.gov/2023-runoff-election.html.

(1) State Defendants are likely to succeed on the merits; (2) they will suffer irreparable harm in the absence of a stay; (3) Plaintiffs will not be substantially harmed by a stay; and (4) the public interest favors a stay. *See id*. Moreover, where, as here, the "balance of the equities weighs *heavily* in favor of granting the stay," only a "*serious legal question*" about the merits is required. *Tex. Dem. Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020).

The district court's injunction—invalidating a major state law that has been in effect for over two years in the middle of ongoing campaigning in connection with ongoing elections—warrants a stay. The injunction inflicts an "institutional injury" through its "inversion of . . . federalism principles," *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016), which recognize that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (alterations omitted) (Roberts, C.J. in chambers). A stay is particularly important here, moreover, because the injunction comes in the middle of runoff elections, and just before a special election for a state house seat. *Vote.org v. Callanen*, 39 F.4th 297, 308-09 (5th Cir. 2022). Among the State's most fundamental duties is to enact clear and uniform laws for voting; to ensure "fair and honest" elections, to bring "order, rather than chaos, [to] the democratic process[]," and ultimately to vindicate meaningful voting. *Storer v. Brown*, 415 U.S. 724, 730 (1974). The district court's injunction threatens each of those interests.

The injunction is also flawed for the same reason the Court identified in rejecting a challenge to a Texas law under the Materiality Provision last year: "It cannot be

that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under the [Materiality Provision]. Otherwise, virtually every rule governing how citizens vote would be suspect." *Vote.org*, 39 F.4th at 305 n.6.

Here, the State has imposed reasonable requirements on voting by mail— namely, that the voter must provide information on a government ID of the sort that most Texans carry in their wallet, which they would be required to present to vote in person. Tex. Elec. Code § 63.001. Because "[e]ven the most permissive voting rules must contain some requirements," imposing such a requirement does not impose an improper burden on the right to vote simply because certain voters "fail[] to follow these rules," which at most "constitutes the forfeiture of the right to vote, not the denial of that right." *Vote.org*, 39 F.4th at 305 n. 6. And in all events, the equities overwhelmingly favor the State because—whatever one thinks of S.B. 1— one election cannot be governed by different rules in different places, as is happening in Houston. As a result, a stay is warranted because the State's merits argument are at least "serious." *Abbott*, 961 F.3d at 397.

## I.    State Defendants are Likely to Succeed on Appeal.

All Defendants are likely to succeed on appeal for two reasons: one of fact, and the other of law. *First*, Plaintiffs have not offered any evidence of discrimination related to S.B. 1. *Second*, Plaintiffs' materiality claims are flawed because the identification requirement is "material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The Secretary is likely to succeed for a third reason: As the Secretary has already

explained in the pending appeals, she is not a proper defendant for standing purposes because she does not enforce the challenged provisions.

## A. The district court invalidated the challenged provisions of S.B. 1 regardless of whether they were racially discriminatory.

Assuming that both the United States and OCA Plaintiffs can even bring an action to enjoin violations of the Materiality Provision,[8] their claims fail because there is no evidence that S.B. 1's identification requirement amounts to racial discrimination. The Materiality Provision was "enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009) (Rosenthal, J.). Accordingly, "only racially motivated deprivations of rights are actionable" under it. *Id.* The district court's decision acknowledged that the Materiality Provision is aimed at eradicating race discrimination, App. A at 39-40, but squarely rejected the argument that "the Materiality Provision does not apply to nondiscriminatory, 'neutrally applied' state laws such as [s]ections 5.07 and 5.13," *id.* at 43. Instead, the court concluded that "regardless of any racial considerations," Congress could and did "require that votes in federal elections be counted despite immaterial paperwork errors." *Id.* at 46. The district court then proceeded to find the relevant sections of S.B. 1 violated Materiality Provision because, in its view, "a

---

[8] The Attorney General may bring an action to enjoin violations of the Materiality Provision, but there is no corresponding private right of action or remedy that would permit OCA Plaintiffs to pursue their claims. 52 U.S.C. § 10101(c); *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000); *e.g.*, *McKay v. Altobello*, No. 2:96-cv-3458, 1996 WL 635987, at *2 (E.D. La. Oct. 31, 1996).

DPS number or SSN4 appearing in state databases is not material to voter qualifications"—regardless of race. *Id.* at 47.

## B. The identification requirement is material and aimed at preventing election fraud.

Plaintiffs' claims also fail for a separate reason: The challenged provisions are material. The Materiality Provision provides, in pertinent part:

(2) No person acting under color of law shall—

. . . .

 (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B). S.B. 1's identification requirement is material to determining whether an individual is qualified under State law because, *inter alia*, it answers whether the person seeking to vote *is* the relevant voter in the first place.

**1.** The district court disagreed with the State Defendants' argument. App. A at 31. The district court's analysis, however, is flawed in numerous respects. For one, it wrongly conflated the fundamental right to vote with a right to vote by mail. "No court," however, "has ever held that a voter has a right to cast a ballot by the method of his choice." *Veasey v. Abbott*, 830 F.3d 216, 307 (5th Cir. 2016) (en banc) (Jones, J., concurring in part and dissenting in part). Rather, voting by mail is a privilege that can be limited without infringing the right to vote. *Tex. Democratic*

*Party v. Abbott*, 961 F.3d 389, 408-09 (5th Cir. 2020) ("*TDP I*") (citing *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969)).

Furthermore, the district court misunderstood the Materiality Provision. Under the district court's analysis, "virtually every electoral regulation" used to confirm a voter's eligibility would be invalidated, no matter how basic, thereby "hamper[ing] the ability of States to run efficient and equitable elections, and compel[ling] federal courts to rewrite state electoral codes." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). As *Vote.org* explains, that is not the law. 39 F.4th at 305 n.6.

**2.**   The district court's ruling is particularly troubling because federal law has required ID numbers on voter-registration applications since 2004 under the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.* Texas has implemented that federal law by requiring all registered voters to provide an ID number, meaning a Texas Driver's License or Personal Identification number (often called a "DPS number") or the last four digits of a social security number, on their voter registration. Tex. Elec. Code § 13.002. That is, Texas now uses the ID number it is required to collect and maintain under federal law to confirm a voter's identity and to reduce the risk of election fraud where this Court has recognized it is most likely to occur—mail-in voting. *Veasey*, 830 F.3d at 239.

Texas is not alone in instituting such identification requirements for mail-in ballots. At least nine other states have implemented similar measures. *See Table 14: How States Verfy Voted Absentee/Mail Ballots*, National Conference of State Legislatures,   ncsl.org/elections-and-campaigns/table-14-how-states-verify-voted-absentee-mail-ballots (Mar. 15, 2022). And the Eleventh Circuit has concluded that

the HAVA ID requirement is "material to determining eligibility to register and to vote." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1174 (11th Cir. 2008). In their merits brief, the State Defendants will explain why the Eleventh Circuit was correct and why its ruling is equally applicable here. But the mere fact that one of this Court's sister circuits has rejected the district court's view underscores that this case presents a "*serious legal question*" justifying a stay. *TDP I*, 961 F.3d at 397.

## C. The district court lacked jurisdiction to enjoin the Secretary of State from enforcing a law she does not enforce.

A stay is also warranted because the injunction cannot be affirmed as applied to the Secretary for the reasons she has already explained the pending appeals. *Supra* p. 6. Even with the benefit of discovery, neither the district court nor the Plaintiffs has identified any action the Secretary, who plays no role in evaluating or rejecting mail-in ballot materials submitted by a voter, is legally authorized to take that will insure compliance with the district court's permanent injunction in a uniform manner. County officials, not the Secretary, enforce the ballot-application requirements. Tex. Elec. Code § 86.001(c). Likewise, EVBBs—not the Secretary— enforce mail-in-ballot requirements. *Id.* § 87.041(a). The Secretary is not the early-voting clerk of any Texas county and does not serve on the EVBB for any Texas county. *Id.* § 87.002.

The Secretary can issue an election advisory to county election officials. But such authority does *not* constitute enforcement of individual provisions of the Texas Election Code. Rather, it is simply that: advisory. *See TARA*, 28 F.4th at 674; *Lewis*,

28 F.4th at 664. Although Travis County and Harris County are enjoined from enforcing S.B. 1, the fact that the injunction does not apply to all counties—even for elections that cross county borders—further supports a stay.

## II. State Defendants and the Public Interest Will Be Irreparably Harmed Absent a Stay.

A stay is vital here under the well-established *Purcell* principle, which provides that federal courts "should not alter state election laws in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered six weeks before the general election). This rule flows from the fact that elections are complex affairs, and changes to election rules—even minor ones—without care and planning risk chaos that will neither ensure the integrity of an election nor engender public confidence in its outcome. *Cf. Purcell*, 549 U.S. at 5, 6.

Tellingly, the district court recognized the importance of this principle, App. A at 50, but dismissed it as inapplicable because—the district court believed—2023 elections are complete, and 2024 elections are still months away. App. A at 51. But the district court was mistaken: Its permanent injunction was issued just days before runoff elections for the City of Houston (impacting three counties) and at least eleven other runoff elections scheduled to take place on December 9, 2023. App. B; App. C. The district court's injunction risks sowing confusion amongst county election officials and voters in connection with these important elections, particularly since the injunction was issued after some mail ballots would been processed. Perhaps most concerning is the City of Houston election, because

Houston falls over three Texas counties: Harris, Fort Bend, and Montgomery. *Id.*[9] The Court's injunction applies to the Harris County Elections Administrator, but not to election officials in Fort Bend County or Montgomery County. App. A at 52. In other words, the election rules that will apply to voters in the *same election* will depend not on what Texas law provides but rather on each voter's address. That cannot be.

The district court's focus whether voters will be confused in future elections, App. 51, ignores that ABBMs that will be counted in these elections have been submitted for weeks.[10] With just a few days left on the clock, counties—and in particular, Harris County, with its millions of voters—do not have sufficient time to go back through the application records, identify ABBMs that were rejected under S.B. 1's enjoined provisions but are now permissible under the district court's analysis (as opposed to being rejected for other reasons), and get a proper mail-in ballot generated and sent to that applicant in compliance with the district court's injunction before the elections close. Voters who applied for a mail-in ballot before the injunction was issued and received a rejection letter will not know whether to cure the defects in their application, ignore the rejection and await a mail-in ballot, or head to an in-person polling station. And if voters do wait, it is far from clear that

---

[9] *Houston, Texas*, U.S. Census Bureau, https://data.census.gov/profile?q=Houston%20city,%20Texas&g=160XX00US4835000 (last visited Dec. 6, 2023).

[10] For a general election, the application period for mail-in ballots spans multiple months, spanning from January 1 to October 27, 2023. See https://www.sos.state.tx.us/elections/voter/important-election-dates.shtml#2023 (last visited Dec. 6, 2023).

they will be able to submit the ballot by the statutorily mandated deadline. Tex. Elec. Code §86.007. Given that the district court's injunction reflects that it was unaware of these elections, App. A at 51, it could not have accounted for this voter confusion and irreparable harm. In denying a stay, the district court dismissed these concerns on the grounds that all it requires State Defendants to do is to "accept otherwise valid ABBMs and mail ballots that failed to satisfy S.B. 1's number matching requirements," ECF 830 at 5—completely ignoring that the State Defendants have no role in processing such materials and only minimal role in training those who do.

## III.    The Equities Favor a Stay Which Will Not Harm Plaintiffs.

Finally, the equities and public interest favor granted the requested relief. An injunction requires a showing of "irreparable harm" that is *likely*, not merely possible. *See, e.g.*, *Winter v. NRDC*, 555 U.S. 7, 22 (2008); *see also Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023) (applying the *Winter* standard in the context of a permanent injunction). And the threatened harm must be "imminent." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). In considering that factor, "the maintenance of the status quo is an important consideration in granting a stay." *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021). Here, a stay will not substantially injure Plaintiffs but will simply maintain the status quo that has existed in Texas since 2021, when S.B. 1 went into effect.

The threat of irreparable harm to the State absent a stay, moreover, also means that the public interest favors a stay. "Because the State is the appealing party, its interest and harm merge with that of the public." *Veasey*, 870 F.3d at 391; *see also, e.g.*, *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)

(Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparably injury.").

## IV.    The Court Should Enter a Temporary Administrative Stay.

For the reasons set out above, Appellants are entitled to a stay pending appeal. Appellants request that the Court enter an order granting a stay by 5:00 pm tomorrow. In the alternative to ruling on the stay motion by that time, Appellants request that the Court immediately enter an administrative stay while it considers this motion. Such administrative stays are routine. *E.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 227-28 (5th Cir. 2020); *M.D. ex rel. Stukenberg v. Abbott*, No. 18-40057, ECF 12 (5th Cir. Jan. 19, 2018). In the absence of a stay pending appeal, a temporary administrative stay will prevent irreparable harm to Appellants while the Court considers their motion for a stay pending appeal. *See Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017) (per curiam) (holding that "a temporary stay is appropriate to 'suspend[] judicial alteration of the status quo'").

## Conclusion

The Court should stay the district court's order and preliminary injunction pending appeal by **December 7, 2023**. Additionally, or alternatively, the Court should enter a temporary administrative stay while it considers this motion.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General


Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Aaron L. Nielson
Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Lanora C. Pettit
Principal Deputy Solicitor General

Allison M. Collins
Assistant Attorney General

Counsel for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 27.3

I certify the following in compliance with Fifth Circuit Rule 27.3:

- Before filing this Motion, counsel for Appellants contacted the Clerk's Office and opposing counsel to advise them of the intent to file this Motion. Counsel for Appellant also made telephone calls to the offices of opposing counsel before filing this Motion.

- The facts stated herein supporting emergency consideration of this motion are true and complete.

- The Court's review of this motion is requested as soon as possible, but no later than **December 7, 2023**. In addition, or alternatively, Appellant respectfully requests an immediate administrative stay while the Court considers this motion.

- True and correct copies of relevant orders and other documents are attached as exhibits to this motion.

- This motion is being served at the same time it is being filed.

- The names of counsel representing the parties, including contact information of all counsel, are as follows:

> Jason Lee
> U.S. Department of Justice
> Email: Jason.lee2@usdoj.gov
> Telephone: (202) 598-1317
>
> *Counsel for Plaintiff-Appellee the United States*
>
> Zachary Dolling
> Texas Civil Right Project
> Email: zachary@texascivilrightsproject.org
> Telephone: (832) 767-3650
>
> *Counsel for Plaintiff-Appellee OCA-Greater Houston*

/s/ Aaron L. Nielson
Aaron L. Nielson

## Certificate of Conference

On December 6, 2023, counsel for Appellant conferred with counsel for Plaintiff-Appellee the United States, U.S. Department of Justice attorney Daniel Freeman, who indicated that the United States was opposed to this motion. On December 6, 2023, counsel for Appellant attempted to confer by telephone with counsel for Plaintiff-Appellee OCA-Greater Houston, Texas Civil Rights Project attorney Zachary Dolling, but were unable to confirm whether Appellees oppose the relief requested in this motion and will file a response in opposition to the motion. The filing of this motion was also preceded by telephone calls to the clerk's office and to the offices of opposing counsel on December 6, 2023, advising of the intent to file the emergency motion.

/s/ Aaron L. Nielson
Aaron L. Nielson

## CERTIFICATE OF SERVICE

On December 6, 2023, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,935 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | 5:21-CV-0844-XR |
| | § | [Consolidated Cases] |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION[1]

On this date, the Court considered the motions for summary judgment as to the Section 101 Materiality Provision claims filed by the United States (ECF No. 609), the OCA Plaintiffs (ECF No. 611), and the Intervenor-Defendants (ECF No. 608), and the responses and replies thereto. After careful consideration, the Court issues the following order.

## BACKGROUND

On September 7, 2021, Texas Governor Greg Abbott signed into law the Election Protection and Integrity Act of 2021, an omnibus election law commonly referred to as S.B. 1. *See* Election Integrity Protection Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021). In the weeks that followed, numerous private plaintiffs, including OCA-Greater Houston, League of Women Voters of Texas, and REVUP-Texas (collectively, the "OCA Plaintiffs"), and the United States filed suit, challenging various provisions of S.B. 1 under the United States Constitution and federal civil rights statutes.[2]

---

[1] This memorandum opinion supplements the Court's earlier summary ruling on these motions issued in August 2023. *See* ECF No. 724.

[2] For the purposes of judicial economy, the Court consolidated these cases under the above-captioned lead case. *See* ECF No. 31 (consolidating *OCA-Greater Houston v. Esparza*, No. 1:21-CV-780-XR (W.D. Tex. 2021); *Houston Justice v. Abbott*, No. 5:21-CV-848-XR (W.D. Tex. 2021); *LULAC Texas v. Esparza*, No. 1:21-CV-786-XR (W.D. Tex. 2021); and *Mi Familia Vota v. Abbott*, No. 5:21-CV-920-XR (W.D. Tex. 2021) under *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-844-XR (W.D. Tex. 2021)); *United States v. Texas*, No. 5:21-CV-1085-XR (W.D. Tex. Nov. 4, 2021), ECF No. 13.

The United States and the OCA Plaintiffs (collectively, "Plaintiffs") allege that various provisions of S.B. 1 adding an identification ("ID") number-matching requirement to Texas's mail-in voting process violate Section 1971 of the Civil Rights Act of 1964 ("CRA"), now codified under 52 U.S.C. § 10101(a)(2) ("Section 101"). *See* ECF No. 200 at 45–46; ECF No. 131 at 16–17.[3] The "Materiality Provision" of Section 101 states:

> (2) No person acting under color of law shall—
>> (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B). The CRA defines the term "vote" broadly: it includes "all action necessary to make a vote effective including, but not limited to . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." *Id.* §§ 10101(a)(3)(A), 10101(e). Section 101, therefore, prohibits state actors from denying a person's right to make their vote effective based on an error or omission that is not material to determining whether they are qualified to vote under state law.

The OCA Plaintiffs attack the number-matching framework as a whole,[4] while the United States merely challenges the provisions requiring election officials to reject applications to vote by mail and mail-in ballots bearing ID numbers that do not match voter registration records— Sections 5.07 and 5.13 of S.B. 1. *See* ECF No. 200 at 45–46; ECF No. 131 at 16–17. Plaintiffs seek injunctions barring enforcement of the provisions they challenge and a declaration that the challenged provisions violate the Materiality Provision. *See id.*

---

[3] When citing to the parties' filings, the Court refers to ECF pagination, which may not reflect the pages numbers of the underlying documents.

[4] In their motion, the OCA Plaintiffs state that they seek to challenge Sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14 of S.B. 1 and have voluntarily withdrawn their challenge to Section 5.06. ECF No. 611 at 8 n.1. Although it will not meaningfully affect the disposition of the Section 101 claims, the Court observes that the Second Amended Complaint does not appear to include any references to Sections 5.08, 5.13, or 5.14 of S.B. 1.

## I.    Voter Qualifications and Registration Records

S.B. 1 did not change voter eligibility requirements in Texas. Texas law defines a "qualified voter" as an individual who is 18 years of age or older, is a United States citizen, is a resident of the state of Texas, has not been adjudged mentally incompetent, has not been convicted of a felony (unless they have completed their term of sentence or received a pardon), and is registered to vote. TEX. ELEC. CODE ("TEC") § 11.002(a); *see also* Tex. Const. art. VI, § 2(a).

The official Texas voter registration form prepared by the Texas Secretary of State ("SOS") enumerates all of these qualifications and asks applicants to confirm their eligibility as to each of them.[5] *See* ECF No. 609-3 at 108 (Texas Voter Registration Application). An applicant must affirm, by checking the applicable boxes on the form, that she is a U.S. citizen and will be 18 years of age by the date of the next election. *See id.* The applicant must also provide her date of birth, residential address, and sign and date a statement, under penalty of perjury, affirming that she is a resident of the county identified on the form, is a U.S. citizen, and satisfies the requirements related to felony convictions and mental incompetence. *See id.* The form also requires the applicant to provide (1) a Texas Driver's License or Personal Identification number ("DPS number"), (2) "if no [DPS number]," the last four digits of her Social Security Number ("SSN4"), or (3) a statement that she has not been issued either identification number.[6] *See id.*

Texas did not require voter-registration applicants to provide an ID number until January 1, 2004, in compliance with the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq. See* ECF No. 609-1 (DOJ's Statement of Uncontested Facts ("SUF")) ¶ 11; TEC § 13.002(c)(8)(A); 52 U.S.C. § 21083(d) (requiring states to comply with relevant HAVA requirements by January 1,

---

[5] An applicant can submit a registration application in order to register to voter for the first time or to inform the registrar of a change of address or other information. *See* ECF No. 609-3 at 108.

[6] The form also contains spaces for "optional" information, including the applicant's gender and telephone number. *See* ECF No. 609-3 at 108.

2004). Congress enacted HAVA in the wake of the November 2000 presidential election and its attendant controversies. One of HAVA's main goals was to "modernize and improve registration nationwide" by "[r]equiring states to develop statewide databases" to track voter registration. H.R. REP. 107-329(I), 2001 WL 1579545, at *35–36.

Under HAVA, states were directed to establish "a single, uniform, official, centralized, interactive computerized statewide voter registration list . . . contain[ing] the name and registration information of every legally registered voter in the State and assign[ing] a unique identifier to each legally registered voter in the State." *See* 52 U.S.C. § 21083(a)(1)(A). HAVA also imposed additional ID number requirements on *new* voter registration applications. Specifically, HAVA provides that applicants must provide a current and valid driver's license number or, if they have not been issued such a number, their SSN4, which the state must then compare with the SSA database or DOL database. *See* 52 U.S.C. § 21083(a)(5)(A)(i). Applicants who indicate that they have neither a driver's license number nor an SSN4 must be assigned a unique identification number on the state's computerized database, which will "serve to identify the applicant for voter registration purposes." *See id.* § 21083(a)(5)(A)(ii).

Texas's statewide voter registration database, maintained by the Texas SOS, is known as the Texas Election Administration Management ("TEAM") system. SUF ¶ 81. TEAM should contain only one record for each registered voter in Texas. SUF ¶ 128. Each record is assigned a Voter Unique Identification Number ("VUID"), which may itself be associated with up to two other ID numbers. *Id.* Specifically, each VUID may be associated with (1) <u>one</u> number issued by the Texas Department of Public Safety ("DPS") on a driver's license, personal identification card, or election identification certificate (collectively, a "DPS number"), (2) <u>one</u> SSN4, (3) both a DPS number and an SSN4, or (4) neither number. *See* SUF ¶¶ 129–30.

## II.     Voting-by-Mail in Texas Generally

Texas authorizes several categories of voters to vote by mail. These include voters who are 65 years of age or older, disabled voters who cannot vote in person on Election Day "without the likelihood of needing personal assistance or injuring [their] health," voters absent from their home counties for the entire in-person voting period, and voters who expect to give birth near Election Day. SUF ¶ 17; TEC §§ 82.001–004, .007–.008.

A qualified voter seeking to obtain a mail ballot must first submit a signed application for a ballot by mail ("ABBM") to their county's early voting clerk. TEC §§ 84.001, 84.007. The ABBM includes "the applicant's name and the address at which the applicant is registered to vote," information demonstrating the voter's eligibility for a mail ballot, "an indication of each election for which the applicant is applying for a ballot," and a mailing address, if different from the address of registration. *See* TEC § 84.002.

If the early voting clerk determines that the application does not "fully comply with the applicable requirements," the clerk is generally required to mail the applicant a new application with a written notice that identifies the defects in the application and explains to the applicant how the defects may be corrected. *Id.* § 86.008. Upon receiving a timely and non-defective ABBM, the clerk sends the voter an official ballot by mail ("BBM"), a ballot envelope in which to place the ballot, and an official carrier envelope in which to place the ballot envelope. *Id.* §§ 86.001–002, .012–.013.

To vote by mail, a voter must then (1) place his BBM in the official ballot envelope, (2) seal the ballot envelope, (3) place the ballot envelope in the official carrier envelope, (4) seal the carrier envelope, (5) sign the certificate on the carrier envelope, and (6) return the ballot materials

to the early voting clerk, either by mail or common or contract carrier or in-person on election day, with an acceptable form of photo identification. *Id.* § 86.005–.06, .013.[7]

In every election, each county in Texas convenes an Early Voting Ballot Board ("EVBB"), which opens the carrier envelopes and determines whether to accept individual BBMs based on, *e.g.*, whether the voter's ABBM stated a legal ground for voting by mail and whether the signature on the carrier envelope matches the signature on the ABBM.[8] *Id.* § 87.041(b). An optional Signature Verification Committee ("SVC") may also be appointed to carry out the same functions. *Id.* §§ 87.027(a), (i).

At the direction of the Texas Legislature, the SOS has developed an online tool for tracking ABBMs and mail ballots, which "must . . . for each carrier envelope, record or assign a serially numbered and sequentially issued barcode or tracking number that is unique to each envelope." *See id.* § 86.015(c)(2) (the "Ballot Tracker"). Accordingly, carrier envelopes now bear a unique number that links them to an associated voter and their ABBM. Counties are responsible for entering the information used to track ABBMs and mail ballots into the Ballot Tracker.

## III.    S.B. 1's Identification-Number Requirements

S.B. 1's number-matching framework, codified in Sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14 of S.B. 1, superimposes a new requirement on the mail-in voting process, at both the application and voting stages. To have their ballots counted under S.B. 1, Texans voting absentee must write an ID number that matches an ID number in TEAM on both their ABBM and BBM materials.

---

[7] Military voters, military family members, and overseas citizens may also use a Federal Post Card Application to apply for a mail ballot and a Texas-issued signature sheet to accompany a mail ballot in lieu of a carrier envelope, both of which must comply with SB1's requirements. *See* TEC §§ 101.052(e), 101.057, 101.107; SUF ¶¶ 27, 48–49.

[8] The voter's ABBM and carrier envelope signatures may also be compared with other signatures on file with the county clerk or voter registrar. TEC §§ 87.027(i), 87.041(e).

At the application stage, Section 5.02 requires voters to write one of three pieces of information on their ABBM:

    (1) the applicant's DPS number;

    (2) if the applicant "has not been issued" a DPS number, his or her SSN4; or

    (3) if the applicant lacks both a DPS ID number and an SSN4, a statement to
        that effect.

TEC § 84.002(a)(1-a). An applicant is permitted to use an expired DPS ID number, if the number is otherwise valid, for purposes of fulfilling these requirements. *Id.* § 84.002(b-1). To implement this new requirement, Section 5.03 of S.B. 1 directs the SOS to create a space for this information on its "officially prescribed" ABBM. TEC § 84.011(a), (a)(3-a); *see id.* § 31.002.

At the voting stage, Section 5.08 further requires that the carrier envelope in which the ballot envelope is mailed include a space, hidden from view when sealed, for the voter to enter the same identification number information required under Section 5.02. TEC § 86.002(g).

Under Sections 5.07 and 5.13 of S.B. 1, an ABBM or mail ballot must be rejected if the voter fails to provide a DPS number or SSN4 that identifies "the same voter identified on the applicant's application for voter registration." *See* TEC § 86.001(f) (codifying Section 5.07, which provides that early voting clerks "shall reject" mail ballot applications that do not include a matching ID number); TEC § 87.041(b)(8) (codifying Section 5.13, which establishes that a mail ballot "may be accepted only if" it includes a matching ID number).

Finally, S.B. 1 establishes notice-and-cure procedures for ABBMs and mail ballots that are rejected based on the number-matching requirements. Section 5.10 requires the SOS Ballot Tracker to "allow a voter to add or correct information" on her ABBM or carrier envelope as required by S.B. 1's matching-number requirement. TEC § 86.015(c)(4). Sections 5.12 and 5.14 amend the responsibilities of the EVBB (and any SVC, if appointed), to include notifying the voter

of any carrier envelope flagged for rejection for a variety of reasons, including pursuant to S.B. 1's number-matching requirement. *See* TEC §§ 87.0411; 87.0271.[9]

## IV.   Implementation of S.B. 1's Number-Matching Requirements

To implement S.B. 1's number-matching requirement at the application stage, the SOS prepared an official ABBM with the following instructions:

> YOU MUST PROVIDE ONE of the following numbers. . . Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (NOT your voter registration VUID#) . . . If you do not have a Texas Driver's License, Texas Personal Identification Number or a Texas Election Identification Certificate Number, give the last 4 digits of your Social Security Number[.]

SUF ¶ 92; *see also* TEC § 84.011(a), (a)(3-a) (codifying Section 5.03's requirement that the SOS create a space for this information on its "officially prescribed" ABBM.).

To implement S.B. 1's requirements at the voting stage, the SOS prepared a carrier envelope with identical instructions under the flap of the envelope. SUF ¶ 93; TEC § 86.002(g). (codifying Section 5.08's requirement that the carrier envelope in which the ballot envelope is mailed include a space, hidden from view when sealed, for the voter to enter the same identification number information required under Section 5.02).

Following S.B. 1's effective date, the SOS identified that incomplete records in the TEAM system could interfere with the ability of many qualified voters to cast a mail ballot that would be counted under the new requirements. SUF ¶ 131. As of January 3, 2023, nearly 190,000 Texas

---

[9] When initially enacted, Sections 5.12 and 5.14 instructed the SVC and EVBB, respectively, to determine within two business days of identifying a defect whether it would be possible for the voter to correct the defect and return the carrier envelope before polls closed on election day. If so, the SVC and EVBB had the option of returning the carrier envelope to the voter by mail or to the early-voting clerk, who could contact the voter directly. If not, Sections 5.12 and 5.14 authorized the SVC and EVBB to contact voters by telephone or e-mail and inform them of their options to either cancel their mail-in ballot and vote in person or to correct the carrier envelope in person at the early voting clerk's office within six days after the election. The Legislature has since enacted a provision, effective September 1, 2023, allowing the SVC and EVBB to mail back a corrective action form to the voter as opposed to the carrier envelope. Tex. S.B. 1599, 88th Legis., R.S., § 8, sec. 87.0271(b), 2023 Tex. Gen. Laws.

voters who have been issued DPS identification still lacked a DPS number in TEAM records, and more than 90,000 Texas registered voters had neither a DPS number nor a SSN4 affiliated with their voter registration record. SUF ¶¶ 140–41. In addition, roughly 2.4 million Texas voters have only one of their multiple DPS numbers in TEAM. SUF ¶ 142. The TEAM database also contains tens of thousands of errors, including over 60,000 DPS numbers inconsistent with DPS records and nearly 45,000 SSN4s inconsistencies between TEAM and DPS databases. SUF ¶¶ 143–44. In light of these inadequacies, both the SOS and county officials have directed duly registered and qualified Texas voters whose registration records are incomplete or erroneous for S.B. 1 purposes to submit new voter registration applications. SUF ¶ 105.

TEAM lacks records adequate to determine the number of ABBMs rejected statewide on account of S.B. 1. SUF ¶¶ 149, 151. Although the parties disagree about the precise number of ABBMs and mail ballots that have been rejected (and cured) since S.B. 1's effective date, it is undisputed that the total is in the thousands. *See, e.g.*, ECF No. 646 (State Opp. to OCA MSJ) (asserting that "nearly half of the 11,430 voters whose records indicated an initial rejection on SB 1 grounds were able to cure or vote in-person"). Data produced by Bexar County and Harris County alone document over 3,000 ABBM rejections in the November 2022 General Election for failure to meet S.B. 1 requirements, only about 1,200 of which were successfully cured. SUF ¶ 152(b)-(c). In the March 2022 primary election, more than 25,000 ballots were rejected statewide based on a mismatched or missing DPS numbers or SSN4s. SUF ¶¶ 153–54. In the November 2022 general election, S.B. 1 required officials across Texas to reject more than 11,000 mail ballots. SUF ¶ 161.

The individual experiences of voters and county officials illustrate S.B. 1's widespread effects. For example, in the 2022 primary election, Ms. Pam Gaskin, a 75-year-old voter who had

been registered to vote in Fort Bend County for over 40 years, had her ABBM rejected after she followed the form's instructions and submitted her Texas Driver License number, which she later learned was not in the voter registration database. SUF ¶¶ 180–81. And in the general election, Mr. Roberto Benavides, a 76-year-old voter in Travis County, attempted to respond to a notice of mail ballot rejection, but his efforts to cure were unsuccessful and his vote went uncounted. SUF ¶¶ 182–85. Local election officials eventually informed Mr. Benavides that the Texas Driver License number in his voter registration record contained a typo. SUF ¶ 184. County election officials reported voter confusion and frustration, including cases of voters discarding carrier envelopes that election officials had returned due to a failure to meet S.B. 1 requirements rather than taking additional steps to overcome the ballot rejection. SUF ¶¶ 99, 186.

In response to the pervasive confusion and rejection of ABBMs and mail ballots, election officials took action to mitigate S.B. 1's impact on voters. SUF ¶ 122. For example, although S.B. 1's text establishes a hierarchy of identification—with voters who have a DPS number being required to provide that number and only voters who lack a DPS number being permitted to provide a SSN4, *see* TEC §§ 84.002(a)(1-a), 86.002(g); SUF ¶¶ 32, 50—officials have accepted a SSN4 from voters with a DPS number on file. SUF ¶ 96. Similarly, state officials have recommended that voters provide both a DPS number and SSN4, and some counties have added inserts to mail voting materials with similar guidance. SUF ¶¶ 97, 123.

Election officials confirmed that the DPS numbers and SSN4s required by S.B. 1 are not used to ensure that voters are qualified to vote or to cast a mail ballot under Texas law, to identify voters, or to flag potential fraud. Keith Ingram, then serving as Director of the Elections Division of the SOS, acknowledged in a 2022 deposition that "individual eligibility criteria ha[ve] nothing to [d]o with the number." SUF ¶ 15. Nor do election officials ordinarily use these numbers to look

up voter records, and the SOS does not instruct them to do so. SUF ¶¶ 118–20. Rather, election officials look up voters using other information on mail ballot materials—such as the voter's name, date of birth, and address—just as they did before S.B. 1. SUF ¶ 120. Election officials must also verify a voter's identity using the signature by which the voter attests to identity and eligibility, just as they did before S.B. 1. TEC § 87.041(b)(2); SUF ¶ 65. Further, the SOS and county officials do not consider a DPS number or SSN4 mismatch or omission to be evidence of fraud. SUF ¶¶ 187–91. And because matching a DPS number or SSN4 against incomplete and erroneous voter registration records fails to identify some voters accurately, S.B. 1 requires election officials to reject mail ballot materials from voters who provided accurate information. SUF ¶¶ 34–36, 51, 92–94, 100–103, 131, 134–37, 139–46, 180–85.

## V.    Procedural History

Plaintiffs allege that S.B. 1's number-matching provisions violate Section 101 of the CRA because they require the rejection of vote-by-mail applications and mail ballot carrier envelopes based on errors or omissions that are not material to determining whether a person is qualified to vote under Texas law.

In November 2021, the United States filed an amended complaint, its operative pleading, against Texas and its Secretary of State ("SOS") in his official capacity, alleging that Sections 5.07 and 5.13 of S.B. 1 violate Section 101 of the CRA. ECF No. 131. Texas and the SOS filed a motion to dismiss claims of the United States in December 2021, *see* ECF No. 145, which the Court denied in all respects in May 2022. *La Union del Pueblo Entero v. Abbott ("LUPE (USA)")*, 604 F. Supp. 3d 512, 517 (W.D. Tex. 2022).

The OCA Plaintiffs filed their Second Amended Complaint in January 2022, asserting eight claims, including their Section 101 claim, against the Texas SOS and the Texas Attorney General

(together with Texas and the SOS, the "State Defendants"), in their official capacities, and several county officials in Travis County and Harris County.[10] ECF No. 200. The State Defendants moved to dismiss the OCA Plaintiffs' claims in February 2022. ECF No. 240. In August 2022, the Court entered an order, which, in relevant part, denied the State Defendants' motion with respect to the OCA Plaintiffs' claim under Section 101 of the CRA. *La Union del Pueblo Entero v. Abbott ("LUPE (OCA)")*, 618 F. Supp. 3d 388, 398 (W.D. Tex. 2022).

The OCA Plaintiffs and the United States both moved for summary judgment as to their Section 101 claims. *See* ECF No. 609 (DOJ MSJ); ECF No. 611 (OCA MSJ). Plaintiffs' motions are opposed by both the State Defendants and the Intervenor-Defendants—the Harris County Republican Party, the Dallas County Republican Party, the Republican National Committee, the National Republican Senatorial Committee, and the National Republican Congressional Committee (collectively, the "Committees" or the "Intervenor-Defendants"). *See* ECF No. 645 (State Opp. to DOJ MSJ); ECF No. 646 (State Opp. to OCA MSJ); ECF No. 634 (GOP Opp. to DOJ MSJ); ECF No. 635 (GOP Opp. to OCA MSJ). The Intervenor-Defendants also independently filed a cross-motion for partial summary judgment, asserting that the Section 101 claims brought by the United States and the OCA Plaintiffs fail as a matter of law.[11] *See* ECF No. 608 (GOP MSJ) at 13–23.

---

[10] The OCA Plaintiffs have also sued, in their official capacities, Travis County Clerk, Travis County District Attorney, Harris County Elections Administrator, and Harris County District Attorney. ECF No. 200 ¶¶ 48–51.

[11] The Committees first sought to intervene in this action in October 2021. ECF No. 57. The Court denied their motion, concluding that the Committees had not established a legally protectable interest at stake in this litigation or that the State Defendants' representation of their purported interests would be inadequate. *See* ECF No. 122 at 2–7. The Fifth Circuit reversed the Court's order concluding that the Committees' interest in S.B. 1's provisions concerning party-appointed poll watchers—an interest raised for the first time on appeal—warranted intervention. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022). In accordance with the Fifth Circuit's mandate, in May 2022, the Court granted the Committees' renewed motion to intervene. *See* Text Orders dated May 13, 2022 and May 18, 2022. It is not clear to the Court that the Committees' interest in the provisions applicable to *partisan* poll watchers establishes a commensurate interest in vote-by-mail procedures. Nonetheless, given that the State Defendants incorporate many of the Committees' arguments by reference in their responses to Plaintiffs' motions, the Court considers the Intervenor-Defendants' motion and briefing. The Intervenor-Defendants' briefing appears to universally misidentify S.B. 1's provisions requiring that ABBMs and BBMs be rejected for failure to satisfy the number-

In August 2023, in advance of the bench trial of this case scheduled for September 2023, the Court entered a summary ruling on the parties' motions for summary judgment as to Plaintiffs' Section 101 claims. *See* ECF No. 724. For the reasons stated in the Court's summary ruling and set out more fully in this memorandum opinion, the Court granted the United States' motion for summary judgment (ECF No. 609) in full and granted the OCA Plaintiffs' motion for summary judgment (ECF No. 611) with respect to their challenge to Section 5.07 of S.B. 1 only.

## LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en* banc, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden.

---

matching requirement as Sections 5.02 and 5.08. *See* ECF Nos. 608, 634, 635, 663. The Court construes the Intervenor-Defendants' arguments to apply to the correct provisions—Sections 5.07 and 5.13.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## DISCUSSION

To violate Section 101, a state law must (1) deny the right of any individual to "vote" in an election (as defined), (2) based on an "error or omission" on a "record or paper relating to any application, registration, or other act requisite to voting," (3) that is not "material in determining whether" that "individual is qualified under State law to vote in such election." 52 U.S.C. §

10101(a)(2)(B); *see also Migliori v. Cohen*, 36 F.4th 153, 162 & n.56 (3d Cir. 2022) (Section 101 violated when error or omission not material to state-law voter qualifications used as basis not to count mail ballot), *judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022);[12] *see also Pa. State Conf. of the NAACP v. Schmidt*, No. 1:22-cv-339, 2023 WL 3902954, at *5–7 (W.D. Pa. June 8, 2023) (rejecting nearly identical arguments by Intervenor-Defendants).

Because there is significant overlap among the parties' motions and accompanying responses, the Court will address their arguments bearing on Sections 5.07 and 5.13 of S.B. 1 and the proper scope of the Materiality Provision collectively. Before turning to the primary question presented in the parties' motions—the materiality of the number-matching requirement to voter qualifications—the Court will briefly address the relevance of certain summary judgment evidence and several issues specific to the OCA Plaintiffs.

## I. Evidence of the Intent and Impact of the Number-Matching Requirements

As a preliminary matter, the Court observes that parties on both sides of this dispute have devoted dozens of pages of briefing to legislative intent and estimates of the past and future impact of the number-matching requirement on voters in Texas. To the extent that this evidence bears on the wisdom of the number-matching provisions, it is entirely irrelevant to the Court's analysis of Plaintiffs' Section 101 claims on the merits.[13] Unlike many other causes of action in the voting-

---

[12] In *Migliori*, a unanimous Third Circuit panel affirmed the application of the Materiality Provision in the mail ballot context and held that voters who had omitted an immaterial date on mail-ballot related paperwork must have their votes counted. 36 F.4th at 156–57. The candidate seeking to prevent qualified voters' votes from being counted sought a stay in the U.S. Supreme Court, which rejected the stay application over the dissent of three justices, in effect allowing the contested votes to be counted. *Ritter v. Migliori*, 142 S. Ct. 1824 (Mem) (2022). The Supreme Court vacated *Migliori* after the underlying dispute became moot. *See Ritter v. Migliori*, 143 S. Ct. 297 (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)). Despite this vacatur, the substantive analysis in *Migliori* remains convincing. *See Gutierrez v. Saenz*, 565 F. Supp. 3d 892, 903–04 (S.D. Tex. 2021); *see also, e.g.*, *United States v. Ambriz*, 727 F.3d 378, 384 n.8 (5th Cir. 2013) (relying on "a case that was vacated for other reasons"); *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 427 (3d Cir. 2020) (relying on vacated opinion whose "prior analysis continues to resonate").

[13] Defendants lodge a number of objections in response to the Statement of Uncontested Facts attached to the United States' motion for summary judgment. *See* ECF No. 634 at 22–25 (GOP Opp. to DOJ MSJ); ECF No. 645-1 (State Response to SUF). Many of these "objections" constitute legal arguments in the guise of a factual dispute. *See, e.g.*,

rights context, the Materiality Provision is not a burden-interest balancing statute. Materiality

Provision violations are prohibited no matter their policy aim.

For their part, the State Defendants and, to a lesser extent the Intervenor-Defendants,

repeatedly direct the Court's attention to the purported purpose of the number-matching

requirement—to prevent voter fraud. *See, e.g.*, ECF No. 646 at 4–13, 24–25, 27, 37. While Texas

undoubtedly has an interest in deterring and preventing voter fraud, that interest must yield to a

qualified voter's right, under Section 101 of the CRA, to have their ballot counted despite

immaterial paperwork errors. *See Schwier v. Cox* (*Schwier II*), 412 F. Supp. 2d 1266, 1276 (N.D.

Ga. 2005) (rejecting contention that any information that "could help to prevent voter fraud" is

material), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (adopting district court's reasoning); *Migliori*, 36

F.4th at 163 ("[W]hatever sort of fraud deterrence or prevention [a] requirement may serve," it is

irrelevant under Materiality Provision if it is not material to determining voter qualifications);

*Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1266, 1270 (W.D. Wash. 2022) (rejecting

state's argument that number-matching voter registration scheme would help prevent voter fraud).

---

645-1 ¶ 105 (asserting that voters must provide a matching ID number in order to be "qualified" to vote by mail). Others, as discussed herein are simply irrelevant because they bear on disputes about the magnitude of harm caused by S.B. 1's number-matching requirements. *See, e.g.*, ECF No. 634 at 23–25. Others still object to statements in the SUF without proffering any contradictory evidence. *See* ECF No. 645-1 ¶ 104 (objecting to the use of the word "directed" to the extent that it implies the SOS's advisories or guidance have the force and effect of law or are in any way authoritative or binding); *id.* ¶¶ 119–20 (objecting to testimony by county election officials because the United States did not elicit testimony from officials in every county in Texas, without identifying any contrary testimony from any other election officials). Defendants' subjective disagreement with Plaintiffs' characterization of the evidence—or the SOS's guidance—does not create a genuine dispute of fact. Finally, while the State Defendants contend that the SUF is "incomplete," the addition of redundant or minimally relevant materials do not establish genuine issues for trial. *See, e.g.*, ECF No. 645-1 ¶¶ 7, 11–12, 21–22, 26–27, 31, 35–37, 41, 49, 58, 62–63, 67.

To the extent that the Court order does not rely on the United States' statements of fact, Defendants' objections are moot. To the extent that this order does rely on Plaintiffs' factual assertions, Defendants' objections are overruled because they have failed to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In short, none of the "factual disputes" identified in Defendants' briefing fail in turn to articulate disputes based on actual evidence that could "affect the outcome of the action" under the appropriate legal standard. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009).

Likewise, all of the parties address the substantial measures that elections officials have taken to reduce S.B. 1's impact on voters, the adequacy (or inadequacy) of S.B. 1's cure provisions, and the relative rejection rates before and after S.B. 1's enactment and officials' various mitigation efforts. *See* ECF No. 609 at 10 (noting that S.B. 1 "continues to disenfranchise Texas voters at historic rates" and that the post-cure rejection rate of 2.7% in the November 2022 general election was "nearly three times the national average and well above historical rejection rates in Texas"); ECF No. 611 at 20–25 (identifying "massive increases in the number of rejected ABBMs and mail ballots" in elections after S.B. 1 and observing that, due to deficiencies in the cure process and "most voters whose ABBMs or ballots were rejected [based on S.B. 1] were not able to cure the issue and cast an effective vote"). The State Defendants assert that the Materiality Provision cannot demand "perfection," because "all systems are prone to some error." ECF No. 645 at 18. But this case has nothing to do with election officials' inadvertent rejection of ABBMs and mail ballots; Sections 5.07 and 5.13 of S.B. 1 *require* election officials to reject voting materials for failure to satisfy the number-matching provisions. The Defendant-Intervenors similarly insist that the Court should uphold the number-matching requirements because "the sky is not falling in Texas." ECF No. 634 at 25. But that is not the standard for relief under Section 101.

The magnitude of S.B. 1's impact is simply not relevant to the question of whether the number-matching provisions require election officials to disenfranchise voters for errors that are immaterial to their eligibility. The Materiality Provision does not demand that Plaintiffs satisfy a balancing test or demonstrate some threshold number of votes denied. *See* 52 U.S.C. § 10101(a)(2)(B). It is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many." *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *see also Migliori*, 36 F.4th at 158, 162–64 (finding Materiality Provision

violation where 257 of about 22,000 ballots rejected). The Court thus reserves any questions as to the burdens that S.B. 1's number matching requirements have imposed on voters and the likelihood of future harm to its analysis of Plaintiffs' claim for injunctive relief.

Nor will the Court consider the wisdom of any voting practices beyond the purview of this litigation, or the theoretical application of the Materiality Provision to those practices. Both the State Defendants and Defendant-Intervenors suggest that granting Plaintiffs' requested relief would have catastrophic consequences on voting in Texas and across the nation, enumerating a whole host of voting regulations that, in their view, would be "on the chopping block." *See, e.g.*, ECF No. 635 at 16 (addressing prohibitions on overvoting and signature requirements); ECF No. 645 at 7 (addressing ID requirements and signature-comparison procedures in other states). Although there are reasons to doubt that the Materiality Provision would invalidate the regulations cited in Defendants' briefing,[14] the mere existence of other voting requirements in Texas and elsewhere is simply irrelevant. Those requirements are not currently before the Court and have not, to the Court's knowledge, survived a Section 101 challenge in any forum with the authority to bind this Court.

## II.  The OCA Plaintiffs' Standing and Challenges to §§ 5.02, 5.03, 5.08, 5.10, 5.12–5.14

Before it can reach the merits of the OCA Plaintiffs' motion for partial summary judgment, the Court must be assured of its subject matter jurisdiction over their claims, including their standing to challenge S.B. 1's number-matching requirements.

---

[14] *See, e.g.*, ECF No. 637 at 30 (arguing that the Materiality Provision would not apply to prohibitions on overvoting ballot—marking it for too many candidates—because the voter's ballot would still be counted in that election, even though her ballot in that particular contest would be treated as unmarked, since election officials would be unable to determine the voter's preference).

18

**A. The OCA Plaintiffs have standing to challenge the ID-matching requirements**

The State Defendants do not meaningfully challenge the Article III standing of any of the

OCA Plaintiffs, and largely recycle arguments from their motion to dismiss that have already been

rejected. *See* ECF No. 646 at 51–55; ECF No. 448 at 49–50.[15] Indeed, in their response to the OCA

Plaintiffs' motion for partial summary judgment, the State Defendants assert a single sentence that

OCA Plaintiffs have not established associational standing "because there is a triable question of

fact regarding their injury for many of the reasons described in State Defendant's motion to

dismiss." ECF No. 646 at 55. As the OCA Plaintiffs point out, however, this argument ignores the

factual evidence demonstrating associational standing raised in their motion and fails to satisfy the

State Defendants' burden on summary judgment. *See* ECF No. 665 at 41 n.54. Nonetheless, given

the OCA Plaintiffs' burden on summary judgment and the Court's duty to review its subject-matter

jurisdiction, the Court will address the evidence offered in support of the OCA Plaintiffs' standing

to challenge S.B. 1's number-matching provisions.

**1. Legal Standard**

It is well settled that a plaintiff invoking a federal court's jurisdiction must establish

standing by satisfying three irreducible requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

(1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the

---

[15] The Court declines the State Defendants' and Intervenor-Defendants' invitations, to reverse its conclusion that the OCA Plaintiffs can challenge the number-matching provisions directly under both the private right of action created by Section 101 and 42 U.S.C. § 1983. *See* ECF No. 646 at 51–56, ECF No. 608 at 14 n.2 (suggesting that only the Attorney General has a right to sue under Section 101); *LUPE (OCA)*, 618 F. Supp. 3d at 434 ("[C]aselaw clearly establishes that organizations, like the OCA-GH Plaintiffs, have historically been able to enforce [Section 101].").A plaintiff proceeding under § 1983 need only show that the federal law includes a private right; after that, § 1983 presumptively supplies a remedy. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002). Indeed, the Supreme Court recently confirmed that the presumption cannot be rebutted merely by pointing to a parallel government enforcement scheme that allows suits by the Attorney General. Rather, "§ 1983 can play its textually prescribed role as a vehicle for enforcing [federal] rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not 'incompatible' with Congress's handiwork." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 189 (2023).

challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Thus, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* On summary judgment, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" showing an injury resulting from the defendant's conduct, "which for purposes of the summary judgment motion will be taken to be true." *Id.* (quoting FED. R. CIV. P. 56(e)). Where multiple plaintiffs seek injunctive relief, only one needs to establish standing for each claim asserted. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

"[P]laintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury" for the self-evident reason that "injunctive and declaratory relief 'cannot conceivably remedy any past wrong.'" *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)).

To constitute an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 720–21 (citations omitted). The injury must be "imminent . . . to ensure that the alleged injury is not too speculative for Article III purposes." *Id.* at 721 (quoting *Lujan*, 504 U.S. at 564 n.2). For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur. *Stringer*, 942 F.3d at 721 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Nonetheless, "[t]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (quotations omitted). "This is because the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *Id.* (quotations omitted).

Juridical entities may establish standing under an associational or organizational theory of standing. *Id.* at 610.

"Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted, nor the relief requested requires participation of individual members." *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 836–37 (5th Cir. 2023).

"By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" *OCA-Greater Hous.*, 867 F.3d at 610 (citations omitted) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)). For example, an organization, like any other party, can satisfy the injury-in-fact requirement by demonstrating financial harm. *See, e.g.*, *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693 (5th Cir. 2011) (hospice care provider had standing to challenge federal regulation governing calculation of annual Medicare hospice provider cap by demonstrating financial harm it suffered through use of the regulation). An organization can likewise establish a likely future injury if it intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979).[16]

---

[16] *See also Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 439 (5th Cir. 2014) (charitable organizations had standing to challenge statute prohibiting their use of bingo proceeds for political

An organization can also demonstrate the requisite injury with evidence that its "ability to pursue its mission is 'perceptibly impaired' because it has 'diverted significant resources to counteract the defendant's conduct[.]'" *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (quoting *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)). But "an organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct." *El Paso Cnty. v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020). "Rather, the Article III injury comes when that diversion of resources concretely and 'perceptibly impairs' the organization's ability to carry out its purpose. Put differently, the 'perceptible impairment' to an organization's ability to carry out its mission, not the 'drain on the organization's resources,' is the 'concrete and demonstrable injury' for organizational standing." *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 353 (5th Cir. 2023) (citations and alteration marks omitted) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

### 2. Analysis

Based on the summary judgment record, the Court concludes that at least one of the OCA Plaintiffs, REV-UP, has established associational standing.[17]

With respect to associational standing, it is undisputed that REV-UP is a membership organization and that it has members in Texas who vote by mail. *see* ECF No. 611 at 41.[18] It is

---

advocacy as an unconstitutional burden on their political speech); *S. Christian Leadership Conf. v. Sup. Ct. of State of La.*, 252 F.3d 781, 878–788 (5th Cir. 2001) (concluding that "at least some" of the plaintiffs—law students and faculty and community and student organizations—had standing to challenge a Louisiana Supreme Court rule restricting representation by student-practitioners because "[t]he operations of law-school clinics were directly regulated" and "[s]everal of the client organizations would be unable to obtain representation by the clinics"); *cf. Lujan*, 504 U.S. at 561–62 ("When the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue[,] . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.").

[17] Although only one of the OCA Plaintiffs must establish standing to assert a claim under Section 101, *see Rumsfeld*, 547 U.S. at 47, 52 n.2, it appears more likely than not that OCA-Greater Houston and LWVTX have standing on the same bases, *see* ECF No. 611 at 32–37 (LWVTX); *id.* at 38–41 (OCA-Greater Houston).

[18] As the Supreme Court recently clarified, the burden of establishing the requirement for "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the

also undisputed that REV-UP members had their ABBMs and/or mail ballots rejected based on S.B. 1's number matching requirement and are at risk of having their voting materials rejected again on the same basis in future elections. *See id.* at 44–45 (describing Teri Saltzman a legally blind voter in Travis County whose March 2022 ABBM and mail ballot and November 2022 mail ballot were rejected based on the number-matching requirement). REV-UP has also presented undisputed evidence that its members have been deterred from voting by mail out of fear that their ABBMs or mail ballots will be rejected due to S.B. 1's matching-number requirement. *See id.* at 44–45. These are sufficient injuries to confer Article III standing. *See, e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing," as is requiring a registered voter to obtain a photo identification, irrespective of how easy it may be to comply with that requirement); *Stringer v. Hughs*, Nos. SA-20-CV-46-OG, SA-16-CV-257-OG, 2020 WL 6875182, at *9 (W.D. Tex. Aug. 28, 2020) (violation of federal statutory right to simultaneously apply for voter registration and driver's license constituted injury "regardless of whether the individual plaintiffs have been registered to vote by alternative means").

Thus, these individual members would have independent standing to challenge the number-matching provisions under Section 101 because they have suffered an injury-in-fact; the harm they have suffered is fairly traceable to the number-matching provisions of S.B. 1 requiring the rejection of certain voting materials; and the injunctive relief requested by the OCA Plaintiffs—barring enforcement of the number-matching requirements—would redress their harm. *Spokeo*, 578 U.S. at 338 (2016).

---

organization operates." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023).

With respect to the second element of associational standing, the interests REV-UP seeks to protect by challenging S.B. 1's number matching requirements are undoubtedly germane to its mission "to empower persons with disabilities through voter registration and assistance, issue advocacy, mobilization, and organizing." ECF No. 611 at 41; *see La Union del Pueblo Entero v. Abbott ("LUPE")*, 614 F. Supp. 3d 509, 526 (W.D. Tex. 2022).

Finally, REV-UP's claims do not require the participation of its members. This "prong of the associational standing test" focuses on "matters of administrative convenience and efficiency," *Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996), and is "solely prudential," *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). The OCA Plaintiffs' claims "can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry," *Tex. Med. Bd.*, 627 F.3d at 552, and there is no question that it is "more administratively convenient and efficient to assert such a challenge in a representative capacity." *LUPE*, 614 F. Supp. 3d at 527.

The Court concludes that the OCA Plaintiffs have met their initial burden on summary judgment with respect to REV-UP's associational standing to assert its Section 101 claim on behalf of its members. Thus, Defendants must either set forth facts to create a material issue or specifically demonstrate why, under the undisputed material facts, the OCA Plaintiffs are not entitled to summary judgment; they cannot simply assert that an issue remains. *Celotex*, 477 U.S. at 322 (1986) (Rule 56(e) of the Federal Rules of Civil Procedure "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial" (cleaned up)). That burden is not discharged by "mere allegations or denials." *Id.* at 322 n.3; FED. R. CIV. P. 56(e). Defendants have failed to discharge their burden.

Accordingly, the Court concludes that there is no genuine dispute of material fact as to the OCA Plaintiffs' standing to challenge S.B. 1's number-matching framework under the Materiality Provision, and turns to the merits of the OCA Plaintiffs' claims.

### B. Challenges to §§ 5.02, 5.03, 5.08, 5.10, and 5.12–5.14

Although the OCA Plaintiffs have standing to challenge the number-matching framework generally, their motion for partial summary judgment as to their Section 101 claim must be denied to the extent that it challenges Sections 5.02, 5.03, 5.08, 5.10, 5.12, 5.13, and 5.14 of S.B. 1, for both procedural and substantive reasons.

Procedurally, the OCA Plaintiffs failed to raise any challenges to Sections 5.08, 5.13, and 5.14 in their Second Amended Complaint. *See* ECF No. 200 ¶ 646. *See Solferini as Tr. of Corradi S.p.A. v. Corradi USA, Inc.*, No. 20-40645, 2021 WL 3619905, at *2 (5th Cir. Aug. 13, 2021) (determining that a movant was precluded from raising a claim at the summary judgment stage when he failed to plead that claim in his complaint).

Regardless of any procedural error, the OCA Plaintiffs' challenges to Sections 5.02, 5.03, 5.08, 5.10, 5.12, and 5.14 of S.B. 1 fail on the merits because none of those provisions require that mail-in ballot applications or mail-in ballots be rejected on any basis. Rather, those provisions merely address the procedures for collecting, tracking, and correcting the relevant identification numbers. *See* TEC §§ 84.002(a)(1-a), 84.011(a), (a)(3-a), 86.002(g), 86.015(c)(4), 87.0411, 87.0271. The Materiality Provision only prohibits actions that "*deny* the right of any individual to vote in any election because of an error or omission on any record or paper[.]" 52 U.S.C. § 10101(a)(2)(B) (emphasis added). It does not, as the State Defendants correctly point out, prevent Texas from otherwise prescribing the form of ballot materials or collecting and reviewing information that may be immaterial to voter eligibility. *See* ECF No. 646 at 47. Indeed, the OCA

Plaintiff's Second Amended Complaint explicitly concedes that "the State may legally request this information from voters (for example, as an optional data point that would prevent the need for a signature review)." ECF No. 200 at 45.

The OCA Plaintiffs nonetheless seek to enjoin these provisions because, even if they do not require election officials to reject any voting materials, they "contribute to the implementation and enforcement of SB 1's matching-number requirement." ECF No. 665 at 37. But these provisions cannot violate the materiality provision because they do not require the rejection of any voting materials. To extent that the OCA Plaintiffs challenge those provisions as unduly burdensome and confusing to voters, the Court does not dispute that being deterred from voting by mail is a harm, or even a legally cognizable harm, but because "deterrence" does not constitute a "denial" based on an "error or omission," the Materiality Provision is simply not the appropriate vehicle for such a claim.

### III.  Plaintiffs' Challenges to Sections 5.07 and 5.13

#### A.  Whether the ID numbers in TEAM are material to voter qualifications

The Court must determine at the outset whether a voter's ability to provide the ID number associated with her voter registration record is material to her qualification to vote in a given election. It is not.

The State Defendants tautologically argue that "Texas law deems [ID] numbers material; therefore, they are material." ECF No. 646 at 30–33. As the OCA Plaintiffs point out, "[t]his logic would erase the Materiality Provision from existence, by defining *whatever* requirements might be imposed by state law in order to vote, no matter how trivial, as being 'material in determining whether such individual is qualified under State law to vote in such election.'" ECF No. 665 at 24 (citing 52 U.S.C. § 10101(a)(2)(B) and *United States v. Mississippi*, 380 U.S. 128, 137–38 (1965)

(phrase "otherwise qualified by law" in Section 10101(a)(1) cannot include invalid statutes; Congress "obviously" meant "qualifications required of all voters by valid state or federal laws")).

To determine whether an error or omission is material, the information required must be compared to state-law qualifications to vote. *See Migliori*, 36 F.4th at 162; *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308–09 (N.D. Ga. 2018). Qualifications are substantive voter attributes. *See, e.g.*, *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51 (1959) (residence, age, criminal record); TEC § 11.002(a) (age, citizenship, mental capacity, criminal record, residence, and prior registration). They are distinct from rules governing the conduct of elections, including the manner of determining qualifications. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13–17 (2013); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966) (distinguishing qualifications and compliance with poll tax).

It is self-evident that a voter's ID number is not material to her eligibility to vote under Texas law. Indeed, by itself, a voter's DPS number or SSN4 cannot offer any information about a voter's substantive eligibility to vote—or even to vote by mail—in the state of Texas because those numbers are static. For example, a person's SSN4 does not change when he turns 18, registers to vote, moves into or out of the state of Texas, is convicted of a felony or judged mentally incompetent, or even dies, even though all of those factors bear on his eligibility to vote in Texas. Nor does a person's SSN4 change when she turns 65, becomes disabled, changes her travel plans, or suffers a miscarriage, even though all of those factors could impact her eligibility to vote by mail in Texas.

Further, the text of S.B. 1 itself acknowledges that even *possession* of a DPS number or SSN4 is immaterial to voter eligibility by permitting applicants and voters to represent on their ABBMs and BBMs that they have "not been issued [such] a number." *See* S.B. 1 §§ 5.02, 5.08;

TEC § 84.002(a)(1-a). The presumably tiny fraction of Texas residents who fall into this category are not disqualified from voting on this basis. Nor are the over 90,000 voters registered in Texas who, regardless of whether they have been issued a DPS number or SSN4, have neither ID number associated with their TEAM record. *See* SUF ¶¶ 140–41. Those voters presumably have neither ID number associated with their TEAM record because they registered to vote before 2004, when Texas began requiring a DPS number or SSN4 on its voter registration form in compliance with HAVA.[19]

Not even HAVA's ID number requirement renders the relevant DPS numbers or SSN4s "material" to voter qualifications.[20] To begin, HAVA did not direct states to purge all existing voters from state rolls and force them to re-register in accordance with the new federal requirements.[21] Indeed, HAVA does not even require states to *implement* a registration process. *See* 52 U.S.C. § 21083(a)(1)(B) (exempting states without voter registration requirements from HAVA's ID number and database provisions).[22] And, as with S.B. 1, HAVA does not prohibit individuals who do not possess a state ID number or SSN4 from registering to vote, but rather directs states to assign those voters unique identification numbers. As a result, even following HAVA, thousands of qualified voters have neither a DPS number nor an SSN4 associated with their TEAM record. SUF ¶ 141 (indicating that, as of January 2023, over 90,000 Texas registered

---

[19] Given the number of errors in the TEAM database, a voter's ability to correctly guess the incorrectly recorded version of their ID number could hardly be considered material to either their eligibility to vote or their identity.

[20] HAVA's ID requirements apply "notwithstanding any other provision of law," which avoids any potential conflict with Section 101. *Id.* § 21083(a)(5)(A)(i); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1174, (11th Cir. 2008); 52 U.S.C. § 21145(a) (omitting the Civil Rights Act of 1964 from list of laws not to be superseded by HAVA).

[21] Such a requirement would almost certainly violate the constitution. *See, e.g.*, *Beare v. Smith*, 321 F. Supp. 1100, 1103 (S.D. Tex. 1971) (concluding that Texas's annual voter registration requirement amounted to an unconstitutional poll tax in violation of the Equal Protection Clause of the Fourteenth Amendment).

[22] *See also Browning*, 522 F.3d at 1183 n.17 (Barkett, J., dissenting in part) ("The [ID number] information also cannot be *per se* material if a state such as North Dakota is allowed to hold federal elections without any registration requirements.").

voters had neither a DPS number nor a SSN4 affiliated with their voter registration record). Thus,

having a DPS number or SSN4 associated with one's registration record cannot be material to

voter *eligibility*.

For the argument that HAVA renders ID numbers *per se* material to voter eligibility, the

State Defendants rely on the majority opinion in *Florida State Conf. of N.A.A.C.P. v. Browning*,

which concluded:

> The fact that HAVA section 303(a) requires states to obtain the applicant's
> identification numbers before accepting a registration application and also to
> "determine whether the information provided . . . is sufficient to meet [that]
> requirement[ ]" indicates that Congress deemed the identification numbers material
> to determining eligibility to register and to vote.

522 F.3d 1153, 1174 (11th Cir. 2008). The Court is neither bound nor persuaded by this reasoning,

which is undermined by the text of HAVA itself.

As the concurrence in *Browning* and at least one other court have pointed out, HAVA does

not require states to verify the accuracy of an applicant's identifying number before registration:

> If a state is not required to verify an applicant's identifying number, then HAVA
> does not automatically make such information material because an individual in a
> state without a matching scheme could provide her driver's license or social
> security number and even though she may have transposed two numbers of her
> application, that immaterial error would not prevent her from voting in that state.
> Furthermore, the information cannot be *per se* material because HAVA provides
> for the assignment of a unique identifying number, which does not have to be
> matched, for those individuals who do not have a driver's license or social security
> number.

*Browning*, 522 F.3d at 1183 n.17 (Barkett, J., dissenting in part); *see also Wash. Ass'n of Churches*,

492 F. Supp. 2d at 1268–69 ("It is clear from the language of the statute and by looking at

legislative history that HAVA's matching requirement was intended as an administrative safeguard

for 'storing and managing the official list of registered voters,' and not as a restriction on voter

eligibility. This is evidenced by the requirement that a person who has no driver's license or social

security number be given a unique identifying number, but not be matched, prior to registering to vote.") (citations omitted). Texas's failure to verify the validity of the ID numbers provided on voters' original registration forms is manifest in the thousands of errors in TEAM. As a matter of common sense, a qualified voter's ability to correctly guess the incorrect DPS number associated with her voter registration record in TEAM cannot be material to her eligibility to vote.

Whatever the force of the *Browning* panel's decision with respect to the materiality of providing (or being assigned) an ID number upon registration, that is not what is at issue in this case. Voters who seek to vote by mail in Texas have already complied with HAVA and the Texas Election Code when they registered to vote. SB 1's matching-number requirement superfluously duplicates HAVA's registration-stage requirement to *provide* an ID number at *both* the ABBM and mail ballot stages, and it then *also* requires the number to match the voter's file in the TEAM database, which is riddled with errors.

The State Defendants assert that the ID number requirement is material to voter eligibility because it confirms the identity of the voter and that the person casting the ballot is in fact the registered voter.[23] ECF No. 645 at 15–22. Here again, the State Defendants have confused voters'

---

[23] The State Defendants suggest that S.B. 1's number-matching requirement constitutes a "decision to bring mail-in voting into conformity with requirements already employed for in-person voting: that voters offer proof of identification by means of a government issued ID." ECF No. 645 at 5. S.B. 1, they argue ,"requires voters to provide a number that identifies them in a similar way a photo ID would identify them if they appeared in person because it is unique to them, and that for reasons unrelated to voting is unlikely in anyone else's possession." *Id.* at 17. The comparison to in-person voter ID requirements is inapt.

Under Texas law, voters who cast a ballot in person can provide one of seven forms of photo ID. TEC § 63.0101(a) (enumerating the following acceptable forms of photo IDs: a U.S. military ID card, a U.S. passport book or card, a U.S. citizenship certificate, and a driver's license, personal ID card, election ID certificate, or handgun license issued by the Texas DPS). A voter can provide an expired photo ID, so long as it has not been expired for over four years. *Id.* In addition, a voter who does not possess and cannot reasonably obtain an acceptable photo ID can still cast a ballot by filling out a declaration at the polls and providing one of seven alternative supporting forms of ID. *See id.* § 63.0101(b) (voter may alternatively provide a current utility bill, bank statement, government check, paycheck, birth certificate, or any other government document showing the voter's name and address).

Any of these forms of identification will suffice for in-person voters, regardless of the specific ID number associated with their TEAM records. S.B. 1, on the other hand, requires absentee voters to recall and produce the very same identification number(s) they provided on a registration form months or years earlier—assuming that the numbers were correctly recorded in TEAM. S.B. 1 not only permits voters to provide expired DPS numbers but *requires* voters

substantive qualifications with the methodology for identifying voters in order to administer an election. *See* 52 U.S.C. §§ 20504(c)(2)(B)(ii), 20508(b)(1) (distinguishing between information necessary "to enable the appropriate State election official to assess the eligibility of the applicant" and information needed "to administer voter registration"); *see also* Tex. Const. art. 6, § 2(a) (defining "qualified voter"), and "The Times, Places and Manner of holding Elections," U.S. Const. art. I, § 4 cl. 1; *see also* Tex. Const. art. 3, § 27 (permitting regulation of elections by law).

As a practical matter, the undisputed evidence confirms that election officials do *not* use the ID numbers on ABBMs and BBMs to confirm voters' identities but to reject their voting materials. While he was serving as the Director of the Elections Division of the Texas SOS, Keith Ingram acknowledged that "individual eligibility criteria ha[ve] nothing to [d]o with the number."[24] SUF ¶ 15. The Travis County Clerk further testified that Travis County is "able to associate [an ABBM] applicant with their voter even in the absence" of an identification number, because they "have to look up [the voter's] file to see if [the voter] ha[s] a number in the first place." *See* ECF No. 611-1, Ex. 18, Charlie Johnson Dep. at 28:19–29:2. This is logical—to compare the DPS number or SSN4 on mail ballot materials with a voter's registration record, as S.B. 1 requires, officials must have already discerned the identity of the voter "identified on the applicant's application for voter registration" or "the voter's application for voter registration."[25] TEC §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 119–20.

---

to provide an expired DPS number whenever their TEAM record contains an expired number. *Cf.* SUF ¶ 142 (noting that roughly 2.4 million Texas voters have only one of their multiple DPS numbers in TEAM).

Thus, the proper analogy in the in-person voting context would be requiring in-person voters to search their closets, filing cabinets, and couch cushions for the long-expired, possibly misplaced, photo ID that happened to be in their possession when they registered to vote (perhaps decades earlier) or else be turned away at the polls.

[24] In *Migliori*, the Third Circuit considered a similar statement from the Pennsylvania Deputy Secretary for Elections & Commissions that the date on the carrier envelope "[was] not used 'to determine the eligibility' (i.e., qualifications) of a voter." *Migliori*, 36 F.4th at 164. "This, without more," the panel concluded, "slams the door shut on any argument that this date is material." *Id.*

[25] The State Defendants insist that the ID numbers could be used to distinguish between two individuals with similar names and personal information, such as a "junior" and "senior" living in the same household. *See* ECF No. 645 at

Similarly, even if the Court were to conclude that S.B. 1's matching-number requirement does not violate Section 101 at the ABBM stage, the duplicative requirement that a voter who has successfully obtained a mail ballot by matching the ID number on their ABBM to their voter file must do so *again* on the carrier envelope to have their vote counted would still be unlawful. After all, the provision of the ballot itself indicates that the voter has already been identified and found qualified by an election official. *See Martin*, 347 F. Supp. 3d. at 1309 (enjoining requirement that voters hand-write their birth year on absentee ballot because "the qualifications of the absentee voters" were "not at issue because [county] elections officials have already confirmed such voters' eligibility through the absentee ballot application process"); *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021) (state law requiring absentee voters to submit duplicative information at mail-ballot stage, after voters had already correctly provided the information at the application stage, under threat of being disenfranchised on the basis of a mismatch or omission, gave rise to a materiality violation).

Once election officials have determined an applicant or voter's identity, additional requirements that confirm identity are not material to determining whether the applicant or voter is qualified to vote or vote by mail and compounds the chance for error and disenfranchisement. *See Schwier v. Cox (Schwier I)*, 340 F.3d 1284, 1294 (11th Cir. 2003). Section 101 does not permit

---

17–18. But Plaintiffs do not dispute that the ID numbers can be *useful* in affirmatively identifying voters. *See* ECF No. 200 at 45 (conceding that "the State may legally request this information from voters (for example, as an optional data point that would prevent the need for a signature review)"). Rather, they challenge S.B. 1's ability to accurately and reliably exclude voters as unqualified for failing to satisfy the ID-matching requirement. Furthermore, even after S.B. 1, election officials continued to rely on other, publicly available information (also provided on the ABBM) to confirm voters' identities. For example, Mr. Ingram testified that, under S.B. 1, a county clerk can provide a voter with her ID number on file so long as the voter validates their identity by providing "information that would be in their voter record," like "name, date of birth, [and] address," all of which were required on ABBMs before S.B. 1. ECF No. 611-1 at 435–36 (Ex. 20, Ingram Dep. at 104:21–105:10). Likewise, an Election Advisory from the SOS instructs county officials to "confirm the voter's identity using publicly available information" in carrying out the cure processes, *i.e.*, without the use of ID numbers, *id.* at 1155 (Ex. 70, Election Advisory No. 2022-08). In short, the State Defendants' assertion that DPS numbers and SSN4s *could* be used to help confirm a voter's identity does not create a genuine dispute of fact as to whether the ID numbers are required to confirm a voter's eligibility.

state actors to require voters to recite redundant information that confirms a known identity, even as a prophylactic against voter impersonation. *See Schwier II*, 412 F. Supp. 2d at 1276 (rejecting contention that any information that "could help to prevent voter fraud" is material to qualifications). Thus, courts have found a wide range of information—such as a driver's license number matching state records, *Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1266, 1270; a social security number, *Schwier v. Cox* (*Schwier III*), 439 F.3d 1285, 1286 (11th Cir. 2006) (mem. op.); or a birth year on an absentee ballot envelope, *Martin*, 347 F. Supp. 3d at 1308–09—not to be material to determining a voter's qualifications, even though this information could conceivably confirm a voter's identity.

Thus, the Court concludes as a matter of law that a voter's ability to provide the ID number associated with her voter registration record on TEAM is not material to her voter qualifications under Texas law.

### B. Whether Section 101's protections extend to S.B. 1's mail-in voting process

The State Defendants and Intervenor-Defendants maintain that Sections 5.07 and 5.13 do not even *implicate* the Materiality Provision because they govern the procedures for requesting and casting a mail-in ballot rather than voter registration. *See* ECF No. 608 at 13–23; ECF No. 634 at 15–18; ECF No. 635 at 13–17; ECF No. 645 at 11–12 (incorporating by reference the arguments in Intervenor-Defendant's MSJ); ECF No. 646 at 29–30 (same). The Materiality Provision, they argue, prohibits states from refusing to register voters *during the voter-registration process* based on violations of rules that seek information immaterial to assessing state-law voter qualifications.

Here, Defendants seek to reassert an argument already rejected in the Court's order denying the State Defendants' motion to dismiss the United States' materiality claim:

> [T]he preparation and submission of an application to vote by mail, as well as the preparation and submission of a mail ballot carrier envelope, are actions that voters

must take in order to make their votes effective. Section 101, as a result, does not only apply when a voter is absolutely prohibited from voting. It also reaches the actions contemplated under sections 5.07 and 5.13.

*LUPE (USA)*, 604 F. Supp. 3d at 541.

Intervenor-Defendants nonetheless argue that their construction is supported by the canon of *ejusdem generis*, which provides that "where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980). Intervenor-Defendants contend that the terms "application" and "registration" relate to an initial qualification determination, and that the term "other act requisite to voting" must "therefore refer[] only to the functional equivalents of 'application' and 'registration'—i.e., the initial processes to assess voter qualifications." ECF No. 608 at 20. Not so.

The CRA's capacious definition of "vote" easily dispenses with the Intervenor-Defendants' position that "all evidence indicates . . . that Congress was concerned with registration when it passed the materiality provision, not other stages of the electoral process." ECF No. 663 at 19. If Section 101 was intended only to protect qualified voters' right to *register* and be added to the voter rolls and not their right to actually cast a ballot and have it counted, Congress could have said so. It did just the opposite: the statute protects an individual's right to *vote*, broadly defined to include "*all action necessary* to make a vote effective including, . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes." 52 U.S.C. §§ 10101(a)(2)(B), (a)(3)(A) (emphasis added).

The text of the Materiality Provision further confirms that the "right to vote" is evaluated on an election-by-election basis. It protects a qualified individual's right to vote "*in any election*" regardless of paperwork errors that are immaterial to their qualification to vote "*in such election*."

52 U.S.C. § 10101(a)(2)(B) (emphasis added). In other words, denying the statutory right to vote based on an error or omission that disqualifies a voter from only a *single* election violates Section 101. This language cannot reasonably be interpreted to mean Congress forbade denying the right to vote only for errors that affect whether the voter is qualified "to register," or to vote "in elections generally." Section 101 prohibits denial of the right to vote in a single election just as thoroughly as it prohibits wholesale refusal to register a voter. *Cf. Migliori*, 36 F.4th at 163 ("[M]ateriality is limited to errors or omissions determining qualification 'to vote in *such* election,' not future elections.").

More importantly, canons of construction such as *ejusdem generis* are applied only to resolve ambiguity, not create it. *See Harrison*, 446 U.S. at 588 (citing *United States v. Powell*, 423 U.S. 87, 91 (1975)). Congress's use of the phrase "any other" when introducing a broadening provision is "expansive language" that "offers no indication whatever that Congress intended [a] limiting construction" of the general phrase constrained by more specific preceding examples. *Harrison*, 446 U.S. at 589.[26] And the Supreme Court has counseled that courts should not "woodenly apply limiting principles every time Congress includes a specific example along with a general phrase," In any event, we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase. *Ali v. Fed. Bureau of Prisons,* 552 U.S.

---

[26] In *Harrison*, the Supreme Court declined to apply a narrowing construction to § 307(b)(1) of the Environmental Protection Act, providing for direct review by a federal court of appeals of administrative actions under several specifically enumerated provisions of the Act and of "any other final action" of the Administrator. 446 U.S. at 587–92. The Court declined to apply the canon of *ejusdem generis* because there was "no uncertainty in the meaning of the phrase, 'any other final action'."

> When Congress amended the provision in 1977, it expanded its ambit to include not simply "other final action," but rather "any other final action." This expansive language offers no indication whatever that Congress intended the limiting construction of § 307(b)(1) that the respondents now urge. Accordingly, we think it inappropriate to apply the rule of ejusdem generis in construing § 307(b)(1). Rather, we agree with the petitioners that the phrase, "any other final action," in the absence of legislative history to the contrary, must be construed to mean exactly what it says, namely, any other final action.

*Id.* at 588–89.

214, 227 (2008). The Court does not find any uncertainty in the phrase "other act requisite to voting" and concludes that the phrase encompasses the completion of both ABBMs and the carrier envelopes. An ABBM is an "application" "requisite to voting" for most individuals who seek to cast a mail ballot. *See* TEC § 84.001(a); SUF ¶ 36. Similarly, preparation of a carrier envelope[27] is "an act requisite to voting" for individuals who cast a mail ballot. *See* TEC §§ 86.005(c), 86.006, 101.057, 101.107; SUF ¶¶ 48, 63, 70.

In support of their position that the Materiality Provision should be limited to the registration stage, the Intervenor-Defendants rely on statements in two non-binding, non-precedential opinions. *See, e.g.*, ECF No. 608 at 17 (citing *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay) and *Vote.org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) (stay opinion)). The motions panel in *Vote.org* suggested in a footnote that "[a] plausible argument can be made that [Section 101] is tied to only voter registration specifically and not to all acts that constitute casting a ballot." 39 F.4th at 305 n.6. The panel relied on reasoning in Justice Alito's reasoning in dissent, that even after qualifying and registering, a voter who "does not follow the rules" may be unable to cast a vote for "any number of reasons":

> A voter may go to the polling place on the wrong day or after the polls have closed. A voter may go to the wrong polling place and may not have time to reach the right place before it is too late. A voter who casts a mail-in ballot may send it to the wrong address.

*Ritter*, 142 S. Ct. at 1825 (Alto, J., dissenting). Thus, the panel reasoned, "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" the Materiality Provision. (5th Cir. 2022)*.* And that is literally correct: only refusals to count a voter's ballot for *immaterial errors on voting-related paperwork* are actionable under the statute's plain terms.

---

[27] Or, with respect to military and overseas voters, a signature sheet.

It is not clear to the Court how any of the errors cited by the motions panel—going to the wrong polling place, sending a ballot to the wrong address, or failing to cast an in-person or mail ballot by the relevant deadline—constitutes an "error or omission" on "any paper or record" that would fall within the scope of the Materiality Provision. *See Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 55 (S.D.N.Y. 2022) (distinguishing between errors regarding a voter's assigned polling place and errors "on any record or paper"); *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1372–73 (S.D. Fla. 2004) (declining to issue an injunction under Section 101 requiring counting of absentee ballots received after a deadline, noting that this was not an error or omission "on any record or paper"). fMore importantly, none of those provisions are at issue in this litigation.

Finally, at odds with the plain text, Intervenor-Defendants insist that the Materiality Provision must be limited to voter registration to avoid constitutional problems, because Congress sought with the Materiality Provision to prevent "racially discriminatory practices in *voter registration*." ECF No. 608 at 15–16; *see also id.* at 7–8. In enacting Section 101, Congress considered "the practice of requiring unnecessary information for voter registration"—such as listing the registrant's "exact number of months and days in his age"—"with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." ECF No. 608 at 14 (citing *Schwier I*, 340 F.3d at 1294*).* "Such trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants." *Browning*, 522 F.3d at 1173; *see* H.R. Rep. No. 88-914, pt. 2, at 5 (1963) ("[R]egistrars [would] overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting" an African-American's application "for the same or more trivial reasons."). The Intervenor-Defendants'

argument—that Section 101 is limited to voter registration because Congress considered discrimination in the registration process—fails, for at least two reasons.

First, because the language of the Materiality Provisions is unambiguous, neither the canon of constitutional avoidance nor legislative history can defeat the text. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 494 (2001) ("[T]he canon of constitutional avoidance has no application in the absence of statutory ambiguity."); *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1750 (2020) ("[L]egislative history can never defeat unambiguous statutory text[.]"). Even assuming that Congress intended to limit the Materiality Provision to errors and omissions at the registration stage, the text simply does not permit that construction. The Supreme Court has counseled that, "[w]hen the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock*, 140 S. Ct. at 1737; *see also id.* ("Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result. . . . But the limits of the drafters' imagination supply no reason to ignore the law's demands.").[28] "Ours is a society of written laws. Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations." *Id.* at 1754.

Second, in addition to its power to regulate federal elections under the Elections Clause, U.S. Const. art. I, § 4, the Reconstruction Amendments authorize Congress to enact prophylactic legislation to protect the right to vote in particular, as the Supreme Court has repeatedly confirmed. *E.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (noting the validity of Congress's "suspension of literacy tests and similar voting requirements" as well as "other measures protecting

---

[28] Likewise, with respect to the CRA's expansive definition of "voting," the Supreme Court has explained that, "[w]hen a statute includes an explicit definition of a term, [courts] must follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020)) (internal quotation marks omitted).

38

voting rights" and collecting cases). When legislating pursuant to its Fifteenth Amendment powers, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966).

While Congress surely intended to prevent abuses in the voter registration process, *see, e.g.*, *Schwier I*, 340 F.3d at 1294, nothing in Section 101's statutory language nor its legislative purpose indicates that Congress chose to *allow* them at other stages in the process between voter registration and completing all legal requirements requisite to voting an effective ballot.[29] Indeed, a rule protecting voter *registration* only, but allowing registered voters to still be denied an *effective* vote based on irrelevant paperwork errors, would not have accomplished Congress' broader, well-documented aim of eradicating all manner of arbitrary and discriminatory denials of the right to vote. *E.g.*, H.R. Rep. No. 88-914 (1963), *reprinted at* 1964 U.S.C.C.A.N. 2391, 2394, 2485–87, 2491. Thus, Congress used expansive language in crafting a prophylactic rule that protects "the right of any individual to vote in any election" and that extends to "all action necessary to make a vote effective." 52 U.S.C. §§ 10101(a)(2)(B) & (e). The broad definition of the "right to vote" further undermines Intervenor-Defendants' position. It would not make sense for Congress to capaciously define the right to vote to include all actions necessary to render a vote effective but limit the application of the statute's protections to the initial act of *registering* to vote.

The "rational means" of combating racial discrimination in voting is not limited to solving a problem—disenfranchisement based on immaterial errors on voting paperwork—on a form-by-form basis. Indeed, Congress's enactment of a broader rule is entirely rational: after identifying a

---

[29] In general, courts should not construe statutes based on what Congress failed to say in legislative history. *See Harrison*, 446 U.S. at 591–92 ("The respondents also rely on what the Committee and the Congress did *not* say about the 1977 amendments to § 307(b)(1). . . . [But] it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute. In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark.").

record of a problem at the registration stage, Congress was not limited to crafting a solution with

an obvious loophole allowing officials to use forms at later stages in the same way, and for the

same purpose. *See Katzenbach*, 383 U.S. at 309 (describing "voluminous legislative history"

addressing "unremitting and ingenious defiance of the Constitution"); *Browning*, 522 F.3d at 1173

("[W]e recognize that Congress in combating specific evils might choose a broader remedy. . . .

The text of the [Materiality Provision], and not the historically motivating examples of intentional

and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning

congressional intent."). To the extent that the Intervenor-Defendants seek to challenge the wisdom

of the Materiality Provision's expansive reach as a policy matter, "[that] is an argument to be

addressed to Congress, not to this Court." *Harrison*, 446 U.S. at 593.

In short, the Court concludes that completing an ABBM is an "application" "requisite to

voting" for most individuals who seek to cast a mail ballot. *See* TEC § 84.001(a); SUF ¶ 36.

Similarly, preparation of a carrier envelope is "an act requisite to voting" for most individuals who

cast a mail ballot. *See* TEC §§ 86.005(c), 86.006, 101.057, 101.107; SUF ¶¶ 48, 63, 70. Thus, the

Materiality Provision reaches Sections 5.07 and 5.13 of S.B. 1 because failure to satisfy the

number-matching requirements constitutes an "error or omission" on an ABBM or carrier

envelope—a "record or paper"—relating to a voter's application to vote by mail or mail-in ballot—

an "application, registration, or other act requisite to voting" under Section 101.

**C.  Whether Sections 5.07 and 5.13 result in a denial of the right to vote in an election**

Denial of the statutory right to vote under Section 101 is complete when a particular

application or carrier envelope is rejected; an opportunity to cure the rejection, submit another

application, or cancel a mail ballot does not negate the denial of the statutory right to vote. *See La

Unión del Pueblo Entero*, 604 F. Supp. 3d at 541; *see also Vote.org v. Ga. State Election Bd.*, No.

40

1:22-cv-1734, 2023 WL 2432011, at *7 (N.D. Ga. Mar. 9, 2023) (rejecting the "argument that the opportunity to cure an error rehabilitates any potential violation"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (same).

Recycling arguments that were already rejected at the motion-to-dismiss stage, the State Defendants and Intervenor-Defendants insist that Sections 5.07 and 5.13 do not violate the Materiality Provision because they do not deny the right to vote. *See* ECF No. 608 at 16–18, ECF No. 634 at 9–15, ECF No. 635 at 7–13, ECF No. 663 at 8–11, ECF No. 645 at 22–26, ECF No. 646 at 41–50.

Defendants reassert that the opportunity to cure a rejection or vote in person after a rejection satisfies their obligation not to deny the statutory right to vote protected by Section 101. *See* ECF No. 646 at 20– 23, 41–47; ECF No. 634 at 9–10. But the Court has already recognized that cure procedures do not absolve an initial violation. *See LUPE (USA)*, 604 F. Supp. 3d at 541. Indeed, the efficacy of any cure procedure is irrelevant to the question under the Materiality Provision, which is violated whenever an ABBM or mail ballot is rejected based on an immaterial error or omission. Section 101 requires paperwork with an immaterial error or omission to be accepted, not rejected with an invitation to try again. If a qualified voter fails to cure an immaterial error or omission on her voting materials, she is unable to cast a ballot and have her vote counted— she was denied the right to vote in that election based on the error or omission.

Nor does the availability of in-person voting negate S.B. 1's denial of the statutory right to vote for failure to satisfy the number-matching requirements. Section 101 protects against rejection of mail voting materials. *See LUPE (USA)*, 604 F. Supp. 3d at 541 n.20; *see also Migliori*, 36 F.4th at 156–57. This is because Section 101 applies to "any individual" participating in "any election" and to "any record or paper" relating to "any application, registration, or act requisite to voting."

52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see also, e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (explaining that "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (quoting Webster's Third New International Dictionary 97 (1976))). Having made mail ballot voting available, Texas is not permitted to refuse to count mail ballots solely because of an insignificant paperwork error. *See In re Georgia Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *10 (N.D. Ga. Aug. 18, 2023) ("The text of the Materiality Provision does not distinguish between . . . 'an act requisite to voting *absentee*' and 'an act requisite to voting *in person*.' Instead, the statute prohibits the denial of the right to vote.").

S.B. 1 provides that mail ballot materials must be rejected if the materials lack an ID number matching voter registration records, preventing an applicant from casting a mail ballot or have that ballot counted. *See* TEC §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 32–35, 50–51, 63. The existence of additional, more onerous procedures that voters could use to try to overcome the rejection does not negate the original denial. Section 101's plain text does not permit election officials to reject mail ballot materials based on errors or omissions not material to voter qualifications *unless and until* voters successfully provide the requested information or the State fixes its own database errors or omissions. *See* 52 U.S.C. § 10101(a)(2)(B); *LUPE (USA)*, 604 F. Supp. 3d at 541. Ultimately, even with a cure process, the fact remains that S.B. 1 requires rejection of mail ballot materials if a voter does not submit an identification number that matches voter registration records. *See* TEC §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 37, 39, 61, 63, 67–68. That rejection denies the statutory right to vote.[30]

---

[30] Even assuming that the Court considered the cure procedures to be legally relevant—and it does not—cure procedures under S.B. 1 do not protect the franchise because some voters cannot effectively use them to ensure their application is accepted and their valid ballot is counted. *Cf. Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030–31 (N.D. Fla. 2018) (finding cure provisions inadequate to resolve due process concerns when "the opportunity to cure has proven illusory"); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2014) (same). For example, to access the online Ballot Tracker, a voter is required by statute to enter their name, SSN4, DPS ID number, and registration address. *See* TEC § 86.015(b). This log-in process compares the information entered by the voter

The number-matching provisions of S.B. 1 require election officials to deny the CRA's broadly defined right to vote based on errors or omissions on ABBM's and carrier envelopes that are not material to voter qualifications under Texas law. In short, it is difficult to imagine a clearer violation of the Materiality Provision than S.B. 1's number-matching requirement. Nonetheless, in an effort to narrow the scope of the Materiality Provision, the State Defendants and Intervenor-Defendants advance a number of unpersuasive interpretations of the text, which the Court will briefly address.

### D.  Defendants' wholly unpersuasive interpretations of the Materiality Provision

#### 1.    The Materiality Provision reaches "neutral, evenly applied" state law.

The State Defendants contend that the Materiality Provision does not apply to non-discriminatory, "neutrally applied" state laws such as Sections 5.07 and 5.13. ECF No. 645 at 9–11; ECF No. 646 at 27–29. Here, State Defendants rely on language from another provision of Section 101, arguing that, "[l]ooking at 10101(a)(2) as a whole . . . it *becomes apparent* that the Materiality Provision functions as a safeguard against the discriminatory application of state voter qualification and registration rules." ECF No. 645 at 9. It is far from "apparent" that the Materiality Provision applies only to discriminatory applications of state voting rules. Indeed, the exception that the State Defendants ask the Court to recognize, which appears nowhere on the face of Section 101's text, would swallow the rule set forth in the Materiality Provision.

---

against the TEAM database. Accordingly, if a voter is missing either a DPS ID number or SSN4 in TEAM, or if TEAM has incorrect information for either of those numbers, the voter simply cannot log in to the tracker. The online Ballot by Mail Tracker is therefore only able to cure an SB 1-related defect in scenarios where the voter (1) is in possession of a number in their TEAM record, but did not include a number on their ABBM or carrier envelope; or (2) made a transcription error on their ABBM or carrier envelope.

In its entirety, Section 10101(a)(2) provides:

> No person acting under color of law shall –

(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure **different from** the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision which have been found by State officials to be qualified to vote;

(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election; or

(C) employ any literacy test as a qualification for voting in any election unless (i) such test is administered to each individual and is conducted wholly in writing, and (ii) a certified copy of the test and of the answers given by the individual is furnished to him within twenty-five days of the submission of his request made within the period of time during which records and papers are required to be retained . . . .

52 U.S.C. § 10101(a)(2).

The State Defendants argue that, because they serve a common function, common tools of statutory construction require the three provisions of section 10101(a)(2) to be read *in pari materia*.[31] ECF No. 645 at 9. As Plaintiffs point out, however, *in pari materia* is a tool used to *resolve* textual ambiguities, not a basis for creating them. ECF No. 670 at 7 (citing *Erlenbaugh v. United States*, 409 U.S. 239, 245 (1972)). Indeed, even where two provisions were "both parts of a comprehensive federal legislative effort" and "enacted by the same legislative body at the same time," one provision cannot be leveraged through the *in pari materia* canon "to introduce an

---

[31] The State Defendants rely on *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), for the proposition that "only racially motivated deprivations of rights are actionable" under the Materiality Provision. ECF No. 646 at 29. But *Broyles* mistakenly cited *Kirksey* v. *City of Jackson*, 663 F.2d 659 (5th Cir. 1981)—which involved claims under Section 2 of the Voting Rights Act—for its conclusion that 42 U.S.C. § 1971 (now 52 U.S.C. § 10101) requires a showing of racial discrimination. *See Broyles*, 618 F. Supp. 2d at 697; *Kirksey*, 663 F.2d at 664–665; *see also Vote.org v. Callanen*, No. SA-21-CV-00649-JKP-HJB, 2021 WL 5987152, at *3 (W.D. Tex. Dec. 17, 2021) (rejecting argument that Materiality Provision claims require showing of racial discrimination and noting that *Broyles* mistakenly invoked *Kirksey* in stating otherwise).

exception to the coverage of the [other] where none is now apparent." *Erlenbaugh*, 409 U.S. at 244–45.

While Subsection (A) and the Materiality Provision may have been enacted to address a common problem, one should not limit the other where they "play different roles in achieving these broad, common goals." *Id.* Indeed, as a matter of common sense, it is simply incorrect to assume that tools directed at the same goal must operate by the same means. Umbrellas, goloshes, and raincoats, for example, all work toward the same purpose—protection from the elements—but function in completely different ways. To assume that, because an umbrella works by "opening," we should likewise "open" our boots and coats in the face of a storm would be nonsensical and even—with respect to the raincoats—counterproductive.

By selectively applying language in Subsection (A) to other provisions, State Defendants would restrict all three subsections of 52 U.S.C. § 10101(a)(2) to accomplish only the purpose of Subsection (A), rendering the other provisions fully redundant. *Compare* 52 U.S.C. § 10101(a)(2)(A) (preventing an official from applying "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals") with ECF No. 645 at 10 (suggesting the Materiality Provision is applicable only to "prevent individuals acting under color of law from applying state laws relating to voting differently with respect to some citizens than to others so as to deny or abridge the right of all citizens to vote" (emphasis in original)).

The State Defendants' interpretation would violate the "obligation to give effect to every provision of [a] statute." *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009). Congress's choice not to include the same disparate treatment requirement of Subsection (A) when drafting the Materiality Provision must be given effect because "when Congress includes particular language in one section

of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (citation and internal quotation marks omitted); *Migliori*, 36 F.4th at 162 n.56 (the Materiality Provision "does not mention racial discrimination" and "we cannot find that Congress intended to limit this statute to either instances of racial discrimination or registration").

While the provisions of Section 101 fall well within the scope of Congress's broad legislative power under the Reconstruction Amendments, *Katzenbach*, 383 U.S. at 324, it is worth remembering that, in enacting the CRA, Congress also relied on its authority under the Elections Clause. *See* Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 74 Stat. 241, 241 (1964) (applying Section 101 only to federal elections); Voting Rights Act of 1965, Pub. L. No. 89–110, § 15(a), 79 Stat. 437, 445 (1965) (expanding Section 101 to cover state and local elections). Thus, regardless of any racial considerations, Congress had the power to require that votes in federal elections be counted despite immaterial paperwork errors, so long as those errors had nothing to do with voters' qualifications under state law. "[B]y tying the federal franchise to the state franchise instead of simply placing it within the unfettered discretion of state legislatures, the Framers avoided 'render[ing] too dependent on the State governments that branch of the federal government which ought to be dependent on the people alone.'" *Inter Tribal Council of Ariz.*, 570 U.S. at 17 (quoting The Federalist No. 52, at 326 (J. Madison)); *see also id.* (overturning, as inconsistent with the NVRA, an Arizona law requiring voter-registration officials to "reject" any application for registration, including a federal form, not accompanied by documentary evidence of citizenship). In other words, it is entirely possible that Congress sought to vindicate the federal franchise

generally by preventing state officials from rejecting voting materials for minor paperwork errors, regardless of the racial impact of the officials' conduct.

### 2. The Materiality Provision applies *because* S.B. 1's requirements are immaterial

The Intervenor-Defendants admit what the State Defendants will not: that a DPS number or SSN4 appearing in state databases is not material to voter qualifications. ECF No. 634 at 15; ECF No. 608 at 20 ("[T]he United States . . . may point out that the personal identification numbers on an application or mail ballot are 'not material' to determining an individual's qualifications to vote. That is entirely correct." (internal citations omitted)). That should end the inquiry. Nonetheless, the Intervenor-Defendants suggest, contrary to both the text and purpose of the Materiality Provision, that that the number-matching provisions of S.B. 1 fall outside of Section 101's purview *because* DPS numbers and SSN4s are *not* used to determine voter qualifications. In other words, the Intervenor-Defendants assert that Section 101 applies only where the error or omission *is* material to a voter's qualifications under state law. "It is because sections 5.02 [sic] and 5.08 [sic] do not regulate voter qualification determinations that they fall *outside* the materiality provision." ECF No. 634 at 21.

A judge in the Northern District to Georgia recently rejected the same argument:

> Contrary to Responding Defendants' position, the fact that the outer envelope is not used to determine voter qualifications merely reinforces the immateriality of the Birthdate Requirement. It has never been the law that the Materiality Provision only applies to that initial determination of whether a voter is qualified to vote. Moreover, interpreting the Materiality Provision in the manner Responding Defendants suggest would essentially render the provision meaningless. In other words, a state could impose immaterial voting requirements yet escape liability each time by arguing that the very immateriality of the requirement takes it outside the statute's reach.

*In re Georgia Senate Bill 202*, 2023 WL 5334582, at *10. The Court agrees.

The Republican Committees suggest that, following successful registration, states and election officials are free to intentionally reject ballots cast by eligible voters for any reason whatsoever, so long as it does not disqualify the voter from attempting to vote in future elections. The interpretation does violence not only to the clear text of the Materiality Provision but to the civil rights of every qualified voter in the State of Texas and to the fundamental premise of our democracy.

## IV. Plaintiffs are entitled to permanent injunctive relief

A party seeking a permanent injunction must prove: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021). The Court addresses each factor in turn.

First, for the reasons set forth in this order, the Court concludes that Sections 5.07 and 5.13 of S.B. 1 violate the Materiality Provision. Plaintiffs have thus succeeded on the merits of their challenge to Sections 5.07 and 5.13 of S.B. 1 under Section 101 of the Civil Rights of 1964, 52 U.S.C. § 10101(a)(2)(B).

Second, the Court concludes that failure to grant the requested injunction will result in irreparable injury to voters in Texas. "The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm." *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020). "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases); *see also Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (recognizing the "strong interest in exercising the fundamental political right to vote") (citing *Dunn v.*

48

*Blumstein*, 405 U.S. 330, 336 (1972)). Given the text of Sections 5.07 and 5.13 (mandating the rejection of mail ballot materials for immaterial paperwork errors and omissions), the thousands of ABBMs and mails ballots that have been rejected thus far, and the persistent ID errors in the TEAM records, the Court concludes that, without the requested injunctive relief, future denials of ABBMs and mail-in ballots in violation of the Materiality Provision are not only likely but certain.

Third, the injury to Plaintiffs and voters in Texas outweighs any damage the injunction will cause to the State Defendants and election officials. The injury to Plaintiffs and voters in Texas is great: "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). On the other hand, enjoining the rejection of otherwise valid voting materials would impose at most a *de minimis* burden on the State Defendants and election officials. The State Defendants can comply with this Order through minor modifications to their election administration practices. Any injunction would not direct the State Defendants to change the *process* for applying to vote by mail or the deadline or eligibility requirements for doing so. Texas election officials could continue to use the form ABBM and carrier envelopes prescribed by the SOS in administering elections, and could even follow the same cure process outlined under Texas law (in an effort to correct outstanding TEAM errors). Rather, the injunction would merely require officials to accept otherwise valid ABBMs and mail ballots that failed to satisfy S.B. 1's number matching requirements.

Finally, it is clear to the Court that the injunction would not disserve the public interest, and, to the contrary, will serve the public interest by protecting individuals' fundamental right to vote. *See Dunn*, 405 U.S. at 336 (stating that protecting the right to vote is of particular public

importance because it is "preservative of all rights.") (citing *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)); *see also Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1271 ("Given Washington's most recent governor's election, where the winner was decided by just hundreds of votes, the Court finds that the public interest weighs strongly in favor of letting every eligible resident of Washington register and cast a vote."). Moreover, it is the public policy of the State of Texas to construe any constitutional or statutory provision which restricts the right to vote liberally: "[a]ll statutes tending to limit the citizen in his exercise of this right should be liberally construed in [the voter's] favor." *Owens v. State*, 64 Tex. 500, 502 (1885).

Even recognizing the importance of the fundamental right to vote, a court must weigh any protective action against the potential for confusion and disruption of the election administration under the "*Purcell* principle." *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). The *Purcell* principle provides that, as a general rule, federal courts "should not alter state election laws in the period close to an election." *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) (Kavanaugh, J., concurring) (upholding Seventh Circuit's stay of injunction entered six weeks before the general election)). In *Purcell*, the Supreme Court reversed a lower court's order enjoining the implementation of a proposition, passed by ballot initiative two years earlier, that required voters to present identification when they voted on election day. Reversing the lower court, the Court emphasized that the injunction was likely to cause judicially-created voter confusion in the face of an imminent election. *Purcell*, 549 U.S. at 2, 6.

The Supreme Court has recognized that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. The *Purcell* principle's logic extends only to injunctions that affect the mechanics and

procedures of the act of voting. *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.* *("RNC v. DNC")*, 140 S. Ct. 1205, 1207 (2020) (extension of absentee ballot deadline); *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (mask mandate exemption for voters); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (new ballot type eliminating straight-ticket voting); *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. at 31 (extension of absentee ballot deadline).

Plaintiffs' requested injunction does not affect the procedures for voting by mail from a voter's perspective. Enjoining election officials from rejecting ballot materials will not affect the forms or deadlines that voters have used to apply for and vote by mail since 2022. Accordingly, it is unlikely that the proposed preliminary injunction would lead to the kind of voter confusion envisioned by *Purcell*. To be sure, at least some voters might be confused by the fact that ABBMs and carrier envelopes continue to solicit ID numbers despite a court order enjoining the ID-number requirement. But unlike confusion about other voting procedures, such as deadlines, polling locations, and S.B. 1's number-matching requirement itself, this "confusion" about the applicability of the ID-number requirements would not disenfranchise anyone—voters will be able to apply for and cast mail-in ballots regardless of their ability to provide a matching ID number. Thus, any voter's potential, subjective confusion is clearly outweighed by the irreparable harm that other voters will suffer absent injunctive relief.

Likewise, the time considerations set forth in *Purcell* are inapplicable here, given that the November 2023 general election has already occurred and the 2024 primaries are months away The Supreme Court has upheld stays of injunctions entered days, weeks, and months before primary or general elections. *See Wis. State Legislature*, 141 S. Ct. at 28; *Raysor v. DeSantis*, 140 S. Ct. 2600 (2020) (upholding Eleventh Circuit's stay of injunction entered three months before

primary election); *RNC v. DNC*, 140 S. Ct. at 1208 (staying preliminary injunction entered five days before primary election); *Veasey v. Perry*, 574 U.S. 951 (2014) (upholding stay of injunction entered 24 days before general election day).

Therefore, Plaintiffs' request for injunctive relief is granted.

**CONCLUSION**

For the reasons stated herein, the United States' motion for summary judgment (ECF No. 609) is **GRANTED**. The OCA Plaintiffs' motion for summary judgment (ECF No. 611) is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted with respect to the OCA Plaintiffs' challenge to Section 5.07 and 5.13 of S.B. 1 and denied in all other respects.

The Court concludes as a matter of law that Sections 5.07 and 5.13 of Senate Bill 1, codified in Sections 86.001(f) and 87.041(b)(8) of the Texas Election Code, require officials to reject mail ballot applications and mail ballots based on errors or omissions on a record or paper relating to an act requisite to voting that is not material in determining whether voters are qualified under Texas law to vote or to cast a mail ballot. Such rejections deny the statutory right to vote protected by Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).

The Court therefore **DECLARES** that Section 5.07 and Section 5.13 of Senate Bill 1 violate Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).

The Court also finds that a permanent injunction of Sections 5.07 and 5.13 of Senate Bill 1 is warranted.

It is therefore **ORDERED** that the State Defendants, the Harris County Elections Administrator, and the Travis County Clerk, their agents and successors in office, and all persons acting in concert with them are **PERMANENTLY ENJOINED** from enforcing the requirements

of Section 5.07 and 5.13 of Senate Bill 1 that violate Section 101 of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).

The Court finally orders that OCA Plaintiffs are entitled to recover their reasonable attorney's fees and expenses, subject to a reduction in recovery for hours expended on these unsuccessful claims unless the district court finds a "common core of facts" or "related legal theories." *Fessler v. Porcelana Corona De Mexico, S.A. DE C.V.*, 23 F.4th 408, 417 (5th Cir. 2022) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 434–35 (1983)).

The United States, the OCA Plaintiffs, and the State Defendants, are hereby **ORDERED** to meet and confer concerning an appropriate remedial plan and, **by no later than December 15, 2023**, to file a proposed order or a joint advisory indicating points of disagreement.

It is so **ORDERED**.

**SIGNED** this 29th day of November, 2023.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

# EXHIBIT B

**NOTICE OF CITY OF HOUSTON, TEXAS, RUNOFF ELECTION**
**SATURDAY, DECEMBER 9, 2023**

**To the registered voters of the City of Houston, Texas:**

**NOTICE IS HEREBY GIVEN that the City of Houston, Texas, will conduct a Runoff Election (the "Election") as described herein, on Saturday, December 9, 2023, between the hours of 7 a.m. and 7 p.m., at which there will be elected the following officers of the City of Houston:**

**Mayor**
**Council Member, District D**
**Council Member, District G**
**Council Member, District H**
**Council Member, At-Large Position 1**
**Council Member, At-Large Position 2**
**Council Member, At-Large Position 3**
**Council Member, At-Large Position 4**
**City Controller**

**Early Voting by Personal Appearance.** Early voting by personal appearance shall be held at the locations and during the periods as set forth below in Exhibit "A," attached hereto and made a part of this Notice for all purposes, subject to such changes as may be necessary.

**Election Precincts and Polling Places.** The Election will be held within the precincts and polling places for the Election as set forth in Exhibit "B," attached hereto and made a part of this Notice for all purposes, subject to such changes as may be necessary.

**Persons Entitled to Vote.** Only voters of the City of Houston, Texas, who are qualified under state and federal law shall be allowed to vote at the Election. Harris County and Fort Bend County voters may vote at any Election Day Voter Center under the county-wide voting program. Montgomery County voters shall vote at the polling place designated for the election precinct in which such voter resides unless otherwise provided. Pursuant to Texas Local Government Code Section 43.130(a) and Section 4.01 of the Strategic Partnership Agreements approved by the City of Houston, qualified resident voters of areas annexed by the City for limited purposes may vote in this election.

**Early Voting by Mail.** Voters who are entitled by law to vote early by mail may obtain applications for early voting ballots to be voted by mail in accordance with the Texas Election Code by making application for a ballot by mail as follows:

**City Voters in Harris County**
Teneshia Hudspeth, Harris County Clerk's Office
Attn: Elections Department
Regular Mail: P.O. Box 1148, Houston, TX 77251-1525
In-Person Delivery or Common/Contract Carrier: 1001 Preston, Suite 426, Houston, TX 77002
Phone Number: 713-755-6965
Email: vbm@HarrisVotes.com or voters@harrisvotes.com
Fax: 713-755-4983 or 713-437-8683
Internet Website: https://www.harrisvotes.com

**City Voters in Montgomery County**
Suzie Harvey, Montgomery County Elections Administrator
Regular Mail: P. O. Box 2646, Conroe, TX 77305-2646
In-Person Delivery or Common/Contract Carrier: 9159 Airport Road, Conroe, TX 77303
Phone: (936) 539-7843
Email: election.ballot@mctx.org
Fax: 936-788-8340
Internet Website: https://elections.mctx.org

**City Voters in Fort Bend County**
John Oldham, Fort Bend County Elections Administrator

Regular Mail: 301 Jackson Street, Richmond, TX 77469
In-Person Delivery or Common/Contract Carrier: 4520 Reading Road, Suite A-400, Rosenberg, TX 77471
Phone Number: 281-341-8670
Email: vote@fortbendcountytx.gov
Fax: 281-341-4418
Internet Website: https://www.fortbendvotes.org

## EXHIBIT A

**Main Early Voting Polling Place - Harris County Voters Only**
County Attorney Conference Center
1019 Congress Avenue
Houston, Texas 77002

**Branch Early Voting Locations – Harris County Voters Only**

| Location | Voting Room | Address | City | Zip |
|---|---|---|---|---|
| Acres Homes MultiService Center | Classroom #1 | 6719 West Montgomery Road | Houston | 77091 |
| Alief ISD Administration Building | Room 750 | 4250 Cook Road | Houston | 77072 |
| Alief ISD Center for Talent Development | Room 200B | 14411 Westheimer Road | Houston | 77082 |
| BakerRipley Ripley House | Room 209 | 4410 Navigation Boulevard | Houston | 77011-1036 |
| Bayland Park Community Center | Auditorium/Voting Annex | 6400 Bissonnet Street | Houston | 77074 |
| Baytown Community Center | Pecan and BlueBonnet Room | 2407 Market Street | Baytown | 77520 |
| Carverdale Park Community Center | Main MultiPurpose Room | 9920 Porto Rico Road | Houston | 77041-7536 |
| County Attorney Conference Center | County Conference Center III/Meeting Room 109 | 1019 Congress Avenue | Houston | 77002 |
| Denver Harbor Community Center | Gym | 6402 Market Street | Houston | 77020-6840 |
| El Franco Lee Community Center | Auditorium | 9500 Hall Road | Houston | 77089 |
| Freeman Branch Library | Meeting Room | 16616 Diana Lane | Houston | 77062 |
| Green House International Church | Community Room/Church | 200 West Greens Road | Houston | 77067 |
| Hampton Inn Galleria | Uptown Room | 4500 Post Oak Parkway | Houston | 77027 |
| HCC Southeast College Building F Student Life | Room 117/Multipurpose Room | 6831 Rustic Street | Houston | 77087 |
| HCC West Loop South | C108A/B | 5601 West Loop South | Houston | 77081 |
| Hiram Clarke Multi Service Center | Classroom 132 or 134 | 3810 West Fuqua Street | Houston | 77045-6402 |
| Hobart Taylor Park Community Center | Main MultiPurpose Room | 8100 Kenton Street | Houston | 77028-4632 |
| Huffman ISD Administrative Offices | Administration Building Room 136 | 24302 Farm to Market 2100 | Huffman | 77336 |
| John P McGovern Texas Medical Center Commons | 1st Floor (Food Court) | 6550 Bertner Avenue | Houston | 77030 |
| John Phelps Courthouse | Training Room/Assembly Room | 101 South Richey Street | Pasadena | 77506 |
| Kashmere MultiService Center | Half Senior Area | 4802 Lockwood Drive | Houston | 77026-2941 |
| Kingwood Community Center | Auditorium A | 4102 Rustic Woods Drive | Kingwood | 77345-1350 |
| Lone Star College North Harris | Career and Skilled Trades Technology Center, Rooms 101/103 | 2700 WW Thorne Drive | Houston | 77073 |
| Lone Star College Victory Center | Room 102 | 4141 Victory Drive | Houston | 77088 |
| Melrose Park Community Center | Gym/Main Multipurpose Room | 1001 Canino Road | Houston | 77076-1218 |

| | | | | |
|---|---|---|---|---|
| Metropolitan MultiService Center | Half Gym, Lobby side | 1475 West Gray Street | Houston | 77019-4926 |
| Moody Park Community Center | Main MultiPurpose Room | 3725 Fulton Street | Houston | 77009 |
| MultiCultural Center | Cordova Prayer Hall | 951 Tristar Drive | Webster | 77598 |
| Northeast MultiService Center | Auditorium | 9720 Spaulding Street | Houston | 77016 |
| Nottingham Park Building | Meeting Room | 926 Country Place Drive | Houston | 77079 |
| Prairie View A and M University Northwest | Room 107/108 | 9449 Grant Road | Houston | 77070 |
| Raindrop Turkish House | Turkistan Room | 9301 West Bellfort Boulevard | Houston | 77031 |
| Shrine of the Black Madonna Cultural and Event Center | Red Room 1 | 5309 Martin Luther King Boulevard | Houston | 77021 |
| SPJST Lodge Num 88 | Annex in back of main building | 1435 Beall Street | Houston | 77008-3441 |
| Sunnyside Health and Multi Service Center | Auditorium/Room 1102 | 4410 Reed Road | Houston | 77051 |
| The Double Tree Houston Brookhollow | The Plaza | 12801 Northwest Freeway | Houston | 77040 |
| Tom Bass Park Community Center Section Three | Auditorium | 15108 Cullen Boulevard | Houston | 77047-6714 |
| Tracy Gee Community Center | Art Rooms 1 & 2 | 3599 Westcenter Drive | Houston | 77042 |
| Trini Mendenhall Community Center | Room 106 | 1414 Wirt Road | Houston | 77055-4917 |
| Wheeler Avenue Baptist Church | Fellowship Hall | 3826 Wheeler Avenue Building D | Houston | 77004-2604 |

### Hours for Early Voting by Personal Appearance - Harris County Voters Only

| | | |
|---|---|---|
| Monday  – Saturday | November 27 – December 2, 2023 | 7:00 a.m. – 7:00 p.m. |
| Sunday | December 3, 2023 | 12:00 p.m. – 7:00 p.m. |
| Monday – Tuesday | December 4 – December 5, 2023 | 7:00 a.m. – 7:00 p.m. |

### Main Early Voting Polling Place - Montgomery County Voters Only
South County Community Center
2235 Lake Robbins Dr., The Woodlands, Texas 77380

### Branch Early Voting Locations – Montgomery County Voters Only

| Location | Address | City | Zip |
|---|---|---|---|
| South County Community Center | 2235 Lake Robbins Dr. | The Woodlands | 77380 |
| Lone Star College - Kingwood, Performing Arts Center | 500 Royston Drive | Kingwood | 77339 |

### Hours for Early Voting by Personal Appearance - Montgomery County Voters Only

| | | |
|---|---|---|
| Monday  – Saturday | November 27 – December 2, 2023 | 8:00 a.m. – 5:00 p.m. |
| Sunday | December 3, 2023 | CLOSED |
| Monday – Tuesday | December 4 – December 5, 2023 | 8:00 a.m. – 5:00 p.m. |

### Main Early Voting Polling Place - Fort Bend County Voters Only
Fort Bend Office of Elections Administration
4520 Reading Road, Suite A-400, Rosenberg, Texas 77471

### Early Voting Locations & Hours – Fort Bend County Voters Only
**Schedule for:**  Cinco Ranch Branch Library – 2620 Commercial Center Blvd, Katy

| | | |
|---|---|---|
| Monday – Friday | November 27 – December 1, 2023 | 7:00 a.m. – 7:00 p.m. |
| Saturday | December 2, 2023 | 8:00 a.m. – 5:00 p.m. |
| Sunday | December 3, 2023 | CLOSED |
| Monday – Tuesday | December 4 – December 5, 2023 | 7:00 a.m. – 7:00 p.m. |

**Schedule for:** Chasewood Clubhouse – 7622 Chasewood Dr, Missouri City
Fort Bend Office of Elections Administration – 4520 Reading Road, Suite A-400, Rosenberg

| | | |
|---|---|---|
| Monday – Friday | November 27 – December 1, 2023 | 7:00 a.m. – 7:00 p.m. |
| Saturday | December 2, 2023 | 8:00 a.m. – 5:00 p.m. |
| Sunday | December 3, 2023 | 12:00 p.m. – 6:00 p.m. |
| Monday – Tuesday | December 4 – December 5, 2023 | 7:00 a.m. – 7:00 p.m. |

## **EXHIBIT B**

### **City of Houston Election Day Polling Locations – Harris County Voters Only**
City of Houston voters in Harris County may cast their ballot at any Harris County Election Day polling location listed below. Polling Locations are subject to change up until Election Day. For the latest information, please visit www.harrisvotes.com.

| PCT | Location | Voting Room | Address | City | Zip |
|---|---|---|---|---|---|
| 0169 | A B Anderson Academy | Hallway | 7401 Wheatley Street | Houston | 77088-7845 |
| 0431 | Al Noor Society of Houston | Prayer Room/Classroom/School Hall | 6443 Prestwood Drive | Houston | 77081 |
| 0936 | Aldine Middle School | Auditorium Hallway | 14908 Aldine Westfield Road | Houston | 77032-3097 |
| 0338 | Alexander Elementary School | Gym | 8500 Brookwulf Drive | Houston | 77072-3837 |
| 0487 | Alief Community Center | Class Room 1121 | 11903 Bellaire Boulevard | Houston | 77072 |
| 0254 | Anclamars W Reception Hall | Hall B | 10330 Eastex Freeway | Houston | 77093 |
| 0293 | Andy Anderson Elementary School | Annex | 5727 Ludington Drive | Houston | 77035-4305 |
| 0092 | Armand Bayou Elementary School | Gym | 16000 Hickory Knoll Drive | Houston | 77059-5299 |
| 0579 | Armandina Farias Early Childhood Center | Cafeteria | 515 East Rittenhouse Street | Houston | 77076 |
| 0481 | Arnold Middle School | Cafeteria | 11111 Telge Road | Cypress | 77429 |
| 0395 | Ashford Elementary School | Gym | 1815 Shannon Valley Drive | Houston | 77077-4901 |
| 1016 | Atascocita Branch Library | the Berry Room | 19520 Pinehurst Trail Drive | Humble | 77346 |
| 0292 | Audrey H Lawson Middle School | Auditorium | 14000 Stancliff Street | Houston | 77045-5328 |
| 0686 | Ayva Center | Main Venue | 9371 Richmond Avenue | Houston | 77063 |
| 0192 | B T Washington High School | Auditorium | 4204 Yale Street | Houston | 77018-6545 |
| 0038 | Baker Montessori School | Gym | 2100 Yupon Street | Houston | 77006-1830 |
| 0175 | BakerRipley Aberdeen | Education Room/Community Room | 3838 Aberdeen Way | Houston | 77025-2416 |
| 0793 | BakerRipley Pasadena Campus | Room 131 | 720 Fairmont Parkway | Pasadena | 77504 |
| 0573 | Bastian Elementary School | Gym | 5051 Bellfort Street | Houston | 77033-3826 |
| 0117 | Baymont By Wyndham Houston Brookhollow | Meeting Room | 12439 Northwest Freeway | Houston | 77092 |
| 0128 | Bellaire Civic Center | Civic Center | 7008 South Rice Avenue | Bellaire | 77401 |
| 0379 | Bellfort Church of Christ | Fellowship Hall | 6606 Bellfort Street | Houston | 77087-6410 |
| 0107 | Berry Elementary School | Library | 2310 Berry Road | Houston | 77093-7418 |
| 0359 | Betty Roberts Best Elementary School | Gym | 10000 Centre Parkway | Houston | 77036-8200 |
| 0418 | Beverly Hills Community Center | Communinty Center/Main MultiPurpose Room | 10201 Kingspoint Road | Houston | 77075 |
| 0423 | Black Elementary School | Library | 160 Mill Stream Lane | Houston | 77060-4199 |
| 0448 | Black Middle School | Auditorium | 1575 Chantilly Lane | Houston | 77018-4150 |
| 0129 | Briargrove Elementary School | Gym | 6145 San Felipe Street | Houston | 77057-2801 |
| 0282 | Briarmeadow Clubhouse | Clubhouse | 3203 Freshmeadows Drive | Houston | 77063-6231 |

| 0064 | Briscoe Elementary School | Room 12-13 - Building B/Multipurpose Room | 321 Forest Hill Boulevard | Houston | 77011 |
|---|---|---|---|---|---|
| 0067 | Brookline Elementary School | Library | 6301 South Loop 610 East | Houston | 77087-1012 |
| 0159 | Bruce Elementary School | Multipurpose Room (cafeteria) | 510 Jensen Drive | Houston | 77020-5834 |
| 0706 | Budewig Intermediate School | Cafeteria | 12570 Richmond Avenue | Houston | 77082-2486 |
| 0330 | Buffalo Creek Elementary School | Cafeteria | 2801 Blalock Road | Houston | 77080-2822 |
| 0431 | Burnett Bayland Community Center | Main MultiPurpose Room | 6000 Chimney Rock Drive | Houston | 77081-4001 |
| 0842 | Burnett Elementary School | Gym | 11825 Teaneck Drive | Houston | 77089-6120 |
| 0578 | Candlelight Park Community Center | Main MultiPurpose Room/Gym | 1520 Candlelight Lane | Houston | 77018-1852 |
| 0041 | Carl Wunsche Senior High School | Conference Center | 900 Wunsche Loop | Houston | 77373 |
| 0078 | CDA International Church | Fellowship Hall | 5203 Fulton Street | Houston | 77009 |
| 0508 | Chambers Elementary School | Cafeteria | 10700 Carvel Lane | Houston | 77072 |
| 0508 | Chancellor Elementary School | Room 157 | 4350 Boone Road | Houston | 77072-1999 |
| 0211 | Charlton Park Recreation Center | Main MultiPurpose Room | 8200 Park Place Boulevard | Houston | 77017 |
| 0507 | Chinese Community Center | Rec Center | 9800 Town Park Drive | Houston | 77036 |
| 0025 | Christian Hope Baptist Church | Rosa Room/Fellowship Hall | 3418 Anita Street | Houston | 77004 |
| 29 | City of South Houston Municipal Court | Court Room | 1019 Dallas Street | South Houston | 77587 |
| 0105 | Clark Park Community Center | Main MultiPurpose Room | 9718 Clark Road | Houston | 77076-5031 |
| 0744 | Clear Lake Intermediate School | Practice Gym | 15545 El Camino Real | Houston | 77062-5794 |
| 0473 | Clear Lake Presbyterian Church | Narthex & Philadelphia Hall in Sanctuary Building | 1511 El Dorado Boulevard | Houston | 77062 |
| 0270 | Clifton Middle School | Multipurpose Room | 6001 Golden Forest Drive | Houston | 77092-2359 |
| 0164 | Clinton Park Community Center | Main MultiPurpose Room | 200 Mississippi Street | Houston | 77029 |
| 0422 | Codwell Elementary School | Cafeteria | 5225 Tavenor Lane | Houston | 77048-1739 |
| 0892 | Combined Arms | Office Area 1020A | 2929 Mckinney Street | Houston | 77003 |
| 1114 | Comfort Inn and Suites FM 1960-Champions | Meeting Room | 3555 Farm to Market 1960 Road | Houston | 77068 |
| 0483 | Comfort Inn and Suites Houston I-10 West   Corridor | Meeting Room | 12323 Katy Freeway | Houston | 77079 |
| 0956 | Cooper Elementary School | Cafeteria | 18655 Imperial Valley Drive | Houston | 77073-4608 |
| 0518 | Country Inn and Suites by Radisson, Houston Northwest | Meeting Room | 12915 Farm to Market 1960 Road West | Houston | 77065 |
| 0308 | Courtyard by Marriott Houston Hobby | Meeting Room A | 9190 Gulf Freeway | Houston | 77017 |
| 1072 | Courtyard by Marriott Houston I-10 West/Park Row | The Meeting Room | 18010 Park Row | Houston | 77084 |
| 0360 | Courtyard by Marriott West University | Lobby Meeting Room | 2929 Westpark Drive | Houston | 77005 |
| 0224 | Courtyard Houston Medical Center/NRG Park | Lonestar Meeting Room | 7702 Main Street | Houston | 77030 |
| 0612 | Creekwood Middle School | Band Hall/Room 901 | 3603 West Lake Houston Parkway | Kingwood | 77339-5216 |
| 0002 | Crockett Elementary School | Library in front of school | 2112 Crockett Street | Houston | 77007-3923 |
| 0730 | Crowne Plaza Houston Galleria | Laurel B Ballroom | 7611 Katy Freeway | Houston | 77024-2001 |
| 0219 | Cullen Middle School | Library L-101 | 6900 Scott Street | Houston | 77021 |
| 0556 | Cummings Elementary School | Entrance Foyer | 10455 South Kirkwood Road | Houston | 77099-5018 |
| 0247 | Cuney Homes Community Center | Community Room/Center | 3260 Truxillo Street | Houston | 77004-4649 |

| 0345 | Cunningham Elementary School | Cafeteria | 5100 Gulfton Street | Houston | 77081 |
|------|------|------|------|------|------|
| 0053 | Damascus Missionary Baptist Church | Fellowship Hall | 3122 Center Street | Houston | 77007 |
| 0036 | Daniel Ortiz Middle School | Auditorium | 6767 Telephone Road | Houston | 77061-2056 |
| 0326 | De Chaumes Elementary School | Library | 155 Cooper Road | Houston | 77076 |
| 0670 | Deerwood Elementary School | Cafeteria | 2920 Forest Garden Drive | Kingwood | 77345-1409 |
| 0809 | Delmar Tusa Sports Complex | Side Entrance Hallway | 2020 Mangum Road Enter West 18th Street Entrance 2 | Houston | 77092 |
| 1025 | Deussen Park Senior Center | Auditorium | 12303 Sonnier Street | Houston | 77044-7208 |
| 0065 | DeZavala Park Community Center | Main MultiPurpose Room | 907 76th Street | Houston | 77012-1199 |
| 0056 | District at Memorial | WiFi Cafe | 10300 Katy Freeway | Houston | 77043 |
| 0027 | Eastwood Academy Charter High School | Community Room 120 | 1315 Dumble Street | Houston | 77023-1902 |
| 0011 | Eastwood Park Community Center | Main MultiPurpose Room | 5020 Harrisburg Boulevard | Houston | 77011-4135 |
| 0026 | EB Cape Center | Room 131 | 4501 Leeland Street | Houston | 77023-3010 |
| 0095 | Econolodge West Energy Corridor | Conference Room/Meeting Room | 715 Highway 6 South | Houston | 77079-4003 |
| 0311 | Ed White Elementary School | Foyer | 9001 Triola Lane | Houston | 77036-6147 |
| 0239 | Edgewood Park Community Center | Main MultiPurpose Room | 5803 Bellfort Street | Houston | 77033-2143 |
| 1060 | Eickenroht Elementary School | Cafeteria | 15252 Grand Point Road | Houston | 77090-6329 |
| 0723 | Eiland Elementary School | Cafeteria | 6700 North Klein Circle Drive | Houston | 77088-1500 |
| 0594 | Eisenhower Senior High School | Library | 7922 Antoine Drive | Houston | 77088-4398 |
| 0635 | Elm Grove Elementary School | Cafeteria | 2815 Clear Ridge Drive | Kingwood | 77339 |
| 0315 | Elrod Elementary School | Cafeteria | 6230 Dumfries Drive | Houston | 77096-4603 |
| 0487 | Elsik Senior High school | North Cafeteria | 12601 High Star Drive | Houston | 77072 |
| 0198 | Emancipation Park | Gym | 3018 Emancipation Avenue | Houston | 77004-3159 |
| 0518 | Emmott Elementary School | Gym/PE Room | 11750 Steeple Way Boulevard | Houston | 77065-4366 |
| 0284 | Episcopal Church of the Epiphany | Parish Hall | 9600 South Gessner Road | Houston | 77071 |
| 0423 | Evelyn Thompson Elementary School | Cafeteria | 220 Casa Grande Drive | Houston | 77060-4899 |
| 0118 | Fall Creek Elementary School | Cafeteria | 14435 Mesa Drive | Humble | 77396-4457 |
| 0660 | Fallbrook Church | Foyer Area Entry 4 | 12512 Walters Road | Houston | 77014 |
| 0401 | Fellowship of Enlightenment | common room/Kennedy Hall | 9005 North Wayside Drive | Houston | 77028 |
| 0059 | Field Elementary School | Library | 703 East 17th Street | Houston | 77008-4414 |
| 0202 | Finnigan Park Community Center | Gym | 4900 Providence Street | Houston | 77020 |
| 0603 | First Christian Church | Fellowship Hall | 22101 Morton Ranch Road | Katy | 77449 |
| 0022 | Foerster Elementary School | Cafeteria | 14200 Fonmeadow Drive | Houston | 77035-5218 |
| 0205 | Fonwood Elementary School | Cafeteria | 9709 Mesa Drive | Houston | 77078 |
| 0469 | Foster Elementary School | Library Enter Door #2 | 1800 Trailwood Village Drive | Kingwood | 77339 |
| 0880 | Frank Elementary School | Gym | 9225 Crescent Clover Drive | Spring | 77379-8590 |
| 0179 | Freed Park Clubhouse | Meeting Room | 6818 Shadyvilla Lane | Houston | 77055-5200 |
| 0080 | Furr High School | Auditorium | 500 Mercury Drive | Houston | 77013 |
| 0109 | G W Carver Contemporary High School | Room 109 | 2100 South Victory Drive | Houston | 77088-7699 |
| 0494 | Garcia Middle School | Mini Gym | 11000 Rosslyn Road | Houston | 77038 |
| 0073 | Garden Oaks Montessori | Gym | 901 Sue Barnett Drive | Houston | 77018 |

| 0755 | Genoa Staff Development Center | Main Room/Gymansium | 12900 Almeda Genoa Road | Houston | 77034-4636 |
|---|---|---|---|---|---|
| 0275 | Glenbrook United Methodist Church | Fellowship Hall | 8635 Glen Valley Drive | Houston | 77061-2339 |
| 0281 | Godwin Park Community Center | MultiPurpose Room/Main Room | 5101 Rutherglenn Drive | Houston | 77096 |
| 0231 | Golfcrest Elementary School | Library | 7414 Fairway Drive | Houston | 77087-3623 |
| 0606 | Greater Emmanuel Family Worship Center | The Hall | 3915 Kelley Street | Houston | 77026-1411 |
| 0689 | Greater Macedonia Baptist Church | Multipurpose Room | 5510 West Sam Houston Parkway North | Houston | 77041 |
| 0832 | Greater New Grove Christian Worship Center Church | Sanctuary | 7518 East Mount Houston Road | Houston | 77050 |
| 0252 | Greater New Hope Missionary Baptist Church | Fellowship Hall | 10505 Bainbridge Street | Houston | 77016-3007 |
| 0573 | Greater New Testament Church | Class Room/Media Hall | 7409 Calhoun Road | Houston | 77033 |
| 0337 | Greater Saint Matthew Church Southwest Campus | Fellowship Hall | 14919 South Main | Houston | 77035 |
| 0030 | Gregory Lincoln Education Center | Library | 1101 Taft Street | Houston | 77019 |
| 0372 | Gross Elementary School | Cafeteria | 12583 South Gessner Road | Houston | 77071 |
| 0071 | Hampton Inn and Suites Katy Freeway | Bayou City Ballroom | 5820 Katy Freeway | Houston | 77007-2102 |
| 0309 | Hampton Inn Houston I-10W Energy Corridor | Meeting Room | 11333 Katy Freeway | Houston | 77079 |
| 0078 | Harris County Department of Education | 100C | 6300 Irvington Boulevard | Houston | 77022-5618 |
| 0235 | Hartsfield Elementary School | STEM Lab | 5001 Perry Street | Houston | 77021-3515 |
| 1122 | Harvest Time Church Community Center | Gym/ Harvest Community Center | 17770 Imperial Valley Drive | Houston | 77060-6100 |
| 0563 | HC Public Library Kingwood Branch | Meeting Room | 4400 Bens View Lane | Kingwood | 77339-3774 |
| 0197 | HCC Acres Homes Campus | Electronic Resource Center/Room 138 | 630 West Little York Road | Houston | 77091 |
| 1037 | HCC Alief Center | Auditorium Room 157 | 13803 Bissonnet Street | Houston | 77083 |
| 0454 | HCC North Forest Campus | C-128 Community Room | 6010 Little York Road | Houston | 77016 |
| 619 | HCPL Maud Smith Marks Branch Library | Meeting Room | 1815 Westgreen Boulevard | Katy | 77450-5370 |
| 1118 | Heflin Elementary School | Cafeteria | 3303 Synott Road | Houston | 77082-4926 |
| 0057 | Heights High School | Bulldog Practice Gym | 560 East 14th Street | Houston | 77008-7021 |
| 0894 | Helen Major Elementary School | Gym/Auditorium | 16855 Sugar Pine Drive | Houston | 77090-3626 |
| 0736 | Helms Community Learning Center | Cafeteria | 503 West 21st Street | Houston | 77008-3641 |
| 0304 | Herod Elementary School | Library | 5627 Jason Street | Houston | 77096-2110 |
| 0543 | Herrera Elementary School | Gym | 525 Bennington Street | Houston | 77022-4911 |
| 0357 | Hidden Hollow Elementary School | Cafeteria | 4104 Appalachian Trail | Kingwood | 77345-1099 |
| 0325 | High School Ahead Academy | Library Front Entrance | 5320 Yale Street | Houston | 77091-5730 |
| 0157 | Highland Park Recreation Center | Main MultiPurpose Room | 3316 De Soto Street | Houston | 77091-3716 |
| 0003 | Hogg Middle School | Gym | 1100 Merrill Street | Houston | 77009-6009 |
| 0738 | Holiday Inn Houston Intercontinental Airport Hotel | Trinity 1-3 | 15222 John F Kennedy Boulevard | Houston | 77032-2306 |
| 0461 | Holiday Inn West Energy Corridor | Memorial Ballroom | 1112 Eldridge Parkway | Houston | 77077 |
| 0610 | Hollibrook Elementary School | Library | 3602 Hollister Street | Houston | 77080-1899 |
| 0814 | Holmquist Elementary School | Cafeteria | 15040 Westpark Drive | Houston | 77082-3900 |
| 224 | Homewood Suites Beltway 8 | Meeting Room | 8950 Fallbrook Drive | Houston | 77064 |

| 0744 | Hope Christian Reformed Church | Gym | 770 Pineloch Drive | Houston | 77062-2548 |
|------|-------------------------------|-----|--------------------|---------|-------------|
| 0429 | Horn Elementary School | Gym | 10734 Bissonnet Street | Houston | 77099 |
| 0699 | House of Prayer Lutheran | Fellowship Hall | 14045 Space Center Boulevard | Houston | 77062 |
| 0179 | Housman Elementary School | Gymnasium | 6705 Housman Street | Houston | 77055-2221 |
| 0153 | Houston Community College Northline | Room 115 | 8001 Fulton Street | Houston | 77022 |
| 0071 | I P S P | Fellowship Hall | 5525 Kansas Street | Houston | 77007-1110 |
| 0120 | Iglesia de Jesucristo Palabra Miel | Agape Fellowship Hall | 1431 Brittmoore Road | Houston | 77043 |
| 0951 | Iglesia Faro de Luz | Main building - Chapel | 4900 Greenhouse Road | Houston | 77084 |
| 0579 | Iglesia Sendero de la Cruz | Conference Room | 390 Benmar Drive | Houston | 77060 |
| 0221 | Iglesia Una Luz en Tu Camino | Meeting Room #2/Hall A | 9045 Howard Drive | Houston | 77017 |
| 0184 | Independence Hall Apartments Community Room | Activities Room/Community Room | 6 Burress Street | Houston | 77022-1944 |
| 0195 | Independence Heights Community Center | Main MultiPurpose Room | 603 East 35th Street | Houston | 77022 |
| 0226 | Ingrando Park Recreation Center | Main MultiPurpose | 7302 Keller Street | Houston | 77012-3518 |
| 0568 | J F Ward Elementary School | Great Hall | 1440 Bouldercrest Drive | Houston | 77062-2247 |
| 0218 | J P Henderson Elementary School | Main Hall | 1800 Dismuke Street | Houston | 77023-4753 |
| 0801 | James DeAnda Elementary School | Music Room 111 | 7980 Almeda Genoa Road | Houston | 77075-2006 |
| 0355 | James H Law Elementary School | Cafeteria | 12401 South Coast Drive | Houston | 77047-2736 |
| 0318 | James Madison High School | Auditorium | 13719 White Heather Drive | Houston | 77045 |
| 0430 | Jane Long Academy Middle School | Auditorium | 6501 Bellaire Boulevard | Houston | 77074-6428 |
| 0332 | Jean Hines Caldwell Elementary School | Cafeteria/Room B101 | 5515 West Orem Drive | Houston | 77085 |
| 0122 | John F Kennedy Elementary School | Multipurpose | 400 Victoria Drive | Houston | 77022-2422 |
| 0407 | John Knox Presbyterian Church | Fellowship Hall | 2525 Gessner Road | Houston | 77080 |
| 0046 | John Marshall Middle School | Library | 1115 Noble Street | Houston | 77009-8437 |
| 0066 | John R Harris Elementary School | Cafeteria | 801 Broadway Street | Houston | 77012-2124 |
| 0237 | Jones Future Academy | Auditorium | 7414 Saint Lo Road | Houston | 77033-2731 |
| 0450 | Josie Ruth Smith School | Library | 5815 West Little York Road | Houston | 77091-1199 |
| 0540 | Judson Robinson Junior Community Center | Activity Room 1A and 1 B, 1st Floor | 2020 Hermann Drive | Houston | 77004-7322 |
| 0080 | Judson Robinson Junior Elementary School | Multipurpose Room | 12425 Woodforest Boulevard | Houston | 77013 |
| 0311 | Judy Bush Elementary School | Cafeteria | 9730 Stroud Drive | Houston | 77036-5105 |
| 0161 | Julia C Hester House | Auditorium | 2020 Solo Street | Houston | 77020-4224 |
| 0553 | Julia W Kahla Middle School | Performance Gym | 16212 West Little York Road | Houston | 77084-6509 |
| 0580 | Kashmere High School | Auditorium Foyer | 6900 Wileyvale Road | Houston | 77028 |
| 0462 | Kate Bell Elementary School | Gym/PE Room | 12323 Shaftsbury Drive | Houston | 77031-3123 |
| 1059 | Katherine Tyra Branch Library | Meeting Room | 16719 Clay Road | Houston | 77084 |
| 0238 | Kelso Elementary School | Cafeteria | 5800 Southmund Street | Houston | 77033-1832 |
| 0037 | Kindred | Fellowship Hall | 2515 Waugh Drive | Houston | 77006 |
| 0590 | Kingwood Middle School | Cafeteria | 2407 Pine Terrace Drive | Kingwood | 77339 |
| 0374 | Knights of Columbus Hall Council 5077 | Ballroom | 5309 Oates Road | Houston | 77013-2850 |
| 0246 | Kreinhop Elementary School | Gym | 20820 Ella Boulevard | Spring | 77388 |

| | | | | | |
|---|---|---|---|---|---|
| 0776 | Lake Houston Church of the Nazarene | Journey Room/Kids Worship Room | 5616 Farm to Market 1960 Road East | Humble | 77346 |
| 0964 | Lakeshore Elementary School | Gym | 13333 Breakwater Path Drive | Houston | 77044-1377 |
| 0486 | Lakewood Elementary School | Cafeteria | 15614 Gettysburg Drive | Tomball | 77377 |
| 0401 | Lakewood Park Community Center | Multi-purpose Room | 8811 Feland Street | Houston | 77028-2016 |
| 0043 | Landrum Middle School | Auditorium Foyer | 2200 Ridgecrest Drive | Houston | 77055-1212 |
| 0060 | Lanier Middle School | Weight Room | 2600 Woodhead Street | Houston | 77098-1615 |
| 0296 | Lansdale Park Community Center | Main MultiPurpose Room | 8201 Roos Road | Houston | 77036-6313 |
| 1063 | Laura Welch Bush Elementary School | Front Hall/Foyer | 9100 Blackhawk Boulevard | Houston | 77075-2250 |
| 0500 | Lemm Elementary School | Cafeteria | 19034 Joan Leigh Drive | Spring | 77388-5255 |
| 0044 | Leonel J Castillo Community Center | Community Room | 2101 South Street | Houston | 77009-8039 |
| 0197 | Lincoln Park Community Center | Gym | 979 Grenshaw Street | Houston | 77088 |
| 0018 | Linkwood Park Community Center | Main MultiPurpose Room | 3699 Norris Drive | Houston | 77025-3600 |
| 0253 | Little Union Missionary Baptist Church | Education Room | 6609 Letcher Drive | Houston | 77028-4029 |
| 0780 | Little York Volunteer Fire Station 81 | Training Room/Assembly Room/Admin Bulding | 10410 Airline Drive | Houston | 77037-1304 |
| 0392 | Living Faith Baptist Church | Living Faith Fellowship Hall | 4310 Holloway Drive | Houston | 77047-1119 |
| 0018 | Longfellow Elementary School | Library | 3617 Norris Drive | Houston | 77025-3600 |
| 0339 | Looscan Elementary School | Hallway | 3800 Robertson Street | Houston | 77009-4959 |
| 0736 | Love Park Community Center | Gymnasium/Main Multipurpose Room | 1000 West 12th Street | Houston | 77008-6619 |
| 0176 | Lovett Elementary School | Data Room 317 | 8814 South Rice Avenue | Houston | 77096-2622 |
| 0194 | MacGregor Elementary School | Cafeteria | 4801 LaBranch Street | Houston | 77004-5650 |
| 1068 | Mahanay Elementary School | Room 417-Gym | 13215 High Star Drive | Houston | 77083-1905 |
| 0219 | MainStay Suites Texas Medical Center/Reliant Park | Bluebonnet Room | 3134 Old Spanish Trail | Houston | 77054 |
| 0569 | Mandarin Immersion Magnet School | Library | 5445 West Alabama Street | Houston | 77056 |
| 1016 | Maplebrook Elementary School | Cafeteria | 7935 Farmingham Road | Atascocita | 77346 |
| 0525 | Marian Park Community Center | Main MultiPurpose Room/gym | 11101 South Gessner Road | Houston | 77071 |
| 0781 | Martin Elementary School | Room 164 | 11718 Hendon Lane | Houston | 77072-3416 |
| 0772 | MAS Katy Center (Masjid Ar-Rahman) | Gymnasium/multipurpose room | 1800 Baker Road | Houston | 77094 |
| 0984 | Mata Intermediate | Cafeteria | 9225 South Dairy Ashford Street | Houston | 77099 |
| 0694 | Matzke Elementary School | Music room | 10002 Mills Road | Houston | 77070 |
| 0070 | Memorial Elementary School | Room 103 | 6401 Arnot Street | Houston | 77007-2007 |
| 0439 | Memorial Middle School | New Gymnasium | 12550 Vindon Drive | Houston | 77024-4130 |
| 0472 | Michael E DeBakey High School for Health Professions | Room 148 | 2545 Pressler Street | Houston | 77030 |
| 0160 | Mickey Leland College Preparatory Academy for Young Men | Lecture Hall | 1700 Gregg Street | Houston | 77020 |
| 0429 | Mildred Rickard Landis Elementary School | Gym Rm 302 | 10255 Spice Lane | Houston | 77072-5035 |
| 0481 | Millsap Elementary School | PE Room | 12424 Huffmeister Road | Cypress | 77429 |
| 0525 | Milne Elementary School | Gymnasium | 7800 Portal Drive | Houston | 77071-1700 |
| 0328 | Milstead Middle School | Small Gym | 338 Gilpin Street | Houston | 77034 |
| 0623 | Mittelstadt Elementary School | Gym | 7525 Kleingreen Lane | Spring | 77379 |
| 0206 | Montie Beach Park Community Center | Main MultiPurpose Room | 915 Northwood Street | Houston | 77009-3703 |

| 0123 | Montrose Branch Houston Public Library | Meeting Room | 4100 Montrose Boulevard | Houston | 77006-4938 |
|------|----------|----------|----------|----------|----------|
| 0321 | Moreno Elementary School | Foyer | 620 East Canino Road | Houston | 77037 |
| 0573 | Mount Hebron Missionary Baptist Church | Gym | 4810 Redbud Street | Houston | 77033 |
| 0722 | Mount Moriah Missionary Baptist Church | Fellowship Hall | 15500 Vandalia Way | Houston | 77053-2128 |
| 0219 | Mount Olive Baptist Church | Fellowship Hall/multi-purpose room | 3515 Yellowstone Boulevard | Houston | 77021-2407 |
| 0575 | Mueller Elementary School | Gym | 7074 Farm to Market 2920 Road | Klein | 77379 |
| 0028 | Navarre Funeral Home | State Room | 2444 Rollingbrook Drive | Baytown | 77521 |
| 0230 | New Mount Carmel Baptist Church | Fellowship Hall first Floor/Meeting Room | 4301 Weaver Road | Houston | 77016-5634 |
| 0589 | New Westlake Volunteer Fire Department Station | Meeting Room | 19636 Saums Road | Houston | 77084-4732 |
| 0467 | Nitsch Elementary School | Gym | 4702 West Mount Houston Road | Houston | 77088-3053 |
| 0504 | North Briar Community Association | Main Club House room | 12042 Riverview Drive | Houston | 77077-3036 |
| 0585 | North Forest High School | Gym | 10726 Mesa Drive | Houston | 77078-1401 |
| 0310 | Northbrook Middle School | Theater | 3030 Rosefield Drive | Houston | 77080-2610 |
| 0444 | Northbrook Senior High School | Auditorium | 1 Raider Circle South | Houston | 77080-3995 |
| 0468 | Northcliffe Manor Community Center | Community Center/Clubhouse | 12026 West Marsham Circle | Houston | 77066-4439 |
| 0485 | Northpointe Intermediate School | Cafeteria | 11855 Northpointe Boulevard | Tomball | 77377 |
| 0498 | Northwest Church of Christ | Spanish Classroom | 6720 West Tidwell Road | Houston | 77092-1436 |
| 0562 | Norton Memorial Temple Church of God In Christ | Fellowship Hall | 5008 Lucille Street | Houston | 77026 |
| 0437 | Nottingham Elementary School | Multipurpose Room | 570 Nottingham Oaks Trail | Houston | 77079-6399 |
| 0189 | Oak Forest Elementary School | Multipurpose Room | 1401 West 43rd Street | Houston | 77018-4106 |
| 0905 | Oates Elementary School | Nurse Room | 10044 Wallisville Road | Houston | 77013 |
| 0140 | One Delta Plaza Educational Center | Hall of Fame #1 / Room by Elevator | 3333 Old Spanish Trail | Houston | 77021 |
| 0642 | Owens Elementary School | Cafeteria Foyer | 7939 Jackrabbit Road | Houston | 77095-2901 |
| 0014 | Parker Elementary School | Auditorium | 10626 Atwell Drive | Houston | 77096-4925 |
| 0461 | Parkway Place | Auditorium/Chapel | 1321 Park Bayou Drive | Houston | 77077-1507 |
| 0492 | Paul Revere Middle School | Hallway/Auditorium | 10502 Briar Forest Drive | Houston | 77042-2338 |
| 0328 | Pearl Hall Elementary School | Gym | 1504 9th Street | South Houston | 77587-5000 |
| 0181 | Pearl Rucker Elementary School | Multipurpose Room | 5201 Vinett Street | Houston | 77017-4958 |
| 0232 | Pershing Middle School | Skyline Hallway | 3838 Blue Bonnet Boulevard | Houston | 77025-1230 |
| 0432 | Pilgrim Academy | Library | 6302 Skyline Drive | Houston | 77057-6902 |
| 1016 | Pine Forest Elementary School | Cafeteria | 19702 West Lake Houston Parkway | Humble | 77346-2000 |
| 0433 | Piney Point Elementary School | Gym | 8921 Pagewood Lane | Houston | 77063-5543 |
| 0416 | Pipers Meadow Community Center | Community Center/ Community Building | 15920 Pipers View Drive | Webster | 77598-2550 |
| 0146 | Platou Community Center | Main MultiPurpose Room | 11655 Chimney Rock Road | Houston | 77035-2807 |
| 0259 | Pleasantville Elementary School | Cafeteria | 1431 Gellhorn Drive | Houston | 77029-3343 |
| 0895 | Poe Elementary School | PE Room/Gym | 5100 Hazard Street | Houston | 77098-5330 |
| 0465 | Ponderosa Elementary School | Gym | 17202 Butte Creek Road | Houston | 77090-2332 |
| 0005 | Proctor Plaza Park Community Center | Main MultiPurpose Room | 803 West Temple Street | Houston | 77009-5257 |
| 0062 | R Martinez Elementary School | Gymnasium | 7211 Market Street | Houston | 77020 |

| 0334 | Ramada Inn | Lilly and Lilac Room | 6115 Will Clayton Parkway | Humble | 77338-8127 |
|------|------------|---------------------|--------------------------|--------|------------|
| 0069 | Raul C Martinez Annex | Room 204 | 1001 South SGT Macario Garcia Drive | Houston | 77011 |
| 0526 | Raul Yzaguirre School for Success Tejano Center Building B | Tejano Center for Community Concerns Board Room | 2950 Broadway Boulevard | Houston | 77017-1794 |
| 0510 | Ray K Daily Elementary School | Gym | 12909 Briar Forest Drive | Houston | 77077 |
| 0288 | Reagan Webb Mading Elementary School | Cafeteria | 8511 Crestmont Street | Houston | 77033 |
| 0255 | Red Elementary School | Cafeteria | 4520 Tonawanda Drive | Houston | 77035-3716 |
| 0807 | Residence Inn by Marriott Houston Westchase on Westheimer | Conference Room | 9965 Westheimer | Houston | 77042 |
| 0158 | Reynolds Elementary School | Multi Purpose | 9601 Rosehaven Drive | Houston | 77051-3132 |
| 0361 | Rice University Welcome Center | Sewall Hall/Welcome Center/Presentation Room | 6100 Main Street | Houston | 77005 |
| 0790 | Richard and Meg Weekley Community Center | Room 300 | 8440 Greenhouse Road | Cypress | 77433-5135 |
| 0308 | Rick Schneider Middle School | Foyer | 8420 Easthaven Boulevard | Houston | 77075-1106 |
| 0227 | River Oaks Elementary School | Music Room | 2008 Kirby Drive | Houston | 77019-6016 |
| 0217 | River Oaks Recreation Center | Main MultiPurpose Room | 3600 Locke Lane | Houston | 77027-4003 |
| 0402 | Robert L Frost Elementary School | Cafeteria | 5002 Almeda Genoa Road | Houston | 77048-4725 |
| 0171 | Roderick Paige Elementary | Parent Conference Room | 7501 Curry Road | Houston | 77093 |
| 0544 | Ross Elementary School | T-Building 32 Room T-2 | 2819 Bay Street | Houston | 77026-3203 |
| 0482 | Roth Elementary School | Gym | 21623 Castlemont Lane | Spring | 77388-3860 |
| 0376 | Royalwood Elementary School | Auditorium | 7715 Royalwood Drive | Houston | 77049-2314 |
| 0258 | Rummel Creek Elementary School | Library Kiva | 625 Brittmoore Road | Houston | 77079-6101 |
| 0217 | Saint Anne Catholic Church | Saint Basil Hall | 2140 Westheimer Road | Houston | 77098 |
| 0569 | Saint George Place Elementary School | Multipurpose Room | 5430 Hidalgo Street | Houston | 77056 |
| 0136 | Saint James Episcopal Church | Parish Hall Building C/Fellowship Hall | 3129 Southmore Boulevard | Houston | 77004-6214 |
| 0448 | Saint James Lutheran Church | Fellowship Hall | 1602 West 43rd Street | Houston | 77018 |
| 0710 | Saint Lukes Missionary Baptist Church | Fellowship Hall | 714 Detering Street | Houston | 77007-5195 |
| 0637 | Saint Patrick Catholic Church | Parish Hall | 4918 Cochran Street | Houston | 77009 |
| 0576 | Saint Pauls Missionary Baptist Church | Fellowship Hall | 2516 Paul Quin St | Houston | 77091-4712 |
| 0132 | Saint Philip Neri Catholic Church | Hospitality Room/Church Hall/Parish Hall | 10960 Martin Luther King Boulevard | Houston | 77048-1896 |
| 0335 | San Mateo Episcopal Church | Parish Hall | 6635 Alder Drive #2 | Houston | 77081 |
| 0483 | SBISD Technology Training Center | Commons Area | 14330 Memorial Drive | Houston | 77079-6704 |
| 0079 | Scroggins Elementary School | Library | 400 Boyles Street | Houston | 77020-5242 |
| 0766 | Seguin Elementary School | Multipurpose Room | 5905 Waltrip Street | Houston | 77087 |
| 0758 | Shadow Forest Elementary School | Cafeteria | 2300 Mills Branch Drive | Kingwood | 77345-2100 |
| 0056 | Shadow Oaks Elementary School | Flex Room 214 | 1335 Shadowdale Drive | Houston | 77043-4208 |
| 0625 | Shadowbriar Elementary School | Cafeteria/Multipurpose Room | 2650 Shadowbriar Drive | Houston | 77077-6000 |
| 0152 | Shady Lane Park Community Center | Main MulitPurpose Room/Activity Room | 10220 Shady Lane | Houston | 77093-4604 |
| 0611 | Shadydale Elementary School | Front foyer | 5905 Tidwell Road | Houston | 77016-4745 |

| | | | | | |
|---|---|---|---|---|---|
| 0426 | Sharpstown International School | Library | 8330 Triola Lane | Houston | 77036-6310 |
| 0297 | Sharpstown Park Community Center | MultiPurpose Room 2 | 6600 Harbor Town Drive | Houston | 77036-4052 |
| 0323 | Sheraton Houston Brookhollow Hotel | Jasmine I & II | 3000 North Loop West Freeway | Houston | 77092-8810 |
| 0475 | SJC South Campus | Jones Technical Building S13 Hallway/Lobby | 13735 Beamer Road Entrance B | Houston | 77089 |
| 0941 | Sonesta ES Suites Houston - NASA | Conference room | 525 Bay Area Boulevard | Houston | 77058 |
| 1006 | South Early College High School | Multi Purpose Room | 1930 Airport Boulevard | Houston | 77051 |
| 0017 | Southwest Central Church of Christ | Lobby | 4011 West Bellfort Boulevard | Houston | 77025 |
| 0973 | Spring Branch Elementary School | Gymnasium | 1700 Campbell Road | Houston | 77080-7404 |
| 0894 | Spring ISD Child Nutrition and Training Center | Training Theater | 15330 Kuykendahl Road | Houston | 77014 |
| 0883 | Spring ISD Transportation Center | Training Room 119 A&B | 341 East Richey Road | Houston | 77073 |
| 0444 | Spring Woods Middle School | Library | 9810 Neuens Road Enter 9700 Hammerly | Houston | 77080-6498 |
| 0958 | St. Paul AME Church | Multipurpose Building/Weight Room | 1554 Gears Road | Houston | 77067 |
| 0514 | Strack Intermediate School | Gym | 18027 South Kuykendahl Road | Spring | 77379-8199 |
| 0417 | Stuchbery Elementary School | Gym | 11210 Hughes Road | Houston | 77089-4636 |
| 0938 | Sugar Grove Academy | Art Room | 8405 Bonhomme Road | Houston | 77074 |
| 0068 | Sunnyside Park Community Center | Main MultiPurpose Room | 3502 Bellfort Street | Houston | 77051-1402 |
| 0435 | T H Rogers School | Orchestra Room | 5840 San Felipe Street | Houston | 77057 |
| 0436 | Tanglewood Middle School | Gym | 5215 San Felipe Street | Houston | 77056 |
| | Texas Southern University W. R. Banks Building | Child Development Laboratory | 3348 Cleburne Street | Houston | 77004 |
| 0706 | The Abbey at Westminster Plaza | Bistro | 2855 Westminster Plaza Drive | Houston | 77082 |
| 0458 | The Collective-The Power Center | South East South Wing/ Southeast Ballroom | 12401 South Post Oak Road | Houston | 77045-2020 |
| 0456 | The Lodge at Pine Creek | Living Room Space | 825 Hunt Road | Baytown | 77521 |
| 0350 | The Rice School | Hallway/Auditorium | 7550 Seuss Drive | Houston | 77025-2271 |
| 0641 | Thomas M Danish Elementary School | Music room | 11850 Fallbrook Drive | Houston | 77065-3508 |
| 0140 | Thompson Elementary School | Gymnasium | 6121 Tierwester Street | Houston | 77021-1311 |
| 0584 | Thurgood Marshall Elementary School | Gymnasium | 6200 Winfield Road | Houston | 77050 |
| 0216 | Townwood Park Community Center | Room 111 | 3402 Simsbrook Drive | Houston | 77045 |
| 0004 | Travis Elementary School HISD | Library | 3311 Beauchamp Street | Houston | 77009-6613 |
| 0299 | Treasure Forest Elementary School | Multipurpose Room S107 (S106 small group) | 7635 Amelia Road | Houston | 77055-1737 |
| 0854 | Tuffly Park Community Center | Multi-purpose Room | 3200 Russell Street | Houston | 77026 |
| 0634 | Twin Creeks Middle School | Gym | 27100 Cypresswood Drive | Spring | 77373-6300 |
| 0391 | University of Houston Clear Lake | UH Clear Lake Bayou Building Garden Room | 2700 Bay Area Boulevard | Houston | 77058 |
| 0389 | University of Houston Student Center | Room 214 Space City | 4455 University Drive | Houston | 77204 |
| 0577 | Valley Oaks Elementary School | Library | 8390 Westview Drive | Houston | 77055-6738 |
| 0595 | Vida City Church Houston | Discovery Center | 1300 West Mount Houston Road | Houston | 77038 |
| 0505 | Wainwright Elementary School | Cafeteria | 5330 Milwee Street | Houston | 77092-6655 |
| 0298 | Waldo Emerson Elementary School | Dance Room | 9533 Skyline Drive | Houston | 77063-5215 |

| 0356 | Walnut Bend Elementary School | Multipurpose Gym | 10620 Briar Forest Drive | Houston | 77042-2320 |
| 0147 | Walter and Inez Stovall EC/PK/K School | Library | 3025 Ellington Street | Houston | 77088-4599 |
| 0927 | Waltrip High School | ISS Room | 1900 West 34th Street | Houston | 77018-6186 |
| 0098 | West Campus Gym | Gym | 24403 East Lake Houston Parkway | Huffman | 77336-4447 |
| 0053 | West End MultiService Center | Auditorium Building 3 Rooms 304 & 305 | 170 Heights Boulevard | Houston | 77007 |
| 0845 | Westbrook Intermediate School | Library | 302 West El Dorado Boulevard | Friendswood | 77546-1724 |
| 1040 | Westbury Senior High School | Library | 11911 Chimney Rock Road | Houston | 77035 |
| 0281 | Westbury United Methodist Church | Parlor | 5200 Willowbend Boulevard | Houston | 77096 |
| 0591 | Westfield Volunteer Fire Station 2 | Bay 1 | 11255 Bentley Street | Houston | 77093-2752 |
| 0711 | Westside High School | Library | 14201 Briar Forest Drive | Houston | 77077-1806 |
| 0256 | William S Sutton Elementary School | Parent Room | 7402 Albacore Drive | Houston | 77074-6512 |
| 0760 | Willow Creek Elementary School in Humble ISD | Cafeteria | 2002 Willow Terrace Drive | Kingwood | 77345-1785 |
| 0485 | Willow Creek Elementary School in Tomball ISD | Gym | 18302 North Eldridge Parkway | Tomball | 77377-8084 |
| 0432 | Wisdom High School | Small Gym | 6529 Beverly Hill Street | Houston | 77057 |
| 0421 | Woodcreek Middle School | University Way/University Hall | 14600 Woodson Park Drive | Houston | 77044-4492 |
| 0044 | Woodland Park Community Center | Gym | 212 Parkview Street | Houston | 77009 |
| 0591 | Worsham Elementary School | Library | 3007 Hartwick Road | Houston | 77093 |
| 1001 | Youngblood Intermediate School | Cafeteria | 8410 Dairy View Lane | Houston | 77072 |

### City of Houston Election Day Polling Locations – Montgomery County Voters Only

City of Houston voters in Montgomery County must cast their vote at the polling place designated for the election precinct in which the voter resides. Polling locations are subject to change up until Election Day. For the latest information, please visit https://elections.mctx.org.

| Location | Address | City | Zip |
| --- | --- | --- | --- |
| W.D. Wilkerson Intermediate School | 12312 Sawmill Road | The Woodlands | 77386 |
| Lone Star College - Kingwood, Performing Arts Ctr. | 500 Royston Drive | Kingwood | 77339 |

### City of Houston Election Day Polling Locations – Fort Bend County Voters Only

City of Houston voters in Fort Bend County may cast their ballot at any Fort Bend County Election Day polling location listed below. Polling locations are subject to change up until Election Day. For the latest information, please visit https://www.fortbendvotes.org.

| Location | Voting Room | Address | City | Zip |
| --- | --- | --- | --- | --- |
| Briarchase Missionary Baptist Church | Fellowship Hall | 16000 Blueridge Rd | MISSOURI CITY | 77489 |
| Chasewood Clubhouse | Level 1 (Clubhouse Facility) | 7622 Chasewood Dr | MISSOURI CITY | 77489 |
| Cinco Ranch Branch Library | Meeting Room | 2620 Commercial Center Blvd. | KATY | 77494 |
| Missouri City Baptist Church | Multipurpose Building | 16816 Quail Park Dr | MISSOURI CITY | 77489 |
| Pinnacle Senior Center | Multi-purpose Room | 5525 Hobby St. | HOUSTON | 77053 |
| Ridgegate Community Ass'n | Main Room | 5855 West Ridgecreek | HOUSTON | 77489 |
| Ridgemont Early Childhood Ctr | Extended Day Room | 5353 Ridgecreek Circle | HOUSTON | 77053 |
| Sugar Land Church of God | Fellowship Hall | 1715 Eldridge Rd. | SUGAR LAND | 77478 |

# EXHIBIT C

# Exhibit C

Texas Counties with December 9, 2023 Runoff Elections*

| | |
|---|---|
| Brazoria County | Current Election Information \| Brazoria County Clerk (brazoriacountyclerktx.gov) |
| Comal County | Elections and Voter Registration-Comal County, Texas |
| Dallas County | Dallas County, TX Elections (dallascountyvotes.org) |
| El Paso County | Current Election - El Paso County, TX Elections \| El Paso County Elections Department (epcountyvotes.com) |
| Guadalupe County | Guadalupe County Elections |
| Hays County | December 9, 2023 City of Kyle Run-Off Election – City Council District 4 - Hays County (hayscountytx.com) |
| Hidalgo County | , City of Mission Special Election \| Hidalgo County, TX - Official Website |
| Hood County | Early Voting \| Hood County, TX - Official Website |
| Nueces County | Elections Department \| Nueces County, TX |
| Rockwall County | Rockwall County, TX Elections \| Rockwall County, TX Elections (rockwallvotes.com) |
| Travis County | Runoff Election - dates and locations \| Austin Public Library (austintexas.gov); |

*Because local officials manage elections, they are not required to inform the Secretary of State of any pending runoffs. These are the current elections of which the Secretary is aware.