No. 23-50885

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

UNITED STATES OF AMERICA, *et al.,*

*Plaintiffs-Appellees,*

v.

WARREN KENNETH PAXTON, *et al.,*

*Defendants-Appellants.*

———————————

**On Appeal from the United States District Court for the
Western District of Texas, San Antonio Division**

———————————

**REPUBLICAN PARTY APPELLANTS' BRIEF IN SUPPORT OF
DEFENDANTS' EMERGENCY MOTION TO STAY**

———————————

John M. Gore
  *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
Ryan M. Proctor
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com
rproctor@jonesday.com

*Counsel for Appellants Harris County Republican Party, Dallas County
Republican Party, Republican National Committee, National
Republican Senatorial Committee, and National Republican
Congressional Committee*

# CERTIFICATE OF INTERESTED PERSONS

## No. 23-50885, *United States of America, et al. v. Warren Kenneth Paxton, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Defendants-Appellants:

- Ken Paxton, Attorney General, State of Texas
- Jane Nelson, in her official capacity as Texas Secretary of State
- State of Texas

2.    Counsel for Defendants-Appellants:

- Aaron Lloyd Nielson
- Kathleen Theresa Hunker
- Ryan Glen Kercher
- Lanora Christine Pettit
- William D. Wassdorf

3.    Intervenors-Appellants:

- Harris County Republican Party
- Dallas County Republican Party
- Republican National Committee
- National Republican Senatorial Committee
- National Republican Congressional Committee

4.    Counsel for Intervenors-Appellants:

- John M. Gore
- E. Stewart Crosland
- Louis J. Capozzi III
- Ryan M. Proctor
- Jones Day

5.    Defendants Not Party to this Appeal:

- Gregory W. Abbott, in his official capacity as Governor of Texas
- Jose A. Esparza, in his official capacity as Deputy Secretary of the State of Texas
- Lupe C. Torres, in her official capacity as Medina County Elections Administrator
- Lisa Wise, in her official capacity as the El Paso County Elections Administrator
- Kim Ogg, Harris County District Attorney
- Joe Gonzales, Bexar County District Attorney
- Jose Garza, Travis County District Attorney
- John Creuzot, Dallas County District Attorney
- Ricardo Rodriguez, Jr.
- Yvonne Rosales, in her official capacity as El Paso County District Attorney
- Rebecca Guerrero
- Teneshia Hudspeth, Harris County Clerk, in her official capacity
- Dyana Limon-Mercado
- Isabel Longoria, Harris County Elections Administrator
- Jacque Callanen, in her official capacity as Elections Administrator of Bexar County
- Yvonne Ramon, in her official capacity as the Hidalgo County Elections Administrator
- Michael Scarpello, in his official capacity as the Dallas County Elections Administrator
- Dana DeBeauvoir, in her official capacity as the Travis County Clerk

6. Plaintiffs-Appellees:

- United States of America
- OCA-Greater Houston
- League of Women Voters of Texas
- REVUP-Texas

7. Counsel for Plaintiff-Appellee United States of America:

- Jason Lee
- Tovah Calderon
- Daniel Joshua Freeman

8. Counsel for Plaintiffs-Appellees OCA-Greater Houston, League of Women Voters of Texas, and REVUP-Texas:

- Alyssa G. Bernsein
- Adriel I. Cepeda Derieux
- Brian Dimmick
- Andre Segura
- Jenner & Block, L.L.P.
- American Civil Liberties Union Foundation
- American Civil Liberties Union
- American Civil Liberties Union of Texas

9. Plaintiffs Not Party to the Appeal:

- Mi Familia Vota
- Marlon Lopez
- Marla Lopez
- Paul Rutledge
- Houston Area Urban League
- Delta Sigma Theta
- Arc of Texas
- Jeffrey Clemmons
- La Union del Pueblo Entero
- Friendship-West Baptist Church

- Anti-Defamation League Austin, Southwest, and Texoma Regions
- Southwest Voter Registration Education Project
- Texas Impact
- Mexican American Bar Association of Texas
- Texas Hispanics Organized for Political Education
- Jolt Action
- William C. Velasquez Institute
- FIEL Houston Inc.
- James Lewin
- LULAC Texas
- Voto Latino
- Texas Alliance for Retired Americans
- Texas AFT

Dated: December 8, 2023
Respectfully submitted,

*/s/ John M. Gore*
_____

*Counsel of Record for*
*Intervenors-Appellants*

# INTRODUCTION

Appellants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee ("Republican Party Appellants") support and seek to uphold free and fair elections on behalf of all Texans. They therefore appeal the District Court's erroneous ruling, join State Defendants' Emergency Motion To Stay, and seek to reinstate the Texas Legislature's commonsense election laws enacted as part of Senate Bill 1 ("SB 1").

The Court should enter a stay pending appeal for all of the reasons explained in State Defendants' Emergency Motion. *See* Dkt. No. 22. Moreover, Appellants are likely to succeed on appeal for an additional reason: SB 1 sections 5.07 and 5.13, which require individuals applying for and casting mail ballots to provide an identification number, do not even *implicate* 52 U.S.C. § 10101(a)(2)(B) ("the Materiality Provision"). Sections 5.07 and 5.13 therefore cannot *violate* the Materiality Provision, as the District Court erroneously held. Indeed, the District Court's construction of the Materiality Provision contradicts the construction adopted by *both* three Supreme Court Justices *and* a prior panel of this

Court.  *See Ritter v. Migliori*, 142 S. Ct. 1824, 1825-26 (2022) (Alito, J., dissenting from the denial of the application for stay); *Vote.Org v. Callanen*, 39 F.4th 297, 305-07 & n.6 (5th Cir. 2022).  A stay pending appeal—and ultimately reversal—are warranted.

## ARGUMENT

The Materiality Provision forbids state actors to:

> deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

The plain text—as well as precedent, *see Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental); *Vote.Org*, 39 F.4th at 305 n.6—reveal that the Materiality Provision applies only when election officials make voter qualification determinations *during the voter-registration process*.  Only that reading harmonizes with history and Congress's intent: stopping southern registration officials from "requiring unnecessary information for voter registration," *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003), with the intent to "induc[e] voter-generated errors that could be used to justify rejecting applicants," *Fla. State Conf. of NAACP v.*

*Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008); H.R. Rep. No. 88-914, pt. 2, at 5 (1963). Thus, as regulations of mail balloting, sections 5.07 and 5.13 do not even implicate, let alone violate, the Materiality Provision: they apply only *after* election officials have made qualification determinations and *after* the voter-registration process is complete.

The District Court, however, applied the Materiality Provision far beyond its narrow textual scope. It concluded that states cannot employ *any* mandatory paper-based election rules unless those rules are used to assess voter qualifications. *See* State Defs.' Emergency Motion To Stay Ex. A at 26-27 ("State Defs.' Ex. A"). But *many* longstanding and commonplace paper-based election rules have nothing to do with assessing voter qualifications or the voter-registration process—including mail-ballot signature requirements, mail-ballot date requirements, overvote prohibitions, pollbook procedures, and voter-assistance-form requirements. The District Court's interpretation of the Materiality Provision imperils all these laws, "alter[ing] the balance between federal and state power" absent "exceedingly clear language," *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam); ignoring the canon that Congress does not hide "elephants in

mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); and jeopardizing the Materiality Provision's constitutionality under the Fifteenth Amendment. Simply stated, the District Court's interpretation is profoundly wrong and, if uncorrected, would contribute to the growing nationwide campaign to enjoin longstanding and commonsensical election regulations under the Materiality Provision. The Court should enter a stay pending appeal.

## I. TEXAS'S MAIL-BALLOT IDENTIFICATION REQUIREMENTS CANNOT VIOLATE THE MATERIALITY PROVISION.

"States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). Yet according to the District Court, the Materiality Provision prohibits states from adopting *any* mandatory paper-based election rule unless it is used to determine voter eligibility. State Defs.' Ex. A at 36.

That makes no sense: "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" the Materiality Provision. *Vote.Org*, 39 F.4th at 305 n.6. Almost every state, including Texas, determines voter eligibility during a voter-registration process. *See, e.g.*,

U.S. Election Assistance Comm'n, *Voter FAQs*, https://www.eac.gov/voters/voter-faqs (last visited Dec. 7, 2023) (noting 49 states require voters "to be registered to vote to participate in an election" and that "[e]ligibility requirements" assessed during process "vary by state"). The Materiality Provision governs only qualification determinations during *that* process, not "the counting of ballots by individuals *already deemed qualified to vote*." *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004). As Justice Alito explained, "the requirements that must be met in order to register (and thus be 'qualified') to vote" are not the "same as the requirements that must be met in order to cast a ballot that will be counted," making it "absurd to judge the validity of [post-registration] voting rules based on whether they are material to eligibility." *Ritter*, 142 S. Ct. at 1825; *see Vote.Org*, 39 F.4th at 305 n.6. Thus, Texas's mail-ballot identification requirements *cannot* violate the Materiality Provision because they are inapplicable to qualification determinations and voter registration.

In at least three ways, the Materiality Provision's plain text demonstrates that Texas's mail-ballot identification requirements cannot violate it. *First*, it applies only to a "record or paper" related to an

"application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The words "registration" and "application" refer to documents used in "voter registration specifically." *Vote.Org*, 39 F.4th at 305 n.6; *see also Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental). The relevant legislative history shows Congress used those words interchangeably to refer to voter registration. H.R. Rep. 88-914, pt. 1, at 77 (referring to "application to register"); *id.*, pt. 2, at 5 (referring to efforts to "defeat [African-American] registration" by "rejecting [African-American] applications" to vote); *id.* (faulting "registrars" for "rejecting [African-American] applications" in registration process); *cf. In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989) (Easterbrook, J.) (endorsing such use of legislative history). And States still do so today.[1]

---

[1] *E.g.*, Voter Registration, Md. State Bd. of Elections ("Voter Registration Application"), elections.maryland.gov/voter_registration/application.html (last visited Dec. 8, 2023); Voter Registration Application, D.C. Bd. of Elections, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://dds.dc.gov/sites/default/files/dc/sites/dds/publication/attachments/VG-VRA-form_1_0.pdf (last visited Dec. 8, 2023); National Voter Registration Application Form for U.S. Citizens, U.S. Election Assistance Comm'n, https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf (last visited Dec. 8, 2023) ("Voter Registration Application").

Texas's mail-ballot identification requirements are not applied during the voter-registration process. *See* State Defs.' Ex. A at 3-4 (discussing Texas's voter-registration process). In fact, *only* successfully registered voters can apply for or cast mail ballots. *See* Tex. Elec. Code §§ 82.001–.004, 82.007–.008 (only "a qualified voter" can apply "for early voting by mail"). Indeed, the District Court acknowledged this: "Voters who seek to vote by mail in Texas have already complied [with Texas's voter registration process] when they registered to vote." State Defs.' Ex. A at 30.

Nor is applying for and casting a mail ballot an "other act requisite to voting" under the Materiality Provision, because that catchall phrase likewise refers only to voter registration. 52 U.S.C. § 10101(a)(2)(B). "[W]here general words follow an enumeration of specific items, [they] are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Indus.*, 446 U.S. 578, 588 (1980). Thus, the phrase "other act requisite to voting" must be "controlled and defined by reference to the enumerated categories," *Cir. City Stores v. Adams*, 532 U.S. 105, 115 (2001), of "application" and "registration," *see Ball v. Chapman*, 289 A.3d 1, 38 n.11 (Pa. 2023) (opinion of Brobson, J.). Indeed,

failure to apply the *ejusdem generis* canon would render the words "registration" and "application" superfluous—an outcome courts must "avoid[]." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012).

Only that reading of the Materiality Provision harmonizes with precedent and Congress's statutory aim: preventing states from "defeat[ing] [African-American voter] registration." H.R. Rep. No. 88-914, pt. 2, at 5. During the 1960s, southern states blocked African Americans' voter registrations through the "practice of requiring unnecessary information for voter registration"—like listing the registrant's "exact number of months and days in his age." *Schwier*, 340 F.3d at 1294. "Such trivial information served no purpose other than as a means of inducing voter-generated errors that could be used to justify rejecting applicants." *Browning*, 522 F.3d at 1173. Simultaneously, "registrars" in southern states "overlook[ed] minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting" African-Americans' applications "for the same or more trivial reasons." H.R. Rep. No. 88-914, pt. 2, at 5.

The Materiality Provision barred that practice by prohibiting the "[d]enial of the right to vote in any federal election because of immaterial

omissions or errors in registration forms."  Warren M. Christopher, *The Constitutionality of the Voting Rights Act of 1965,* 18 Stan. L. Rev. 1, 7 (1965); H.R. Rep. No. 88-914, pt. 2, at 5.  That is why the Materiality Provision applies "only" in the context of "voter registration specifically." *Vote.Org*, 39 F.4th at 305 n.6; *see also Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental).  And that is why, until *very* recently, courts "have applied the [Materiality Provision]" only "in the context of voter registration." *Thrasher v. Ill. Republican Party*, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013); *Friedman*, 345 F. Supp. 2d at 1371.

*Second*, the Materiality Provision requires that the paper or record be used "in determining" the voter's qualifications.  52 U.S.C. § 10101(a)(2)(B).  When used with a "verbal noun[]"—here, "determining"—the word "in" is typically "equivalent in sense to a temporal clause introduced by *when*, *while*, *if*."  *In*, prep., def. 21(b), *Oxford English Dictionary* (3d ed. 2021, rev. online Mar. 2023).  The provision thus only applies to actions state officials take *when determining* a voter's eligibility.  *See Ball*, 289 A.3d at 38 (opinion of Brobson, J.).

In Texas, as in virtually every state, the "determin[ation] whether [an] individual is qualified to vote" happens during the *voter-registration process*. *See, e.g.*, Tex. Elec. Code § 13.002; State Defs.' Ex. A at 3 (discussing Texas's voter registration process, in which "applicants [must] confirm their eligibility as to each of" Texas's "eligibility requirements"). SB 1's mail-ballot identification requirements apply only after the State has *already* found the voter qualified. Again, only a successfully registered voter can apply for a mail ballot—let alone cast one. Tex. Elec. Code §§ 82.001–.004, 82.007–.008. Asking whether rules *outside* the voter-registration process (like Texas's rules governing the application for and casting of mail ballots) are material to making a qualification determination that must occur *during* the voter-registration process is like asking if a football player struck out swinging. The Materiality Provision's reference to voter "qualifi[cation]" proves that it applies only to the registration process. *E.g.*, *Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental); *Vote.Org*, 39 F.4th at 305 n.6.

The structure of § 10101 underscores this point. The subparagraph immediately preceding the Materiality Provision uses a substantially identical phrase—"in determining whether any individual is qualified

under State law or laws to vote in any election"—to introduce a prohibition on disparate treatment in voter-eligibility determinations during voter registration. 52 U.S.C. § 10101(a)(2)(A). And the subparagraph following the Materiality Provision, banning literacy tests commonly used in southern states during voter registration, *e.g.*, *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 46 (1959), is likewise limited to "qualification" determinations, § 10101(a)(2)(C). *See* H.R. Rep. No. 88-914, pt. 2, at 19 ("Section [10]101(a) is designed to insure nondiscriminatory practices in the registration of voters"). In contrast, when Congress wanted to prohibit intimidation in the *act* of voting, it sensibly set that topic apart in its own subsection, § 10101(b), rather than stuff it between provisions about voter registration and qualification.

Further, subsection (e) empowers courts to address systemic violations of "*any* right or privilege secured by subsection (a)," including the Materiality Provision (emphasis added). Yet the only remedy it authorizes is a declaration that an individual "is qualified under State law to vote" but has been denied the opportunity "to register … or otherwise qualify to vote" or has been wrongly "found not qualified to vote." *Id.* If the Materiality Provision extended beyond voter-

11

qualification determinations, this subsection would not enable courts to address the violation of "*any* right" secured by it.  *Id.* (emphasis added).

*Third*, the Materiality Provision prohibits only "deny[ing] the right of any individual to vote," not imposing mandatory rules for election administration like Texas's mail-ballot identification numbers.  52 U.S.C. § 10101(a)(2)(B); *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). "[D]enials" of the right to vote occur under the Materiality Provision only where election officials "disqualify" or refuse to qualify "potential voters," remove qualified voters from the voter-registration list, or prevent future voting.  *Schwier*, 340 F.3d at 1294.  They do not occur when election officials decline to count ballots "because [individuals] did not follow the rules for casting [them]." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental).

Indeed, the phrase "right … to vote" had a well-established meaning in the mid-1960s.  *E.g.*, *Baker v. Carr*, 369 U.S. 186, 247 (1962) (Douglas, J., concurring) (the "right to vote" was "protected by the judiciary long before that right received the explicit protection it is now accorded" in the civil-rights statutes).  The Materiality Provision's "right … to vote" would not have been originally understood to protect voting by mail. *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969); *see*

*Tex. Democratic Party v. Abbott*, 961 F.3d 389, 402-06 (5th Cir. 2020) (discussing *McDonald*). And it certainly does not prohibit application of neutral state-law voting rules to the act of voting. *Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973); *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral). ("[A] State's election [rule] does not disenfranchise voters who are capable of [following it] but fail to do so."). Instead, it forbids baselessly denying a voter's registration application— an action that actually disenfranchises the applicant. *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

SB 1's mail-ballot identification requirements cannot "deny" the "right … to vote." Election officials enforcing them do not "disqualify potential voters," remove them from the voter-registration list, or prevent future voting. *Schwier*, 340 F.3d at 1294. Instead, they do not accept or immediately count noncompliant mail-ballot applications or mail ballots "because [individuals] did not follow the rules for" completing the application or "casting a ballot." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental). Such individuals are not denied the right to vote: instead, they remain free to vote in any election on equal terms with, and according to the same rules applicable to, all other voters. *See id.*; *see*

*also Rosario*, 410 U.S. at 757; *Wis. State Leg.*, 141 S. Ct. at 35 (Kavanaugh, J., concurral).  The Court should grant a stay.

## II.  THE DISTRICT COURT'S REASONING IS FLAWED.

The District Court gave three reasons for rejecting Appellants' arguments.  All are unpersuasive.

*First*, the District Court held that the *sole* legitimate purpose of *any* paper-based election regulation is seeking information "material to [a voter's] qualification to vote in a given election."  State Defs.' Ex. A at 26.  But *many* state-law voting rules laws have nothing to do with assessing qualifications or voter registration.  *E.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (distinguishing between state laws that "govern[] the registration and qualifications of voters" and "the voting process itself"); *Ritter*, 142 S. Ct. at 1825 ("There is no reason why the requirements that must be met in order to register (and thus be 'qualified') to vote should be the same as the requirements that must be met in order to cast a ballot that will be counted.") (Alito, J., dissental).  The Materiality Provision regulates only *qualification* determinations during the *voter-registration* process, but SB 1's mail-ballot identification requirements apply only *outside* voter registration and only to voters previously found eligible and

qualified to vote. *See* Tex. Elec. Code §§ 82.001–.004, 82.007–.008 (only "a qualified voter" can apply "for early voting by mail"); State Defs.' Ex. A at 30 (acknowledging this). That SB 1's mail-ballot identification requirements are not used to assess voter qualifications only illustrates the District Court's error, not a Materiality Provision violation. *See Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental); *Vote.Org*, 39 F.4th at 305 n.6.

Indeed, SB 1's mail-ballot identification requirements serve other purposes, like "prevention of fraud" and facilitating the "counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see* SB 1 §§ 1.03, 1.04 (stating purposes of SB 1). For example, Denton County Election Administrator Frank Phillips testified at trial that SB 1's mail-ballot identification requirements would have helped deter and detect a fraudulent mail-ballot scheme that occurred in 2020. *E.g.*, Oct. 12 Trial Trans. 113:4-17, 124:24-127:17 (Republican Party Appellants' Ex. A).

The District Court deemed any evidence of fraud prevention irrelevant in assessing whether the Materiality Provision preempts SB 1's mail-ballot identification requirements. State Defs.' Ex. A at 16. According to the District Court: "Unlike many other causes of action in

the voting-rights context, the Materiality Provision is not a burden-interest balancing statute" and "Materiality Provision violations are prohibited no matter their policy aim." *Id.* at 15-16.  In other words, under the District Court's reading, states cannot use paper-based requirements to further *any* interests besides assessing voter qualifications.  This is true no matter how vital the state's interest or how necessary the rule is to secure it.  *Id.*  This approach would render the Materiality Provision startlingly unique in election law.  *Cf. Crawford v. Marion Cnty Election Bd.*, 553 U.S. 181, 189-90 (2008) (instructing courts to consider range of state interests for right-to-vote claims); *Brnovich v. DNC,* 141 S. Ct. 2321, 2339-40 (2021) (same for claims under Section 2 of the Voting Rights Act).

The District Court's approach would jeopardize many longstanding election rules nationwide, as recent experience has shown.  From 1964 until a couple years ago, courts enjoined hardly any state-law rules under the Materiality Provision.  But in the past year-and-a-half, several district courts have adopted the same theory as the District Court in this case and held unlawful important state laws regulating mail voting.  *Pa. NAACP v. Chapman*, 2023 WL 8091601, at * 28-34 (W.D. Pa. Nov. 21,

2023) (Pennsylvania requirement to date mail ballots); *In re Ga. Senate Bill 202*, 2023 WL 5334582, at *8 (N.D. Ga. Aug. 18, 2023) (Georgia requirement to list birthdate on ballot); *Vote.org v. Ga. State Election Bd.*, 2023 WL 2432011, at *1, 6-9 (N.D. Ga. Mar. 9, 2023) (Georgia requirement to sign absentee ballot application).

This is only the beginning. Under the District Court's logic, many other widespread, commonsense paper-based regulations are now federal civil-rights violations, because they further interests other than determining eligibility. These include:

- Mail-ballot signature requirements, *e.g.*, 25 P.S. §§ 3146.6(a), 3150.16(a); N.J. Stat. § 19:62-11(c); 15 Del. Code § 5514(a)(1);

- Mail-ballot date requirements, *e.g.*, 25 P.S. §§ 3146.6(a), 3150.16(a).

- Prohibitions on voting for more candidates than there are offices, *e.g.*, P.S. § 3063(a); Ariz. Rev. Stat. § 16-611; 15 Del. Code § 4972(b)(6).

- Requirements to maintain pollbooks, *e.g.*, 25 P.S. § 3050; Va. Code § 24.2-611; Tex. Elec. Code § 63.003; and

- Voter assistance forms, *e.g.*, 25 P.S. § 3058; Ind. Code § 3-11.5-4-13.

*See Ritter*, 142 S. Ct. at 1826 (Alito, J., dissental) (discussing signature requirement); *Ball*, 289 A.3d at 38-39 (opinion of Brobson, J.). Indeed, the District Court did not really reject this argument, merely claiming that none of these provisions "survived a [Materiality Provision]

challenge in any forum with the authority to bind [it]." State Defs.' Ex. A at 18.

Basic principles of federalism counsel against this extreme result. Courts must not read a statute "to significantly alter the balance between federal and state power" absent "exceedingly clear language." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. And federal statutes should not be read to "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). But that is what follows from the District Court's reasoning.

It is also implausible that so many commonplace rules would stand unchallenged for generations if, in fact, the Materiality Provision outlawed them *all* nearly sixty years ago. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) ("[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred"). Congress did not "hide [this] elephant[]" in the Materiality Provision's obscure "mousehole[]." *Whitman*, 531 U.S. at 468.

Moreover, the District Court's construction risks rendering the Materiality Provision unconstitutional. Congress enacted the Materiality Provision under its power "to enforce th[e] [Fifteenth] Amendment[.]" *United States v. Mississippi*, 380 U.S. 128, 138 (1965). That power is subject to important limits. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009). Among them, an enforcement statute must be justified by the "evidence in the record" assembled by the enacting Congress. *City of Boerne v. Flores*, 521 U.S. 507, 525 (1997).[2] When enacting the Materiality Provision, Congress marshalled evidence of racially discriminatory practices *in voter registration*. *See supra* at 8-10. The District Court's reinterpretation would decouple the provision's reach from Congress's findings—placing the statute in constitutional jeopardy. Constitutional avoidance therefore requires rejecting the District Court's interpretation. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005).

*Second*, the District Court justified its decoupling of the Materiality

---

[2] The District Court rejected this argument by relying on the permissive test in *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); State Defs.' Ex. A at 38-39. But *Boerne rejected* that test. *See City of Boerne*, 521 U.S. at 527-28. *Boerne* applies the proper framework, *see id.* at 530, which the District Court entirely ignored.

Provision from voter registration by relying on the statutory definition of "vote," which it claimed is "broad[]." State Defs.' Ex. A at 2, 34. But the provision only protects against errors *during voter registration*. *Supra* at 7-8. In any event, "vote" is not the relevant statutory term. The Materiality Provision reaches only denials of the "*right* … to vote," not neutral and mandatory rules that govern the *act* of voting. *See Rosario*, 410 U.S. at 757; *supra* at 11-13.

*Third*, the District Court relied on thin and unpersuasive authority to support its ruling. The District Court should have followed *this Court's* panel opinion in *Vote.org*. But the District Court explicitly declined to do so and rejected its logic. State Defs.' Ex. A at 35-37. Instead, the District Court's primary authority was the Third Circuit's opinion in *Migliori v. Cohen*, which held invalid under the Materiality Provision Pennsylvania's rule that mail ballots must be dated. 36 F.4th 153 (3d Cir. 2022), *vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022); *see, e.g.*, State Defs.' Ex. A at 27. The Supreme Court, however, vacated *Migliori*, "depriv[ing] [it] of precedential effect." *L.A. Cnty. v. Davis*, 440 U.S. 625, 634 n.6 (1979).

Nor is *Migliori* persuasive. The Third Circuit considered *Migliori*

on an "expedited" basis, 36 F.4th at 156, and based on underdeveloped briefing that one panel member faulted for overlooking important arguments, *see id.* at 165-66 (Matey, J., concurring in the judgment). Indeed, the *Migliori* briefing did not make most of the Republican Party Appellants' current arguments and barely developed the rest. Little wonder, then, that three Supreme Court Justices and this Court have reasoned that *Migliori* is "very likely wrong." *Ritter*, 142 S. Ct. at 1824 (Alito, J., dissental); *see Vote.org*, 39 F.4th at 305 n.6. Even the Pennsylvania Supreme Court declined to follow *Migliori* and has ordered that undated mail ballots may not be counted. *See Ball v. Chapman*, 284 A.3d 1189, 1192 (Pa. 2022).

The only other on-point cases cited by the District Court were from out-of-circuit district courts. *E.g.*, State Defs.' Ex. A at 47 (block quoting from *In re Ga. Senate Bill*, 2023 WL 5334582, at *10). Those decisions likewise followed the logic of the Third Circuit's vacated and unpersuasive reasoning in *Migliori* and simply prove too much. Indeed, they depart from the plain text and precedent to sweep aside paper-based election rules that have nothing to do with election officials making qualification determinations during the voter-registration process.

## CONCLUSION

This Court should stay the District Court's order pending appeal and reject its atextual and unreasonable interpretation of the Materiality Provision.

Dated:  December 8, 2023          Respectfully submitted,

                                   /s/ John M. Gore
                                   John M. Gore
                                    *Counsel of Record*
                                   E. Stewart Crosland
                                   Louis J. Capozzi, III
                                   Ryan M. Proctor
                                   JONES DAY
                                   51 Louisiana Ave. NW
                                   Washington, DC  20001
                                   (202) 879-3939
                                   jmgore@jonesday.com
                                   scrosland@jonesday.com
                                   lcapozzi@jonesday.com
                                   rproctor@jonesday.com

*Counsel for Appellants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee*

**CERTIFICATE OF SERVICE**

On December 8, 2023, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free from viruses.

Dated: December 8, 2023

*/s/* John M. Gore

John M. Gore

*Counsel for Intervenors-Appellants*

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,901 words, excluding the parts of the motion exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the same program used to calculate the word count).

Dated: December 8, 2023

/s/ John M. Gore

John M. Gore

*Counsel for Intervenors-Appellants*

# EXHIBIT A

```
IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO,        .
ET AL,                             .
                                   .
            PLAINTIFFS,            .
      vs.                          . DOCKET NO. 5:21-CV-844-XR
                                   .
GREGORY W. ABBOTT, ET AL,          .
                                   .
            DEFENDANTS.            .



            TRANSCRIPT OF BENCH TRIAL
      BEFORE THE HONORABLE XAVIER RODRIGUEZ
         UNITED STATES DISTRICT JUDGE
              OCTOBER 12, 2023






APPEARANCES:
FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
                       FATIMA MENENDEZ, ESQUIRE
                       JULIA LONGORIA, ESQUIRE
                       MALDEF
                       110 BROADWAY
                       SUITE 300
                       SAN ANTONIO TX 78205

                       AMIR BADAT, ESQUIRE
                       NAACP LEGAL DEFENSE & EDUCATIONAL
                       FUND INC
                       40 RECTOR STREET, FIFTH FLOOR
                       NEW YORK NY 10006
```

```
 1
 2                          LEAH J. TULIN, ESQUIRE
                           JASLEEN K. SINGH, ESQUIRE
 3                          BRENNAN CENTER FOR JUSTICE AT NYU
                            SCHOOL OF LAW
 4                          1140 CONNECTICUT AVENUE NW
                           SUITE 1150
 5                          WASHINGTON DC 20036

 6

 7                          AMIR BADAT, ESQUIRE
                           NAACP LEGAL DEFENSE & EDUCATIONAL
 8                          FUND INC
                           40 RECTOR STREET, FIFTH FLOOR
 9                          NEW YORK NY 10006

10

11
    FOR THE DEFENDANTS:    RYAN G. KERCHER, ESQUIRE
12                          KATHLEEN HUNKER, ESQUIRE
                           WILLIAM WASSDORF, ESQUIRE
13                          DAVID BRYANT, ESQUIRE
                           TEXAS ATTORNEY GENERAL
14                          P.O. BOX 12548
                           MC 009
15                          AUSTIN TX 78711

16

17                          ERIC J.R. NICHOLS, ESQUIRE
                           BUTLER SNOW LLP
18                          1400 LAVACA STREET, SUITE 1000
                           AUSTIN TX 78701
19

20

21

22  REPORTED BY:           GIGI SIMCOX, RMR, CRR
                           OFFICIAL COURT REPORTER
23                          UNITED STATES DISTRICT COURT
                           SAN ANTONIO, TEXAS
24

25
```

1 and — you know, I don't want somebody in Collin County doing
2 something —— a voter doing something different than a voter in
3 Denton County does, so we tend to follow their advice mainly
4 for the uniformity.
5 Q.  Did you and your office receive election advisories
6 regarding the implementation of Senate Bill 1?
7 A.  Yes.
8 Q.  Did these advisories address the implementation of the ID
9 number requirement?
10 A.  They did.
11 Q.  Did these advisories address poll watcher provisions?
12 A.  Yes.
13 Q.  Did your office follow the guidance provided by the
14 Secretary of State in these advisories?
15 A.  We did.
16 Q.  In the event you had questions that were not addressed by
17 the election advisories, would you and your office contact
18 staff at the Secretary of State's Office directly?
19 A.  Yes.
20 Q.  Was of the Secretary of State's Office able to answer your
21 questions?
22 A.  I've never had the Secretary of State office never been
23 able to answer a question.
24 Q.  Do you find that you and your office have a better
25 understanding of SB 1's provisions today than when SB 1 was

1 first enacted?

2 A.  Yeah.  Just from the use of it.  Just –– it's just become

3 normal for us now, yes.

4 Q.  Were you the election administrator for Denton County

5 during the November 2020 General Election?

6 A.  Yes, I was.

7 Q.  During that election, did your office identify any

8 incidents of election fraud?

9 A.  We did.  There was a –– even though that was the General

10 Election for state and county officers, we still had a –– a

11 special election that the City of Carollton had placed on the

12 ballot for mayor.  And we discovered that one of the mayoral

13 candidates was submitting multiple fraudulent applications for

14 ballot by mail.

15 Q.  The person who conducted this fraud, do you recall his

16 name?

17 A.  Zul Mohamed.

18       THE COURT:  We are saying "did fraud."  I mean, is

19 there an adjudication of that or is this an allegation?

20       MISS HUNKER:  There's an adjudication ongoing.

21       THE COURT:  There's no adjudication ongoing.  It's

22 either been adjudicated or not adjudicated, so it's an

23 allegation.

24       MISS HUNKER:  The trial is upcoming.  It is

25 continuing allegation until, of course, the conviction.

1 signatures match.  If they don't, then the whole ballot board
2 reviews that signature -- those signatures.  And either accept
3 or reject it.
4 Q.  What signatures would the signature verification committee
5 or early voting ballot board use as the comparison?
6 A.  Well, on the face of it, they would use the signature on
7 the ABBM, application for ballot-by-mail, and the carrier
8 envelope.  They also had the authority to go back -- I believe
9 it was six years at the time -- to -- of any other signatures
10 we may have had on file.
11 Q.  Would the signature verification committee or early voting
12 ballot board compare the signature on the ballot with --
13 BY MISS HUNKER:
14 Q.  Would the signature verification committee or early voting
15 ballot board compare the signature to the ballot with the
16 signature on the application for ballot-by-mail?
17 A.  Yes.
18 Q.  Does this mean that if a person submitted a fraudulent
19 ABBM and then submitted a mail ballot, the signature
20 verification committee or early voting ballot board would
21 compare the signature on the ballot to the previous signature
22 submitted on the application for ballot-by-mail?
23 A.  Yes.
24 Q.  You mentioned earlier that you caught on to the fraud in
25 2020 because there were a number of ballots being sent to the

1  same commercial mailbox.  Were you also alerted to the fraud

2  by the signature requirement?

3  A.  No.

4  Q.  Why didn't the signature requirement flag the fraud in

5  this specific case?

6  A.  Well, in this specific case, we only had the signature on

7  the application for ballot-by-mail.  At that point, there was

8  no other signature to compare it to.

9  Q.  Is this one of the vulnerabilities of voting by mail that

10  you discussed earlier?

11  A.  Yes.

12  Q.  Let's discuss the changes to these practices and

13  procedures in the wake of Senate Bill 1.  Following the

14  passage of Senate Bill 1, how does Denton County establish the

15  identity of a voter who submit an application for

16  ballot-by-mail?

17  A.  It's virtually the same process I described before with

18  the addition of driver's license, Texas state ID or -- and/or

19  the last four of the Social Security number.  And one of those

20  has to match what we have on file in the voter registration

21  system.

22  Q.  And how does Denton County establish the identity of a

23  voter who submitted a mail ballot?

24  A.  With that driver's license or Social.

25  Q.  Will your office remove the flap on the carrier envelope

1  to determine whether the voter put an ID number that matches

2  the one on file?

3  A.  Yes.

4  Q.  Since the law's passage, does the Denton County Elections

5  Office utilize the ID number requirement under SB 1 to confirm

6  the identity of a mail voter?

7  A.  We do.

8  Q.  Does the Denton County Election's Office utilize the ID

9  number required under SB 1 to confirm that the person casting

10  the ballot is, in fact, the registered voter qualified to vote

11  by mail?

12  A.  We do.

13  Q.  We spoke a little while ago about the vulnerabilities

14  associated with mail-in voting.  In your opinion, does SB 1

15  address that vulnerability?

16  A.  It definitely goes a long way in addressing

17  vulnerabilities, yes.

18  Q.  How does it address that vulnerability?

19  A.  Well, not to use the exact example, but if we had someone

20  that was submitting a fraudulent application for

21  ballot-by-mail, before SB 1, really, all they needed was a

22  list of registered voters, and they could fill out their

23  information, the information that was required on the

24  application for ballot-by-mail.

25  Q.  How does —

1  A.  And it would be very hard to do that post—SB 1, because

2  you're also going to have to have a driver's license number or

3  the last four of a Social or Texas ID number.  To find those

4  in large numbers would be extremely difficult.

5  Q.  Had SB 1's mail ballot ID number requirement been in place

6  in 2020, do you believe it would have helped identify the

7  alleged mail voting fraud that we discussed earlier?

8  A.  I do, in the sense of they would have — they would have

9  had to probably make up numbers.  But that's just speculation

10 again.

11          THE COURT:  Well, that answered that.

12          THE WITNESS:  Yeah, sorry.

13 BY MISS HUNKER:

14 Q.  Do you think the lack of an ID number requirement made it

15 easier to complete fraudulent ABBMs and receive illegitimate

16 mail ballots in the alleged fraud you and I had discussed?

17 A.  Yes.

18 Q.  You mentioned earlier that the person accused of voting

19 fraud in 2020 was running for the mayor of Carollton.  Is the

20 City of Carollton contained entirely within Denton County or

21 does to span multiple counties?

22 A.  It's in multiple counties.

23 Q.  In which other counties is the City of Carollton also

24 located?

25 A.  It's also in Dallas and Collin.