No. 23-50885

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

UNITED STATES OF AMERICA; OCA-GREATER HOUSTON, LEAGUE OF
WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

Plaintiffs-Appellees

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS; JANE NELSON, in
her official capacity as Texas Secretary of State; STATE OF TEXAS; HARRIS
COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY;
NATIONAL REPUBLICAN SENATORIAL COMMITTEE; NATIONAL
REPUBLICAN CONGRESSIONAL COMMITTEE,

Defendants-Appellants

REPUBLICAN NATIONAL COMMITTEE

Movant-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

———————————

APPELLEE UNITED STATES' OPPOSITION TO DEFENDANTS-APPELLANTS'
EMERGENCY MOTION TO STAY DISTRICT COURT ORDER AND
PERMANENT INJUNCTION PENDING APPEAL AND FOR A TEMPORARY
ADMINISTRATIVE STAY

———————————

*(see inside cover for counsel)*

KRISTEN CLARKE
  Assistant Attorney General

TOVAH R. CALDERON
JASON LEE
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-1317

**INTRODUCTION**

Defendants-appellants State of Texas, its Secretary of State, and its Attorney General seek a stay pending appeal of an order that permanently enjoins the enforcement of select provisions of Texas's Election Protection and Integrity Act of 2021 because they violate Section 101 of the Civil Rights Act of 1964, 52 U.S.C. 10101(a)(2)(B) (Materiality Provision).  The district court weighed an analogous request but denied it after "careful consideration."  Doc. 830, at 1.[1]  This Court should do the same.

Defendants cannot satisfy the traditional, four-factor standard established in *Nken v. Holder*, 556 U.S. 418 (2009), for obtaining a stay pending appeal.  They cannot make the requisite strong showing that they are likely to succeed on the merits because their arguments misconstrue the Materiality Provision, contradict undisputed evidence, and misapprehend the scope and impact of the district court's order.  This Court's recent grant of a temporary administrative stay has resolved defendants' concerns about irreparable injury.  By contrast, a stay would substantially harm Texas voters by denying them the statutory right to vote afforded by the Civil Rights Act.  And the public interest aligns with the United States' interest in safeguarding that right to vote.

---

[1] "Doc. _" refers to the docket number of documents filed in the district court.  "Mot. _" refers to defendants' stay motion.

Defendants' motion should be denied.[2]

## STATUTORY AND FACTUAL BACKGROUND

**A.    The Materiality Provision protects against denials of the right to vote based on errors or omissions that are not material in determining under state law whether a person is qualified to vote.**

Enacted through Section 101 of the Civil Rights Act of 1964, the Materiality Provision protects against denials of the right to vote based on errors and omissions that are not material in determining an individual's voter qualifications under state law.  It states:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. 10101(a)(2)(B).  The statute defines "vote" to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted."  52 U.S.C. 10101(a)(3)(A) and (e).

---

[2]  As defendants note and despite the caption of this appeal, the district court's order does not apply to Texas's Attorney General.  *See* Mot. 1 n.2; Doc. 830, at 2 n.1.

**B.      Texas law authorizes specific categories of individuals to vote by mail ballot.**

Under Texas election law, a "qualified voter" is someone who (1) is 18 years of age or older, (2) is a United States citizen, (3) has not been determined by a court exercising probate jurisdiction to be either "totally mentally incapacitated" or "partially mentally incapacitated without the right to vote," (4) has not been convicted of a felony (unless the person has completed their term of sentence or received a pardon), (5) resides in the State, and (6) has registered to vote.  Tex. Elec. Code Ann. § 11.002(a) (West 2023); *see also* Tex. Const. Art. VI, § 2(a).

State law authorizes several categories of persons to vote by mail ballot. These include voters who are 65 years of age or older, those who have a "sickness or physical condition" that prevents them from voting in person "without a likelihood of needing personal assistance or injuring [their] health," and persons who will be absent from their home counties for the entirety of the in-person voting period.  *See* Tex. Elec. Code Ann. §§ 82.001-.004, 82.007-.008 (West 2023).  A person who seeks to vote by mail must submit a signed application for a mail ballot to their county's early voting clerk.  *Id.* §§ 84.001, 84.007.  Before 2021, voters were required to provide specific pieces of personal information on their application, including their name, the address at which they are registered to vote, and their mailing address, if it differs from their address of registration.  *Id.* § 84.002(a) (2020).  After a vote-by-mail application is accepted, the clerk sends the

- 3 -

voter an official mail ballot, a ballot envelope in which to place their ballot, and a carrier envelope in which to place the ballot envelope. *Id.* §§ 86.001-002, .012-.013 (2023).

### C. The TEAM System

The Texas Secretary of State maintains an official, statewide voter registration database through the Texas Election Administration Management ("TEAM") system. Doc. 820, at 4. A voter's record in the system may be associated with (1) one number issued by the Texas Department of Public Safety (DPS) on an identification document, and (2) one full or partial Social Security number. *Ibid.*

The TEAM system, however, is "riddled with errors." Doc. 820, at 30. As of January 2023, the DPS number in "over 60,000" records in the TEAM system differs from the number associated with the same voter in DPS's own database. Doc. 820, at 9. Similarly, there are "nearly 45,000" inconsistences between the last four digits of a voter's Social Security number listed in TEAM records and that listed in DPS's database for the same voter. *Ibid.* Beyond these inconsistencies, this information is altogether absent in hundreds of thousands of TEAM records. The records of "nearly 190,000 Texas voters" in the system contain no DPS number, even though DPS previously has issued an identification number for those individuals. *Id.* at 8-9. And the TEAM records for "more than 90,000 Texas

registered voters" lack both a DPS number and the last four digits of the voter's

Social Security number. *Id.* at 9.

> **D.    Following SB 1, vote-by-mail applications and mail ballots must be rejected when the information provided by a voter does not match the information in the TEAM system.**

On September 7, 2021, Texas enacted the Election Protection and Integrity

Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021), more "commonly referred to

as S.B. 1." Doc. 820, at 1.  Among its numerous provisions, SB 1 imposes new

requirements for individuals seeking to vote by mail.  Under Section 5.02, an

individual applying for a mail ballot must provide on their application a DPS

number—the number from a Texas driver's license, a Texas election identification

certificate, or a DPS personal identification card.  Tex. Elec. Code Ann. §

84.002(a) (West 2021).  If the applicant has no DPS number because they have

never been issued any of these documents, they must provide either the last four

digits of their social security number or a statement attesting that they have never

been issued a DPS number or a social security number.  *Id.* § 84.002(a)(1-a)(B)-

(C).  If an applicant does not provide the information described in Section 5.02, or

where the information provided does not match that in the applicant's TEAM

record, Section 5.07 requires an early voting clerk to "reject" the application.  *Id.* §

86.001(f).

- 5 -

If the applicant successfully obtains a mail ballot, they must provide the information described in Section 5.02 a second time when returning their marked ballot. Specifically, Section 5.13 requires the voter to provide the information again on the carrier envelope containing their ballot. Tex. Elec. Code Ann. § 87.041(b)(8) (West 2021); *see also id.* § 86.002(g). If the voter does not provide the required information on the carrier envelope, or if the information provided does not match that in the applicant's TEAM record, Section 5.13 bars "accept[ance]" of the ballot. *Id.* § 87.041(b)(8).[3]

Neither these provisions, nor any of SB 1's other provisions, "change[d] voter eligibility requirements in Texas." Doc. 820, at 3. Rather, as the then-Director of the Elections Division for Texas's Secretary of State acknowledged, "individual eligibility criteria" for voting under Texas election law "ha[ve] nothing to [d]o with the number" that Section 5.02 requires voters to list on their application for a mail ballot or carrier envelope. *Id.* at 10 (alterations in original). A group of intervenor-defendants, *see* p.8, *infra*, which include the Harris County Republican Party, also repeatedly conceded that the number required by SB 1 is not material to voter qualifications under state law. *See* Doc. 608, at 13 ("[T]he

---

[3] In certain circumstances, SB 1 requires that notice be provided if a vote-by-mail application or a mail ballot is rejected for failure to provide the information described in Section 5.02. *See* Tex. Elec. Code Ann. § 86.001(f-1) (West 2021); *id.* § 87.0271(b)-(d); *id.* § 87.0411(b)-(d).

United States . . . may point out that the personal identification numbers on an

application or mail ballot are 'not material' to determining an individual's

qualifications to vote.  That is entirely correct." (citation omitted)); Doc. 634, at 9

("Sections 5.02 and 5.08 do not . . . affect a 'determin[ation] whether [any]

individual is qualified under State law to vote.'" (first alteration added; citation

omitted)).

Nor did SB 1 change the way local election officials verify voters' identities.

"Election officials confirmed that the DPS numbers and [partial Social Security

numbers] required by S.B. 1 are not used to . . . identify voters" or "flag potential

fraud." Doc. 820, at 10.  Rather, they "look up voters using other information on

mail ballot materials," like "the voter's name, date of birth, and address," and

confirm voters' identities using their signature, "just as [officials] did before S.B.

1." *Id.* at 11.

### E.    The United States and private plaintiffs file suit to enjoin enforcement of Sections 5.07 and 5.13.

1.  After Texas enacted SB 1, the United States and a group of private

plaintiffs filed separate suits to enjoin the law.

In its suit, the United States named Texas and its Secretary of State as

defendants (Doc. 131, at 3) and alleged, as relevant here, that SB 1's new

regulations on voting by mail violate the Materiality Provision.  The United States

argued that the information described in Section 5.02 and required under Sections

5.07 and 5.13 is not material to determining whether a voter satisfies Texas's state law qualifications to vote or cast a mail ballot. *Id.* at 17. Consequently, SB 1 violates the Materiality Provision by requiring the rejection of vote-by-mail applications and mail ballots based on errors in providing, or omission of, that information. *Id.* at 16-17.

In their separate suit, the private plaintiffs challenged "the number-matching framework as a whole" under the Materiality Provision. Doc. 820, at 2; *see also id.* at 2 n.4 (identifying the specific SB 1 provisions they challenged). Their complaint named Texas's Secretary of State and Attorney General as defendants, as well as certain county-level elections officials, including the Elections Administrator for Harris County. *Id.* at 15-22.

In light of the "common questions of law and fact" raised across all of the cases challenging SB 1, the district court consolidated the suits. Doc. 31, at 2; *see also* Order (Doc. 13), *United States v. State of Texas*, No. 5:21-cv-1085 (W.D. Texas filed Nov. 9, 2021). The Harris County Republican Party, along with a number of other parties (intervenor-defendants), later intervened in the litigation. Text Order, May 13, 2022.

2. Both the United States and the private plaintiffs moved for summary judgment on their respective Materiality Provision claims (Docs. 609, 611), and the district court granted the former in full and the latter in part (Doc. 820).

- 8 -

Specifically, the court agreed with the United States and the private plaintiffs that requirements of Sections 5.07 and 5.13 violate the Materiality Provision, reasoning that "a voter's ability to provide the ID number associated with her voter registration record on TEAM is not material to her voter qualifications under Texas law." *Id.* at 33, 52. It therefore issued a permanent injunction, including as to the State of Texas, enjoining the enforcement of those provisions. *Id.* at 52-53 (enjoining "the State Defendants"); *see also id.* at 12 (defining "State Defendants" to include Texas). Additionally, the court denied summary judgment to the private plaintiffs on their Materiality Provision challenges to other provisions of SB 1. *Id.* at 52.

Defendants timely appealed. Doc. 823; *see also* Doc. 827 (intervenor-defendants' notice of appeal).

3. While their appeal was pending, defendants asked the district court to stay its decision pending appeal, or in the alternative, to grant a seven-day administrative stay to permit them to seek relief from this Court. Doc. 824, at 1; *see also* Doc. 828 (intervenor-defendants' notice that they joined the stay motion). After weighing the applicable factors, the court denied defendants' request. Doc. 830, at 3-6.

Defendants then filed the instant motion in this Court, asking again for a stay pending appeal, or in the alternative, a temporary administrative stay pending

adjudication of their motion. Mot. 3. Later that day, this Court granted

defendants' request for a temporary administrative stay. Order, Dec. 6, 2023.

## ARGUMENT

**The Court should deny defendants-appellants' motion for a stay pending appeal.**

This Court should deny defendants' motion for an emergency stay pending

appeal. Defendants bear the burden of showing that a stay is justified. *See Nken v.*

*Holder*, 556 U.S. 418, 433-434 (2009). In assessing whether to grant a stay, this

Court considers whether a movant has established four factors:

> (1) whether the stay applicant has made a strong showing that he is
> likely to succeed on the merits; (2) whether the applicant will be
> irreparably injured absent a stay; (3) whether issuance of the stay will
> substantially injure the other parties interested in the proceeding; and
> (4) where the public interest lies.

*Freedom from Religion Found., Inc. v. Mack*, 4 F.4th 306, 311 (5th Cir. 2021)

(quoting *Nken*, 556 U.S. at 426).

Defendants suggest that "only a 'serious legal question' about the merits is

required" here because "the 'balance of the equities weighs heavily in favor of

granting the stay.'" Mot. 9 (emphases omitted) (quoting *Texas Democratic Party*

*v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020)). But this misquotes this Court's

decision in *Texas Democratic Party* and consequently misrepresents the applicable

standard. What this Court actually said was that "[i]n a limited subset of cases, a

'movant need only present a *substantial case on the merits*' if (1) 'a serious legal

question is involved' and (2) 'the balance of the equities weighs heavily in favor of granting the stay.'" *Texas Democratic Party*, 961 F.3d at 397 (emphases added and omitted; citation omitted). This action does not fall within that limited subset of cases because, as explained below, the other three stay factors are not "heavily tilted in the movant's favor." *Hernandez v. Erazo*, No. 23-50281, 2023 WL 3175471, at *2 (5th Cir. May 1, 2023) (citation omitted). But even if that standard applied, defendants' arguments fall far short of establishing a substantial case on the merits.

### A.     Defendants fail to make a strong showing that they are likely to succeed on the merits.

Defendants' unpersuasive and otherwise erroneous arguments cannot establish the requisite "strong showing" that they are likely to succeed on the merits. *Freedom from Religion Found.*, 4 F.4th at 311. Defendants thus falter at the outset on "arguably the most important" factor in establishing entitlement to a stay. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

1. *The Materiality Provision is not limited to racially discriminatory denials of the right to vote*. First, defendants contend that, absent evidence SB 1 discriminates based on race, the United States' and private plaintiffs' claims fail because "'only racially motivated deprivations of rights are actionable' under [the Materiality Provision]." Mot. 11 (quoting *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009)). This argument fails at its premise, which lacks any basis in

- 11 -

the text of the statute. Nowhere does the Provision's text so much as mention race, much less suggest that racial discrimination is required to trigger its application. Rather, it enforces a broader prohibition on state or local actions that deny an individual the right to vote based on "meaningless requirements that . . . ha[ve] nothing to do with determining one's qualifications to vote" under state law. *Migliori v. Cohen*, 36 F.4th 153, 164 (3d Cir. 2022), *cert. granted*, *judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022) (mem.).[4]

Statutory context buttresses this plain-text reading. Unlike the Materiality Provision, a neighboring provision, 52 U.S.C. 10101(a)(1), expressly mentions race, mandating that otherwise qualified voters "shall be entitled and allowed to vote . . . without distinction of race, color, or previous condition of servitude." Likewise, 52 U.S.C. 10101(e) limits pattern-or-practice claims to circumstances in which people are "deprived on account of race or color of any right or privilege secured by subsection (a)." Because protections against racial discrimination in voting are "already explicitly achieved by []other portion[s] of" the same statute, restricting the Materiality Provision to also target racially discriminatory denials of

---

[4] Though later vacated as moot, *Migliori*'s substantive analysis remains persuasive and informative on the Materiality Provision's scope and application. *See United States v. Ambriz*, 727 F.3d 378, 384 n.8 (5th Cir. 2013) (relying on "a case that was vacated for other reasons"); *see also Free Speech Coal., Inc. v. Attorney Gen.*, 974 F.3d 408, 427 (3d Cir. 2020) (relying on vacated opinion where its "prior analysis continues to resonate").

the right to vote would "render[]" the Provision "superfluous." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 307 (2003).

Nor does the solitary case cited by defendants, *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010), aid their reading. *See* Mot. 11. *Broyles* suggested that a prior Fifth Circuit decision, *Kirksey v. City of Jackson*, 663 F.2d 659 (5th Cir. 1981), had "reasoned that" the Materiality Provision "is 'coterminous with the Fifteenth Amendment'" and that *Kirksey* had therefore held that the Provision only prohibits intentional racial discrimination. *Broyles*, 618 F. Supp. 2d at 697. But as the district court here pointed out (Doc. 820, at 44 n.31), *Broyles* mixed up its statutes. In the part of *Kirksey* that *Broyles* cited, this Court discussed Section 2 of the Voting Rights Act, not the Materiality Provision. *See Broyles*, 618 F. Supp. 2d at 697 (citing *Kirksey*, 663 F.2d at 664-665). And unlike Section 2, the Materiality Provision is not written in racial terms.

2.   *The Materiality Provision's protections extend to voting by mail.*
Second, defendants suggest that because voting by mail is a mere "privilege," SB 1 can "limit[]" a person's ability to do so without infringing on the Constitution's "fundamental right to vote." Mot. 12. This Court need not address the scope of that constitutional right because the Materiality Act defines and protects a separate and specific "right . . . to vote." 52 U.S.C. 10101(a)(2)(B). This right ensures that

voters can take steps necessary for making a vote effective—such as satisfying state law prerequisites for "voting, casting a ballot, and having such ballot counted"—without a state or local official invalidating that action based on an "error or omission [that] is not material in determining" whether they are qualified under state law to vote.  52 U.S.C. 10101(a)(2)(B), (a)(3)(A) and (e).  The district court enjoined provisions of SB 1 because they violated *that* right under the Materiality Provision.  *Cf. Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 665 (1966) (explaining that the right to vote "is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed" (citation omitted)).

Defendants additionally (and erroneously) assert that "[u]nder the district court's analysis, 'virtually every electoral regulation' used to confirm a voter's eligibility would be invalidated," though they identify no particular part of the court's analysis.  Mot. 13.  Citing a footnote in this Court's motions-panel decision in *Vote.org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022),[5] defendants aver that "that is not the law."  Mot. 13.  Indeed, it is not:  as the district court explained, the Materiality Provision targets denials of a specific statutory right to

---

[5]  As a motions-panel decision, the opinion in *Vote.org* is "not binding." *Texas Democratic Party v. Abbott*, 978 F.3d 168, 176 (5th Cir. 2020).

vote based on "immaterial errors on voting-related paperwork."  Doc. 820, at 36 (emphasis omitted); *see also* 52 U.S.C. 10101(a)(2)(B).

Additionally, defendants err in describing SB 1's mandatory rejection of a person's vote-by-mail application or ballot for failure to supply information matching their TEAM record as a "forfeiture of the right to vote" for "fail[ure] to follow [voting] rules."  Mot. 10 (citing *Vote.org*, 39 F.4th at 305 n.6).  Under SB 1, a voter's application or ballot may be rejected through no fault of their own— including where they *correctly* provide the information described in Section 5.02— due to an error or discrepancy in the voter record that *Texas* maintains in its TEAM system.  *See* pp.4-5, *supra*.  This can hardly be described as a forfeiture by the voter.  *See Forfeiture*, Black's Law Dictionary (11th ed. 2019) (defining "forfeiture" as "[t]he loss of a right . . . because of . . . neglect of duty").  Moreover, the *point* of the Materiality Provision is to prohibit States and localities from requiring individuals to provide extraneous information that is immaterial to determining their voter qualifications, where the penalty is rejection of election materials.

3. *The information described in Section 5.02 is not material.*  Next, defendants suggest that the information described in Section 5.02 is material because it is used to "confirm a voter's identity."  Mot. 12-13.  Anti-fraud measures like voter-ID or signature-matching requirements can be material if they

determine would-be registrants' or voters' qualifications indirectly by verifying their identities. However, such requirements must be *needed* for this purpose, and as the district court explained here, "the undisputed evidence confirms that election officials do not use the ID numbers" referenced in Section 5.02 and listed on individuals' vote-by-mail applications and mail ballots "to confirm voters' identities." Doc. 820, at 31. Nor does the Texas Secretary of State "instruct them to do so." *Id.* at 11. Rather, officials "look up voters using other information on mail ballot materials" (like the person's "name, date of birth, and address"), and also "verify a voter's identity using the signature by which the voter attests to identity and eligibility, just as they did" for these activities "before S.B. 1." *Ibid.* The fact that "election officials continue[] to rely on other, publicly available information . . . to confirm voters' identities" is hardly surprising given the sheer number of errors that "riddle[]" the TEAM system. *Id.* at 30, 32 n.25; *see also* pp. 4-5, *supra*.

Defendants try to sidestep this evidence by implying that the information described in Section 5.02 must be material because the State collects it pursuant to the Help America Vote Act (HAVA), 52 U.S.C. 20901 *et seq.*, when residents register to vote. Mot. 13. But as the district court explained, HAVA did not change States' voter qualification criteria; rather, HAVA requires most individuals registering to vote to provide certain information (like a current and valid driver's

license number or the last four digits of their social security number) to enable the State to assign "a number which will serve to identify the applicant for voter registration purposes." 52 U.S.C. 21083(a)(5)(A)(ii); *see also Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012); Doc. 820, at 28. In short, the HAVA requirement defendants cite simply helps to facilitate the creation of a state database identifier for the voter.

Defendants' cursory reference (Mot. 13-14) to the Eleventh Circuit's split decision in *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), does not salvage their contention regarding materiality. Defendants claim the panel majority opinion as support for their position, but then withhold any reasoning for why the opinion is "correct" and "applicable here," pledging to provide it later in their merits briefing. Mot. 14. In the absence of that explanation, defendants' token invocation of *Browning* does little to establish a strong showing that they are likely to succeed on the merits, especially given the district court's reliance on HAVA's text and persuasive explanation for why Judge Barkett's separate opinion in *Browning*, concurring in part and dissenting in part, has the more persuasive analysis of materiality. *See* Doc. 820, at 28 n.22, 29-30.

4. *Defendants' arguments regarding the Secretary of State's election responsibilities are futile.* Finally, defendants urge this Court to issue a stay because the district court's order "cannot be affirmed" as to the Texas Secretary of

- 17 -

State, who they say lacks any "legal[] authoriz[ation] to . . . [e]nsure compliance" by local election officials "with the district court's permanent injunction." Mot. 14. Even if defendants were right—and they are not (*see*, *e.g.*, Doc. 424, at 33-24 & n.14)—their argument is irrelevant. The district court expressly confirmed that its "injunction applies to *all* counties in the State of Texas, not just the individual counties named in" the private plaintiffs' complaint. Doc. 830, at 4; *see also ibid.* (explaining that "the United States sought and obtained relief against the entire State of Texas," and "Texas counties are legal subdivisions of the State of Texas" (citing Tex. Const. Art. 9, § 1 & Art. 11, § 1)). Accordingly, a stay is unwarranted because local election officials are properly bound by the court's order, separate and apart from its applicability to the Secretary.[6]

### B.    Defendants cannot show they will suffer any irreparable injury.

In addition to defendants' inability to make a strong showing that they are likely to succeed on the merits, defendants cannot establish the "critical" element of irreparable injury, *Nken*, 556 U.S. at 434, because this Court has already

---

[6] Two days after this Court set an expedited, five-day briefing schedule on defendants' motion, intervenor-defendants filed a brief supporting defendants' motion and addressing their likelihood of success on the merits. *See* Republican Party Appellants' Br. in support of Defs.' Emergency Mot. to Stay. The United States responded to many of intervenor-defendants' arguments in its district court filings (Docs. 637, 670), and its amicus brief in *Vote.org v. Paxton*, No. 22-50536 (5th Cir.) (argued Mar. 6, 2023), *see* United States Br. as Amicus (Doc. 67), *Vote.org*, No. 22-50536, https://perma.cc/PRJ3-X864.

remedied the alleged harm on which they relied.  The entirety of defendants'
briefing on irreparable injury focuses on the possibility that the district court's
order could cause "confusion amongst county election officials and voters in
connection with" runoff elections in Houston and elsewhere scheduled for
December 9, 2023.  Mot. 15; *see also* Mot. 15-17 & Exs. B, C.

Those concerns have been assuaged.  On December 6, 2023—the same day
defendants moved for emergency relief—this Court granted defendants' request for
a temporary administrative stay of the district court's order pending adjudication of
defendants' stay motion.  Order, Dec. 6, 2023; *see also* Mot. 18.  Since then, the
December 9 runoff election date has passed.  Accordingly, defendants' fears of
irreparable injury have been addressed, and additional relief is unnecessary.

Elsewhere in their motion, defendants allude to other elections and related
activities scheduled for 2024.  Mot. 2-3.  But defendants do not argue that, absent a
stay, they will suffer any irreparable injury in connection with any of these events.
*See* Mot. 15-17.  Nor do they challenge the timing of the district court's order in
relation to those events, or suggest that any "risk[] [of] confusion" (like that which
they alleged relating to the December 9 runoff elections) will occur.  Mot. 15.

Rather, defendants simply assert that, in light of these upcoming activities,
the district court's order will "prevent the uniform enforcement of the State's
election laws across Texas's 254 counties" because only "Travis County and

- 19 -

Harris County are enjoined." Mot. 3, 15. To the contrary, the order applies

statewide, *see* Doc. 830, at 4, which means that it will *facilitate* uniformity by

ensuring that no Texan's vote-by-mail application or mail ballot is rejected for

errors or omissions in providing immaterial information.[7]

### C.    Defendants fail to carry their burden on the final two stay factors.

Because defendants cannot satisfy either of the first two factors, the Court

should deny their motion. *See Nken*, 556 U.S. at 434. But even if the Court

considers the remaining factors, they, too, militate against a stay. A stay would

wreak substantial injury on other interested parties—namely, Texas voters who

attempt to vote by mail ballot—because, absent the injunctive relief ordered by the

---

[7] As defendants' motion (Mot. 2-3) makes clear, a State will often, if not invariably, be able to point to upcoming state, local, or federal elections, or other election-related activity, that could be affected if a state election law like SB 1 is enjoined. Especially here, where defendants do not argue under *Purcell v. Gonzalez*, 549 U.S. 1 (2006), that the district court issued its injunction too close to other elections on the horizon, or that the order will cause any disruption or voter confusion, a stay based on *Purcell* is unwarranted. Moreover, an orderly rollout of the changes required under the court's order is eminently achievable. The Texas Secretary of State can take steps to minimize any potential disruption by exercising her authority to "obtain and maintain uniformity" in the administration of Texas's election laws to issue directives, guidance, and new forms to local election officials. *See* Tex. Elec. Code Ann. § 31.003 (West 2023); *see also id.* § 31.002(a) and (b)(1); *id.* § 86.013(d). Additionally, as the district court explained, any voter confusion that might occur is likely to be minimal and, importantly, "would not disenfranchise anyone": voters' vote-by-mail applications and mail ballots simply would be processed without regard to whether the SB 1-related information they provided matches their voter record in the TEAM system. Doc. 820, at 51.

district court, "future denials of [vote-by-mail applications] and mail-in ballots in violation of the Materiality Provision are not only likely but certain."  Doc. 820, at 49.  Indeed, tens of thousands of applications and ballots previously have been rejected under Sections 5.07 and 5.13, due in part to "persistent ID errors in the TEAM records."  *Id.* at 9, 49; *see also* pp.4-5, *supra*.  The prospect of further "irreparable injury to voters in Texas" strongly weighs against defendants' request for extraordinary relief.  *Id.* at 48; *see also Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) ("The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm.").

So, too, does the public interest, given that the United States here seeks to enforce federal law safeguards for a right that is, for citizens, "preservative of all rights."  *Harper*, 383 U.S. at 667 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).  By contrast, defendants seek the ability to recommence rejecting vote-by-mail applications and mail ballots for failure to provide information that has "nothing to [d]o" with voter eligibility criteria under Texas law (Doc. 820, at 10), and that is not used to confirm a voter's identity, *see* p.16, *supra*.  As the district court pointed out, this hardly serves the public interest.  *See* Doc. 830, at 6 ("Counting valid votes is always in the public interest.  Excluding them because of immaterial paperwork errors is not.").

# CONCLUSION

For the foregoing reasons, this Court should deny defendants-appellants' motion.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Jason Lee
TOVAH R. CALDERON
JASON LEE
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-1317

## CERTIFICATE OF SERVICE

On December 11, 2023, I filed this brief with the Clerk of the Court by using

the CM/ECF system.  Participants in the case are registered CM/ECF users, and

service will be accomplished by the CM/ECF system.

s/ Jason Lee
JASON LEE
Attorney

# CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5198 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Jason Lee
JASON LEE
Attorney

Date:  December 11, 2023