No. 23-50885

─────────────────────────────────────────

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA; OCA-GREATER HOUSTON, LEAGUE OF
WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS; JANE NELSON, IN
HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE; STATE OF
TEXAS; REPUBLICAN NATIONAL COMMITTEE; HARRIS COUNTY
REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL
REPUBLICAN SENATORIAL COMMITTEE; NATIONAL REPUBLICAN
CONGRESSIONAL COMMITTEE,

*Defendants-Appellants.*

─────────────────

**On Appeal from the United States District Court for the Western
District of Texas, San Antonio Division**

─────────────────

## INTERVENOR-APPELLANTS' OPENING BRIEF

─────────────────

John M. Gore
  *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com
*Counsel for Intervenor-Appellants*

**CERTIFICATE OF INTERESTED PERSONS**

**No. 23-50885,** *United States of America, et al. v. Warren Kenneth Paxton, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Local Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    Defendants-Appellants:

- Ken Paxton, Attorney General, State of Texas
- Jane Nelson, in her official capacity as Texas Secretary of State
- State of Texas

2.    Counsel for Defendants-Appellants:

- Aaron Lloyd Nielson
- William Francis Cole
- Kathleen Theresa Hunker
- Kateland R. Jackson
- Ryan Glen Kercher
- Lanora Christine Pettit
- William D. Wassdorf

3.    Intervenors-Appellants:

- Harris County Republican Party
- Dallas County Republican Party
- Republican National Committee

- National Republican Senatorial Committee
- National Republican Congressional Committee

i

4.    Counsel for Intervenors-Appellants:

- John M. Gore
- E. Stewart Crosland
- Louis J. Capozzi III
- Ryan M. Proctor
- Jones Day

5.    Defendants Not Party to this Appeal:

- Gregory W. Abbott, in his official capacity as Governor of Texas
- Jose A. Esparza, in his official capacity as Deputy Secretary of the State of Texas
- Lupe C. Torres, in her official capacity as Medina County Elections Administrator
- Lisa Wise, in her official capacity as the El Paso County Elections Administrator
- Kim Ogg, Harris County District Attorney
- Joe Gonzales, Bexar County District Attorney
- Jose Garza, Travis County District Attorney
- John Creuzot, Dallas County District Attorney
- Ricardo Rodriguez, Jr.
- Yvonne Rosales, in her official capacity as El Paso County District Attorney
- Rebecca Guerrero
- Teneshia Hudspeth, Harris County Clerk, in her official capacity
- Dyana Limon-Mercado
- Isabel Longoria, Harris County Elections Administrator
- Jacque Callanen, in her official capacity as Elections Administrator of Bexar County
- Yvonne Ramon, in her official capacity as the Hidalgo County Elections Administrator
- Michael Scarpello, in his official capacity as the Dallas County Elections Administrator
- Dana DeBeauvoir, in her official capacity as the Travis County Clerk

6.    Plaintiffs-Appellees:

- United States of America
- OCA-Greater Houston
- League of Women Voters of Texas
- REVUP-Texas

7.    Counsel for Plaintiff-Appellee United States of America:

- Jason Lee
- Tovah Calderon
- Daniel Joshua Freeman

8.    Counsel for Plaintiffs-Appellees OCA-Greater Houston, League of

Women Voters of Texas, and REVUP-Texas:

- Hani Mirza
- Alyssa G. Bernsein
- Dayton Campbell-Harris
- Adriel I. Cepeda Derieux
- Brian Dimmick
- Zachary Dolling
- Sophia Lin Lakin
- Christopher McGreal
- Ari Savitzky
- Andre Segura
- Jenner & Block, L.L.P.
- American Civil Liberties Union Foundation
- American Civil Liberties Union
- American Civil Liberties Union of Texas
- Texas Civil Rights Project

9.    Plaintiffs Not Party to the Appeal:

- Mi Familia Vota
- Marlon Lopez
- Marla Lopez
- Paul Rutledge
- Houston Area Urban League
- Delta Sigma Theta

- Arc of Texas
- Jeffrey Clemmons
- La Union del Pueblo Entero
- Friendship-West Baptist Church
- Anti-Defamation League Austin, Southwest, and Texoma Regions
- Southwest Voter Registration Education Project
- Texas Impact
- Mexican American Bar Association of Texas
- Texas Hispanics Organized for Political Education
- Jolt Action
- William C. Velasquez Institute
- FIEL Houston Inc.
- James Lewin
- LULAC Texas
- Voto Latino
- Texas Alliance for Retired Americans
- Texas AFT

Dated: June 12, 2024                Respectfully submitted,

*/s/ John M. Gore*
_____

*Counsel of Record for Intervenors-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The Intervenor-Appellants request oral argument.  This case raises an important issue of first impression in this Circuit with far-reaching consequences for all paper-based voting regulations.  Specifically, the District Court invalidated a state voter-identification statute through a novel interpretation of the Materiality Provision of the Civil Rights Act.  If affirmed, the decision would cast into doubt the lawfulness of many other voting rules and create a circuit split with the Third Circuit.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................................. v

TABLE OF AUTHORITIES .................................................................................. vviii

INTRODUCTION.................................................................................................... 1

STATEMENT OF JURISDICTION...................................................................... 4

STATEMENT OF THE ISSUE ............................................................................. 4

STATEMENT OF THE CASE................................................................................ 4

      A.    *Congress Enacted The Materiality Provision To Target Discriminatory Voter-Registration Practices.* ............................... 4

      B.    *Texas Enacted S.B. 1 To Prevent Fraud And Promote Public Confidence In Elections.* ............................................. 8

      C.    *Private Plaintiffs And The United States Challenge S.B. 1's Identification Rules.* ............................................. 15

SUMMARY OF ARGUMENT ............................................................................. 17

STANDARD OF REVIEW .................................................................................. 20

ARGUMENT ....................................................................................................... 20

      I.    S.B. 1'S IDENTIFICATION REQUIREMENTS DO NOT VIOLATE THE MATERIALITY PROVISION.......................................................... 20

            A.    *S.B. 1's Identification Requirements Do Not Implicate The Materiality Provision.*.............................. 22

                  1.    S.B. 1's Identification Requirements Do Not Apply To A "Record Or Paper" Related To An "Application, Registration, Or Other Act Requisite To Voting."............................. 23

                  2.    S.B. 1's Identification Requirements Are Not Used "In Determining" Any Individual's Qualifications To Vote.......................... 30

                  3.    S.B. 1's Identification Requirements Do Not "Deny The Right Of Any Individual To Vote."............. 29

## TABLE OF CONTENTS
### (continued)

**Page**

4.    The Federalism Canon Bars Application Of The Materiality Provision to S.B. 1's Identification Requirements. .......................................................................... 35

5.    Constitutional Avoidance Bars Application Of The Materiality Provision To S.B. 1's Identification Requirements. ............................................. 39

B.    *The District Court's Reasoning Is Flawed.*................................. 49

II.    THE PANEL DECISION IN *VOTE.ORG II* DOES NOT APPLY BEYOND VOTER REGISTRATION, BUT S.B. 1'S IDENTIFICATION REQUIREMENTS SATISFY IT. ........................................................... 50

CONCLUSION ................................................................................... 67

COMBINED CERTIFICATIONS .......................................................... 69

CERTIFICATE OF SERVICE................................................................. 70

vii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) ......................................................................... 39, 43

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983) ......................................................................... 23, 40

*Baker v. Carr,*
    369 U.S. 186 (1962) ..............................................................................34

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023) ...................................................................... 28, 30

*Brnovich v. DNC,*
    594 U.S. 647 (2021) ............................................................ 34, 36, 60, 61

*Brown v. Gardner,*
    513 U.S. 115 (1994) ..............................................................................51

*Cir. City Stores v. Adams,*
    532 U.S. 105 (2001) ..............................................................................27

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ......................................................................... 45, 46

*Clingman v. Beaver,*
    544 U.S. 581 (2005) ..............................................................................40

*Condon v. Reno,*
    913 F. Supp. 946 (D.S.C. 1995) ............................................................ 7

*County of Los Angeles. v. Davis,*
    440 U.S. 625 (1979) ..............................................................................55

*Crawford v. Marion Cnty. Election Bd.*,
472 F.3d 949 (7th Cir. 2007) ...................................................................37

*Crawford v. Marion Cnty. Election Bd.*,
553 U.S. 181 (2008) .................................................................... *passim*

*DNC v. Wis. State Legislature*,
141 S. Ct. 28 (2020) .............................................................. 37, 39

*Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ...................................... 6, 7, 59

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012) ...................................................................28

*Friedman v. Snipes*,
345 F. Supp. 2d 1356 (S.D. Fla. 2004) .............................. 6, 24, 41

*Harrison v. PPG Indus.*,
446 U.S. 578 (1980) ...................................................................27

*Husted v. A. Philip Randolph Inst.*,
584 U.S. 756 (2018) ...................................................................65

*In re Ga. Senate Bill 202*,
2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ............................41

*In re Sinclair*,
870 F.2d 1340 (7th Cir. 1989) ...................................................26

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) ...................................................................44

*La Union del Pueblo Entero v. Abbott*,
29 F.4th 299 (5th Cir. 2022) ...................................... 11, 18

*La Union Del Pueblo Entero v. Abbott*,
68 F.4th 228 (5th Cir. 2023) ...................................................18

*Lassiter v. Northampton Cnty. Bd. of Elections*,
  360 U.S. 45 (1959)................................................................31

*Liebert v. Millis*,
  23-cv-672, 2024 WL 2078216 (W.D. Wis. May 9, 2024) ...........................*passim*

*McDonald v. Bd. of Election Comm'rs*,
  394 U.S. 802 (1969)...........................................................*passim*

*Migliori v. Cohen*,
  36 F.4th 153 (3d Cir. 2022)...................................................41

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ............................................................34

*NFIB v. OSHA*,
  595 U.S. 109 (2022)..........................................................44

*Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
  97 F.4th 120 (3d Cir. 2024)..................................................*passim*

*Reynolds v. Sims*,
  377 U.S. 533 (1964)..........................................................50

*Richardson v. Hughes*,
  978 F.3d 220 (5th Cir. 2020).................................................58

*Ritter v. Migliori*,
  142 S. Ct. 1824 (2022).......................................................*passim*

*Rosario v. Rockefeller*,
  410 U.S. 752 (1973)........................................................ 37, 39

*Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*,
  410 U.S. 719 (1973)..........................................................54

*Schwier v. Cox*,
  340 F.3d 1284 (11th Cir. 2003)...............................................*passim*

*Shelby Cnty. v. Holder,*
    570 U.S. 529 (2013) ................................................................. 46, 48

*Smiley v. Holm,*
    285 U.S. 355 (1932) ............................................................23, 40, 47

*State v. Hollins,*
    620 S.W.3d 400 (Tex. 2020) ........................................................ 9

*Tennessee v. Lane,*
    541 U.S. 509 (2004) .....................................................................45

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ................................................ 8, 35, 61

*Tex. Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) .......................................................53

*Tex. League of United Latin Am. Citizens v. Hughs,*
    978 F.3d 136 (5th Cir. 2020) ................................................ 8, 9, 10

*Thrasher v. Ill. Republican Party,*
    4:12–cv–4071–SLD–JAG, 2013 WL 442832
    (C.D. Ill. Feb. 5, 2013) ................................................................ 6

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) .....................................................................23

*United States v. Mississippi,*
    380 U.S. 128 (1965) .....................................................................46

*United States v. Mosley,*
    238 U.S. 383 (1915) ................................................................ 36, 51

*United States v. Segura,*
    747 F.3d 323 (5th Cir. 2014) ........................................................49

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) (en banc) ...................................... 1, 61

*Vote.Org v. Callanen*,
   39 F.4th 297 (5th Cir. 2022) ................................................ 2, 19, 24, 26

*Vote.Org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) ................................................ *passim*

*Vote.Org v. Ga. State Election Bd.*,
   661 F. Supp. 3d 1329 (N.D. Ga. 2023) .............................. 41

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ............................................................ 44

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ............................................................ 44

## Constitutional and Statutory Authorities

U.S. Const. amend. XV .......................................................... 45

Act of May 29, 2023, 88th Leg. R.S., H.B. 357 ...................... 63

Help America Vote Act,
   52 U.S.C.§ 21083 ................................................................ 12, 13, 59

28 U.S.C. § 1292 .................................................................... 4

28 U.S.C. § 1331 .................................................................... 4

52 U.S.C. § 10101 .................................................................. *passim*

52 U.S.C. § 10501 .................................................................. 31

10 ILCS § 5/17-4 .................................................................... 42

10 ILCS § 5/19-5 .................................................................... 42

10 ILCS § 5/19-6 .................................................................... 43

10 ILCS § 5/19A-40 ................................................................ 42

10 ILCS § 5/19A-45 ................................................................ 42

15 Del. Code § 4972 ........................................................................ 42

25 Pa. Cons. Stat. § 3050 ............................................................... 42

25 Pa. Cons. Stat. § 3058 ............................................................... 43

25 Pa. Cons. Stat. § 3146.4 ............................................................ 43

25 Pa. Cons. Stat. § 3146.6 ............................................................ 42

25 Pa. Cons. Stat. § 3150.16 .......................................................... 42

26 Okla. Stat. § 26-14-107 ............................................................. 43

Ala. Code § 11-46-50 ...................................................................... 43

Ala. Code § 17-11-7 ........................................................................ 42

Ala. Code § 17-11-9 ........................................................................ 42

Ariz. Rev. Stat. § 16-542 ................................................................ 42

Ariz. Rev. Stat. § 16-547 ................................................................ 42

Ariz. Rev. Stat. § 16-611 ................................................................ 42

Cal. Elec. Code § 3011 .............................................................. 42, 43

Colo. Rev. Stat. § 31-10-1002 ....................................................... 42

Fla. Stat. § 101.23 ........................................................................... 42

Fla. Stat. § 101.051 ......................................................................... 43

Fla. Stat. § 101.64 ........................................................................... 42

Fla. Stat. § 101.65 ........................................................................... 42

Fla. Stat. § 101.657 ......................................................................... 42

Ga. Code § 21-2-384 .................................................................. 42, 61

Ga. Comp. R. & Regs. § 183-1-14.02 ................................................................ 42

Ind. Code § 3-11-10-24 ..................................................................................... 43

Ind. Code § 3-11-10-29 ..................................................................................... 42

Ind. Code § 3-11.5-4-13 ..................................................................................... 43

Ky. Rev. Stat. § 117.076 ..................................................................................... 43

Ky. Rev. Stat. § 117.085 ..................................................................................... 42

Ky. Rev. Stat. § 117.0863 ................................................................................... 43

La. Stat. Ann. § 562.C ........................................................................................ 43

La. Stat. § 18:1306E ........................................................................................... 42

Mass. Gen. Laws ch. 54 § 25 ............................................................................. 42

Mass. Gen. Laws § 25B ................................................................................ 42, 43

Md. Code, Elec. Law § 9-308 ............................................................................. 43

Md. Code § 9-305 ............................................................................................... 42

Minn. Stat. § 203B.07 ................................................................................... 42, 61

N.J. Stat. § 19:62-11 ........................................................................................... 42

N.J. Stat. § 19:63-12 ........................................................................................... 42

N.M. Stat. § 1-6-8 ............................................................................................... 42

Ohio Rev. Code § 3509.04 .................................................................................. 61

Pa. Cons. Stat. § 3063 ........................................................................................ 42

S.C. Code § 7-15-370 .......................................................................................... 43

Tenn. Code § 2-6-202 ......................................................................................... 42

Tenn. Code § 2-7-112 ..................................................................43

Tenn. Code § 2-7-116 ..................................................................43

Tex. Elec. Code

§ 13.002 ........................................................................... 12, 32

§ 43.007 ................................................................................. 8

§ 63.003 ......................................................................... 42, 43

§ 64.0322 .............................................................................43

§ 65.011 ...............................................................................42

§ 82.001 ..........................................................................8, 29

§ 82.002 ..........................................................................8, 29

§ 82.003 ..........................................................................8, 29

§ 82.004 ..........................................................................8, 29

§ 82.007 ...............................................................................29

§ 82.008 ...............................................................................29

§ 84.001 ........................................................................ 11, 42

§ 84.002 ...................................................................11, 12, 33

§ 84.007 ........................................................................ 11, 14

§ 84.031 ...............................................................................14

§ 84.032 ...............................................................................15

§ 84.035 ...............................................................................15

§ 85.001 ................................................................................. 8

§ 86.001 ...................................................................12, 13, 33

§ 86.002 ...............................................................................14

§ 86.006 ...............................................................................42

§ 86.008 ...............................................................................13

§ 86.013 ...............................................................................14

§ 86.0015 ..............................................................................11

§ 87.041 ........................................................................ 14, 42

§ 87.0271 ....................................................................... 14, 15

§ 87.0411 ..............................................................................14

Tex. S.B. 1 ................................................................. passim

Va. Code § 24.2-611 ..................................................................42

Va. Code § 24.2-649 ................................................................43

Vt. Stat. 17 § 2542 .................................................................42

Wash. Rev. Code § 29A.40.091 ............................................42

**OTHER AUTHORITIES**

Jody Barr, *Lawsuit planned over Travis County Clerk's poll watcher*
    *'sequester' during ballot counting*, Kxan
    (Nov. 9, 2020) .....................................................................10

W. Christopher, *The Constitutionality of the Voting Rights Act of*
    *1965*, 18 STAN. L. REV. 1 (1965).......................................... 6

Comm'n on Fed. Election Reform, *Building Confidence in U.S.*
    *Elections* (2005) ...............................................................61

*Governor Abbott Priortizes Election Integrity this Legislative*
    *Session*, WBAP (Mar. 15, 2021).........................................10

H.R. Rep. No. 88-914, (1963) .......................................*passim*

National Conf. of State Legislatures, *Voter ID Laws*
    (Feb. 2, 2024) ...................................................................... 1

*National Voter Registration Application Form for*
    *U.S. Citizens*, U.S. Election Assistance Comm'n .....................27

*Oxford English Dictionary*
    (3d ed. 2021, rev. online Mar. 2023).................................30

Proclamation No. 41-3752, 45 Tex. Reg. 5455 (Aug. 7, 2020).................. 9

A. Samuels, *Carrollton mayoral candidate arrested on suspicion of*
    *fraudulently obtaining mail-in ballots*,
    Tex. Tribune (Oct. 8, 2020)...............................................10

University of Texas/Texas Tribune Poll (2021).........................10

U.S. Election Assistance Comm'n, *Voter FAQs* ...............................................24

*Voter Registration*, Md. State Bd. of Elections ...............................................27

*Voter Registration Application*, D.C. Bd. of Elections ...................................27

## INTRODUCTION

Most States, including Texas, require those voting in person to show identification.  *See, e.g.*, National Conf. of State Legislatures, *Voter ID Laws* (Feb. 2, 2024), https://perma.cc/4HGH-7NS6.  The Supreme Court has upheld such laws because they impose no meaningful burden on the right to vote and are amply justified by the States' "interest in deterring and detecting voter fraud." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008).  Through Senate Bill 1 (S.B. 1), the Texas Legislature adopted identification requirements for individuals applying for and casting mail ballots—a voting method for which "the potential and reality of fraud is much greater … than with in-person voting."  *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (en banc).

The District Court, however, enjoined these commonsense measures under the so-called Materiality Provision of the Civil Rights Act of 1964.  In fact, under the District Court's reading of the Provision, *all* paper-based voting requirements—including all such measures to protect election integrity, to verify identity, and to prevent fraud—have been outlawed by Congress since 1964 because they are not used to determine an individual's "qualification to vote."  ROA.33240.

The District Court was wrong.  As the Third Circuit recently held—and three Supreme Court Justices and two prior panels of this Court have

indicated—the Materiality Provision applies only to rules used to make voter-qualification determinations during the voter-registration process. It has no application to ballot-casting rules, like S.B. 1's vote-by-mail identification requirements, that govern how registered voters request and cast a ballot. *See Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 130 (3d Cir. 2024), *reh'g denied* (Apr. 30, 2024); *accord Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissental); *Vote.Org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022) (*Vote.Org I*); *Vote.Org v. Callanen*, 89 F.4th 459, 479 n.7 (5th Cir. 2023) (*Vote.Org II*). In fact, other than a vacated Third Circuit decision now disavowed, *every* federal appellate decision to apply the Materiality Provision has involved a voter-qualification rule, not a ballot-casting rule. *See Pa. State Conf. of NAACP*, 97 F.4th at 127-28.

The plain statutory text requires this reading. *See, e.g.*, *id.* at 131-39. The Materiality Provision applies only to "registration" and "other" analogous acts. 52 U.S.C. § 10101(a)(2)(B). It is implicated only "in determining" voters' qualifications. *Id.* And it prohibits only outright "den[ials]" of "the right … to vote" by deeming a would-be voter ineligible based on "not material" errors or omissions on registration-related paperwork. *Id.*; *see also* Stay Order 5, ECF No. 80-1. Congress thus enacted the Provision to serve an important, but properly

focused, role in protecting the right to vote against discriminatory state efforts to prevent qualified individuals from registering to vote.

The District Court's contrary construction would unleash electoral chaos by imperiling paper-based voting rules all across the country—including numerous rules that regulate, and make possible, voting by mail. *See Pa. State Conf. of NAACP*, 97 F.4th at 134-35; *Liebert v. Millis*, 23-cv-672, 2024 WL 2078216, at *14 (W.D. Wis. May 9, 2024). It also offends the federalism canon by inferring from vague language a transformative shift in power from state legislatures to federal courts. *See Pa. State Conf. of NAACP*, 97 F.4th at 134-35; *Liebert*, 2024 WL 2078216, at *17. And it risks rendering the Provision unconstitutional by unmooring it from the Congressional findings supporting it.

The Court should adhere to the plain statutory text, decline Plaintiffs' invitation to create a split with the Third Circuit, and reverse.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1) because Intervenor-Appellants timely appealed, ROA.33297-33298, from the District Court's grant of an injunction, ROA.33266-33267.

The District Court had original jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under a federal statute.

## STATEMENT OF THE ISSUE

Whether S.B. 1's identification requirements for individuals applying for and casting mail ballots violate the Materiality Provision.

## STATEMENT OF THE CASE

### A. *Congress Enacted The Materiality Provision To Target Discriminatory Voter-Registration Practices.*

Almost a century after the Fifteenth Amendment gave African Americans the right to vote on paper, many had been thwarted in their attempts to register to vote. As late as 1963, in "over 250 counties … less than 15 percent of the voting-age [African-Americans were] registered to vote." H.R. Rep. 88-914, pt. 2, at 2 (1963). Congress laid the blame for this on efforts by local "voting officials to defeat [African-American] registration" *Id.* at 5. Among other things, local "registrars [would] overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting [an African-American] application for the same or more trivial reasons." *Id.*

Congress addressed these problems in Section 101(a) of the Civil Rights Act of 1964, which consists of three provisions addressed to "State registration officials," *id.*, and "designed to insure nondiscriminatory practices in the registration of voters," *id.*, pt. 1, at 19; *see* 52 U.S.C. § 10101(a)(2).

The first requires state officials to apply uniform standards "in determining whether any individual is qualified" to vote. 52 U.S.C.

4

§ 10101(a)(2)(A).  The second—the Materiality Provision at issue here—prohibits "deny[ing] the right … to vote" based on certain errors or omissions that are "not material in determining whether [an] individual is qualified under State law to vote."  *Id.* § 10101(a)(2)(B).  The third narrowed the permissible uses of a "literacy test as a qualification for voting."  *Id.* § 10101(a)(2)(C).

The House Report consistently described the Materiality Provision, like its Section 101(a) neighbors, as a regulation of the voter-registration process.  *See* H.R. Rep. 88-914, pt. 1, at 19 (Provision bars "registration officials" from "disqualifying an applicant for immaterial errors or omissions" and "prohibit[s] the disqualification of an individual because of immaterial errors or omissions"); *id.*, pt. 2, at 5 (under the Provision, "State registration officials must … disregard minor errors or omissions if they are not material in determining whether an individual is qualified to vote").  Contemporary observers read the Provision the same way.  *See e.g.*, W. Christopher, *The Constitutionality of the Voting Rights Act of 1965*, 18 STAN. L. REV. 1, 7 (1965) (Provision prohibits "[d]enial of the right to vote in any federal election because of immaterial omissions or errors in registration forms").

For the next half-century, that same understanding prevailed in federal courts.  In 2004, one district court observed that no "case law … in [any] jurisdiction[] indicates that section [10101](a)(2)(B) was intended to apply to

5

the counting of ballots by individuals *already deemed qualified to vote*." *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371 (S.D. Fla. 2004). Indeed, courts nationwide agreed that the Materiality Provision targets "the practice of disqualifying potential voters for their failure to provide information irrelevant to determining their eligibility to vote." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); *see also Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008); *Thrasher v. Ill. Republican Party*, 4:12–cv–4071–SLD–JAG, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013); *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995). As the Third Circuit summarized: "Until recently, the Materiality Provision received little attention from federal appellate courts. When it did, the challenged state law prescribed rules governing voter registration." *Pa. State Conf. of NAACP*, 97 F.4th at 127. In fact, other than the now-repudiated *Migliori* decision, *every* federal appellate decision to apply the Materiality Provision has involved voter-registration rules rather than ballot-casting rules. *See, e.g., id.* at 127-28; *Schwier*, 340 F.3d 1284; *Browning*, 522 F.3d 1153.

A panel of this Court recently upheld a voter-registration rule under the Materiality Provision while acknowledging that extending the Provision beyond the voter-registration context is "possibly overbroad." *Vote.Org II*, 89 F.4th at 479 n.7. In particular, the *Vote.Org II* panel held that Texas's wet-

signature requirement for voter-registration applications is "material" and valid. *See id.* Even where the Provision applies, the panel explained, courts must defer to a State's "considerable discretion in deciding what is an adequate level of effectiveness to serve [the] important interest" of protecting "voter integrity." *Id.* at 485. Thus, courts must uphold state laws covered by the Provision whose "justification" is "more than tenuous." *Id.* at 484-85. That standard is "[u]ndeniabl[y]" met by laws aimed at confirming a would-be voter's identity: Whether such an individual is "actually who they say they are" is a material "premise for all [] statutory qualifications" to vote. *Id.* at 487.

**B.    *Texas Enacted S.B. 1 To Prevent Fraud And Promote Public Confidence In Elections.***

Texas provides voters many ways to complete and cast their ballots. All voters may vote in person on Election Day or during a two-week early-voting period. *See Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 140 (5th Cir. 2020) ("*LULAC*"); Tex. Elec. Code § 85.001(a). Such voters can vote at any polling place within their county. Tex. Elec. Code § 43.007. Texas also permits several groups of voters—the elderly, disabled, incarcerated, and those out-of-state during the voting period—to vote by mail. *See* Tex. Elec. Code §§ 82.001-.004; *see also Tex. Democratic Party v. Abbott*, 961 F.3d 389, 414 (5th

Cir. 2020) (Ho, J., concurring) ("For nearly a century, mail-in voting has been the exception—and in-person voting the rule—in Texas.").

S.B. 1's reforms responded to "the myriad difficulties experienced by state election officials concerning mail-in ballots during the 2020 election cycle." Stay Order 2. Prior to that election, Texas took unprecedented action to ensure all Texans the opportunity to vote safely amid the COVID-19 pandemic. *See, e.g.*, Proclamation, No. 41-3752, 45 Tex. Reg. 5455, 5456–57 (Aug. 7, 2020). For example, Governor Abbott extended the early-voting period ahead of the November general election and allowed counties to accept hand-delivered mail ballots before Election Day. *See id.* at 5457.

Unfortunately, that year's election administration also spawned several high-profile controversies. For example, Harris County unlawfully sent mail-ballot applications to all registered voters over the age of 65, set up "drive-through" voting locations, kept early-voting locations open overnight, and established 12 ballot "drop boxes." ROA.21916-21917; *see also State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (holding that Harris County unlawfully sent unsolicited mail-ballot applications). Other counties set up multiple drop-box locations, even as most counties had only one. *See LULAC*, 978 F.3d at 141. These local actions created inconsistent rules across counties and hindered poll watchers from observing ballot drop-offs as Texas law entitles them to do. *See*

*id.*; Jody Barr, *Lawsuit planned over Travis County Clerk's poll watcher 'sequester' during ballot counting*, Kxan (Nov. 9, 2020), https://perma.cc/D5H5-WTDT (discussing problems in Travis County).

Simultaneously, many Texans were concerned about the risk of fraud in Texas's elections. *See, e.g.*, University of Texas/Texas Tribune Poll, at 20 (2021), https://perma.cc/H9QP-UWCK. Those fears were not unfounded: In 2020, Denton County Elections Administrator Frank Phillips successfully detected a scheme to submit fraudulent vote-by-mail applications and ballots in a mayoral election. *See* ROA.22627-22628, 22634-22635; A. Samuels, *Carrollton mayoral candidate arrested on suspicion of fraudulently obtaining mail-in ballots*, Tex. Tribune (Oct. 8, 2020), https://perma.cc/S6PG-Y438.

In response to such incidents, Governor Abbott "made election integrity an emergency item" for the 2021 legislative session, explaining that "[i]n the 2020 election, [Texans] witnessed actions … that could risk the integrity of our elections and enable voter fraud." *Governor Abbott Prioritizes Election Integrity this Legislative Session*, WBAP (Mar. 15, 2021), https://www.wbap.com/2021/03/15/governor-abbott-prioritizes-election-integrity-this-legislative-session/. The Legislature responded. After months of debate, compromises between competing draft bills, multiple public hearings, and two special sessions, the Legislature passed S.B. 1—a bill designed to

"reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the ballot, promote voter access, and ensure that all legally cast ballots are counted." S.B. 1, § 1.04. Governor Abbott signed it into law on September 7, 2021.

S.B. 1 regulates many aspects of Texas's elections, including voter registration, early voting, poll watching, voter assistance, and vote harvesting. *See La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 304 (5th Cir. 2022). As relevant here, S.B. 1 adopted modest changes to Texas's mail-voting rules.

In order to vote by mail in a given year, an individual must submit a signed application to the county early-voting clerk. Tex. Elec. Code §§ 84.001, .007. Applicants must provide their "name and the address at which the applicant is registered to vote," the reason they are eligible to vote by mail, and a mailing address, if different from their registration address. *Id.* § 84.002(a)(1). Once approved, an applicant can vote by mail for the rest of the year. *Id.* § 86.0015(a).

S.B. 1 amended the mail-voting process to require voters applying for— and, later casting—a mail ballot to provide:

> (A) the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety;

10

(B) if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number; or

(C) a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B).

S.B. 1, § 5.02 (codified at Tex. Elec. Code § 84.002(1-a)); S.B. 1, § 5.07 (codified at Tex. Elec. Code § 86.001(f)-(f-2)).  Notably, this is the same identification information Texans must provide when registering to vote, *see* Tex. Elec. Code § 13.002(c)(8), in line with federal requirements in the Help America Vote Act ("HAVA"), 52 U.S.C. § 21083(a)(5)(A).

S.B. 1 thus establishes an apparent hierarchy among acceptable identification numbers:  A Department of Public Safety number is required for individuals who have been issued one, and the last four digits of a Social Security number may be provided by individuals who have not.  Nonetheless, to ease the burden of complying with S.B. 1, the Secretary of State has advised that voters may provide either number, and election officials have encouraged voters to provide both numbers on applications and ballot carrier envelopes. *See* ROA.33224.  Election officials have accepted applications and ballots with either (or both) numbers, so long as a provided number matches a number recorded for the voter in the State's voter-registration database, Texas Election Administration Management ("TEAM"). *Id.*

11

Section 5.07 of S.B. 1 requires election officials to deny a mail-ballot application if the applicant provides no number or a number that does not match the number the individual provided during voter registration.  S.B. 1, § 5.07 (codified at Tex. Elec. Code § 86.001(f)-(f-2)).  Texas law grants applicants a right to cure a defective mail-ballot application.  *See* Tex. Elec. Code § 86.008; ROA.33219, 33221-33222.  Election officials notify applicants of a defect by either (i) "return[ing] the application … or deliver[ing] an official application form to the applicant," along with a written explanation of the defect and how to cure it, or (ii) telephone or e-mail if the application deadline is looming.  Tex. Elec. Code §§ 86.008(a)-(c-1).  Curing may be accomplished in person, by mail, or online through Texas's "Ballot Tracker."  *See id.* § 86.008; ROA.33219, 33221-33222.  Anyone unable to cure an application retains the right to vote in person through Election Day.  *See* Tex. Elec. Code §§ 84.007(c), 84.031(b).

Once a mail-ballot application is approved, election officials mail the voter a ballot, a ballot envelope in which to place the ballot, and a carrier envelope in which to place the ballot envelope and ballot.  Tex. Elec. Code § 86.002(a).  Even before S.B. 1, voters were required to provide certain information on the carrier envelope, such as a name, address, and signature.  *Id.* § 86.013.  S.B. 1 adds a new requirement:  Voters must record on the carrier

envelope the same number they successfully used to *apply* for the mail ballot, *id.* § 86.002(g)-(i)), or their ballot will be rejected, S.B. 1, § 5.13 (codified at Tex. Elec. Code § 87.041(b), (d-1), (e)).

S.B. 1 created a new curing right for Texans who submit defective mail ballots, including due to noncompliance with S.B. 1's identification requirement. Tex. Elec. Code § 87.0411; ROA.33221-33222. Election officials notify voters of any defect by either (i) returning the carrier envelope and a "corrective action form" to the voter or (ii) by telephone or e-mail if the mail-ballot submission deadline is looming. Tex. Elec. Code § 87.0411; *see also id.* § 87.0271(b). A voter may cure a defective mail ballot during the six days after Election Day, Tex. Elec. Code § 87.0271, and may do so online through the Ballot Tracker, by mail, or in person. ROA.33221-33222. Anyone unable to cure a mail ballot retains the right to vote in person through Election Day. Tex. Elec. Code §§ 84.032, 84.035.

Thus, election officials applying S.B. 1's identification requirements do not make any determination regarding any individual's qualifications to vote. *See, e.g.*, ROA.33224. Election officials do not "disqualify" individuals who fail to comply with S.B. 1's identification requirements, remove them from the list of registered voters, or prevent them from voting in person or in future elections. *Schwier*, 340 F.3d at 1294. Instead, they simply decline to accept

noncompliant applications or to count noncompliant ballots "because [individuals] did not follow the rules for" completing the application or "casting a ballot." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental); *cf. Pa. State Conf. of NAACP*, 97 F.4th at 133.

The 2022 primary and general elections were conducted under S.B. 1. Despite Plaintiffs' fears that S.B. 1 would suppress voter turnout, turnout in Texas in the 2022 general election compared favorably to past turnout and national trends. *See* ROA.13180-13181. Although the mail-ballot rejection rate was unusually high in the March 2022 primary, it plummeted to just 2.7% during the general election. *See* ROA.13204-13206; *see also* ROA.13227 (Plaintiffs' expert concluding "the uncured/uncanceled rejection rate [to] be 2.5%"). Moreover, in the 2022 general election, nearly half of those whose ballots were initially rejected under S.B. 1 successfully cured their ballots. ROA.13203-13205. That includes member of Appellee REVUP-Texas. *See* ROA.40980-40981.

In sum, out of more than 8.1 million votes cast in the 2022 general election, only 6,355 mail ballots were rejected for reasons related to S.B. 1. *See* ROA.13201. "That is well less than one out of every thousand votes statewide." *Id.* at 13201-02. Multiple election officials testified that, as voters have become more familiar with S.B. 1, overall mail-ballot rejection rates have fallen to

historical levels—or even *lower*. *See, e.g.*, ROA.22523-22525 (Bexar County rejection rate lower in 2022 general election than in 2020 general election); ROA.22628-22630 (Denton County); ROA.22846-22847 (Secretary of State).

Indeed, despite their best efforts, Plaintiffs have not produced even a single voter who was unable to vote because of S.B. 1's identification rules. Plaintiffs initially identified one voter, Teri Saltzman, whose sworn declaration recounted that her mail ballot was rejected in the March and November 2022 elections because of those rules. ECF No. 123 at 3. At trial, however, Ms. Saltzman testified that her ballot was rejected in the March primary election for a reason unrelated to S.B. 1, and that her ballot was accepted in the general election without incident. *Id.* Plaintiffs subsequently informed this Court that Ms. Saltzman's sworn declaration was "incorrect" on these points. *Id.*

### C.   *Private Plaintiffs And The United States Challenge S.B. 1's Identification Rules.*

Even before Governor Abbott signed S.B. 1 into law, various organizations challenged it in federal court. *See, e.g.*, No. 1:21-cv-780, Doc. 1 (complaint filed Sept. 3, 2021). As relevant here, OCA Greater-Houston, REVUP-Texas, and the League of Women Voters of Texas (collectively, "OCA Plaintiffs") argued that S.B. 1's vote-by-mail identification requirements violate the Materiality Provision. The United States later brought a substantially identical

Materiality Provision challenge.  *See* 5:21-cv-1085, Doc. 13.

The cases were consolidated with other lawsuits challenging almost every provision of S.B. 1.  ROA.33215 n.2.  The Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee intervened as defendants after this Court reversed the District Court's denial of their intervention motion.  *See La Union Del Pueblo Entero*, 29 F.4th at 306-08.

Nearly two years of extensive discovery followed, in which Plaintiffs sought documents from and deposed a host of Texas election officials.  *See La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 231 (5th Cir. 2023) (reversing District Court's rejection of non-party state legislators' legislative-privilege assertion).  Eventually, the OCA Plaintiffs, United States, State Defendants, and Intervenor-Defendants all moved for summary judgment on the Materiality Provision challenges.

The District Court granted Plaintiffs' motions in relevant part. ROA.33266-33267.  In an opinion issued only after a lengthy bench trial on Plaintiffs' remaining claims, the District Court held that the Materiality Provision preempts all state paper-based election rules unless they demand information "material to [a voter's] qualification to vote in a given election."

16

ROA.33240.  The District Court thought it "is self-evident that a voter's ID number is not material to her eligibility to vote under Texas law."  ROA.33241. It therefore enjoined State Defendants from enforcing S.B. 1's identification requirements.  ROA.33262-33267.

A panel of this Court stayed the injunction pending appeal.  *See* Stay Order.  Among other reasons, the panel concluded that it would likely reverse because the Materiality Provision does not apply to "vote-by-mail restrictions." *Id.* at 5-6.  Mere weeks later, the Third Circuit rejected the rationale espoused by the District Court, holding that the Materiality Provision "only applies when the State is determining *who* may vote" and "does not apply to rules ... that govern *how* a qualified voter must cast his ballot for it to be counted."  *Pa. State Conf. of NAACP*, 97 F.4th at 125.

## SUMMARY OF ARGUMENT

**I.**   **A.**   S.B. 1's identification requirements cannot violate the Materiality Provision for three reasons.

**1.**   Neither a vote-by-mail application nor a mail ballot is a "record or paper" related to an "application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B).  The words "registration" and "application" refer to documents used in "voter registration specifically."  *Vote.Org I*, 39 F.4th at 305 n.6; *see Pa. State Conf. of NAACP*, 97 F.4th at 129-133.  Because the challenged

17

S.B. 1 requirements do not apply to voter-qualification determinations made during Texas's voter-registration process, the Materiality Provision has nothing to say about them.

**2.** Nor are the challenged identification requirements used "in determining whether [an] individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B). Like virtually every other State, Texas determines whether individuals satisfy the State's voter-qualification rules during the *voter-registration* process. And only *registered* Texans can apply for or receive mail ballots. Thus, the challenged requirements apply only to individuals *already* "determin[ed] ... qualified under State law ... to vote," *id.*, and application of the requirements does not result in a determination whether any individual is qualified to vote. The Materiality Provision therefore does not reach them.

**3.** Finally, S.B. 1's identification rules do not "deny" anyone "the right to vote." The Materiality Provision's plain text confirms as much: the operative statutory definition of "vote" refers to "all action necessary to make a vote effective" under state law. 52 U.S.C. § 10101(e). Accordingly, the Provision prohibits only state rules that "deny" voters the "*right*" to *take* "all action necessary to make a vote effective" under state law, not rules that *delineate* those actions. *Id.* §§ 10101(a)(2)(B) (emphasis added), 10101(e).

18

This plain text tracks longstanding understanding of the term "right to vote." When the Provision was enacted, that term had a well-established meaning: It guaranteed "access to the polls." *Pa. State Conf. of NAACP*, 97 F.4th at 133. But then, as today, individuals were still required to follow neutrally-applied "ballot-casting" rules for their ballots to be counted. *Id.* at 133-34. "[A]nd the failure to follow [such a] rule[] constitutes the forfeiture of the right to vote, not the denial of that right." *Id.* at 135 (cleaned up). S.B. 1's identification rules are ballot-casting rules that delineate *how* qualified individuals vote; they therefore do not "deny" anyone "the right ... to vote."

**B.** The District Court's contrary reading is untenable. It would disable States from pursuing through paper-based regulations *any* interest other than determining voter eligibility. That would jeopardize a host of longstanding ballot-casting rules, including signature requirements, rules against writing on secrecy envelopes, and witness requirements. Under the federalism canon, such a dramatic withdrawal of States' authority requires a clear statement— which the Materiality Provision lacks. The District Court's reading would also render the Provision unconstitutional under the Fifteenth Amendment by unmooring it from the enacting Congress's findings, which were limited to voter registration.

**II.**    The framework applied by this Court in *Vote.Org II* does not extend beyond voter-registration rules.  Even if this Court applies that framework here, it should reverse because S.B. 1's identification requirements easily pass muster.  They are designed to confirm that would-be voters "actually [are] who they say they are" and, thus, to protect election integrity and prevent fraud in mail voting—just like identification requirements for individuals who vote in person.  *Vote.Org II*, 89 F.4th at 487.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment and questions of statutory interpretation *de novo*.  *Vote.Org II*, 89 F.4th at 469.

## ARGUMENT

By its plain text, the Materiality Provision does not apply to S.B. 1's vote-by-mail identification requirements.   Precedent, legislative history, and bedrock interpretive principles all bolster that conclusion.  Even if this Court disagrees, it should uphold the challenged provisions under the deferential standard established in *Vote.Org II*.

**I.    S.B. 1'S IDENTIFICATION REQUIREMENTS DO NOT VIOLATE THE MATERIALITY PROVISION.**

"States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997).  And "States

have separate bodies of rules for separate stages of the voting process." *Pa. State Conf. of NAACP*, 97 F.4th at 129-30. "One stage, voter qualification, deals with *who* votes" and is governed by rules designed to answer that question. *Id.* at 130. Meanwhile, a "different set of rules" "deals with *how* ballots are cast by those previously authorized to vote." *Id.*; *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (distinguishing laws that "govern[] the registration and qualifications of voters" from those regulating "the voting process itself"); *see also Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental). Post-registration rules often have nothing to do with assessing who is qualified to vote; they pursue other objectives, like the "prevention of fraud" or facilitating the "counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). Yet according to the District Court, the Materiality Provision prohibits States from adopting *any* mandatory paper-based election rule—including any ballot-casting rule—unless it is used to determine voter eligibility. ROA.33240-33247.

That makes no sense. "[I]t would be absurd to judge the validity of voting rules based on whether they are material to eligibility." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental); *see Pa. State Conf. of NAACP*, 97 F.4th at 136. Almost every State, including Texas, determines voter eligibility during a voter-registration process. *See, e.g.*, U.S. Election Assistance Comm'n, *Voter FAQs*, https://perma.cc/FNQ3-SLC4 (last visited Apr. 18, 2024) (noting 49 States

require voters "to be registered to vote to participate in an election"). The Materiality Provision governs only qualification determinations during *that* process, not rules governing requesting or casting of ballots by "those previously authorized to vote." *Pa. State Conf. of NAACP*, 97 F.4th at 130; *see Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental); *Vote.Org I*, 39 F.4th at 305 n.6; *Friedman*, 345 F. Supp. 2d at 1371 (explaining that the Provision does not regulate "the counting of ballots [cast] by individuals *already deemed qualified to vote*"). Because S.B. 1's identification requirements are not used during voter registration to assess voter qualifications, they do not even *implicate*, let alone violate, the Materiality Provision.

### A.    *S.B. 1's Identification Requirements Do Not Implicate The Materiality Provision.*

The Materiality Provision forbids state actors to:

> deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).

In at least three ways, the Provision's plain text confirms that S.B. 1's identification requirements cannot violate it. Those requirements do not apply to any "application, registration, or other act requisite to voting," are not used

"in determining" any individual's qualifications to vote, and do not result in "den[ial]" of any individual's "right … to vote." *Id.* Instead, they govern the validity of vote-by-mail applications and ballots purportedly submitted by individuals who have "already been … found qualified by an election official." ROA.33246. And to the extent any doubt remains, the federalism and constitutional avoidance canons require the conclusion that the Provision does not apply to these requirements.

> **1.   S.B. 1's Identification Requirements Do Not Apply To A "Record Or Paper" Related To An "Application, Registration, Or Other Act Requisite To Voting."**

The Materiality Provision applies only to a "record or paper" related to an "application, registration, or other act requisite to voting." *Id.* These terms refer to documents used in "only voter registration specifically." *Vote.Org I*, 39 F.4th at 305 n.6; *see Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental); *Pa. State Conf. of NAACP*, 97 F.4th at 132-33.

When this language was enacted, the terms "application" and "registration" were interchangeable, and referred to voter registration. H.R. Rep. 88-914, pt. 1, at 19 (Provision bars "registration officials" from "disqualifying an applicant for immaterial errors or omissions"); *id.* at 77 (referring to "application to register"); *id.*, pt. 2, at 5 (referring to efforts to "defeat [African-American] registration" by "rejecting … applications" to vote);

*id.* (faulting "registrars" for "rejecting [African-American] application[s]" in registration process); *Pa. State Conf. of NAACP*, 97 F.4th at 132-33 (analyzing legislative history and reaching same conclusion); *cf. In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989) (Easterbrook, J.) (recognizing that legislative history is appropriately used to "reconstruct the legal and political culture" in which the text was enacted).  And States still use those terms to refer to voter registration today.[1]

The residual phrase "other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B), likewise refers only to voter registration, *see Pa. State Conf. of NAACP*, 97 F.4th at 132.  A straightforward application of the *ejusdem generis* canon compels that interpretation.  *Id.*  "[W]here general words follow an enumeration of specific items, [they] are read as applying only to other items akin to those specifically enumerated."  *Harrison v. PPG Indus.*, 446 U.S. 578, 588 (1980).  Here, that means the residual phrase must be "controlled and defined by reference to the enumerated categories," *Cir. City Stores v. Adams*, 532 U.S. 105, 115 (2001), of "application" and "registration," 52 U.S.C. § 10101(a)(2)(B).

---

[1] *E.g.*, *Voter Registration*, Md. State Bd. of Elections ("Voter Registration Application"), https://perma.cc/FXC6-QKUD (last visited Dec. 8, 2023); *Voter Registration Application*, D.C. Bd. of Elections, https://perma.cc/B8GX-K4E7 (last visited Apr. 18, 2024); *National Voter Registration Application Form for U.S. Citizens*, U.S. Election Assistance Comm'n, https://perma.cc/GEU2-9SNN (last visited Apr. 18, 2024).

*See Pa. State Conf. of NAACP*, 97 F.4th at 132 ("The phrase 'act requisite to voting' also draws its import from the context in which it appears."); *Liebert*, 2024 WL 2078216, at \*13; *Ball v. Chapman*, 289 A.3d 1, 38 n.11 (Pa. 2023) (opinion of Brobson, J.).

Applying *ejusdem generis* is the only way to give meaning to the entire phrase "application, registration, or other act requisite to voting."  Ignore the canon, and the words "registration" and "application" become "superfluous"— an outcome courts must avoid.  *Pa. State Conf. of NAACP*, 97 F.4th at 138; *Liebert*, 2024 WL 2078216 at \*13; *see also Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012).  If the residual phrase already captured *all* voting-related paperwork, the first two categories were a waste of ink.

Conversely, applying *ejusdem generis* leaves the residual phrase work to do: "prevent[ing] government officials from creating a new voter qualification process and avoiding the requirements of the Materiality Provision simply by calling the process something besides 'registration' or 'application.'"  *Liebert*, 2024 WL 2078216, at \*15.  The residual phrase may also cover forms that citizens must submit to *remain* registered to vote once deemed qualified, such as a declaration by a released felon that he has paid all outstanding fines or by an inactive voter that she remains at her registered address.

Moreover, a context-sensitive interpretation of the residual phrase harmonizes the statute's reach with precedent and Congress's obvious aim: preventing States from "defeat[ing]" African-American voter "registration" by denying registration applications based on "minor misspelling errors or mistakes in age or length of residence."  H.R. Rep. No. 88-914, pt. 2, at 5; *see Pa. State Conf. of NAACP*, 97 F.4th at 132-33; *supra* at 4-5.

The Provision's crucial but cabined scope dooms Plaintiffs' challenges.  Only registered voters can apply for or cast mail ballots, *see* Tex. Elec. Code §§ 82.001–.004, 82.007–.008, as the District Court acknowledged, ROA.33246.  S.B. 1's identification requirements are not applied during the voter-registration process, but instead to determine the validity of vote-by-mail applications and ballots.  The requirements therefore do not implicate, let alone violate, the Materiality Provision.  *See Pa. State Conf. of NAACP*, 97 F.4th at 131-35.

### 2.     S.B. 1's Identification Requirements Are Not Used "In Determining" Any Individual's Qualifications To Vote.

The Materiality Provision also requires that the paper or record be used "in determining" whether someone is "qualified" to vote.  § 10101(a)(2)(B).  When paired with a "verbal noun" (like "determining") the word "in" is typically "equivalent in sense to a temporal clause introduced by *when*, *while*, *if*."  *In*, prep., def. 21(b), *Oxford English Dictionary* (3d ed. 2021, rev. online Mar. 2023).

Here, that means the Provision applies only to actions taken *when determining* an individual's eligibility.  *See Ball*, 289 A.3d at 38 (opinion of Brobson, J.); *Liebert*, 2024 WL 2078216 at *2, *13; *see also Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental).  As the Third Circuit explained, these words "describe a process—namely, determining whether an individual is qualified to vote." *Pa. State Conf. of NAACP*, 97 F.4th at 131.  Voting papers are covered by the Provision "only" when they are used *during that process* and "in that context." *Id.*

The structure of 52 U.S.C. 10101(a), in which the Provision resides, underscores the point.  *Id.* at 131; *Liebert*, 2024 WL 2078216, at *13.  The immediately preceding provision—§ 10101(a)(2)(A)—requires "uniform standards *for vot[er] qualifications*" within the same political subdivision.  52 U.S.C. § 10101(a) (subsection title) (emphasis added).  It also uses a substantially identical phrase—"in determining whether any individual is qualified under State law or laws to vote in any election"—to limit its reach to voter-qualification determinations.  *Id.* § 10101(a)(2)(A).  And the subparagraph immediately following the Provision, which restricts use of literacy tests formerly used during voter registration, *see, e.g.*, *Lassiter v.*

27

*Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 46 (1959), is likewise limited to "qualification" determinations, 52 U.S.C. § 10101(a)(2)(C).[2]

Subsection (e) further reinforces the qualification-and-registration focus of § 10101(a). That subsection empowers courts to address systemic violations of "*any* right or privilege secured by subsection (a)," including the Materiality Provision. *Id.* § 10101(e) (emphasis added). Yet the only remedy it authorizes is "an order declaring [an applicant] qualified to vote." *Id.* Subsection (e) thus confirms that the "right" secured by the Provision is the right of qualified individuals to *register* to vote. If the Provision extended beyond voter-qualification determinations during the registration process, subsection (e)'s remedy would not enable courts to redress the violation of "*any* right" secured by § 10101(a). *Id.* (emphasis added).

By contrast, when Congress sought to prohibit intimidation of anyone engaged in the *act of voting*, it assigned the topic its own subsection, rather than sandwich it between two provisions about voter registration and qualifications. *See id.* § 10101(b).

Texas, like virtually every State, determines whether an "individual is qualified to vote," *id.* § 10101(a)(2)(B), during the voter-registration process,

---

[2] Confirming that point, Congress later enacted a separate provision banning literacy tests at all other steps of the voting process. *See* 52 U.S.C. § 10501.

*see* Tex. Elec. Code § 13.002; ROA.33217 (discussing Texas's voter-registration process). S.B. 1's identification requirements apply only *after* the State has *already* found the individual qualified. ROA.33244, 33246. Election officials applying those requirements do not make any qualification determinations— as the District Court recognized. ROA.33261. Officials do not "disqualify" individuals who fail to comply with the requirements, remove them from the voter-registration list, or prevent them from voting in person or in future elections. *Schwier*, 340 F.3d at 1294. Instead, they merely determine that noncompliant applications and ballots are invalid and that voters retain a right to vote in the current election—either by curing or voting in person—and in future elections. *E.g.*, S.B. 1, § 5.02 (codified at Tex. Elec. Code § 84.002(1-a)); S.B. 1, § 5.07 (codified at Tex. Elec. Code § 86.001(f)-(f-2)). S.B. 1's identification rules are not used "in determining whether [an] individual is qualified under State law … to vote" and, thus, do not implicate the Materiality Provision. 52 U.S.C. § 10101(a)(1)(B).

### 3. S.B. 1's Identification Requirements Do Not "Deny The Right Of Any Individual To Vote."

The Materiality Provision prohibits only "deny[ing] the right of any individual to vote"—it does not preclude States from imposing mandatory rules for election administration like those Plaintiffs challenge. *See* 52 U.S.C.

§ 10101(a)(2)(B); *Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental); *Pa. State Conf. of NAACP*, 97 F.4th at 125. For at least two reasons, this clause confirms that S.B. 1's identification rules fall beyond the Materiality Provision's sensible, and sensibly limited, scope.

*First*, the "right to vote" does not encompass mail voting, so mail-voting rules do not deny any individual that right. The stay panel already confirmed that point. *See* Stay Order 5 (mail-in voting rules "do not deny anyone the right to vote" under "the Materiality Provision" "because they only affect the ability of some individuals to vote by mail"). Indeed, by the mid-1960s, the "right to vote" was a well-established concept with a well-established meaning. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 247 (1962) (Douglas, J., concurring) (the "right to vote" was "protected by the judiciary long before that right received the explicit protection" in civil-rights statutes). By using that phrase, the Materiality Provision did not encode a "novel principle," but instead "codified a *pre-existing* right" whose contours must be discerned from "history." *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 20 (2022); *Brnovich v. DNC*, 594 U.S. 647, 649 (2021) (consulting the "standard practice" at the time "when § 2 [of the Voting Rights Act] was amended" to determine what "furnish[es] an equal 'opportunity' to vote in the sense meant by § 2").

When the Provision was enacted, the "right to vote" meant the right to register to vote and to cast a ballot on equal terms with other registered voters. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969). It was *not* understood to entail a right to vote by mail, since mail voting was limited to a small number of situations. *See, e.g.*, *id.* at 804 (discussing statute permitting mail voting only for voters "absent from the county" and those "unable to appear at the polls because of physical incapacity, religious holidays, or election duties"). Just a few years after the Provision became law, the Supreme Court in *McDonald* unanimously held that "the right to vote" does not encompass the "right to receive absentee ballots," *id.* at 807—a holding this Court recently and expressly reaffirmed. *See Tex. Democratic Party*, 961 F.3d at 403-06 ("*McDonald* lives.").

Therefore, application of S.B. 1's identification rules *cannot* deny an individual the "right to vote" under the Materiality Provision. Stay Order 5. After all, anyone unable to vote by mail successfully—including under S.B. 1's identification rules—remains free to vote in person, either on Election Day or during two weeks of early voting. As this Court explained, "Texas permits [voters] to vote in person; that is the exact opposite of 'absolutely prohibiting' them from doing so." *Tex. Democratic Party*, 961 F.3d at 404 (quoting *McDonald*, 394 U.S. at 808 n.7).

31

*Second*, more generally, mandatory election-administration and ballot-casting rules do not deny anyone "the right to vote" under the Materiality Provision. *See Pa. State Conf. of NAACP*, 97 F.4th at 133-34; *accord Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental). The plain statutory text confirms as much. The operative definition of "vote" refers to "all action necessary to make a vote effective" under state law. 52 U.S.C. § 10101(e). Accordingly, the Materiality Provision prohibits only state rules that "deny" voters the "*right*" to *take* "all action necessary to make a vote effective" under state law, not the underlying rules that *delineate* those "action[s]." *Id.* §§ 10101(a)(2)(B) (emphasis added), 10101(e).

This text tracks longstanding understanding of the term "right to vote." Courts have long understood the "right to vote" to require election officials to count any "lawful and regular" ballot "entitled to be counted" under state law. *See, e.g.*, *United States v. Mosley*, 238 U.S. 383, 385-86 (1915). In 1964 as now, the "right to vote" was not understood to vitiate neutral, generally applicable state laws governing the act of casting a ballot. *See, e.g.*, *id.*; *Brnovich*, 594 U.S. at 668-670.

*McDonald*, for instance, recognized that restrictions on mail voting may make casting a ballot "extremely difficult, if not practically impossible," for a select handful of individuals. 394 U.S. at 810. But because such restrictions do

not formally deny anyone—even within that category—"the exercise of the franchise," they do not implicate "the right to vote." *Id.* at 807-08. In contrast, laws that "totally den[y] the electoral franchise to a particular class of residents" by deeming them not "eligible to vote" implicate "the right to vote." *Rosario v. Rockefeller*, 410 U.S. 752, 756-57 (1973). Laws regulating the voting process, however, such as "a time deadline," do not "disenfranchise" anyone. *Id.* at 757.

This distinction—between laws that disenfranchise by depriving eligible individuals of the opportunity to vote on equal terms and laws that regulate the receipt and casting of ballots—persists to this day. *See, e.g.*, *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental) ("Even the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the forfeiture of the right to vote, not the denial of that right."); *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 35 (2020) (Kavanaugh, J., concurral) ("[A] State's election [rule] does not disenfranchise voters who are capable of [following it] but fail to do so."); *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 952 (7th Cir. 2007) (distinguishing denials of the right to vote from regulations that cause some "eligible voters to disenfranchise themselves"), *aff'd*, 553 U.S. 181.

And that distinction informs the Materiality Provision's scope. As the Third Circuit recently confirmed, there is "no authority that the 'right to vote'

encompasses the right to have a ballot counted that is defective under" a State's otherwise valid ballot-casting rules. *Pa. State Conf. of NAACP*, 97 F.4th at 133. "If state law provides that ballots completed in different colored inks, or secrecy envelopes containing improper markings, or envelopes missing a date, must be discounted, that is a legislative choice that federal courts might review if there is unequal application, but they have no power to review" such choices under the Materiality Provision. *Id.* Only rules that deprive eligible individuals of all opportunity to vote on equal terms can violate the Provision; rules that regulate *how* eligible individuals receive and cast their ballots do not. *See, e.g.*, *id*; *accord Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental).

For this reason too, S.B. 1's identification requirements cannot "deny" the "right … to vote" under the Provision. Officials enforcing these requirements do not "disqualify potential voters," remove them from the list of registered voters, or prevent them from voting in the current or any future election. *Schwier*, 340 F.3d at 1294. Instead, they simply decline to accept noncompliant applications or to count noncompliant ballots "because [individuals] did not follow the rules for" completing the application or "casting a ballot." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental); *see Pa. State Conf. of NAACP*, 97 F.4th at 133. Such individuals are not denied the right to vote; they remain free to vote in any election on equal terms with, and according to the same rules as, all other

voters.  *See id.*; *accord Rosario*, <u>410 U.S. at 757</u>; *Wis. State Legislature*, <u>141 S. Ct. at 35</u> (Kavanaugh, J., concurral).

### 4. The Federalism Canon Bars Application Of The Materiality Provision to S.B. 1's Identification Requirements.

By extending the Materiality Provision beyond qualification determinations during the voter-registration process, the District Court's interpretation jeopardizes many longstanding election-administration and ballot-casting rules nationwide.  Since the Materiality Provision does not clearly require this result, the federalism canon forbids it.  *See Liebert*, <u>2024 WL 2078216</u> at *16.

Under that canon, courts must not read a statute "to significantly alter the balance between federal and state power" absent "exceedingly clear language" announcing that change.  *Ala. Ass'n of Realtors v. HHS*, <u>594 U.S. 758, 764</u> (2021).  Courts thus must avoid interpreting statutes to "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes."  *Clingman v. Beaver*, <u>544 U.S. 581, 593</u> (2005).

Indeed, States must provide a "complete code for ... elections," regulating not only voter qualifications, but also "supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns,"

among others. *Smiley*, 285 U.S. at 366; *see also Anderson*, 460 U.S. at 788; *Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental). Unsurprisingly, States have often enacted such regulations through paper-based requirements.

Voter-identification requirements are one such example. They regulate the casting of ballots, not qualification or registration of voters. They serve a legitimate purpose besides determining eligibility—*i.e.*, "deterring and detecting voter fraud." *Crawford*, 553 U.S. at 191. For instance, Denton County Election Administrator Frank Phillips, who successfully detected a mail-voting fraud scheme during the 2020 elections, testified that S.B. 1's identification provisions would have helped prevent that scheme. *See* ROA.22627-22628, 22634-22635.

Until quite recently, the Materiality Provision and paper-based ballot-casting rules coexisted peacefully, thanks to the universal understanding that the Provision did not cover "the counting of ballots by individuals *already deemed qualified to vote*." *Friedman*, 345 F. Supp. 2d at 1371; *see Pa. State Conf. of NAACP*, 97 F.4th at 127.

But over the last few years, activists have invoked the Materiality Provision as part of a nationwide campaign to weaken regulations of mail voting. And some courts, including the District Court below, have accepted their arguments. *See Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022) (blocking

requirement that individuals date mail ballots), *vacated* 143 S. Ct. 297 (2022); *In re Ga. Senate Bill 202*, 2023 WL 5334582, at \*8 (N.D. Ga. Aug. 18, 2023) (requirement to list birthdate on ballot); *Vote.Org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1334 (N.D. Ga. 2023) (requirement to sign absentee ballot application).

Left unchecked, that approach will doom countless statutes and erode the integrity of elections across the country. Under the District Court's logic, many other widespread, commonsense paper-based regulations are now federal civil-rights violations, merely because they further interests besides determining eligibility. These include:

- Mail-ballot signature requirements, *e.g.*, Tex. Elec. Code § 87.041(b); Ariz. Rev. Stat. § 16-547(A), (D); Cal. Elec. Code § 3011(a)(2); Fla. Stat. § 101.65(7); 10 ILCS § 5/19-5; Ky. Rev. Stat. § 117.085(2); La. Stat. § 18: 1306E.(1)(f); N.J. Stat. § 19:62-11(c); 25 Pa. Cons. Stat. §§ 3146.6(a), 3150.16(a); Wash. Rev. Code § 29A.40.091(1);

- Mail-ballot application signature requirements, *e.g.*, Tex. Elec. Code § 84.001(b); Ariz. Rev. Stat. § 16-542; Colo. Rev. Stat. § 31-10-1002(1); Ky. Rev. Stat. § 117.085(2); Md. Code § 9-305(a)(3)(i); Mass. Gen. Laws ch. 54 § 25B(a)(2); Tenn. Code § 2-6-202(a)(3);

- Requirements to have a witness sign a mail ballot or application, *e.g.*, Ala. Code § 17-11-7; Colo. Rev. Stat. § 31-10-1002(1); Ind. Code 3 § 3-11-10-29; Ky. Rev. Stat. § 117.085(7); La. Stat. §§ 18:1306E.(2)(a); Minn. Stat. § 203B.07(3); Vt. Stat. 17 § 2542(a); *see also Liebert*, 2024 WL 2078216, at \*2 (rejecting Materiality Provision challenge to witness requirement);

- Requirements to sign early-voting certificate, *e.g.*, Tex. Elec. Code § 86.006(a-2); Fla. Stat. § 101.657(4)(a); Ga. Comp. R. & Regs. § 183-1-

14.02(11); 10 ILCS § 5/19A-40, 45; Mass. Gen. Laws ch. 54 § 25B(b)(8), (c)(5);

- Requirements to date mail ballots, *see Pa. State Conf. of NAACP*, 97 F.4th at 125 (reversing injunction against date requirement);

- Prohibitions on voting for more candidates than there are offices, *e.g.*, Tex. Elec. Code § 65.011; Ariz. Rev. Stat. § 16-611; 15 Del. Code § 4972(b)(6); Fla. Stat. § 101.65(3); Pa. Cons. Stat. § 3063(a);

- Requirements to maintain pollbooks, *e.g.*, Tex. Elec. Code § 63.003; Fla. Stat § 101.23; 10 ILCS § 5/17-4; Mass. Gen. Laws § 25B(b)(7); 25 Pa. Cons. Stat. § 3050; Va. Code § 24.2-611;

- Secrecy envelope requirements, Ala. Code § 17-11-9; Fla. Stat. § 101.64; Ga. Code § 21-2-384(b); Ky. Rev. Stat. § 117.085(3); Mass. Gen. Laws ch. 54 § 25(B)(a)(10); N.J. Stat. § 19:63-12; N.M. Stat. § 1-6-8; 26 Okla. Stat. § 26-14-107(A)(1); 25 Pa. Cons. Stat. § 3146.4; S.C. Code § 7-15-370;

- Requirements to sign poll lists, *e.g.*, Tex. Elec. Code § 63.003; Ala. Code § 11-46-50; Ky. Rev. Stat. § 117.076; La. Stat. Ann. § 562.C; Tenn. Code 2-7-112(a)(2)(A);

- Voter assistance forms, *e.g.*, Tex. Elec. Code § 64.0322; Fla. Stat. § 101.051(4); Ind. Code § 3-11.5-4-13; Ky. Rev. Stat. 117.0863; Md. Code, Elec. Law § 9-308; Mass. Gen. Laws ch. 54 § 25B(a)(3), (14); 25 Pa. Cons. Stat. § 3058; Tenn. Code § 2-7-116; Va. Code § 24.2-649(A); and

- Laws requiring the signature of person returning a mail ballot, *e.g.*, Cal. Elec. Code § 3011(a)(9); 10 ILCS § 5/19-6; Ind. Code § 3-11-10-24(d).

In short, Plaintiffs' and the District Court's overbroad construction of the Materiality Provision would "tie state legislatures' hands in setting voting rules unrelated to voter eligibility." *Pa. State Conf. of NAACP*, 97 F.4th at 134; *see Liebert*, 2024 WL 2078216 at *14 ("[A] broader interpretation of the Materiality

Provision would mean that numerous rules related to vote casting would be invalid.").

The federalism canon forbids this extreme result. *Liebert*, 2024 WL 2078216, at \*16. For the reasons explained above, the Provision contains no "exceedingly clear language" expanding its reach beyond qualification determinations and voter registration to this plethora of commonsense state statutes. *Ala. Realtors*, 594 U.S. at 764. And the "lack of historical precedent" for this "broad" reading is a particularly "'telling 'indication' that [it] extends beyond the [Provision's] legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022). It is not plausible that so many commonplace rules would stand unchallenged for generations if the Provision outlawed them *all* nearly 60 years ago. *See West Virginia v. EPA*, 597 U.S. 697, 725 (2022) ("[T]he want of assertion of power by those who presumably would be alert to exercise it, is … significant in determining whether such power was actually conferred."). Congress did not "hide [this] elephant[]" in the Provision's obscure "mousehole[]." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

### 5. Constitutional Avoidance Bars Application Of The Materiality Provision To S.B. 1's Identification Requirements.

Finally, constitutional avoidance requires reading the Materiality Provision to cover voter-eligibility determinations in the registration process,

rather than voting rules generally.  Courts must construe statutes to avoid "serious doubt[s]" about their "constitutionality" when another "plausible" construction is available.  *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). Intervenor-Appellants' reading of the Provision is at least plausible, whereas the District Court's would render it unconstitutional.

Under the Fifteenth Amendment, States may not deny or abridge the right to vote "on account of race, color, or previous condition of servitude."  U.S. Const. amend. XV, § 1.  Congress has the power to "enforce" that prohibition "by appropriate legislation."  *Id.* § 2.

Using this enforcement power, Congress may pass laws "to remedy … violation[s] of rights" guaranteed by the Fifteenth Amendment and "enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct."  *Tennessee v. Lane*, 541 U.S. 509, 518 (2004).  But Congress *lacks* power to redefine "the substance" of the Fifteenth Amendment's guarantee.  *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).  Thus, there "must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."  *Id.* at 520.  "Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one."  *Id.* at 530.  To assess congruence and proportionality, courts look to the "record" compiled by the enacting

Congress.  *Id.* at 531-32; *accord Shelby Cnty. v. Holder*, 570 U.S. 529, 553-55 (2013).

Congress enacted the Materiality Provision using its Fifteenth Amendment enforcement authority.  *See United States v. Mississippi*, 380 U.S. 128, 138 (1965).  Because all agree that S.B. 1's identification requirements are *constitutional*, the Materiality Provision can only be justified as prophylactic legislation.  And when properly limited to voter registration, the Provision is a reasonably tailored prophylactic measure:  Congress identified Fifteenth Amendment violations in efforts by state "registrars" to "defeat" black voter "registration" based on "minor … errors or mistakes" in applications for registration.  H.R. Rep. 88-914, pt. 2, at 2; *supra* at 4-5.  Congress found ample evidence of unscrupulous officials discriminating during in-person voter registration, which was common in the 1960s and during which officials could observe the voter's race.  *See id.*

Congress's chosen remedy—forbidding registrars to deny applications based on immaterial mistakes—fits the violations it identified.  And its invasion of state prerogatives is minimal.  The Provision entirely respects States' role in defining voter eligibility.  It simply keeps registrars honest by forbidding them from relying on irrelevant considerations when determining eligibility.

41

Under the District Court's reading, by contrast, the Provision does far more than remedy violations of the Fifteenth Amendment. The record reveals no legislative consideration of discriminatory voting practices *beyond* the registration process, such as ballot-casting rules applied by officials with no knowledge of the voter's race. *See Pa. State Conf. of NAACP*, 97 F.4th at 132-33. Even if it did, extending the Provision beyond registration would be an "absurd" way to combat discrimination. *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental); *see also Pa. State Conf. of NAACP*, 97 F.4th at 136 ("[V]ote-casting rules … serve entirely different purposes than voter-qualification rules."). States have myriad legitimate reasons to regulate the electoral process, including the casting of ballots, besides ensuring eligibility. *Supra* at 35-36. Thus, it is unsurprising that Congress neither compiled a record to support, nor enacted, a statute requiring States to apply ballot-casting rules based only on considerations material to eligibility.

Indeed, deeming illegitimate a host of state interests long thought "necessary" to vindicate, *Smiley*, 285 U.S. at 366, would represent "an uncommon exercise of congressional power" that could only "be justified by 'exceptional conditions,'" *Shelby Cnty.*, 570 U.S. at 545. But Congress's record does not attempt to justify that drastic measure. It never suggests, for instance,

that commonsense state interests in preventing fraud or ensuring timely voting must be cast aside to advance the statute's objectives.

That silence is particularly telling because the House Report responded to an objection that the Act's voting provisions exceeded Congress's enforcement power. The bill's advocates replied that "wide-ranging evidence has been produced before Congress" that "State *voter-qualification* standards and procedures have been regularly used by some States to deny people the right to vote because of their race," and that "Congress has the authority to eliminate such denials through legislative means." H.R. Rep. 88-914, pt. 2, at 6 (emphasis added). The Report did not even hint at any findings implicating laws *beyond* qualification determinations during voter registration. *See id.*

To be sure, this Court in *Vote.Org II* concluded that the Materiality Provision falls within Congress's enforcement power. 89 F.4th at 487. *But see* Stay Order 5-6 (suggesting Provision must be read to prohibit only racially-discriminatory rules to avoid constitutional problem). But it did so *in a voter-registration case* while explicitly declining to decide whether the Provision applies to "vote counting" rules. *Vote.Org II*, 89 F.4th at 479 n.7; *see infra* at 50-59. Intervenor-Appellants agree that the Provision is constitutional when construed—in line with its plain text—to reach *only* voter-qualification

determinations. Stretched further, the Provision would forfeit its status as a congruent and proportional prophylactic rule.[3]

### B. The District Court's Reasoning Is Flawed.

The District Court gave four main reasons for rejecting Intervenor-Appellants' textual construction of the Materiality Provision. All are unpersuasive.

**1.** The District Court's primary justification for decoupling the Provision from voter registration was the statutory definition of "vote," which includes "having [one's] ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(a)(3)(A), (e); ROA.33216, 33248. As the District Court saw it, that "broad" definition supplants the contemporaneous understanding of "the right to vote." ROA.33248; *see supra* Part I.A.3. Its work not yet done, that same "capacious definition" of "vote" also convinced the District Court that the Provision extends beyond voter-registration rules to all "other stages of the electoral process." ROA.33248 (cleaned up).

This reasoning is multiply flawed. To begin, even if the District Court were correct about the meaning of "right to vote," the Provision still applies

---

[3] In any event, because *Vote.Org II* ultimately held that the challenged state law fell outside the Provision's text, its constitutional discussion was nonbinding "dictum" not "necessary to the result." *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014).

only to paperwork used in the registration process, *supra* Part I.A.1, and to determinations of voter eligibility, *supra* Part I.A.2, neither of which S.B. 1's identification rules implicate.

But the District Court was incorrect about the meaning of "right to vote"—and even the statutory definition of "vote" it invoked. *See supra* Part I.A.3; *Pa. State Conf. of NAACP*, 97 F.4th at 133-35. After all, the Provision extends only to state rules that "deny" the "*right*" to take "all action necessary to make a vote effective," not to rules delineating those actions. 52 U.S.C. §§ 10101(a)(2)(B) (emphasis added), 10101(e).

Indeed, in 1964, it was well established that the "right to vote" included "the right to have one's vote counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (quoting *Mosley*, 238 U.S. at 386). Thus, the statutory reference to "having [one's] ballot counted and included in the appropriate totals of votes cast," 52 U.S.C. § 10101(a)(3)(A), (e), invoked by the District Court, ROA.33216, 33248, changes nothing. It merely confirms that the right to have one's vote counted abides only so long as the individual complies with applicable ballot-casting rules for "mak[ing] a vote effective." 52 U.S.C. § 10101(a)(3)(A), (e); *see, e.g.*, *Mosley*, 238 U.S. at 386. Thus, however broad the statutory definition of "vote," it remains the case that the "*right* to vote" does not cover mail voting and is not "denied" when election officials reject a ballot for noncompliance

45

with ballot-casting rules.  *Supra* Part I.A.3; *Ritter*, 142 S. Ct. at 1825-26 (Alito, J.,

dissental); *Pa. State Conf. of NAACP*, 97 F.4th at 133-35.

Moreover, the District Court's reading is incompatible with the statutory

context.  The same definition of "vote" applies to *all* of § 10101(a), but it is

undisputed that § 10101(a)(2)(A) and (C) apply only to voter-eligibility

determinations during the registration process.  *See supra* Part I.A.1.  The

shared definition of "vote" cannot require extending § 10101(a)(2)(B)—but

not its immediate neighbors—beyond registration-related eligibility

determinations.  *See, e.g.*, *Brown v. Gardner*, 513 U.S. 115, 118 (1994)

(explaining "presumption that a given term is used to mean the same thing"

across sections of a statute).

The District Court's reading also proves too much:  It would prohibit

States from adopting paper-based rules regulating the "other stages of the

electoral process" that are not "material" to determining a voter's

qualifications.  ROA.33248 (cleaned up).  But "[t]here is no reason why the

requirements that must be met in order to register (and thus be 'qualified') to

vote should be the same as the requirements that must be met in order to cast

a ballot that will be counted."  *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissental).  In

fact, *every* State in the country has *different* rules for qualifying to vote and for

casting ballots—a reality the District Court's construction blinks.  As the Third

Circuit memorably put it, the view adopted by the District Court is akin to allowing a driver who runs a red light to dodge a ticket by insisting that traffic rules are irrelevant to determining the validity of his drivers' license. *Pa. State Conference of NAACP*, 97 F.4th at 129-30, 136. "If that sounds confusing, that's because it is." *Id.* at 136. Just as "those authorized to drive must obey the State's traffic laws," successfully registered voters must still "abide by certain requirements" to effectuate their votes. *Id.* at 130.

**2.** The District Court also posited that S.B. 1's identification requirements fall within the Provision's calibrated scope on the theory that a mail-ballot "application" is an "'application' 'requisite to voting' for most individuals who seek to cast a mail ballot" and "preparation of a carrier envelope is 'an act requisite to voting' for individuals who cast a mail ballot." ROA.33250. This theory is flawed: The Provision's plain text aims only at the voter-registration process and voter-qualification determinations, not at every paper-based voting rule a State may call an "application" or impose in order to have a ballot counted. *See, e.g.*, *Pa. State Conf. of NAACP*, 97 F.4th at 131-35.

Indeed, mail voting was rare in 1964 when Congress enacted the Provision, underscoring that Congress did not use "application" or "act requisite" to refer to requirements connected to that method of voting. *See McDonald*, 394 U.S. at 807-08 (noting limited reach of then-existing mail-voting

systems); Stay Order 5.  As this Court recently explained when analyzing the "right to vote" in the Twenty-Sixth Amendment, "the right to vote in 1971 did not include a right to vote by mail" because "[i]n-person voting was the rule, absentee voting the exception."  *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 188 (5th Cir. 2020).  Moreover, properly completing a mail-ballot application, ballot, or carrier envelope is not "requisite to voting" in Texas because individuals who fail to do so remain free to vote in person.

**3.** The District Court next reasoned that, because the Provision protects the right to vote "'*in any election*'" and "'*in such election*,'" it must apply beyond registration to refusing to count a vote in even "a *single* election."  ROA.33248-33249.  Again, this proves too much.  Subparagraphs (a)(2)(A) and (C) likewise protect voters "in any election," but just as surely apply only to qualification determinations, not ballot-casting rules.  And the phrase "such election" in the Provision simply refers back to "any election."

The phrase "such election" further recognizes that States may adopt different qualifications for different types of elections.  *See, e.g.*, *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 734-35 (1973) (upholding property requirement for local water-district election). The Provision applies to voter-qualification determinations for "any election"; permits States to apply their specific qualifications to any "such election"; and

prohibits disqualification based on paper-based mistakes "immaterial" to determining the applicable qualifications for any "such election." 52 U.S.C. § 10101(a)(2)(B). The phrase thus in no way implies application beyond voter-qualification determinations.

**4.**    Finally, the District Court relied on thin and unpersuasive judicial authority. It leaned most heavily on the Third Circuit's opinion in *Migliori*—which already lacked "precedential effect" due to being vacated, *County of Los Angeles. v. Davis*, 440 U.S. 625, 634 n.6 (1979)—and the district-court decision in *Pennsylvania State Conference of the NAACP*. ROA.33229. But the Third Circuit has now reversed that district-court decision, renounced *Migliori*, and adopted Intervenor-Appellants' interpretation of the Provision. *See Pa. State Conf. of NAACP*, 97 F.4th at 131-39; *see also Liebert*, 2024 WL 2078216, at *11.

With *Migliori* in the dustbin, Plaintiffs can point to precisely zero appellate cases supporting their reading. Instead, their request for affirmance necessarily invites this Court to create a circuit split. This Court should reject that invitation; adopt the reasoning of the Third Circuit, three Justices of the Supreme Court, and multiple prior panels of this Court; and reverse.

II.    THE PANEL DECISION IN *VOTE.ORG II* DOES NOT APPLY BEYOND VOTER
REGISTRATION, BUT S.B. 1'S IDENTIFICATION REQUIREMENTS SATISFY IT.

In its recent decision in *Vote.Org II*, this Court properly upheld Texas's
wet-signature requirement for voter-registration forms against a Materiality
Provision claim. *See* 89 F.4th at 490-91. To reach that result, the panel assessed
whether the State's justification for the requirement was "more than tenuous"
and whether, in the "totality of the circumstances," the requirement "advances
th[e] [State's] interest[s] without imposing pointless burdens." *Id.* at 485.

This Court need not, and should not, apply the *Vote.Org II* framework to
analyze S.B. 1's identification requirements. After all, *Vote.Org II* concerned a
voter-registration rule, not a ballot-casting rule. *See Id.* at 482-85. The *Vote.Org
II* panel itself acknowledged that extending the Provision to ballot-casting rules
is "possibly overbroad" and was "not involved" in that case. *Id.* at 479 n.7. As a
case involving "voter registration" only, *Pa. State Conf. of NAACP*, 97 F.4th at 127
(discussing *Vote.Org II*), *Vote.Org II* does not prescribe the analysis for cases
involving ballot-casting rules. It therefore does nothing to change the course
the Court should follow here. *See supra* Part I.

In fact, extending *Vote.Org II* beyond voter registration risks destabilizing
election law. Divorced from its proper context, *Vote.Org II* would require
federal courts to apply a "tenuousness" and "totality of the circumstances"

approach to assess the validity of *any* paper-based state election rule at *any* stage of the voting process. 89 F.4th at 483-85. As discussed above, that approach would improperly grant federal courts superintendence over—and open the door to jeopardizing—a host of state election rules which are not the proper subject of federal judicial scrutiny. *See supra* Part I.A.4; *cf. Crawford*, 553 U.S. at 208 (Scalia, J., concurring in the judgment) (warning against "detailed judicial supervision of the election process [that] would flout the Constitution's express commitment of the task to the States."). It would also create a circuit split on the Materiality Provision's scope. The Court should avoid this course and instead reverse for the reasons explained above. *See supra* Part I.

Even if the Court were to split from the Third Circuit and extend the Provision to ballot-casting rules, it still should reverse. As *Vote.Org II* recognized, "[v]oter integrity" is "a substantial interest" that Texas may and must pursue through its election laws. 89 F.4th at 488; *see Richardson v. Hughs*, 978 F.3d 220, 239 (5th Cir. 2020) ("Texas indisputably has a compelling interest in preserving the integrity of its election process." (cleaned up)). Texas, moreover, "[o]bviously ... has considerable discretion in deciding what is an adequate level of effectiveness to serve its important interests in voter integrity" and fraud prevention. *Vote.Org II*, 89 F.4th at 485. And given Texas's "significan[t] ... authority to set its [own] electoral rules," federal courts must

give "considerable deference [to those] election procedures so long as they do not constitute invidious discrimination." *Id.* at 481.

S.B. 1's identification requirements easily satisfy the *Vote.Org II* framework for at least three reasons. *First*, like the voter-registration rule upheld in *Vote.Org II*, the identification requirements verify "a premise for all the statutory qualifications" to vote—whether individuals seeking to vote are "actually who they say they are." *Id.* at 487. Such identity verification *necessarily* is "material" and valid under the Materiality Provision. *See id.* at 487-89.

And that is what S.B. 1's rules do. They require an individual completing a vote-by-mail application or ballot to supply a piece of identifying information: the same nmber the individual used to register to vote. *See supra* at 10-12. Department of Public Safety and Social Security numbers are unique to each person, so individuals who know those numbers quite likely are "actually who they say they are." 89 F.4th at 487. Similarly, individuals who know the number used to register are likely the person who registered. *See* ROA.22629. And unlike other information those applying for and casting mail ballots must provide—like name and address—the identification numbers S.B. 1 requires are not publicly available to third parties. *See, e.g.*, ROA.22620-22621.

The identification number is not only unique, specific, and non-public—it is the *same* identification number federal law obligated the voter to provide during voter registration. *See supra* at 12. Congress plainly deemed such information material to assessing voter qualifications because it compelled States to seek that information in HAVA. *See id.* at 11. However one defines "material," "a law requiring voters to include the same information on mail-in voting materials that Congress itself asks voters to include on their voter registration applications" cannot "violate[] the Materiality Provision." Stay Order 6; *see Browning*, 522 F.3d at 1174.

*Second*, S.B. 1's identification rules *directly*—and far more than "tenuous[ly]"—advance the State's "substantial interest[s]," including promoting "[v]oter integrity," *Vote.Org II*, 89 F.4th at 487-88, and "reduc[ing] the likelihood of fraud," S.B. 1, § 1.04. By requiring voters to supply unique, specific, material identifying information to receive a mail ballot and have it counted, S.B. 1 makes it harder for third-party fraudsters to apply for, receive, and cast mail ballots in others' names. *See* ROA 22628.

States "may take action" like enacting the identification rules "to prevent election fraud without waiting for it to occur and be detected within [their] own borders." *Brnovich*, 594 U.S. at . Even so, there have been recent instances of mail-ballot fraud in Texas. The Texas Legislature knew, for example, that

Denton County Election Administrator Frank Phillips had detected a mail-ballot fraud scheme in 2020.  ROA.22627-22628, 22634-22635.  The identification rules "reduce the likelihood of fraud," S.B. 1, § 1.04, and, thus, promote "voter integrity," *Vote.Org II*, 89 F.4th at 488; *see Liebert*, 2024 WL 2078216, at *17-18 (holding witness requirements are material because they "may help to deter an unqualified voter from using the absentee-voting process to submit a fraudulent vote").  Indeed, Mr. Phillips testified that the rules would have made it more difficult for fraudsters to execute the scheme he detected.  ROA.22627-22628, 22634-22635.

In fact, S.B. 1's identification requirements are far *more* relevant to advancing "voter integrity" than the wet-signature requirement upheld in *Vote.Org II.*  89 F.4th at 488.  As the stay panel explained, Texans voting in person must show identification.  Stay Order 6.  Both experts and courts have recognized that mail voting is *more* vulnerable to fraud than in-person voting.  *See Crawford*, 553 U.S. at 195-96; *Brnovich*, 594 U.S. at 685; *Veasey*, 830 F.3d at 239, 256; *Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring); Comm'n on Fed. Election Reform, *Building Confidence in U.S. Elections* 46 (2005).  Texas therefore acted sensibly by establishing an identification requirement for this less secure mode of voting.  Other States have made the same policy decision.  *See, e.g.*, Ga. Code § 21-2-384(b); Minn. St. § 203B.07, subdiv. 3; Ohio Rev. Code

§ 3509.04.  And even if the question were close, *Vote.Org II* requires "deference" to the Legislature's judgment that the requirements are appropriate to promote election integrity.  89 F.4th at 481, 485.

*Third*, any "burden" S.B. 1's identification rules impose on voters is "slight" and far from "pointless"—if it can even be characterized as a "burden" at all.  *Id.* at 485, 490.  All voters must do to comply with the rules is supply one of two unique numbers—or both—that federal law required them to provide when they registered to vote and that they ordinarily will have at the ready.  This is a minimal price to pay to further assure the Texas electorate and public that individuals seeking to cast a mail ballot are "actually who they say they are."  *Vote.Org II*, 89 F.4th at 487; *see* ROA.22631-22632 (election official's testimony that S.B. 1 identification requirements have "reduced concerns among voters about mail voting fraud").

The "totality of the circumstances" only underscores this point.  *Vote.Org II*, 89 F.4th at 489; *see also id.* at 490 (burden analysis considers "other available ... options" to vote).  Texas has taken considerable steps to make it easier for Texans to comply with S.B. 1's identification rules.  S.B. 1 also established a new cure process for individuals to correct mistakes on their vote-by-mail applications and ballots online, by mail, or in person.  *See supra* at 12-13.  Many Texans have taken advantage of that process, including nearly half of

those who submitted defective ballots in the 2022 general election.  *See supra* at 12-14.  Texas, moreover, has continued to improve the cure process since S.B. 1; in late 2023, it enacted legislation making it easier to cure online.  *See* Act of May 29, 2023, 88th Leg. R.S., H.B. 357, § 2.  And if all else fails, would-be mail voters who do not comply with S.B. 1's identification rules can vote in person.  The identification rules, therefore, are "material" and valid to the extent the Court concludes that the Materiality Provision applies to them.  *Vote.Org II*, 89 F.4th at 489.

Accordingly, the District Court's pre-*Vote.Org II* invalidation of those rules cannot survive *Vote.Org II*.  For example, the District Court concluded that a voter's identification number cannot be material because, without more, it cannot establish age, residence, felony status, or any other voter qualification.  ROA.33241.  But it is "[u]ndeniable" that an individual's identity is "a premise for *all* the statutory qualifications" to vote and, thus, "material" under the Provision.  *Vote.Org II*, 89 F.4th at 487 (emphasis added).

The District Court next reasoned that because election officials "already [have] discerned the identity of" voters at "voter registration," the Provision prohibits them from verifying the identity of individuals applying for and casting mail ballots.  ROA.33245-33246.  This makes no sense: the State has an obvious election-integrity and anti-fraud interest in verifying that individuals

who seek to vote are "actually who they say they are." *Vote.Org II*, <u>89 F.4th at 487</u>.

That is why Texas law *already* required election officials to verify the identity of individuals who vote in person, *see* Stay Order 6, and S.B. 1 extends this mandate to would-be mail voters. The District Court entirely ignored the very real possibility—which has happened in Texas—that a third-party fraudster might *claim* to be someone else during mail voting. *See* <u>ROA.22632</u> (testimony highlighting this risk). That the State ascertained a voter's identity at voter registration does nothing to assure that the individual applying for or submitting a mail ballot in the voter's name actually is the voter. S.B. 1's requirement that mail-ballot applicants and submitters supply a piece of unique, non-public identifying information helps to confirm that fact.

The District Court also highlighted data limitations, errors, and discrepancies in TEAM, suggesting that such issues render the identification rules immaterial under federal law. <u>ROA.33222-33223</u>. Of course, problems with state databases do not violate the Materiality Provision and are neither new nor unique. *See, e.g.*, *Husted v. A. Philip Randolph Inst.*, <u>584 U.S. 756, 760</u> (2018). The Secretary of State, moreover, has taken substantial steps to improve the quantity and quality of data in TEAM, including by harvesting

identification numbers from the Department of Public Safety's database.  *See* ROA.22650-22651.

Finally, the District Court held that, even assuming identity verification is material to voter qualifications, S.B. 1's provisions remain immaterial because, "[a]s a practical matter," election officials generally do not use the identification numbers to verify identity or ferret out fraud.  ROA.33245; *see also* ROA.33171-33172, 33225.  But the evidence the District Court cited establishes no such thing.  Instead, it establishes that an identification number is not one of Texas's qualifications to vote and that the Travis County Clerk believes he can "associate" a mail-ballot applicant with a "voter" using information other than an identification number.  ROA.33245; *see also* ROA.33225.  That evidence says precisely nothing about how election officials use identification numbers in practice, including in Texas's 253 other counties.  In fact, the evidence before the District Court demonstrated that Denton County *does* use the identification numbers "to confirm the voter's identity."  ROA.33192 n.25.

Relying on Plaintiffs' proposed factual finding, the District Court also selectively quoted State election official Keith Ingram for the proposition that "individual eligibility criteria have nothing to do with the [identification] number[s]."  ROA. 33245.  But as Ingram explained, "the point of the [identification] number" is identity verification: to confirm "this is the voter

who is already in your [voter-registration] list as an eligible voter." Apr. 28, 2022 Ingram Dep. 86:2-87:19 (Ex. A); *accord* ROA.22593 (same point). The State explained this when it rebutted Plaintiffs' proposed factual finding, but the District Court ignored that explanation. ROA.22452-22453. In all events, that the identification numbers confirm that would-be mail voters are "actually who they say they are" establishes that they satisfy the Materiality Provision to the extent it applies. *Vote.Org II*, 89 F.4th at 487.

Furthermore, the Materiality Provision does not countenance invalidating state voting laws simply because federal courts believe that election officials have not invoked them with sufficient frequency. That is why the *Vote.Org II* panel rejected the same objection that the original wet signatures at issue there "are, in practice, not used to verify anyone's identity." 89 F.4th at 489. The question is not whether, in the judgment of federal courts, election officials use the challenged law *enough*, but whether, giving due "weight to [the] state legislature's judgment," the challenged law "meaningfully, even if quite imperfectly, corresponds to the substantial State interest" in confirming identity. *Id.* Establishing identification rules for mail voting—particularly where identification rules already apply to in-person voting—clearly satisfies that standard.

**CONCLUSION**

The Court should reverse the District Court's judgment and render judgment in Defendants' favor.

Dated: June 12, 2024

Respectfully submitted,

*/s/* John M. Gore
John M. Gore
 *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I hereby certify the following:

1.      I am  a member in good standing of the Bar of this Court.

2.      This Brief complies with the type-volume limitations of <u>Fed. R. App. P. 32(a)(7)(B)</u> because it contains 12,880 words, excluding the parts exempted by <u>Fed. R. App. P. 32(f)</u>.

3,       This Brief complies with the typeface and type-style requirements of <u>Fed. R. App. P. 32(a)(5)</u> & <u>(a)(6)</u> because it has been prepared using Microsoft Word in a proportionally spaced 14-point font (namely, Century Schoolbook Standard) in the text and the footnotes.

4.      The text of the electronic Brief is identical to the text in the paper copies.

5.      The electronic file containing the Brief was scanned for viruses using the most recent version of a commercial virus scanning program, and no virus was detected.

Dated: June 12, 2024                    */s/* John M. Gore
                                        John M. Gore
                                        *Counsel for Intervenor-Appellants*

61

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2024, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system. Service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.

Dated: June 19, 2024                    */s/* John M. Gore
                                        John M. Gore
                                        *Counsel for Intervenor-Appellants*

62