No. 23-50885

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
—————————————

UNITED STATES OF AMERICA; OCA-GREATER HOUSTON, LEAGUE OF
WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

Plaintiffs-Appellees

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS; JANE NELSON, in her
official capacity as Texas Secretary of State; STATE OF TEXAS; HARRIS COUNTY
REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL
REPUBLICAN SENATORIAL COMMITTEE; NATIONAL REPUBLICAN
CONGRESSIONAL COMMITTEE,

Defendants-Appellants

REPUBLICAN NATIONAL COMMITTEE,

Movant-Appellant
—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
—————————————

BRIEF FOR THE UNITED STATES AS APPELLEE
—————————————

*(see inside cover for counsel)*

KRISTEN CLARKE
  Assistant Attorney General

TOVAH R. CALDERON
JASON LEE
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-1317

## STATEMENT REGARDING ORAL ARGUMENT

Given the importance of the issues presented, the United States respectfully requests that this case be set for oral argument.

# TABLE OF CONTENTS

**PAGE**

STATEMENT REGARDING ORAL ARGUMENT

STATEMENT OF JURISDICTION .......................................................................1

STATEMENT OF THE ISSUES .........................................................................1

STATEMENT OF THE CASE.............................................................................3

    A.    Statutory Background ..........................................................................3

    B.    Factual Background..............................................................................8

            1.    Texas's Qualifications To Vote, Including By Mail Ballot .........8

            2.    Texas's Error-Strewn Voter Database .........................................9

            3.    SB 1's Rejection Of Voting Materials When The Identification Information Provided Does Not Match That In TEAM.................................................................11

            4.    SB 1's Rejection Of Thousands Of Mail Ballots In The 2022 Primary And General Elections ...............................15

    C.    Procedural Background ......................................................................16

SUMMARY OF ARGUMENT.............................................................................18

STANDARD OF REVIEW ...............................................................................21

ARGUMENT

    I.    The Materiality Provision applies beyond registration to all denials of the right to vote based on errors or omissions on voting-related paperwork, where those errors or omissions are not material in determining a person's qualifications to vote...........................................................21

A. The text of the Provision reaches beyond registration and applies to the challenged SB 1 provisions. ...............................................................21

B. Arguments based on the Third Circuit's decision in *Pennsylvania NAACP* cannot be reconciled with the statutory text........................................................24

    1. State defendants and intervenors render significant portions of the Materiality Provision superfluous and misapply the *ejusdem generis* canon...............................................................25

    2. State defendants and intervenors misunderstand the Provision's use of the phrase "in determining."........31

    3. State defendants and intervenors misapprehend the "right . . . to vote" safeguarded by the Materiality Provision. ........................................................34

C. State defendants and intervenors misread neighboring statutory provisions. ...................................................38

D. Neither the federalism canon nor the constitutional-avoidance canon applies here or compels state defendants' and intervenors' interpretation................................40

II. The district court correctly held that SB 1 violates the Materiality Provision.............................................................47

A. The identification information required under Sections 5.07 and 5.13 is not material under this Court's decision in *Vote.org v. Callanen*. .............................................47

B. The identification information is not material under the Eleventh Circuit's decision in *Browning*. ...................52

III.    The United States has standing to sue Texas's Secretary of State............................................................................54

CONCLUSION ..................................................................................57

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:** PAGE

*Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) (per curiam) ............ 40-41

*Alden v. Maine*, 527 U.S. 706 (1999) ....................................................... 57

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008) .................................. 28, 36

*Allen v. Milligan*, 599 U.S. 1 (2023) ........................................................ 45

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ........................... 41

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ....................................... 44

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) .................................... 4

*Bruesewitz v. Wyeth LLC*, 562 U.S. 223 (2011) ............................................ 22

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) .............. 27, 31, 34

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ........................................... 46

*Corley v. United States*, 556 U.S. 303 (2009) ............................................ 26

*Environmental Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) .......................... 33

*Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021) ........................................... 29

*Fischer v. United States*, 144 S. Ct. 2176 (2024) ........................................ 27-29

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ........................................... 41

*Florida State Conf. of NAACP v. Browning*,
 522 F.3d 1153 (11th Cir. 2008) .......................................................... *passim*

*Fort Stewart Schs. v. FLRA*, 495 U.S. 641 (1990) ....................................... 28

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980) ..................................... 30

**CASES (continued):**                            **PAGE**

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)........................4

*In re Debs*, 158 U.S. 564 (1895)................................................. 16, 55

*Johnson v. Arteaga-Martinez*, 596 U.S. 573 (2022)................................45

*League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174,
    2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) ..........................23

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ......................................51

*League of Women Voters of Wis. v. Wisconsin Elections Comm'n*,
    No. 2022CV2472 (Wis. Cir. Ct. Dane Cnty. Jan. 2, 2024) (slip op.) ..........23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................54

*Marks v. Stinson*, No. 93-CV-6157,
    1994 WL 146113 (E.D. Pa. Apr. 26, 1994)................................38

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018)................................23

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ..........................45

*Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024) ........................ 29, 44

*OCA-Greater Hous. v. Texas*, 867 F.3d 604 (5th Cir. 2017)....................55

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998)....................44

*Pennsylvania State Conf. of NAACP Branches v.
    Secretary Commonwealth of Pa.*, 97 F.4th 120 (3d Cir. 2024),
    *reh'g denied*, No. 23-3166,
    2024 WL 3085152 (3d Cir. Apr. 30, 2024)......................... *passim*

*Quarles v. United States*, 587 U.S. 645 (2019)......................................47

*Republic of Iraq v. Beaty*, 556 U.S. 848 (2009)......................................27

**CASES (continued):** PAGE

*Salinas v. United States*, 522 U.S. 52 (1997)............................................................40

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ........................................................45

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ......................................3-4, 45

*Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020)............... 50, 55-56

*United States v. Elashi*, 789 F.3d 547 (5th Cir. 2015)............................................53

*Van Buren v. United States*, 593 U.S. 374 (2021) ...................................................34

*Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023)........................................ *passim*

**CONSTITUTIONS:**

U.S. Const. Art. I, § 4, Cl. 1.....................................................................................41

Tex. Const. Art. VI, § 2(a) .........................................................................................8

**STATUTES:**

Act of May 31, 1870, Ch. 114, § 1, 16 Stat. 140. ..................................................3-4

Civil Rights Act of 1957
  Pub. L. No. 85-315, § 101(a), 71 Stat. 634.......................................................5
  Pub. L. No. 85-315, § 104(a), 71 Stat. 635.......................................................5
  Pub. L. No. 85-315, § 104(b), 71 Stat. 635 ......................................................5
  Pub. L. No. 85-315, § 131(c), 71 Stat. 637.......................................................5

Civil Rights Act of 1960
  Pub. L. No. 86-449, § 601, 74 Stat. 90-92.....................................................5-6

Civil Rights Act of 1964
  52 U.S.C. 10101...................................................................... 1, 3, 38
  52 U.S.C. 10101(a)(1) ...............................................................39
  52 U.S.C. 10101(a)(2) ...............................................................33
  52 U.S.C. 10101(a)(2)(A)..................................................... 33, 38

52 U.S.C. 10101(a)(2)(B) ............................................... *passim*
52 U.S.C. 10101(a)(2)(C) ................................................. 38-39
52 U.S.C. 10101(a)(3)(A) ........................................................8
52 U.S.C. 10101(b) ..................................................................5
52 U.S.C. 10101(e) ..................................................... *passim*
Pub. L. No. 88-352, § 101, 78 Stat. 241-242 ....................6
Pub. L. No. 89-110, § 15(a), 79 Stat. 437, 445 ................7

Help America Vote Act
52 U.S.C. 20901 ...................................................................20
52 U.S.C. 21083(a)(5)(A)(i) ......................................... 9, 53
52 U.S.C. 21083(a)(5)(A)(ii) ....................................... 53-54
Pub. L. No. 107-252, 116 Stat. 1666 ...............................9

28 U.S.C. 1292(a)(1) .............................................................1

28 U.S.C. 1331 ......................................................................1

28 U.S.C. 1335 ......................................................................1

Act Relating to the Requirements to Access the Online Tracker,
Tex. H.B. 357 § 2 (2023) ...............................................13

Ala. Code § 17-11-7(b) (2019) .......................................42

Ala. Code § 17-11-10(b)(2) (2019).................................42

Ariz. Rev. Stat. Ann. § 16-611 (2023) .........................43

Cal. Elec. Code § 3011(c) (West 2022) .........................43

Colo. Rev. Stat. § 31-10-1002(1) (2014) .......................42

Fla. Stat. § 101.657(4)(a) (2020) ...................................42

Ill. Rev. Stat. Ch. 46 § 4-22 (1961).................................27

Ky. Rev. Stat. Ann. § 117.085(3) (West 2021) ............. 42-43

**STATUTES (continued):**                                              **PAGE**

Ky. Rev. Stat. Ann. § 117.085(7) (West 2021) .................................................. 42-43

La. Stat. Ann. § 18:562(C) (2023) ...................................................................42

Tex. Elec. Code Ann.
    § 1.011 (West 2021) ...................................................................................42
    § 11.002(a) (West 2023) ..............................................................................8
    § 13.002(c)(8) (West 2023) .........................................................................9
    § 31.003 (West 2023) ................................................................................56
    § 64.031 (West 2023) ................................................................................43
    § 64.032 (West 2023) ................................................................................43
    § 64.033 (West 2023) ................................................................................43
    § 64.034 (West 2023) ................................................................................43
    § 64.035 (West 2023) ................................................................................43
    § 64.036 (West 2023) ................................................................................43
    § 64.037 (West 2023) ................................................................................43
    § 64.0322 (West 2023) ..............................................................................43
    § 82.001 (West 2023) .............................................................8, 23, 25, 38
    § 82.002 (West 2023) ....................................................................8, 25, 38
    § 82.003 (West 2023) ...........................................................................8, 25
    § 82.004 (West 2023) ...........................................................................8, 25
    § 82.007 (West 2023) ..................................................................................8
    § 82.008 (West 2023) ..................................................................................8
    § 84.001 (West 2023) ...........................................................................8, 23
    § 84.001(b) (West 2023) ...........................................................................42
    § 84.002 (West 2023) ................................................................................23
    § 84.002(a)(1-a) (West 2023) ...................................................................11
    § 84.005 (West 2023) ................................................................................23
    § 84.007 (West 2023) ..................................................................................8
    § 84.007(c) (West 2023) ...........................................................................12
    § 84.014 (West 2023) ................................................................................23
    § 86.001 (West 2023) .....................................................................9, 23, 25
    § 86.001(f) (West 2023) ........................................................................ 11-12
    § 86.001(f-1) (West 2023) ........................................................................12
    § 86.001(f-2) (West 2023) ........................................................................12
    § 86.002 (West 2023) ..................................................................................9
    § 86.002(g) (West 2023) ...........................................................................11
    § 86.005(c) (West 2023) ...........................................................................42

**STATUTES (continued):**                                                 **PAGE**

§ 86.007(a)(2) (West 2023) ....................................................43

§ 86.008(a-1) (West 2021)......................................................12

§ 86.008(b) (West 2021) .........................................................12

§ 86.008(c-1) (West 2021) .......................................................13

§ 86.011(d) (West 2023) ..........................................................12

§ 86.012 (West 2023) ................................................................9

§ 86.013 (West 2023) ................................................................9

§ 86.015 (West 2021) ..............................................................13

§ 86.015(b) (West 2021) ..........................................................13

§ 87.0271(b) (West 2021).........................................................12

§ 87.0271(e-1) (West 2021) ......................................................13

§ 87.041(b)(2) (West 2021) ......................................................42

§ 87.041(b)(6) (West 2021) ......................................................42

§ 87.041(b)(8) (West 2021) ......................................................11

§ 87.0411(b) (West 2023).........................................................12

§ 87.0411(e-1) (West 2023)......................................................13

S.B. 1, 87th Leg., 2d Spec. Sess. (2021) ...................................2

Va. Code Ann. § 24.2-643(B) (2022) ......................................43

## LEGISLATIVE HISTORY:

110 Cong. Rec. 6779 (1964) .......................................................5

110 Cong. Rec. 6970 (1964) ................................................ 6-7, 45

110 Cong. Rec. 6998 (1964) .......................................................7

110 Cong. Rec. 8915 (1964) .......................................................7

110 Cong. Rec. 11935 (1964) .................................................7, 26

H.R. Rep. No. 914, 88th Cong., 1st Sess. (1963) ....................46

## MISCELLANEOUS:

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012)..............................30

**MISCELLANEOUS (continued):**                               **PAGE**

Oxford English Dictionary (3d ed. 2021, rev. online Mar. 2023) ..........................32

U.S. Comm'n on C.R., *Report of the United States Commission on Civil Rights* (1959).......................................................5

U.S. Comm'n on C.R., *Voting:  1961 United States Commission on Civil Rights Report* (1961)....................................6, 28

Webster's Seventh New Collegiate Dictionary (1963) ...........................................32

# STATEMENT OF JURISDICTION

The United States sued Texas and its Secretary of State to enforce Section 101 of the Civil Rights Act of 1964, 52 U.S.C. 10101. ROA.4381, 4394-4395.[1] The district court had jurisdiction under 28 U.S.C. 1331 and 1335. In a summary ruling on August 17, 2023, the court entered summary judgment in favor of the United States and a group of private plaintiffs. ROA.27041-27048. On November 29, 2023, the court issued a memorandum opinion that "supplement[ed] the Court's earlier summary ruling." ROA.33215-33267 & n.1. Texas, its Secretary of State, and its Attorney General (state defendants) timely appealed, as did a group of Republican Party committees that had intervened as defendants (intervenors). ROA.33271, 33297. This Court has jurisdiction under 28 U.S.C. 1292(a)(1).[2]

# STATEMENT OF THE ISSUES

In Section 101(a)(2)(B) of the Civil Rights Act of 1964, also known as the "Materiality Provision," Congress prohibited state officials from denying "the right of any individual to vote" based on "error[s] or omission[s] on any record or paper

---

[1] "ROA.__" refers to the page numbers of the Record on Appeal. "State Defs.' Br. __" and "Intervenors' Br. __" refers to the page numbers in the opening briefs filed by state defendants and intervenors, respectively.

[2] Despite the caption of this appeal, the challenged district court order does not apply to Texas's Attorney General. ROA.33306 n.1.

relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. 10101(a)(2)(B). As used in the Provision, "the word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. 10101(e).

Three years ago, Texas enacted the Election Protection and Integrity Act of 2021, S.B. 1, 87th Leg., 2d Spec. Sess. (2021) (SB 1). Among its many provisions, SB 1 requires voters to provide certain identification information when applying for a mail ballot and returning their marked mail ballot. Election officials do not use this information to identify voters or confirm their identities. But under SB 1, those mail-ballot applications and mail ballots must be rejected if the identifying information provided does not precisely match the corresponding information in Texas's voter database.

The issues presented are:

1. Whether the Materiality Provision's prohibition on denials of the statutory right to vote based on certain types of errors and omissions on voting-related paperwork applies outside of voter registration.

2.     Whether the district court correctly held that SB 1 violates the

Materiality Provision because it requires the rejection of mail-ballot applications

and mail ballots for errors or omissions that are not material in determining voter

qualifications.

3.     Whether the district court correctly found that the United States had

standing to sue the Texas Secretary of State for violations of the Materiality

Provision.

## STATEMENT OF THE CASE

### A.     Statutory Background

1.  The Materiality Provision traces its lineage to Reconstruction-era efforts

to safeguard African American citizens' right to vote under the Fifteenth

Amendment.  Congress adopted the precursor to modern-day 52 U.S.C. 10101 in

the Enforcement Act of 1870.  *See* Act of May 31, 1870, Ch. 114, § 1, 16 Stat. 140.

That legislation "[p]romptly" followed ratification of the Fifteenth Amendment

and "made it a crime for public officers and private persons to obstruct exercise of

the right to vote." *South Carolina v. Katzenbach*, 383 U.S. 301, 310 (1966).

Specifically, the Act provided that any person otherwise qualified to vote "shall be

entitled and allowed to vote at all such elections, without distinction of race, color,

or previous condition of servitude; any constitution, law, custom, usage, or

regulation of any State . . . to the contrary notwithstanding." Act of May 31, 1870, Ch. 114, § 1, 16 Stat. 140.

Despite the legislation, African American voters' exercise of the franchise was soon stymied. As the "fervor for racial equality waned," enforcement of the Act and related voter-protection laws "became spotty and ineffective." *Katzenbach*, 383 U.S. at 310. Meanwhile, southern States adopted facially-neutral practices that were "specifically designed to prevent [African Americans] from voting." *Ibid.* This included "a variety of notorious methods, including poll taxes, literacy tests, [and] property qualifications." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 655 (2021). Due to the "variety and persistence of these and similar [practices]," *Katzenbach*, 383 U.S. at 311, "the right of African-Americans to vote was heavily suppressed for nearly a century," *Brnovich*, 594 U.S. at 655.

2. During the Civil Rights Movement, Congress embarked on "an eight-year effort to research and combat discrimination in elections." *Pennsylvania State Conf. of NAACP Branches v. Secretary Commonwealth of Pa.*, 97 F.4th 120, 149 n.19 (3d Cir. 2024) (*Pennsylvania NAACP*) (Schwartz, J., dissenting), *reh'g denied*, No. 23-3166, 2024 WL 3085152 (3d Cir. Apr. 30, 2024). This began with enactment of the Civil Rights Act of 1957, which was the first "major legislation in th[e] [civil-rights] field . . . [in] 82 years." *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 245 (1964). Among other things, the legislation established

the United States U.S. Commission on Civil Rights and directed it to "investigate

allegations . . . that certain citizens of the United States are being deprived of their

right to vote and have that vote counted by reason of their color[] [or] race."  Pub.

L. No. 85-315, §§ 101(a), 104(a)-(b), 131(c), 71 Stat. 634-635, 637 (52 U.S.C.

10101(b)).

The Commission's report in 1959 recounted the "ingenious" tactics being

used to ensure that, "on election day," African American voters "generally

remained at home."  U.S. Comm'n on C.R., *Report of the United States*

*Commission on Civil Rights* 30 (1959).  This included application of "different and

more rigid standards" to African American voters based on "inconsequential

errors."  *Id.* at 91.  To combat these and other "devices by which the right to vote is

denied," the Commission recommended legislation prohibiting "arbitrar[y]" state

action that deprives African Americans of "the opportunity to register, vote and

have that vote counted" in federal elections.  *Id.* at 138-139.

Congress responded by passing the Civil Rights Act of 1960.  *See* 110 Cong.

Rec. 6779 (1964) (statement of Sen. Long).  The legislation authorized the

Attorney General to bring pattern-or-practice claims for racial discrimination in

voting and adopted an expansive definition of "vote" drawing upon the

Commission's suggested language.  Pub. L. No. 86-449, § 601, 74 Stat. 90-92 (52

U.S.C. 10101(e)).  Specifically, the Act defined "'vote' [to] include[] all action

necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." *Id.* § 601, 74 Stat. 91.

The Commission found "encouraging" trends following the 1960 Civil Rights Act but warned that the ability to vote was still "denied entirely to some because of race and diluted for many others." U.S. Comm'n on C.R., *Voting: 1961 United States Commission on Civil Rights Report* 133, 135 (1961) (*1961 CCR Report*). Its report in 1961 summarized the "many forms" of state "[e]fforts to deny the right to vote" perpetuating "discriminatory disfranchisement" of African Americans. *Id.* at 133. And the Commission again urged Congress to pass legislation to prohibit "arbitrary action" that "deprives or threatens to deprive any person of the right to register, vote, and have that vote counted in any Federal election." *Id.* at 141.

Congress heeded the Commission's call and enacted the Materiality Provision as part of the Civil Rights Act of 1964. Pub. L. No. 88-352, § 101, 78 Stat. 241-242. The Provision was a "[m]odifie[d]" version of the legislative remedy the Commission had recommended in 1959 and 1961. 110 Cong. Rec. at 6970 (statement of Sen. Scott). And as described in summaries of the Provision entered into the *Congressional Record*, the effect of the Provision would be to

proscribe denials of the right to vote "because of immaterial errors or omissions *in any step of the voting process*." *Ibid.* (emphasis added); *see also* 110 Cong. Rec. at 6998 (statement of Sen. Long); 110 Cong. Rec. at 8915 (statement of Sen. Williams).

The Provision's expansive language was the product of careful congressional consideration. As the Senate Minority Leader described, "I doubt very much whether in my whole legislative lifetime any measure has received so much meticulous attention." 110 Cong. Rec. at 11935 (statement of Sen. Dirksen). Indeed, drafters "ha[d] tried to be mindful of every word, of every comma, and of the shading of every phrase." *Ibid.*

Although the Provision originally was limited to federal elections, Congress later amended the Provision to make it applicable to state and local elections. Pub. L. No. 89-110, § 15(a), 79 Stat. 437, 445.

3. Today, the Materiality Provision states:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. 10101(a)(2)(B). The statute continues to define the word "vote" as "includ[ing] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting

a ballot, and having such ballot counted and included in the appropriate totals of votes."  52 U.S.C. 10101(a)(3)(A) and (e).

**B.    Factual Background**

**1.    Texas's Qualifications To Vote, Including By Mail Ballot**

Under Texas law, a "qualified voter" is someone who (1) is 18 years of age or older, (2) is a United States citizen, (3) has not been determined "totally mentally incapacitated" or "partially mentally incapacitated without the right to vote," (4) has not been convicted of a felony (unless the person has completed their sentence or been pardoned), (5) resides in the State, and (6) has registered to vote. Tex. Elec. Code Ann. § 11.002(a) (West 2023); *see also* Tex. Const. Art. VI, § 2(a).  Certain individuals may vote by mail ballot, including those who are 65 years of age or older, have a "sickness or physical condition" that prevents them from voting in person "without a likelihood of needing personal assistance or injuring [their] health," or will be absent from their home county during the in-person voting period.  *See* Tex. Elec. Code Ann. §§ 82.001-.004, .007-.008 (West 2023).

A person who intends to vote by mail must submit a mail-ballot application to their county's early voting clerk.  Tex. Elec. Code Ann. §§ 84.001, .007 (West 2023).  If accepted, the clerk sends the voter a mail ballot, an envelope in which to

place the ballot, and a carrier envelope in which to place the ballot envelope.  *Id.*
§§ 86.001-.002, .012-.013.

## 2.     Texas's Error-Strewn Voter Database

In 2004, to comply with new requirements under the Help America Vote Act
(HAVA), Pub. L. No. 107-252, 116 Stat. 1666 (52 U.S.C. 20901-21145), Texas
began requiring that individuals registering to vote provide one of three things:  (1)
the person's "Texas driver's license number or the number of a personal
identification card issued by [Texas's] Department of Public Safety" (DPS); (2) the
last four digits of the person's social security number, if they have not been issued
a driver's license or DPS identification card; or (3) an attestation that they have not
been issued a driver's license, DPS identification card, or social security number.
Tex. Elec. Code Ann. § 13.002(c)(8) (West 2023); *see also* 52 U.S.C.
21083(a)(5)(A)(i) (HAVA); ROA.33217.

Texas stores this information in a voter registration database "maintained by
the Texas [Secretary of State]" and "known as the Texas Election Administration
Management ('TEAM') system."  ROA.33218.  Each record in the database can
contain no more than (1) one number issued by DPS on an identification
document, like a driver's license or personal identification card (DPS number); and
(2) one full or partial social security number.  ROA.33218.

The TEAM database, however, is "riddled with errors."  ROA.33244.  As of

January 2023, "over 60,000" records in the database contain a DPS number that

differs from the number associated with the same voter in DPS's own database.

ROA.33223.  Similarly, in "nearly 45,000" TEAM records, the last four digits of a

voter's social security number differs from that listed in DPS's database for the

same voter.  ROA.33223.  These discrepancies are at least partially explained by

the fact that local election officials enter information *manually* into TEAM.

ROA.15095, 15267.

Beyond these inconsistencies, identification numbers are altogether absent in

hundreds of thousands of TEAM records.  As of December 2022, the TEAM

records for more than 750,000 registered Texas voters lack either a DPS number or

the last four digits of the voter's social security number.  ROA.14407.  And the

TEAM records for "more than 90,000 Texas registered voters" lack *both* numbers.

ROA.33223.  With regard to DPS numbers specifically, "roughly 2.4 million Texas

voters have only one of their *multiple* DPS numbers in TEAM," and the records of

"nearly 190,000 Texas voters" in the database contain no DPS number at all, even

though DPS has issued an identification number for those individuals.

ROA.33222-33223 (emphasis added).

### 3. SB 1's Rejection Of Voting Materials When The Identification Information Provided Does Not Match That In TEAM

a. In 2021, Texas enacted SB 1, which "superimposes" new requirements for mail voting. ROA.33220. Under Section 5.02, an individual applying to vote by mail must provide on their mail-ballot application their DPS number, the last four digits of their social security number, or an attestation that they have never been issued a DPS number or a social security number. Tex. Elec. Code Ann. § 84.002(a)(1-a) (West 2023). If the applicant does not provide this information, or if the information provided does not match the information in the applicant's TEAM record, Section 5.07 requires an early voting clerk to "reject" the application. *Id.* § 86.001(f).

If the applicant obtains a mail ballot, then under Section 5.13, they must provide the same identification information a second time on their carrier envelope when returning their marked ballot. Tex. Elec. Code Ann. § 87.041(b)(8) (West 2021); *see also id.* § 86.002(g). As above, if the voter does not provide the required information, or if the information does not match the voter's TEAM record, Section 5.13 bars "accept[ance]" of the ballot. *Id.* § 87.041(b)(8).

b. In certain circumstances, SB 1 requires that a voter receive notice if officials discover a mismatch between the identification information provided by the voter and the information in TEAM. Even if notice is provided, however, a

voter may lack any way of remedying the discrepancy.  For example, if an early

voting clerk identifies a "defect" in a voter's mail-ballot application and

determines there is sufficient time for the voter to submit a corrected or new

application, the clerk must send the voter their original application or a new

application and "a brief explanation of [the] defect."  Tex. Elec. Code Ann.

§ 86.008(a-1)-(b) (West 2021).  But if the "defect" stems from missing or incorrect

information in TEAM—for example, where the voter lists the number from their

personal identification card on their application, but the TEAM database only

contains the number from an old driver's license, which the voter no longer

possesses—the voter may have no way of resubmitting an application with an

identification number that matches TEAM, as SB 1 requires.  *Id.* § 86.001(f).

Moreover, the application-submission deadline and cure deadline are both 11 days

before Election Day, *id.* §§ 84.007(c), 86.001(f)-(f-2), 86.011(d), meaning that

some voters may not receive notice of rejection prior to the deadline to cure.

Similar problems arise when an election official finds that the identification

number on a voter's carrier envelope does not match the information in TEAM.  In

such a circumstance, the official "send[s] the voter a notice of the defect and a

corrective action form developed by the secretary of state."  Tex. Elec. Code Ann.

§ 87.0271(b) (West 2021); *see also id.* § 87.0411(b); ROA.33222 (corrective

action form).  But again, because the corrective action form simply asks the voter

to provide once more their DPS number or the last four digits of their social security number (ROA.14738), the voter may lack any recourse if, for example, they cannot recall the DPS number they used when registering to vote and did not provide the last four digits of their social security number at that time.

SB 1 also provides a means of "cur[ing] an SB 1-related defect" through an "online Ballot by Mail Tracker" developed by the Secretary. ROA.33256 n.30; *see also* Tex. Elec. Code Ann. §§ 86.008(c-1), 86.015, 87.0271(e-1), 87.0411(e-1) (West 2021). But before being "permit[ed]" to "access information" on the Tracker, a voter must enter (1) their name, (2) their date of birth, (3) the last four digits of their social security number, and (4) their DPS number. *Id.* § 86.015(b).[3] The information entered by the voter is "compare[d] . . . against the TEAM database." ROA.33256 n.30. Consequently, if the voter's TEAM record "is missing either a DPS ID number or [the last four digits of the voter's social security number] . . . or if TEAM has incorrect information for either of those numbers, the voter simply cannot log in to the tracker." ROA.33256 n.30. This means that none of the more than 750,000 registered voters in Texas whose records

---

[3] Before 2023, voters attempting to access the Tracker had to enter their "registration address" instead of their date of birth. *See* ROA.33256 n.30; *see also* Act Relating to the Requirements to Access the Online Tracker, Tex. H.B. 357 § 2 (2023).

in TEAM lack a DPS number or the last four digits of the voter's social security number, *see* p.10, *supra*, can access the Tracker.

c. Even where voters provide an identification number that matches TEAM, election officials do not use the number "to ensure that voters are qualified to vote or to cast a mail ballot under Texas law." ROA.33224. As the former Elections Division Director for Texas's Secretary of State explained, the identification number "ha[s] nothing to [d]o with" the "individual eligibility criteria" for voting in Texas. ROA.33224 (second alteration in original) (citation omitted).

Nor did SB 1 change the way officials verify voters' identities. "Election officials confirmed that the DPS numbers and [partial social security numbers] required by S.B. 1 are not used to . . . identify voters, or to flag potential fraud." ROA.33224; *see also* ROA.33224-33225 (explaining that election officials do not "ordinarily use these numbers to look up voter records, and the [Texas Secretary of State] does not instruct them to do so"). Rather, officials "look up voters using other information on mail ballot materials," like "the voter's name, date of birth, and address," and confirm voters' identities using their signatures, "just as they did before S.B. 1." ROA.33225. Moreover, given the "incomplete and erroneous voter registration records" in TEAM, neither the Secretary nor county officials "consider a DPS number or [a social security number] mismatch or omission to be evidence of fraud." ROA.33225.

### 4. SB 1's Rejection Of Thousands Of Mail Ballots In The 2022 Primary And General Elections

In the year following SB 1's enactment, election officials rejected "thousands" of mail ballots under SB 1 (ROA.33223), resulting in statewide rejection rates far above pre-SB 1 norms. For example, "[i]n the March 2022 primary election, more than 25,000 ballots were rejected statewide based on a mismatched or missing DPS number[] or [the last four digits of the voter's social security number]." ROA.33223. In total, the election saw a rejection rate of 12.38%, with SB 1's new requirements accounting for approximately 82% of those rejections. ROA.14479, 14657. This rate was "significantly greater" than what county officials had experienced "in years past." ROA.15189.

Rejection rates were similarly elevated during the general election later that year. "S.B. 1 required officials across Texas to reject more than 11,000 [general election] mail ballots." ROA.33223. Overall, the election had a statewide rejection rate of 2.7% (ROA.15078), and SB 1's new requirements accounted for approximately 83.8% of those rejections (ROA.14417). This rejection rate was "almost three times the national average (1%), and more than the state's average prior to SB1 passage (1.7% in the comparable midterm election of 2018)." ROA.14489.

## C.    Procedural Background

1.  The United States and a group of private plaintiffs filed separate suits contesting parts of SB 1.  The United States' suit named Texas and its Secretary of State as defendants and challenged Sections 5.07 and 5.13 under the Materiality Provision.  ROA.4381, 4394-4395.  The private plaintiffs named Texas's Secretary of State and other officials and challenged "the number-matching framework as a whole" under the Provision.  ROA.6438-6445, 33163.  The district court consolidated the suits.  ROA.689.  Later, a number of Republican Party committees intervened as defendants.  ROA.152-153 (text order).

2.  The district court denied Texas and its Secretary of State's motion to dismiss the United States' suit against the Secretary for lack of standing.  ROA.10508-10551.  The court held that the United States had standing under *In re Debs*, 158 U.S. 564 (1895), to enforce the Materiality Provision against the Secretary.  ROA.10518.  Alternatively, the court found the Article III requirements of standing satisfied based on the United States' uncontested "injury to its sovereignty" and the absence of any dispute that the injury was fairly traceable to and redressable by an order against the Secretary.  ROA.10524 & n.9, 10531 & n.14.

3.  The district court entered summary judgment in favor of the United States on its claim that Sections 5.07 and 5.13 violate the Materiality Provision.

ROA.33240-33262, 33266.  The court found that completion of a mail-ballot

application and use of a carrier envelope qualify as "act[s] requisite to voting"

under the Provision.  ROA.33250.  And it reasoned that Sections 5.07 and 5.13

deny individuals the right to vote based on errors or omissions on those

applications and envelopes because, by rejecting materials that "lack an ID number

matching voter registration records," those Sections "prevent[] an applicant from

casting a mail ballot or hav[ing] that ballot counted."  ROA.33256.  Finally, the

court held that those errors and omissions are "not material to [determining] voter

qualifications under Texas law."  ROA.33247.  The court thus concluded that "it is

difficult to imagine a clearer violation of the Materiality Provision than S.B. 1's

number-matching requirement."  ROA.33257.

The district court also rebuffed state defendants' and intervenors' narrow

interpretation of the Provision.  The court rejected their argument that the

Provision merely "protect[s] qualified voters' right to register," explaining that

Congress "broadly defined" the word "vote" in the Provision to safeguard "all

action necessary to make a vote effective."  ROA.33248 (emphases omitted)

(quoting 52 U.S.C. 10101(e)).  The court also dismissed suggestions that Sections

5.07 and 5.13 do not "deny the right of any individual to vote," 52 U.S.C.

10101(a)(2)(B), because voters have "the opportunity to cure a rejection or vote in

person after a rejection" of their mail-ballot application or mail ballot.

ROA.33255.  As the court noted, "[t]he existence of additional, more onerous procedures that voters could use to try to overcome the rejection does not negate the original denial."  ROA.33256.

Accordingly, the district court enjoined state defendants from enforcing Sections 5.07 and 5.13.  ROA.33266-33267.  State defendants and intervenors timely appealed.  ROA.33271, 33297.

4.  A motions panel of this Court stayed the district court's order pending appeal, though cautioning that its analysis "does not bind a later merits panel's evaluation" of the issues raised.  Order Granting Stay Pending Appeal 7 n.†, 9.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's holding that SB 1 Sections 5.07 and 5.13 violate the Materiality Provision.

1.  The Provision applies outside voter registration based on the straightforward statutory text.  By its terms, the Provision applies to records and papers related to any "act requisite to voting."  52 U.S.C. 10101(a)(2)(B).  And the term "vote" as used in the Provision is expressly defined as being "*not* limited to[] registration"; rather, it "include[s] all action necessary to make a vote effective." 52 U.S.C. 10101(e) (emphasis added).  The deliberately broad language Congress used in the Provision and the expansive definition of "vote" that it incorporated extend beyond the voter-registration context.

- 18 -

State defendants' and intervenors' reliance on flawed reasoning from the Third Circuit's decision in *Pennsylvania NAACP* does not support a contrary interpretation. They read the clause "any application, registration, or other act requisite to voting," 52 U.S.C. 10101(a)(2)(B), to refer only to the second item listed, "registration." That approach contravenes basic principles of statutory interpretation and misapplies the *ejusdem generis* canon. Intervenors argue that the subsequent clause, "if such error or omission is not material in determining whether such individual is qualified under State law to vote," 52 U.S.C. 10101(a)(2)(B), limits the Provision to determinations of voter eligibility. But this misunderstands the phrase "in determining," which modifies the term "material" and thus limits the *types* of errors and omissions that may be material. Finally, in arguing that SB 1 does not "deny the right of any individual to vote," 52 U.S.C. 10101(a)(2)(B), state defendants and intervenors confuse the Provision's statutorily defined right with the constitutional right to vote.

State defendants' and intervenors' other arguments fare no better. They suggest that the Materiality Provision is restricted to voter registration because other neighboring provisions are, as well. But this contention fails on its premise because statutory text and case law establish that those provisions are not so limited. State defendants and intervenors also err in invoking the federalism and constitutional-avoidance canons: neither canon applies because the Provision's

text is unambiguous and the district court's reading raises no federalism or constitutional concerns.

2. The challenged portions of SB 1 violate the Materiality Provision because the identification information they require—which triggers rejection of mail-ballot applications and mail ballots when the information provided does not match that in TEAM—is not material in determining a person's qualifications to vote. SB 1 falters at both steps of the materiality analysis that this Court adopted in *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), because the connection between the challenged SB 1 provisions and Texas's asserted interest in establishing voters' identities is tenuous at best, and because the provisions do not meaningfully correspond to any legitimate state interests. Rather, tens of thousands of ballots cast by registered Texas voters have been rejected under the challenged provisions, with no evidence that these rejections enhance voter integrity. State defendants' and intervenors' reliance on HAVA, 52 U.S.C. 20901 *et seq.*, to establish materiality also fails. HAVA obligates most individuals to provide identification information when registering to vote to help facilitate the creation of database identifiers for those voters. But the statute neither renders that information *per se* material, nor permits election officials to reject mail-ballot applications and mail ballots based on errors or omissions when voters are required to provide that information again after *already* having registered.

3. State defendants' challenge to the United States' standing to sue Texas's Secretary of State is meritless.  State defendants do not dispute the United States' injury in fact.  And the Secretary's numerous duties implementing the challenged SB 1 provisions establish traceability and redressability for standing purposes.

## STANDARD OF REVIEW

This Court reviews grants of summary judgment *de novo*.  *See Vote.org v. Callanen*, 89 F.4th 459, 469 (5th Cir. 2023).

## ARGUMENT

I.     **The Materiality Provision applies beyond registration to all denials of the right to vote based on errors or omissions on voting-related paperwork, where those errors or omissions are not material in determining a person's qualifications to vote.**

   A.     **The text of the Provision reaches beyond registration and applies to the challenged SB 1 provisions.**

1. As discussed above, the Materiality Provision bars state actors from

> deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. 10101(a)(2)(B).  This text reflects a two-part structure.  The first clause in the Provision sets the Provision's scope by describing the particular conduct prohibited under the statute—namely, denial of the right to vote by a state actor based on an error or omission on a record or paper relating to an application,

registration, or other act requisite to voting. Subsection (e) defines the word "vote" to "include[] all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to . . . having [a] ballot counted." 52 U.S.C. 10101(e).

Next, the second clause in the Provision describes the type of error or omission that may not be used as a basis for denying the right to vote. Set off by a comma and introduced by the "conditional term" "if," *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 233 (2011), this part of the Provision bars denials of the right to vote if the error or omission is "not material in determining whether such individual is qualified under State law to vote," 52 U.S.C. 10101(a)(2)(B). The term "qualified" refers to whether a person meets "the substantive qualifications needed to vote under [state] law." *Vote.org v. Callanen*, 89 F.4th 459, 488 (5th Cir. 2023).

Accordingly, in summary, the Provision prohibits the denial of an individual's right to take action necessary for making a vote effective based on an error or omission on a paper or record relating to any act requisite to voting— which is expressly "*not limited to*[] registration," 52 U.S.C. 10101(e) (emphasis added)—if the error or omission is not material in determining whether a person meets the State's substantive qualifications to vote.

2. The plain text of the Materiality Provision thus reaches and constrains the portions of SB 1 challenged here. As the district court explained, an application

for a mail ballot quite obviously constitutes an "application" under the Provision. *See* ROA.33250. The Texas Election Code repeatedly refers to the document as an "application," *see, e.g.*, Tex. Elec. Code Ann. §§ 82.001, 84.001, 84.002, 84.005, 84.014, 86.001 (West 2023), and the document itself bears the title, "Application for a Ballot by Mail," ROA.14099. As for the carrier envelope, it is a "paper" related to an "act requisite to voting"—specifically, return of a mail ballot. 52 U.S.C. 10101(a)(2)(B); *see also* ROA.33250. The Provision thus applies to both documents. *See League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021) (applying the Provision in the context of absentee-ballot applications); *see also League of Women Voters of Wis. v. Wisconsin Elections Comm'n*, No. 2022CV2472 (Wis. Cir. Ct. Dane Cnty. Jan. 2, 2024), slip op. 4-5 (same in the context of absentee ballot materials); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-1309 (N.D. Ga. 2018) (same).

Analyzing Sections 5.07 and 5.13 under the Provision, the record establishes that they give rise to precisely the kind of disenfranchisement the Provision prohibits. Sections 5.07 and 5.13 deny the right to vote because they void actions that voters take "to make a vote effective" and to have it "counted," 52 U.S.C. 10101(e), when the information on a mail-ballot application or carrier envelope does not match information in the TEAM database, *see* p.11, *supra*. Additionally, as the district court found, and as state defendants and intervenors confirm on

appeal, the identification information that Sections 5.07 and 5.13 require voters to provide "is not material to [determining a voter's] eligibility to vote under Texas law."  ROA.33241; *see also* State Defs.' Br. 9 (acknowledging that "S.B. 1's identification requirement" is not used "to determine whether an individual is qualified to vote"); Intervenors' Br. 29 ("S.B. 1's identification rules are not used 'in determining whether [an] individual is qualified under State law . . . to vote.'" (alterations in original) (citation omitted)).  Consequently, SB 1 Sections 5.07 and 5.13 violate the Materiality Provision "as a matter of law."  ROA.33266.

**B.  Arguments based on the Third Circuit's decision in *Pennsylvania NAACP* cannot be reconciled with the statutory text.**

State defendants and intervenors resist this straightforward application of the Materiality Provision's plain text.  Citing the Third Circuit's decision in *Pennsylvania NAACP*, they ask this Court to read the Provision as applicable "only to 'registration' and 'other' analogous acts."  Intervenors' Br. 2; *see* State Defs.' Br. 23; *see also Pennsylvania NAACP*, 97 F.4th 120, 135 (3d Cir. 2024) (finding the Provision inapplicable to a state law requirement that voters date a declaration on their mail-ballot carrier envelopes), *reh'g denied*, No. 23-3166, 2024 WL 3085152 (3d Cir. Apr. 30, 2024).

As an initial matter, this argument misreads *Pennsylvania NAACP*, which pointedly did *not* draw the line at voter registration.  Rather, that court found the Provision applicable only to "laws [that] restrict *who* may vote"—in other words,

laws that assess voter qualifications. *Pennsylvania NAACP*, 97 F.4th at 130. And the Third Circuit recognized that such determinations can occur *after* a person already has registered to vote. For example, in Pennsylvania, an individual voting by mail ballot is "deemed qualified to vote . . . when his application to register is approved and *again* when his application for a mail ballot is accepted." *Id.* at 137 (emphasis added). Similarly, in Texas, early voting clerks determine whether a "qualified voter" is "entitled to vote an early voting ballot by mail." Tex. Elec. Code Ann. §§ 82.001-.004, 86.001. Even on the Third Circuit's reading of the Provision, it would apply to these post-registration determinations of voter qualifications.

But regardless, this Court should reject state defendants' and intervenors' unduly narrow interpretation of the Materiality Provision and their arguments echoing erroneous reasoning from *Pennsylvania NAACP*. As explained below, their proposed construction contradicts the Provision's text and lacks support in the Provision's neighboring statutory provisions, and their federalism and constitutional concerns are unfounded.

> **1. State defendants and intervenors render significant portions of the Materiality Provision superfluous and misapply the *ejusdem generis* canon.**

a. In arguing that the Materiality Provision is restricted to voter registration, state defendants and intervenors misread multiple parts of the statutory text. To

begin, they ask this Court to read the phrase "any application, registration, or other act requisite to voting," 52 U.S.C. 10101(a)(2)(B), to mean "only voter registration" (Intervenors' Br. 23 (citation omitted); *see also* State Defs.' Br. 29). But this construction violates "one of the most basic interpretive canons, that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Corley v. United States*, 556 U.S. 303, 314 (2009) (alteration and citation omitted). Indeed, their interpretation renders the statutory text doubly superfluous, construing *both* the term "application" *and* "the residual phrase 'other act requisite to voting' . . . [to] refer[] only to voter registration." Intervenors' Br. 23-24 (citation omitted); *see also Pennsylvania NAACP*, 97 F.4th at 138 (admitting that its interpretation "renders 'other act requisite to voting' superfluous"). This is an implausible construction of the text, especially given the "meticulous attention" congressional drafters gave to "every word" and "the shading of every phrase" in the statute. 110 Cong. Rec. 11935 (1964) (statement of Sen. Dirksen).

By contrast, the district court's interpretation gives independent meaning to "application" and "other act requisite to voting" (ROA.33250) in a manner consistent with history and case law. For example, at the time Congress enacted the Provision, some individuals who had *already* registered to vote were still required under state law to submit an "application to vote" before being permitted

to participate in an election.  *See* Ill. Rev. Stat. Ch. 46 § 4-22 (1961).  On the

district court's reading, the Materiality Provision would bar disenfranchisement

based on immaterial errors or omissions on this "application to vote," whereas state

defendants' and intervenors' reading would leave such an application outside the

Provision's reach, despite the obvious textual basis in the statute.

Likewise, the district court's construction ensures that the phrase "other act

requisite to voting" retains interpretive significance.  The "value" of a "generally

phrased residual clause . . . is that it serves as a catchall for matters not specifically

contemplated—known unknowns."  *Republic of Iraq v. Beaty*, 556 U.S. 848, 860

(2009); *see also Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (explaining

that the purpose of catchall language is "to cover some set of 'matters not

specifically contemplated'" (citation omitted)).  The district court's reading

preserves that function, unlike state defendants' and intervenors' narrow

interpretation, which would "defeat Congress' intent" to protect the right to vote

"in a broad manner."  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142,

163 (2012).

Nor is the term "registration" simply "a waste of ink" under the district

court's interpretation.  Intervenors' Br. 25.  By expressly mentioning papers and

records related to "registration," in addition to "other act[s] requisite to voting," 52

U.S.C. 10101(a)(2)(B), Congress made clear that the Provision reaches steps in the

voting process that *precede* the casting of a ballot. If the Provision instead referenced only "acts requisite to voting," its text would have left unclear how proximate an act must be to casting a ballot before it falls within the Materiality Provision's purview. Inclusion of the word "registration" removes that uncertainty for a crucial access point in the right to vote. The district court's interpretation thus leaves the word "registration" with "work to do" within the Provision. *Fischer*, 144 S. Ct. at 2185.

Moreover, "Congress may have simply intended to remove any doubt that" the Provision reaches the voter-registration process. *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 226 (2008); *see also Fort Stewart Schs. v. FLRA*, 495 U.S. 641, 646 (1990) (explaining that "technically unnecessary" statutory exceptions may be "inserted [by Congress] out of an abundance of caution"). Congress had good reason to take such approach, given the evidence compiled by the Commission on Civil Rights of rampant discrimination in voter registration. *See 1961 CCR Report* 137-138. That drafting choice "does not necessarily render" the statutory language "superfluous." *Ali*, 552 U.S. at 226. But even if it did, it is substantially less surplusage than under state defendants' and intervenors' interpretation, which renders both "application" and "other act requisite to voting" duplicative of "registration." As the Supreme Court recently admonished, a "construction that creates substantially less [surplusage] is better than a

construction that creates substantially more." *Fischer*, 144 S. Ct. at 2189 (citation omitted).

b.  Nor does the *ejusdem generis* canon aid state defendants' and intervenors' effort to truncate "any application, registration, or other act requisite to voting," 52 U.S.C. 10101(a)(2)(B), to "registration."  Under the canon, "a general phrase following an enumeration of things should be read to encompass only things of the same basic kind." *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 975 (2024).  Here, Congress expressly identified the "common denominator" that "unite[s] the provision's several parts," *ibid.*:  the "application[s], registration, and other acts" to which the Provision refers are all "*requisite to voting*," 52 U.S.C. 10101(a)(2)(B) (emphasis added).  *See also Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021) ("[A] modifier at the end of the list 'normally applies to the entire series.'" (citation omitted)).  Intervenors thus err in suggesting that the commonality across the enumerated items is that each "refers only to voter registration."  Intervenors' Br. 24.  To the contrary, "[t]he text itself provides a different shared trait." *Muldrow*, 144 S. Ct. at 975.

State defendants' and intervenors' application of *ejusdem generis* additionally fails because the listed examples do not all fall within state defendants' and intervenors' proposed classification.  *Ejusdem generis* "presumes" that an "entire [statutory] passage" falls within a single "category"; consequently, a

precondition of the canon's application is that the "initial terms" in the list "all belong to an obvious and readily identifiable genus."  Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 199 (2012).  Here, however, the two enumerated examples in the Provision (application and registration) do not both fall within state defendants' and intervenors' proposed category—namely, "registration."  *See, e.g.*, Intervenors' Br. 23-24.  Rather, as explained above, the term "application" can encompass *non*-registration-related documents like applications to vote and applications for mail ballots.  *See* pp.22-23, 26-27, *supra*.  Consequently, state defendants and intervenors derive no support for their reading from the canon.  *See* Scalia & Garner 209; *see also Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980) (finding a party's reliance on *ejusdem generis* "misplaced" where a "specifically enumerated" item did not share the attribute proposed for limiting the catchall phrase).

But again, even if state defendants and intervenors were right and "application" and "registration" both refer to "registration," application of *ejusdem generis* would bolster the *district court's* reading of the statutory text, not theirs. As Justice Scalia explained, "when the specifics [in a list] exhaust the class and there is nothing left besides what has been enumerated, the follow-on general term must be read literally."  Scalia & Garner 209.  Read literally here, papers and

records relating to any "act requisite to voting" clearly include mail-ballot applications and carrier envelopes.[4]

State defendants' and intervenors' application of *ejusdem generis* takes the opposite approach: instead of reading "other act requisite to voting" in a literal fashion, they interpret the phrase to encompass nothing more than "registration." *See* State Defs.' Br. 29; Intervenors' Br. 23. But a court may not use *ejusdem generis* to "strip [a] catchall phrase of independent meaning" by rendering it reiterative of enumerated examples, as state defendants and intervenors urge. *Christopher*, 567 U.S. at 163 n.20.

2. **State defendants and intervenors misunderstand the Provision's use of the phrase "in determining."**

Intervenors' reliance on the Provision's use of the phrase "in determining" fares no better. *See* Intervenors' Br. 26-27. That phrase is used in the Provision's conditional clause: "if such error or omission is not material in determining whether such individual is qualified under State law to vote." 52 U.S.C. 10101(a)(2)(B). Citing a recent dictionary definition, intervenors argue that because the word "in" is "typically equivalent" to "when," the phrase "in

---

[4] For this reason, state defendants err in suggesting (State Defs.' Br. 24) that the Provision cannot reach papers and records relating to mail-ballot applications and mail ballots absent congressional amendment: the text of the Provision *already* reaches such papers and records based on a plain reading of the statutory language or through application of *ejusdem generis*.

determining" limits the Provision's applicability "only to actions taken *when determining* an individual's [voter] eligibility." Intervenors' Br. 26-27 (internal quotation marks omitted) (quoting *In*, Oxford English Dictionary (3d ed. 2021, rev. online Mar. 2023)).

This argument misunderstands the phrase "in determining" and its operation within the Provision, especially as contrasted with the subparagraph that precedes the Provision. As explained in a contemporaneous definition, the word "in" is "a function word t[hat] indicate[s] means or instrumentality." *In*, Webster's Seventh New Collegiate Dictionary (1963). Accordingly, the Provision uses the phrase "in determining" to make clear that the information to which the error or omission relates must be a *means* of determining whether a person is qualified to vote. *See Florida State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008) (explaining that the Provision focuses on "the nature of the underlying information requested"). If the information is not used as a means of determining voter qualifications, then election officials may not deny the right to vote based on an error or omission in providing that information. The conditional language introduced by "if" and containing the "in determining" phrase ("if such error or omission is not material in determining whether such individual is qualified") thus limits the *types* of errors or omissions that may be material. It does *not* limit the "record[s]" or "paper[s]" on which those errors or omissions may appear and to

which the Provision applies—rather, the first part of the Provision (the scope clause) sets that boundary. 52 U.S.C. 10101(a)(2)(B).

Comparison to the preceding subparagraph in 52 U.S.C. 10101(a)(2)—specifically, Subparagraph (A)—bolsters this understanding. Subparagraph (A) uses the phrase "in determining" to modify the conduct it prohibits:

> No person acting under color of law shall . . . in determining whether any individual is qualified under State law or laws to vote . . . apply any standard, practice, or procedure different from [those] applied . . . to other individuals . . . found . . . qualified to vote.

52 U.S.C. 10101(a)(2)(A). This placement of "in determining" establishes that the conduct at issue (application of different standards, practices, or procedures) cannot occur when an election official is determining voter qualifications. By contrast, in the Materiality Provision, the phrase "in determining" modifies not the prohibited act (denial of the right to vote), but the type of error or omission that may not be used to deny that right. *See* 52 U.S.C. 10101(a)(2)(B) ("if such error or omission is not material in determining"); *see also Environmental Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (referencing the presumption that words used multiple times in a statute carry the same meaning, but cautioning that this presumption "is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent" (citation omitted)).

### 3. State defendants and intervenors misapprehend the "right . . . to vote" safeguarded by the Materiality Provision.

State defendants' and intervenors' arguments regarding "den[ial] [of] the right of any individual to vote," 52 U.S.C. 10101(a)(2)(B), are similarly unpersuasive.

First, they contend that the Provision has no applicability to mail voting because its reference to "the right . . . to vote," 52 U.S.C. 10101(a)(2)(B), merely "codifie[s] a pre-existing [constitutional] right" that does not include "a right to vote by mail" (Intervenors' Br. 30-31 (emphasis and citation omitted); *see also* State Defs.' Br. 23-24). But regardless of whether state defendants and intervenors correctly describe the scope of that constitutional right, the Materiality Provision protects a separate *statutory* "right . . . to vote," delineated by the definition of "vote" that Congress provided in Subsection (e). *See* 52 U.S.C. 10101(a)(2)(B) and (e). "When 'a statute includes an explicit definition' of a term, '[the Court] must follow that definition." *Van Buren v. United States*, 593 U.S. 374, 387 (2021); *see also Christopher*, 567 U.S. at 162 n.18 (explaining that "reliance on dictionary definitions" is "misplaced" when a statute "provides its own definition" of a term "that is more expansive than the term's ordinary meaning"). Consequently, "the relevant question is" whether the challenged SB 1 provisions violate the "right . . . to vote," 52 U.S.C. 10101(a)(2)(B), "*as the [Materiality Provision] defines that phrase*," *Van Buren*, 593 U.S. at 387-388. As the district

court explained, SB 1 *does* violate that "statutory right" by requiring the rejection of mail-ballot applications and mail ballots "based on an immaterial error or omission" (ROA.33254-33255), and none of state defendants' or intervenors' constitutional cases shows otherwise (*see* State Defs.' Br. 23-26; Intervenors' Br. 30-33).

Second, state defendants and intervenors argue that denial of the right to vote only occurs under the Provision when an individual is "deprive[d] . . . of all opportunity to vote on equal terms" as other persons. Intervenors' Br. 34; *see also* State Defs.' Br. 25. This fundamentally misunderstands the Provision, which employs a standard of "materiality," not "neutrality." In prohibiting denials of the right to vote based on errors or omissions not material to determining voter qualifications, Congress sought to *remove* obstacles to exercise of the franchise— for example, the requirement that voters "list the exact number of months and days in [their] age." *Browning*, 522 F.3d at 1173 (citation omitted). The Provision does not permit imposition of such a requirement so long as it applies equally to *all* voters—rather, the Provision outlaws such a requirement altogether.

Third, state defendants and intervenors attempt to distinguish the denial of the right to vote from a "forfeiture of the right to vote" for "fail[ure] to follow the[] rules" for casting a ballot. State Defs.' Br. 3 (citation omitted); *see also* Intervenors' Br. 33-35. Setting aside that SB 1 often "requires election officials to

reject mail ballot materials from voters who provided *accurate information*"—for example, when correct information on mail-ballot applications or carrier envelopes does not match "incomplete [or] erroneous voter registration records" in the TEAM database (ROA.33225 (emphasis added))—state defendants' and intervenors' argument proves too much. A failure to follow *voter-registration rules* similarly could be characterized as mere forfeiture of the right to vote. However, all agree that the rejection of a voter registration form based on an immaterial error or omission constitutes a denial of the right to vote under the Provision, and not a forfeiture.

Intervenors respond by emphasizing that, unlike rejection of voter-registration materials, rejection of a mail ballot or mail-ballot application does not "remove [a person] from the list of registered voters, or prevent them from voting in the current or any future election." Intervenors' Br. 34. On their view, only this type of action deprives a voter of "the '*right*'" to take steps necessary for making a vote effective. Intervenors' Br. 32. But the Provision is not narrowly directed at the problem of wholesale disenfranchisement. Rather, it applies to denials of a person's right to vote "in *any* election." 52 U.S.C. 10101(a)(2)(B) (emphasis added); *see also Ali*, 552 U.S. at 219 (explaining that "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (citation omitted)). As the district court correctly reasoned, this means that

"denying the statutory right to vote based on an error or omission that disqualifies a voter from [even] a *single* election violates" the Provision. ROA.33249.

Fourth, state defendants and intervenors argue that SB 1 effects no denial of the right to vote because when mail-ballot applications and mail ballots are rejected, affected voters may be able to "cure" the defect (State Defs.' Br. 25) or "vote in person" (Intervenors' Br. 31). But the Provision vests voters with a "right" to take "all action necessary to make a vote effective including . . . casting a ballot[] and having such ballot counted." 52 U.S.C. 10101(a)(2)(B) and (e). It does not countenance invalidation of those efforts because a voter failed to fix the immaterial error or omission, or because some other means of voting exists. Put differently, the Provision "requires [voting-related] paperwork with an immaterial error or omission to be *accepted*, not rejected with an invitation to try again." ROA.33255 (emphasis added).

Indeed, it may be pointless or impossible for a voter to "try again." As discussed above, when a voter's record in TEAM is inaccurate or incomplete, the voter may lack any way of using the State's cure options to ensure acceptance of their mail-ballot application or mail ballot absent re-registration. *See* pp.11-14, *supra*. Moreover, voting in person may be impossible where a person's eligibility for voting by mail ballot is premised on their *absence* from their home county during the in-person voting period, or on a "sickness or physical condition" that

risks injury to their health if they appear at the polling place on election day.  *See* Tex. Elec. Code Ann. §§ 82.001-.002 (2023).

### C. State defendants and intervenors misread neighboring statutory provisions.

Intervenors expand their misreading of 52 U.S.C. 10101 by asserting that neighboring statutory provisions—specifically, Section 10101(a)(2)(A) and (C), and Subsection (e)—"apply only to voter-eligibility determinations during the registration process," and therefore, so, too, must the Materiality Provision. Intervenors' Br. 27-28, 46.  This argument fails at its premise because those provisions are not so limited.

Section 10101(a)(2)(A) states that, "in determining whether any individual is qualified" to vote, no election official may "apply any standard, practice, or procedure different from" those applied to others who have been found "qualified to vote."  Contrary to intervenors' suggestion, nothing in this language restricts the provision to "voter-qualification determinations" during registration.  Intervenors' Br. 27; *see also* pp.25, 32-33, *supra* (explaining that determinations of voter qualifications can happen after voter registration and discussing the term "in determining").  Thus, unsurprisingly, Section 10101(a)(2)(A) has been applied in the post-voter-registration context.  *See Marks v. Stinson*, No. 93-CV-6157, 1994 WL 146113, at *34 (E.D. Pa. Apr. 26, 1994) (applying Section 10101(a)(2)(A) in claim involving "delivery of Absentee Ballot Packages").

Likewise, intervenors read a limitation into Section 10101(a)(2)(C) where none exists. The subparagraph says nothing about voter registration—rather, it simply restricts election officials' ability to "employ any literacy test as a qualification for voting in any election," regardless of when those qualifications are assessed. 52 U.S.C. 10101(a)(2)(C); *see also* p.25, *supra*.

Intervenors' reliance on 52 U.S.C. 10101(e) is similarly unavailing. They note (Intervenors' Br. 28) that, under certain circumstances, the subsection enables a person "qualified under State law to vote" to obtain a judicial "order declaring him qualified to vote," 52 U.S.C. 10101(e). But for two reasons, they err in suggesting that this remedy evinces a "qualification-and-registration focus." Intervenors' Br. 28. First, the remedy seeks to redress the deprivation "of a[] right or privilege secured by subsection (a)." 52 U.S.C. 10101(e). And the rights and privileges under Subsection (a) extend *beyond* registration: they provide that "[a]ll citizens of the United States who are otherwise qualified by law to vote . . . shall be entitled and *allowed to vote*." 52 U.S.C. 10101(a)(1) (emphasis added). Second, the judicial order available under Subsection (e) aims to ensure that the recipient actually can vote. The Attorney General must transmit copies of the order to "appropriate election officers" to make certain the recipient is "permitted to vote" in subsequent elections. 52 U.S.C. 10101(e). And if there is insufficient time for a court to rule on the request for an order, the individual may obtain "an order

authorizing [them] to vote provisionally." *Ibid.* In short, the point of Subsection

(e) is to ensure that qualified individuals can vote, and not just register to do so.

> **D.** **Neither the federalism canon nor the constitutional-avoidance canon applies here or compels state defendants' and intervenors' interpretation.**

State defendants' and intervenors' invocations of the federalism canon and

the constitutional-avoidance canon are both unavailing.

1. For multiple reasons, the principle that Congress must use "exceedingly

clear language if it wishes to significantly alter the balance between federal and

state power," *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per

curiam) (citation omitted), does not compel intervenors' interpretation.

First, this canon "d[oes] not apply when a statute [is] unambiguous," as is

the case here. *Salinas v. United States*, 522 U.S. 52, 60 (1997). "A statute can be

unambiguous without addressing every interpretive theory offered by a party."

*Ibid.* It simply needs to be "'plain to anyone reading the [text]' that the statute

encompasses the conduct at issue." *Ibid.* (citation omitted). For the reasons above,

a reasonable person reading the Provision's discussion of "record[s] or paper[s]

relating to any . . . act requisite to voting," and the definition of "vote" to include

"all action necessary to make a vote effective," 52 U.S.C. 10101(a)(2)(B) and (e),

would understand that the Provision reaches rejections of mail-ballot applications

and mail ballots.

Second, the federalism canon is inapplicable here in the context of federal elections because, as originally enacted and applied to federal elections, the Materiality Provision is lawful Elections Clause legislation. That Clause grants Congress the power to "make or alter" laws related to "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. Art. I, § 4, Cl. 1. Congress permissibly exercised this power via the Materiality Provision by limiting the way States may conduct registration and voting activities. The federalism canon thus "has no work to do in th[is] Elections Clause setting" because "Congress's regulation of congressional elections *necessarily* displaces state regulations," meaning there is no "alter[ation] [of] the traditional state-federal balance." *Fish v. Kobach*, 840 F.3d 710, 731 (10th Cir. 2016); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12-13 (2013).

Third, the federalism canon also is inapposite here in the context of state and local elections because when Congress amended the Provision to make it applicable to such elections, *see* p.7, *supra*, Congress effected no significant alteration of the balance between federal and state power. *Cf. Alabama Ass'n of Realtors*, 594 U.S. at 764-765 (characterizing a challenged interpretation as giving the agency an "unprecedented" and "breathtaking amount of authority"). The Provision imposes a narrow but important prohibition on denials of the right to vote based on immaterial errors or omissions on voting-related paperwork. *See*

ROA.33250.  Although this prohibition applies beyond voter-registration, its targeted focus preserves significant election-administration authority for States.

Indeed, intervenors' opposing view—that the district court's interpretation will "imperil[] paper-based voting rules all across the country" (Intervenors' Br. 3)—rests on gross exaggerations of the Provision's impact and ignores the many "reasons to doubt that the Materiality Provision would invalidate the regulations" they cite (ROA.33232).  For example, signature requirements for mail ballots, mail-ballot applications, early-voting certificates, and poll lists may be material where they establish a person's voter qualifications via attestations to eligibility criteria.  *See, e.g.*, Tex. Elec. Code Ann. §§ 84.001(b), 86.005(c), 87.041(b)(2) (West 2021); Fla. Stat. § 101.657(4)(a) (2020); La. Stat. Ann. § 18:562(C) (2023); *see also Vote.org*, 89 F.4th at 489.  The same can be true of address requirements.  *See* Tex. Elec. Code Ann. § 87.041(b)(6) (West 2023). Mandating witness signatures on mail-ballot applications and ballots may also serve to establish a voter's identity, including where, due to a disability, a voter needs to fulfill a signature requirement in some other way—for example, by using a non-signature mark.  *See, e.g.*, Ala. Code §§ 17-11-7(b), 10(b)(2) (2019); Colo. Rev. Stat. § 31-10-1002(1) (2014); Tex. Elec. Code Ann. § 1.011 (West 2021).

Intervenors' remaining examples (Intervenors' Br. 38) do not implicate the Materiality Provision at all.  Obligations to use secrecy envelopes, *see, e.g.*, Ky.

Rev. Stat. Ann. §§ 117.085(3) and (7) (West 2021), and comply with postmark requirements, Tex. Elec. Code Ann. § 86.007(a)(2) (West 2023), do not involve "error[s] or omission[s] on a[] record or paper," 52 U.S.C. 10101(a)(2)(B). Recordkeeping duties to document in pollbooks the names and sequence of voters, *see, e.g.*, Va. Code Ann. § 24.2-643(B) (2022), are unlikely to result in retroactive denials of the right to vote. And neither state prohibitions on over-marked ballots, nor signature requirements for individuals returning mail ballots for others, involve denials of the right to vote. Over-marked ballots make it impossible for election officials to discern an individual's preferred candidate and "include[]" a vote from that individual "in the appropriate total[]" for the candidate. 52 U.S.C. 10101(e); *see also* Ariz. Rev. Stat. Ann. § 16-611 (2023). And none of the state signature requirements for individuals returning mail ballots for others cited by intervenors (Intervenors' Br. 38) requires rejection of a ballot as a penalty—indeed, California forbids it, *see* Cal. Elec. Code § 3011(c) (West 2022). Likewise, Texas law does not mandate rejection of ballots based on errors or omissions on voter assistance forms, which must be completed when a person "other than an election officer" assists a voter who "cannot prepare or read the[ir] ballot"—for example, due to a "physical disability that renders the voter unable to write or see." Tex. Elec. Code Ann. §§ 64.031, 64.0322 (West 2023); *see also id.* §§ 64.032-.037.

For these reasons, intervenors are simply wrong to postulate "extreme result[s]" arising from the district court's textually faithful reading of the Provision. Intervenors' Br. 29. "But even supposing th[at] [intervenors'] worst predictions come true, that would be the result of the statute Congress drafted." *Muldrow*, 144 S. Ct. at 976. Statutes often reach beyond the "principal evil" that animated them, and "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998). Intervenors balk at such an approach, declaring it "implausible" that Congress intended the Provision to apply beyond voter registration and arguing that "Congress did not 'hide [this] elephant[]' in the Provision's obscure 'mousehole[].'" Intervenors' Br. 39 (alterations in original; citation omitted). But even if applicability beyond registration were "an elephant[,] . . . where's the mousehole?" *Bostock v. Clayton Cnty.*, 590 U.S. 644, 680 (2020). Where, as here, a civil rights statute "is written in starkly broad terms," courts are obliged to "recognize" the "consequence[s] of that legislative choice," including where new "applications [have] emerge[d] over time." *Id.* at 680, 683.

2. State defendants and intervenors also wrongly urge application of the constitutional-avoidance canon, arguing that interpreting the Provision to apply beyond voter registration would "render it unconstitutional" under the Fifteenth

Amendment.  Intervenors' Br. 40; *see also* State Defs.' Br. 27-28.  As above, the canon is inapplicable because their proposed reading is not a "plausible construction of the text."  *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 581 (2022).

But regardless, the argument fails on its merits.  Courts assess Fifteenth-Amendment legislation under the rationality standard articulated in *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819).  *See Allen v. Milligan*, 599 U.S. 1, 41 (2023) (upholding Section 2 of the VRA as "appropriate" legislation based on cases applying the *McCulloch* standard); *Shelby Cnty. v. Holder*, 570 U.S. 529, 556 (2013) (invalidating the VRA's coverage formula only after finding that Congress's justification was "irrational").  Under this deferential test, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."  *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966).

Ensuring that the Provision's protections extend to "any step of the voting process," 110 Cong. Rec. at 6970 (statement of Sen. Scott), was such a rational means.  By 1964, voting rights "[s]tatutes enacted in 1870, 1871, 1957, and 1960" had proven to be "unsuccessful attempts to counteract state and local government tactics of using, *among other things*, burdensome registration requirements to disenfranchise African-Americans."  *Browning*, 522 F.3d at 1173 (emphasis added).  To deal with this well-entrenched problem and "reduce discriminatory

obstacles to the *exercise* of the right to vote," H.R. Rep. No. 914, 88th Cong., 1st Sess. 18 (1963) (1963 House Report) (emphasis added), Congress enacted a general prohibition that "broadly 'prohibit[s] the disqualification of an individual because of immaterial errors or omissions," *Vote.org*, 89 F.4th at 486 (quoting 1963 House Report 19). Writing the Provision in this "over-inclusive form" helps to "capture well-disguised discrimination" and address "hard-to-predict variations" in curtailments of access to voting. *Id.* at 482, 486. Taking this more expansive approach was surely a rational means of combatting racially discriminatory obstacles to exercise of the franchise.

Such an approach also would be "a congruent and proportional exercise of congressional power," *Vote.org*, 89 F.4th at 487, if this Court were to apply the "congruence and proportionality" standard applicable to Fourteenth Amendment legislation, *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). *See also Vote.org*, 89 F.4th at 486 n.11 (addressing the rational-means and congruent-and-proportional tests and holding that the Provision permissibly reaches race-neutral denials of the right to vote under "either test"). Although Congress's primary aim in enacting the Provision was to eliminate racially discriminatory barriers to voter registration, Congress pointedly did not limit its remedy to registration (or to racially motivated acts, *see* note 5, *infra*)—and for good reason: doing so would have meant that the Provision bars rejection of a voter's registration form for

omission of immaterial information, but permits rejection of the voter's ballot for the *same* omission. It was a congruent and proportional exercise of Congress's Fourteenth-Amendment authority to broadly bar denials of the right to vote for immaterial errors or omissions at any stage of the voting process, instead of "crafting a solution with an obvious loophole." ROA.33254; *see also Quarles v. United States*, 587 U.S. 645, 654 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute.").[5]

## II. The district court correctly held that SB 1 violates the Materiality Provision.

### A. The identification information required under Sections 5.07 and 5.13 is not material under this Court's decision in *Vote.org v. Callanen*.

Applying the Provision here, it bars the rejection of mail-ballot applications and mail ballots under SB 1 Sections 5.07 and 5.13 because the identification information they require is not material in determining voter qualifications. In *Vote.org v. Callanen*, this Court identified "two steps" for assessing materiality.

---

[5] State defendants ask this Court to hold that "'only racially motivated deprivations of rights are actionable' under the Materiality Provision." State Defs.' Br. 26 (citation omitted). But as noted, *Vote.org* forecloses that proposition. *See Vote.org*, 89 F.4th at 487. Intervenors describe *Vote.org*'s Fifteenth-Amendment holding as "'dictum' not 'necessary to the result.'" Intervenors' Br. 44 n.3 (citation omitted). But the opinion forecloses that characterization, too, explaining that the Court had considered and "rejected [all] arguments that would avoid actually analyzing the materiality of" the challenged election measure. *Vote.org*, 89 F.4th at 487. In short, the Court's resolution of the Fifteenth-Amendment issue was a necessary step for reaching the question of materiality.

89 F.4th 459, 485 (5th Cir. 2023). First, a court assesses the "tenuous[ness]" of the "connection between" a State's asserted interest and the voting requirement adopted to further that interest. *Ibid.* Second, if the connection is "more than tenuous," a court proceeds to determine, "under the totality of circumstances," whether the requirement "meaningfully corresponds to 'legitimate interests the State claims to have been advancing.'" *Ibid.* (citation omitted). This entails consideration of the "relat[ionship]" between the interest and the determination of voter qualifications, and "how well" the requirement "advances that interest without imposing pointless burdens." *Ibid.*[6]

The challenged SB 1 provisions' immateriality is apparent at both steps of this analysis. At the first step, the interest on which state defendants and intervenors rely—"verify[ing] a voter's identity" (State Defs.' Br. 32; *see also* Intervenors' Br. 53)—bears, at best, a tenuous connection to the SB 1 provisions at issue, given the multitude of errors that "riddle[]" the TEAM database. ROA.33244. For tens of thousands of individuals, the DPS and social security numbers in TEAM differ from the information in DPS's own database. *See* p.10, *supra*. For nearly 200,000 voters who previously have been issued a DPS number,

---

[6] The district court's memorandum opinion preceded this Court's decision in *Vote.org*. Consequently, while the district court's summary-judgment ruling can and should be affirmed under *Vote.org* as explained below, remand for the district court to apply *Vote.org*'s analytical framework in the first instance also would be appropriate.

this information is not recorded at all in the TEAM database. *See* p.10, *supra*. And for almost 100,000 voters, their TEAM record contains neither a DPS number nor the last four digits of their social security number. *See* p.10, *supra*.

These figures demonstrate the "absence of a[ny] strong connection between" the State's interest verifying a voter's identity and the challenged SB 1 provisions. *Vote.org*, 89 F.4th at 485. For hundreds of thousands of registered Texas voters, the identification information required under Sections 5.07 and 5.13 does not enable officials to "determine whether the person seeking to vote is the relevant voter" (State Defs.' Br. 19) because the "incomplete and erroneous voter registration records" that pervade the TEAM database (ROA.33225) preclude such a function. Consequently, in practice, divergences between the number listed on a voter's mail-ballot application or carrier envelope and the voter's TEAM record are *not* considered evidence that someone other than the relevant voter is attempting to vote. *See* ROA.33225 (noting that neither the Secretary nor county officials "consider a DPS number or [a social security number] mismatch or omission to be evidence of fraud"). The challenged SB 1 provisions are thus not material at step one of the analysis.

The same conclusion applies at step two, as well, because the SB 1 provisions do not meaningfully correspond to any legitimate state interests. As the discussion above makes clear, the SB 1 provisions fail to "substantial[ly]" advance

the State's proffered interest in establishing a voter's identity. *See Vote.org*, 89 F.4th at 485; *see also ibid.* (discussing "the strength of the connection between the State's interest and the measure"). Consequently, state defendants and intervenors pivot to relying on more generalized "voter integrity" concerns. State Defs.' Br. 32 (citation omitted); *see also* Intervenors' Br. 53. However, "the risk of fraud [in voting] is exceedingly rare," and "[t]o the extent there is any risk of voter fraud, Texas has mechanisms in place to protect the integrity of its elections." *Texas Democratic Party v. Abbott*, 978 F.3d 168, 200 (5th Cir. 2020) (Stewart, J., concurring and dissenting in part). Unsurprisingly, then, state defendants and intervenors cite no evidence showing that the challenged provisions further "legitimate interests the State claims to have been advancing," *Vote.org*, 89 F.4th at 485 (citation omitted)—for example, there is no sign the provisions have impeded "third-party fraudsters" (Intervenors' Br. 53) or revealed voter-fraud "scheme[s]" (State Defs.' Br. 33). *See also* ROA.33224 ("Election officials confirmed that" the identification information submitted under Sections 5.07 and 5.13 "are not used to . . . flag potential fraud.").

Meanwhile, the challenged SB 1 provisions have had tremendous negative impacts on Texas elections. *See Vote.org*, 89 F.4th at 485 (asking whether challenged requirements impose "pointless burdens"). In the wake of SB 1's passage, county officials saw "significantly greater" mail-ballot rejection rates than

what they had experienced "in years past." ROA.15189. Indeed, the rejection rate for the 2022 general election was "almost three times the national average . . . , and more than the state's average prior to SB1 passage." ROA.14489. Overall, SB 1's new requirements accounted for more than 80% of all mail-ballot rejections during the 2022 primary and general elections, totaling in the tens of thousands. *See* p.15, *supra*. These results offend the "basic truth that even one disenfranchised voter— let alone several thousand—is too many." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).

Given these results, it is hardly surprising that SB 1's cure options are far from the panacea that state defendants and intervenors describe. As the district court explained, many voters "cannot effectively use the[] [cure options] to ensure their [mail-ballot] application is accepted and their valid ballot is counted." ROA.33256 n.30. For example, where identification information in the TEAM database is incorrect or incomplete, the voter may lack any way of complying with SB 1 and providing on their mail-ballot application or carrier envelope an identification number that will match what is in TEAM, absent re-registration. *See* pp.11-14, *supra*. And although SB 1 required the creation of an online mail-ballot tracker through which curing theoretically is possible, a voter "cannot log in to the tracker" if their record in TEAM "is missing either a DPS ID number or [the last four digits of the voter's social security number] . . . or if TEAM has incorrect

information for either of those numbers." ROA.33256 n.30. This is the case for more than 750,000 registered voters in Texas. *See* pp.13-14, *supra*.

Accordingly, considering "the totality of circumstances," the challenged SB 1 provisions do not "meaningfully correspond[] to 'legitimate interests the State claims to have been advancing.'" *Vote.org*, 89 F.4th at 485. This means that the Materiality Provision bars the rejection of mail-ballot applications and mail ballots under SB 1 Sections 5.07 and 5.13 because the identification information they require from voters is not material.[7]

## B. The identification information is not material under the Eleventh Circuit's decision in *Browning*.

Citing the Eleventh Circuit's opinion in *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), state defendants and intervenors suggest that a separate statute—namely, HAVA—renders the identification information required by SB 1 Sections 5.07 and 5.13 material under the Materiality Provision. State Defs.' Br. 36-37; Intervenors' Br. 53. HAVA obligates most

---

[7] Contrary to state defendants' suggestion (State Defs.' Br. 32-36), voting requirements are not material simply because state law makes them mandatory. *Vote.org* rebuffed a version of this argument. *See* 89 F.4th at 487 ("We reject that States may circumvent the Materiality Provision by defining all manner of requirements, no matter how trivial, as being a qualification to vote and therefore 'material.'"). And such an approach would effectively "erase the Materiality Provision from existence, by defining [as material] whatever requirements might be imposed by state law in order to vote." ROA.33240 (emphasis omitted) (citation omitted).

individuals registering to vote to provide certain information (like a current and valid driver's license number or the last four digits of their social security number) so that election officials can assign "a number which will serve to identify the applicant for voter registration purposes." 52 U.S.C. 21083(a)(5)(A)(ii). State defendants and intervenors argue that because SB 1 requires voters to include on their mail-ballot applications and carrier envelopes the "same identification information" that HAVA requires during voter registration, the information must be material under the Materiality Provision. Intervenors' Br. 11, 53; *see also* State Defs.' Br. 36-37.

Not so. Nothing in HAVA renders this identification information *per se* material in all other contexts and for all other uses. Rather, HAVA's requirement specifically applies at the registration stage "notwithstanding any other provision of law"—meaning, regardless of what the Materiality Provision might otherwise allow. 52 U.S.C. 21083(a)(5)(A)(i); *see also United States v. Elashi*, 789 F.3d 547, 552 (5th Cir. 2015) (explaining that a "notwithstanding" clause "signal[s] a clear Congressional intent to override conflicting federal law" (citation omitted)). HAVA does not go further and permit election officials to reject mail-ballot applications and mail ballots *after* registration based on errors or omission in providing such identification information an additional time.

Indeed, as the Eleventh Circuit acknowledges in *Browning*, states are "free [under HAVA] to accept the numbers provided on [an] application form . . . as self-authenticating" and need not "match[] the[] [numbers] against existing databases." 522 F.3d at 1174 n.21. HAVA does not require such verification because the numbers operate as *database identifiers* for voters, not as confirmation of a person's identity or voter qualifications. *See* 52 U.S.C. 21083(a)(5)(A)(ii) (assigning identifier "number[s]" to voters who cannot provide the required identification information). Nothing about HAVA's assistance in creating such identifiers alters the Materiality Provision's substantive standard for whether a voting requirement is "material in determining whether [an] individual is qualified under State law to vote" or the application of that standard outside of registration. 52 U.S.C. 10101(a)(2)(B).

## III. The United States has standing to sue Texas's Secretary of State.

State defendants also challenge the district court's inclusion of Texas's Secretary of State in its order enjoining enforcement of Sections 5.07 and 5.13. They contend that "Plaintiffs . . . lack standing to bring any of their claims against the Secretary" because "traceability and redressability" is absent. State Defs.' Br. 42-43; *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (discussing the requirements for Article III standing).

As an initial matter, state defendants fail to address—much less identify any error in—the district court's conclusion that, in addition to establishing "standing under modern standing doctrine," the United States also has standing to sue the Secretary under *In re Debs*, 158 U.S. 564 (1895). *See* ROA.10516-10523 (finding standing based on the United States' "significant stake in ensuring the supremacy of its laws and the general welfare of its citizenry"). But regardless, state defendants' standing arguments fail on their merits. The United States' Materiality Provision claim "challenged the facial invalidity of sections . . . 5.07[] and 5.13 of S.B. 1." ROA.10531 n.14. And "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the . . . Secretary of State, who serves as the 'chief election officer of the state.'" *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) (citation omitted).

State defendants protest, however, that "county officials, not the Secretary, enforce" mail voting requirements. State Defs.' Br. 40. But even though there may be "a division of responsibilities, the Secretary has the needed connection" to the challenged SB 1 provisions to establish traceability and redressability. *Texas Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020). The Secretary "has the specific and relevant duty to design the application form for mail-in ballots," *id.* at 179, which must "include[] a space for entering the required identification information" under SB 1 (ROA.10786). Likewise, "[t]o implement

S.B. 1's requirements at the voting stage," the Secretary must "prepare[] a carrier envelope with . . . instructions under the flap of the envelope" for providing the required SB 1 information.  ROA.33222.  The Secretary also "prepare[s] detailed and comprehensive written directives and instructions relating to and based on" Texas's election code, Tex. Elec. Code Ann. § 31.003 (West 2023); *see also* ROA.13435-13462 (Secretary's 2022 election advisory), which are distributed to "state and local authorities," including "election judges and clerks" (ROA.10529 (citations omitted)).  The Secretary's "stance" on state-election-law issues in these directives and instructions "binds all election officials in Texas."  ROA.10529.

The Secretary thus "had a role" in causing the United States' uncontested injury-in-fact.  *Texas Democratic Party*, 978 F.3d at 178; *see also* ROA.10524 n.9.  And she "is in a position to redress it at least in part."  *Texas Democratic Party*, 978 F.3d at 178.  For example, she "would need to correct" the SB 1-related election materials, directives, and instructions if the challenged portions of SB 1 were found to violate the Materiality Provision.  *Ibid.*  And if enjoined, she would have "statutory recourse to enforce the Court's order against election judges and clerks."  ROA.10530.  "Th[is] is enough to confer standing."  *Texas Democratic Party*, 978 F.3d at 178.[8]

_____

[8] State defendants' *Ex parte Young* arguments (State Defs.' Br. 38-42) do not implicate the United States' claim because, as they correctly recognize,

# CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Jason Lee
TOVAH R. CALDERON
JASON LEE
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 598-1317

---

sovereign immunity does not "run[] against the federal government" (State Defs.'
Br. 43); *see also Alden v. Maine*, 527 U.S. 706, 755-756 (1999).

**CERTIFICATE OF SERVICE**

On August 12, 2024, I filed this brief with the Clerk of the Court by using

the CM/ECF system.  Participants in the case are registered CM/ECF users, and

service will be accomplished by the CM/ECF system.

s/ Jason Lee
JASON LEE
Attorney

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,993 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Jason Lee
JASON LEE
Attorney

Date: August 12, 2024