No. 23-50885

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA, OCA-GREATER HOUSTON,
LEAGUE OF WOMEN VOTERS OF TEXAS, REV UP-TEXAS,

*Plaintiffs–Appellees,*

*v.*

KEN PAXTON, Attorney General, State of Texas; JANE NELSON,
in her official capacity as Texas Secretary of State; STATE OF
TEXAS; HARRIS COUNTY REPUBLICAN PARTY; DALLAS
COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN
SENATORIAL COMMITTEE; NATIONAL REPUBLICAN
CONGRESSIONAL COMMITTEE,

*Defendants–Appellants,*

REPUBLICAN NATIONAL COMMITTEE,

*Movant-Appellant*

On Appeal from the United States District Court
for the Western District of Texas
San Antonio Division – No. 5:21-cv-00844

## BRIEF OF PLAINTIFFS–APPELLEES OCA-GREATER
## HOUSTON, LEAGUE OF WOMEN VOTERS OF TEXAS, and
## REVUP-TEXAS

*Counsel on Next Page*

Ari Savitzky
Dayton Campbell-Harris
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
212-284-7334
asavitzky@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Adriel I. Cepeda Derieux
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
202-457-0800
acepedaderieux@aclu.org

Zachary Dolling
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (phone)
zachary@texascivilrightsproject.org

Peter Thomas Hofer
DISABILITY RIGHTS TEXAS
2222 W. Braker Lane
Austin, TX 78758
512-454-4816 (phone)
phofer@drtx.org

Ashley Harris
Thomas Buser-Clancy
Edgar Saldivar
Savannah Kumar
AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION OF TEXAS
1018 Preston Street
Houston, TX 77002
(713) 942-8146
aharris@aclutx.org
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org

Jessica Ring Amunson
JENNER & BLOCK, LLP
1099 New York Avenue, N.W.,
Ste 900 Washington, DC
20001-4412
202-639-6000
202-661-4993 (Facsimile)
jamunson@jenner.com

Jerry Vattamala
Susana Lorenzo-Giguere
ASIAN AMERICAN LEGAL
DEFENSE AND
EDUCATIONAL FUND
99 Hudson Street, 12th Floor
New York, NY 10013
212-966-5932 (phone)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Plaintiffs-Appellees** | **Counsel** |
| --- | --- |
| <ul><li>OCA-Greater Houston</li><li>League of Women Voters of Texas</li><li>REVUP-Texas</li></ul> | <ul><li>Zachary Dolling</li><li>Ari Savitzky</li><li>Jessica Ring Amunson</li><li>Adriel I. Cepeda Derieux</li><li>Dayton Campbell-Harris</li><li>Peter Thomas Hofer</li><li>Ashley Harris</li><li>Sophia Lin Lakin</li><li>Susan Mizner</li><li>Brian Dimmick</li><li>Jerry Vattamala</li><li>Susana Lorenzo-Giguere</li><li>Thomas Buser-Clancy</li><li>Savannah Kumar</li><li>Edgar Saldivar</li><li>Texas Civil Rights Project</li><li>American Civil Liberties Union Foundation of Texas</li><li>Asian American Legal Defense & Education Fund</li><li>American Civil Liberties Union</li><li>Disability Rights Texas</li><li>Jenner & Block LLP</li></ul> |

**Co-Plaintiffs-Appellees**

- United States of America

**Counsel**

- Daniel J. Freeman
- Jason Lee
- Tovah Calderon

**Defendants**

- Jane Nelson

**Counsel**

- Aaron L. Nielson
- William F. Cole
- Kathleen T. Hunker
- Kateland R. Jackson
- Ryan G. Kercher
- Lanora C. Pettit
- William D. Wassdorf

**Intervenors**

- Harris County Republican Party
- Dallas County Republican Party
- Republican National Committee
- National Republican Senatorial Committee
- National Republican Congressional Committee

**Counsel**

- John M. Gore
- E. Stewart Crosland
- Louis J. Capozzi III
- Ryan M. Proctor
- Jones Day

**Other Interested Persons or Groups Not Party to this Appeal**

- Gregory W. Abbott
- Warren Ken Paxton
- Lupe C. Torres
- Lisa Wise
- Teneshia Hudspeth
- Dyana Limon-Mercado
- Jacque Callanen
- Hilda A. Salinas
- Heider Garcia
- Kim Ogg
- Joe Gonzales
- Jose Garza
- Toribio "Terry" Palacios
- John Creuzot
- Bill D. Hicks
- Mi Familia Vota
- Houston Area Urban League
- Delta Sigma Theta Sorority Inc.
- The Arc of Texas
- La Union del Pueblo Entero
- Friendship-West Baptist Church

- Southwest Voter Registration Education Project
- Texas Impact
- Mexican American Bar Association of Texas
- Texas Hispanics Organized for Political Education
- JOLT Action
- William C. Velasquez Institute
- James Lewin
- Fiel Houston, Inc.
- Marla Lopez
- Marlon Lopez
- Paul Rutledge
- Jeffrey Lamar Clemmons
- LULAC Texas
- Voto Latino
- Texas Alliance for Retired Americans
- Texas AFT

Dated: August 12, 2024

*/s/ Ari Savitzky*
Ari Savitzky
Counsel of Record for OCA-GH Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns the scope and interpretation of a federal statute and raises questions for which there is no binding precedent from the United States Supreme Court or this Court. Accordingly, oral argument should be permitted and Plaintiffs request leave to present argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iv

TABLE OF CONTENTS....................................................................................v

TABLE OF AUTHORITIES ............................................................................ vii

INTRODUCTION ............................................................................................1

STATEMENT OF THE CASE...........................................................................4

     I.  STATUTORY BACKGROUND ...............................................................4

     II. FACTUAL BACKGROUND .....................................................................9

          A. For Decades, Texans Who Are Over 65 or Have a Disability
             Have Securely Voted by Mail. ....................................................9

          B. S.B.1 Requires Mail-Ballot Voters to Handwrite a Number
             that Matches an Error-Riddled Database or Else Have Their
             Mail-Ballot Applications or Mail Ballots Rejected. ......................16

          C. Tens of Thousands of Texans Attempt to Vote by Mail but
             Are Denied Due to S.B.1's Number-Matching Requirement.........21

          D. Plaintiffs Sue and the District Court Determines that the
             Number-Matching Requirement Violates the Materiality
             Provision.........................................................................26

SUMMARY OF THE ARGUMENT .................................................................29

ARGUMENT .................................................................................................30

     I.  STANDARD OF REVIEW...................................................................30

     II. THE MATERIALITY PROVISION APPLIES TO THE
        NUMBER-MATCHING REQUIREMENT. ...........................................31

          A. The Materiality Provision Applies to Immaterial Errors or
             Omissions on Voting-Related Paperwork.....................................31

             1.  The statute applies as a matter of plain text.........................31

2.   Appellants misread the text. ...............................................37

3.   Appellants ask the Court to ignore the text. .......................46

B.  The Materiality Provision Is Limited in Scope and Affirming Here Does Not Change That. ........................................49

1.   Affirming will not create any new right to vote by mail. ......................................................................................50

2.   Affirming will not implicate federalism. .............................54

3.   Affirming will not implicate HAVA. ..................................58

4.   Affirming will not implicate other constitutional concerns. .............................................................................60

C.  On This Record, the Materiality Provision Prohibits Enforcement of the Number-Matching Requirement. ..................64

III. THE DISTRICT COURT HAD JURISDICTION AS TO THE SECRETARY OF STATE .....................................................................70

CONCLUSION .......................................................................................76

# TABLE OF AUTHORITIES

## Cases

*Air Evac EMS, Inc. v. Texas, Department of Insurance, Division of Workers' Compensation*,
851 F.3d 507 (5th Cir. 2017) .............................................................. 73

*Alabama Association of Realtors v. Department of Health and Human Services*,
594 U.S. 758 (2021) ............................................................................ 57

*Ali v. Federal Bureau of Prisons*,
552 U.S. 214 (2008) ............................................................................ 39

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ............................................................................ 51

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ................................................................................ 61

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
515 U.S. 687 (1995) ............................................................................ 33

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004) ............................................................................ 31

*Board of Trustees of University of Alabama v. Garrett*,
531 U.S. 356 (2001) ............................................................................ 62

*Bostock v. Clayton County*,
590 U.S. 644 (2020) .................................................................... passim

*Brnovich v. DNC*,
594 U.S. 647 (2021) ............................................................................ 48

*Broyles v. Texas*,
618 F. Supp. 2d 661 (S.D. Tex. 2009) ............................................... 63

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ................................................................ 42

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2024) ................................................ 33

*Cazorla v. Koch Foods of Mississippi, L.L.C.*,
838 F.3d 540 (5th Cir. 2016) ................................................ 2

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) .............................................................. 40

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) ........................................................ 40, 56

*City of Austin v. Paxton*,
943 F.3d 993 (5th Cir. 2019) ................................................ 73

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ........................................................ 61, 62

*City of Mobile v. Bolden*,
446 U.S. 55 (1980) ................................................................ 64

*Clingman v. Beaver*,
544 U.S. 581 (2005) .............................................................. 50

*Common Cause v. Thomsen*,
574 F. Supp. 3d 634 (W.D. Wis. 2021) .............................. 37

*Condon v. Reno*,
913 F. Supp. 946 (D.S.C. 1995) ............................................ 5

*Connecticut National Bank v. Germain*,
503 U.S. 249 (1992) ........................................................ 47, 49

*Crawford v. Marion County Election Board*,
553 U.S. 181 (2008) .............................................................. 34

*Davis v. Scott,*
157 F.3d 1003 (5th Cir. 1998) ............................................. 30

*DNC v. Wisconsin State Legislature,*
141 S. Ct. 28 (2020) ........................................................... 51

*Ex parte Siebold,*
100 U.S. 371 (1880) ............................................................ 61

*Flora v. United States,*
362 U.S. 145 (1960) ............................................................ 40

*Florida State Conference of N.A.A.C.P. v. Browning,*
522 F.3d 1153 (11th Cir. 2008) ............................... 5, 6, 41, 59

*Ford v. Tennessee Senate,*
No. 06-cv-2031, 2006 WL 8435145 (W.D. Tenn.
Feb. 1, 2006) ...................................................... 7, 32, 47, 55

*Friedman v. Snipes,*
345 F. Supp. 2d 1356 (S.D. Fla. 2004) ................................ 56

*Griggs v. Provident Consumer Discount Co.,*
459 U.S. 56 (1982) .............................................................. 75

*Harrison v. PPG Industries, Inc.,*
446 U.S. 578 (1980) ............................................................ 39

*Hartford Underwriters Insurance Co. v. Union Planters Bank,*
*N.A.,*
530 U.S. 1 (2000) .................................................................. 2

*In re Ga. Senate Bill 202,*
No. 1:21-cv-1259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18,
2023) ................................................................................... 8

*In re State,*
602 S.W.3d 549 (Tex. 2020) ..................................... 10, 11, 33

*International Truck & Engine Corp. v. Bray,*
  372 F.3d 717 (5th Cir. 2004) .................................................................. 74

*Kilty v. Weyerhaeuser Co.,*
  758 F. App'x 530 (7th Cir. 2019) ....................................................... 75

*Kirksey v. City of Jackson,*
  663 F.2d 659 (5th Cir. 1981) ............................................................... 63

*League of Women Voters of Arkansas v. Thurston,*
  No. 5:20-cv-05174, 2023 WL 6446015 (W.D. Ark.
  Sept. 29, 2023) ................................................................................ 8, 35

*Martin v. Crittenden,*
  347 F. Supp. 3d 1302 (N.D. Ga. 2018) ........................................... 8, 35

*Martin v. Kemp,*
  341 F. Supp. 3d 1326 (N.D. Ga. 2018) ................................................ 52

*Matter of PetroQuest Energy, Inc.,*
  54 F.4th 299 (5th Cir. 2022) ............................................................... 74

*McDonald v. Board of Election Commissioners of Chicago,*
  394 U.S. 802 (1969) ....................................................................... 50, 51

*Migliori v. Cohen,*
  36 F.4th 153 (3d Cir. 2022) ................................................................... 8

*Milligan v. Allen,*
  599 U.S. 1 (2023) ................................................................................ 64

*Milner v. Department of Navy,*
  562 U.S. 562 (2011) ............................................................................ 47

*Municipal Employees' Retirement System of Michigan v. Pier 1
  Imports, Inc.,*
  935 F.3d 424 (5th Cir. 2019) ............................................................... 15

*Munoz v. Orr,*
  200 F.3d 291 (5th Cir. 2000) ............................................................... 15

*National Federation of Independent Business v. Department of Labor, Occupational Safety & Health Administration,*
595 U.S. 109 (2022) ............................................................. 57

*Nationwide Mutual Insurance Co. v. Baptist,*
762 F.3d 447 (5th Cir. 2014) .............................................. 30

*Neinast v. Texas,*
217 F.3d 275 (5th Cir. 2000) .............................................. 75

*Nevada Department of Human Resources v. Hibbs,*
538 U.S. 721 (2003) ...................................................... 61, 62

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
597 U.S. 1 (2022) ................................................................ 48

*OCA-Greater Houston v. Texas,*
867 F.3d 604 (5th Cir. 2017) .............................................. 53

*Pennsylvania State Conference of NAACP v. Secretary Commonwealth of Pennsylvania,*
97 F.4th 120 (3d Cir. 2024) ........................... 2, 8, 38, 42

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
566 U.S. 639 (2012) ...................................................... 38, 43

*Raetzel v. Parks/Bellemont Absentee Election Board,*
762 F. Supp. 1354 (D. Ariz. 1990) .................................... 52

*Richardson v. Texas Secretary of State,*
978 F.3d 220 (5th Cir. 2020) .............................................. 51

*Ritter v. Migliori,*
143 S. Ct. 297 (2022) .................................................... 8, 51

*Rosario v. Rockefeller,*
410 U.S. 752 (1973) ............................................................ 51

*Russello v. United States,*
464 U.S. 16 (1983) .............................................................. 45

*Schwier v. Cox,*
  340 F.3d 1284 (11th Cir. 2003) .................................... 4, 5, 7

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ................................................. 49

*Self Advocacy Solutions N.D. v. Jaeger,*
  464 F. Supp. 3d 1039 (D.N.D. 2020) ............................. 52

*Smiley v. Holm,*
  285 U.S. 355 (1932) ................................................. 51

*South Carolina v. Katzenbach,*
  383 U.S. 301 (1966) ............................................... 6, 62

*Tesfamichael v. Gonzales,*
  411 F.3d 169 (5th Cir. 2005) .................................. 38, 43

*Texas Alliance for Retired Americans. v. Scott,*
  28 F.4th 669 (5th Cir. 2022) ...................................... 70

*Texas Democratic Party v. Abbott,*
  961 F.3d 389 (5th Cir. 2020) ..................................... 51

*Texas Democratic Party v. Abbott,*
  978 F.3d 168 (5th Cir. 2020) ............................... passim

*Texas Education Agency v. United States Department of
  Education,* 908 F.3d 127 (5th Cir. 2018) ...................... 31

*Timmons v. Twin Cities Area New Party,*
  520 U.S. 351 (1997) ................................................. 51

*United States v. Gonzales,*
  520 U.S. 1 (1997) ................................................... 35

*United States v. Key,*
  599 F.3d 469 (5th Cir. 2010) .................................... 47

*United States v. Texas*,
143 U.S. 621 (1892) ............................................................. 76

*United States v. Transocean Deepwater Drilling, Inc.*,
767 F.3d 485 (5th Cir. 2014) ............................................. 41

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016) ............................................. 67

*Vicknair v. Formosa Plastics Corp. Louisiana*,
98 F.3d 837 (5th Cir. 1996) ............................................... 65

*Vote.Org v. Callanen*,
89 F.4th 459 (5th Cir. 2023) ....................................... passim

*Walker v. Thetford*,
418 S.W.2d 276 (Tex. Civ. App. 1967) ................................ 9

*Washington Association of Churches v. Reed*,
492 F. Supp. 2d 1264 (W.D. Wash. 2006) ................... 7, 9, 59

*Zessar v. Helander*,
No. 05-cv-1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) .............. 52

**Statutes**

52 U.S.C. § 10101(a)(2)(A) ................................................. 45

52 U.S.C. § 10101(a)(2)(B) ........................................... passim

52 U.S.C. § 10101(a)(3)(A) ........................................... passim

52 U.S.C. § 10101(e) ................................................... passim

52 U.S.C. § 20901 .............................................................. 10

52 U.S.C. § 21803(a)(5)(A) ........................................... 10, 59

Election Integrity Protection Act of 2021,
S.B.1, 87th Leg. (2021) ....................................................... 16

H. Rep. No. 88-914 (1963),
*reprinted* 1964 U.S.C.C.A.N. 2391 ............................................. 5, 6, 60

Pub. L. No. 88-352, § 101, 78 Stat. 241, 241 (1964) ................................... 5

Pub. L. No. 89-110, § 15(a), 79 Stat. 437, 444 (1965) ............................... 5

Tex. Elec. Code § 11.002 ........................................................... 65

Tex. Elec. Code § 11.002(a) ......................................................... 9

Tex. Elec. Code § 276.013(3)(B) ................................................... 14

Tex. Elec. Code § 276.018 ........................................................ 14

Tex. Elec. Code § 31.002 ...................................................... 71, 73

Tex. Elec. Code § 31.003 .......................................................... 71

Tex. Elec. Code § 82.001 .......................................................... 11

Tex. Elec. Code § 82.002 .......................................................... 11

Tex. Elec. Code § 82.003 .......................................................... 11

Tex. Elec. Code § 82.004 .......................................................... 11

Tex. Elec. Code § 82.007 .......................................................... 11

Tex. Elec. Code § 82.008 .......................................................... 11

Tex. Elec. Code § 84.001 ...................................................... 10, 11

Tex. Elec. Code § 84.002 ................................................... 11, 16, 17

Tex. Elec. Code § 84.007 .......................................................... 12

Tex. Elec. Code § 84.011 .......................................................... 35

Tex. Elec. Code § 84.011(a) ....................................................... 18

Tex. Elec. Code § 84.011(a)(1) .................................................... 14

Tex. Elec. Code § 84.013 ........................................................... 11

Tex. Elec. Code § 84.032 ........................................................... 13

Tex. Elec. Code § 84.033 ........................................................... 13

Tex. Elec. Code § 86.001 ..................................................... 12, 36

Tex. Elec. Code § 86.001(f) ........................................... 17, 32, 67

Tex. Elec. Code § 86.002 ..................................................... 12, 35

Tex. Elec. Code § 86.002(g) ................................... 16, 17, 19, 35

Tex. Elec. Code § 86.005 ........................................................... 13

Tex. Elec. Code § 86.006 ........................................................... 13

Tex. Elec. Code § 86.008 ........................................................... 12

Tex. Elec. Code § 86.012 ........................................................... 12

Tex. Elec. Code § 86.013 ..................................................... 12, 13

Tex. Elec. Code § 86.015(c)(2) ................................................. 13

Tex. Elec. Code § 86.015(c)(4) ................................................. 19

Tex. Elec. Code § 87.027 ........................................................... 14

Tex. Elec. Code § 87.0271 ................................................... 19, 72

Tex. Elec. Code § 87.041 .................................................. passim

Tex. Elec. Code § 87.0411 ................................................... 19, 72

## Other Authorities

110 Cong. Rec. 6530 (1964) ....................................................... 6

110 Cong. Rec. 6714-7615 (1964) ............................................. 6

Antonin Scalia & Bryan A. Garner,
   *Reading Law: The Interpretation of Legal Texts* (2012)...............41, 49

*Civil Rights Act of 1964: Hearings on H.R. 7152*,
   88th Cong. 2653-54 (1963).....................................................60

Tom Taylor,
   *Our American Cousin* (1858).................................................42

U.S. Election Assistance Commission, *2018 Election
   Administration and Voting Survey*,
   https://public.tableau.com/app/profile/u.s.election.assistance.co
   mmission/viz/EAVS2018DataViz-
   Labeld_11_25/EACDataVizTool.......................................25

## Rules

FED. R. CIV. P. 56(a) .......................................................................30

## Constitutional Provisions

Tex. Const. art. VI, § 2(a) ............................................................9

U.S. Const. art. I, § 4, cl.1 .......................................................60

**INTRODUCTION**

Since 2021, thousands of Texas voters have had their mail ballots rejected because of an error or omission on a piece of required, voting-related paperwork that has nothing to do with their qualifications to vote. Most of those disenfranchised voters are seniors and people with disabilities. Their votes were rejected due to a new requirement that they handwrite an ID number that in turn must match a number from an inaccurate, error-riddled set of ID numbers in the state voter database.

A specific federal statute applies where voters are excluded from having their votes counted due to an irrelevant mistake on required paperwork. The Materiality Provision of the 1964 Civil Rights Act provides that the right to "cast[] a ballot, and hav[e] [it] counted" may not be denied "in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. §§ 10101(a)(2)(B), (a)(3)(A), (e).

Reading Appellants' briefs, one might not realize that this case involves the interpretation of a federal statute. The statutory text is

almost nowhere to be found. Appellants tout policy arguments, appeal to consequentialism, and cherry-pick snippets of legislative history. But "when the statute's language is plain, the sole function of the courts … is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (Scalia, J.) (cleaned up). That "basic principle[] of statutory interpretation" resolves this appeal. *Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 553 & n.37 (5th Cir. 2016). "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 653 (2020).

Appellants ask the Court to ignore the Materiality Provision's text as Congress wrote it and substitute it for a new policy. The key precedent they rely on, a recent, split-panel ruling from the Third Circuit, is so divorced from text that the panel majority admitted its interpretation created textual "redundancies" and resulted in a reading where "the tail"—*i.e.*, a few words plucked from a subordinate clause—"wags the dog." *Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 136, 138 (3d Cir. 2024). This Court ought to do better. Indeed, it

already has:  In *Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), this Court rejected most of Appellants' legal arguments.  They fail here as well.

The sky will not fall if the Court follows the statutory text and affirms.  A plain-text reading of the Materiality Provision limits the statute to voting-related paperwork requirements that are immaterial to assessing a voter's qualifications.  It leaves untouched the vast run of time, place, and manner election-administration rules.  Texas already has numerous policies in place to ensure the integrity of the mail-ballot process (like criminal penalties, signature verification, and more) and remains free to craft additional measures—so long as they do not unlawfully disenfranchise thousands of qualified, registered Texas voters.

In the meantime, excluding voters on this basis violates the Materiality Provision's terms as Congress wrote them.  The Court should affirm.

# STATEMENT OF THE CASE

## I.   STATUTORY BACKGROUND

The Materiality Provision prohibits state actors from

> "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]"

52 U.S.C. § 10101(a)(2)(B).  The statute defines the word "vote" broadly, as "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast."  *Id.* § 10101(a)(3)(A), (e).

The Provision thus prohibits denying any registration or application, or preventing a voter from casting a ballot or having it counted in any election, due to an error or omission on a required, voting-related form or paper, *if* the error or omission is not material in ascertaining the voter's qualifications to vote in the election.  52 U.S.C. § 10101(a)(2)(B).  It prohibits state actors from "requiring unnecessary information" on voting-related paperwork as a condition to voting. *Schwier v. Cox*, 340 F.3d 1284, 1294, 1297 (11th Cir. 2003).

The law was enacted as part of new voting protections in the Civil Rights Act of 1964.  *See* Pub. L. No. 88-352, § 101, 78 Stat. 241, 241 (1964).  Then, in the 1965 Voting Rights Act, it was expanded to cover state as well as federal elections.  *See* Pub. L. No. 89-110, § 15(a), 79 Stat. 437, 444 (1965).

The Materiality Provision had a clear purpose.  It was designed to eradicate the use of irrelevant errors on paper forms as a barrier to the franchise.  *E.g.*, *Fla. State Conf. of N.A.A.C.P. v. Browning,* 522 F.3d 1153, 1173 (11th Cir. 2008) (statute prohibits requiring "trivial information" that merely serves "as a means of inducing voter-generated errors").  Such paperwork requirements, such as making a voter write their age in months and days, were widely used in the Jim Crow South, often to prevent Black citizens from even registering to vote in the first place.  *E.g.*, *id.*; *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995); *accord Schwier*, 340 F.3d at 1294; *see also* H. Rep. No. 88-914 (1963), *reprinted* 1964 U.S.C.C.A.N. 2391, 2394, 2485-2487, 2491.

The Materiality Provision was also meant to succeed where narrower voting protections enacted in 1957 and 1960 failed, due to persistent, "ingenious" efforts to evade them.  *E.g.*, *South Carolina v.*

*Katzenbach*, 383 U.S. 301, 309 (1966); *see, e.g.*, H.R. Rep. 88-914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2489 (Rep. McCulloch); 110 Cong. Rec. 6714-7615 (1964) (Sen. Keating) (explaining that immaterial paperwork errors had been used to "circumvent the 1957 and 1960 acts"). Accordingly, Congress sought to protect not merely people registering to vote, but "all persons *seeking to vote*"—and it did so "by prohibiting the disqualification of an individual because of immaterial errors or omissions in papers or acts relating *to such voting*." H.R. Rep. 88-914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2394, 2491 (emphasis added); *see also, e.g.*, 110 Cong. Rec. 6530 (1964) (Sen. Humphrey) (discussing "technique[s] for denying … *the right to vote*," such as "ask[ing] questions that have nothing to do with the applicant's qualifications to vote." (emphasis added)).

Against this backdrop, Congress crafted the Materiality Provision broadly enough to encompass all manner of trivial paperwork requirements that might be foisted on voters as a barrier to voting. Its "over-inclusive form" was purposeful, meant "to capture well-disguised discrimination." *Vote.Org*, 89 F.4th at 482; *see also Browning*, 522 F.3d at 1173 (explaining that, "in combating specific evils," Congress may

"choose a broader remedy"). The statute thus protects qualified individuals' right not merely to register but "to vote in any election," 52 U.S.C. § 10101(a)(2)(B), and applies to "all action necessary to make a vote effective," from "registration" all the way to "casting a ballot, and having such ballot counted," *id.* § 10101(a)(3)(A), (e).

Consistent with Congress's aims and the statute's textual scope, the Materiality Provision has been applied in various contexts. It has been applied to errors on required paper forms at the polls. *See Ford v. Tenn. Senate*, No. 06-cv-2031, 2006 WL 8435145, at *7, *10-11 (W.D. Tenn. Feb. 1, 2006) ("technical requirement" to separately sign both application form and poll book could not be enforced to disenfranchise voters).

It has also been applied to errors on voter-registration forms, including ID-matching or other requirements, including with respect to paperwork requirements imposed in some states after the passage of new voter registration procedures in connection with the Help America Vote Act ("HAVA"). *See, e.g.*, *Schwier*, 340 F.3d at 1294; *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1266, 1271 (W.D. Wash. 2006).

And more recently, with the expansion of mail-ballot voting in several states, it has been applied to immaterial mistakes on mail-ballot-

related paper forms, like this case. *See League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-05174, 2023 WL 6446015, at *16 (W.D. Ark. Sept. 29, 2023) (statute applied to absentee ballot application but challenged attestation requirement was material); *In re Ga. Senate Bill 202*, No. 1:21-cv-1259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) (statute prohibited requirement to handwrite birth year on mail-ballot return envelope form); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) (similar); *see also Migliori v. Cohen*, 36 F.4th 153, 162-66 (3d Cir.) (unanimously concluding that statute prohibited requirement to write date on mail-ballot envelope form), *judgement vacated as moot sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (Mem.) (2022). *But see Pa. State Conf. of NAACP*, 97 F.4th at 127 (concluding in a split 2-1 ruling that the statute did not apply to same requirement).

In this Circuit, the question whether any particular "error or omission" with respect to some voting-related paperwork requirement is "material" for purposes of the Materiality Provision is evaluated using a "totality of the circumstances" approach, considering any proffered state interest and the fit between that interest and the paperwork requirement at issue. *Vote.Org*, 89 F.4th at 489. Under this framework, superfluous

or extraneous paperwork requirements may be too tenuous to be considered "material." *Id.* Indeed, courts have blocked the enforcement of ID-number-matching requirements in the past for this reason. *E.g.*, *Reed*, 492 F. Supp. 2d at 1271.

## II. FACTUAL BACKGROUND

### A. For Decades, Texans Who Are Over 65 or Have a Disability Have Securely Voted by Mail.

In Texas, anyone is a "qualified voter" if they are 18 years old, a U.S. citizen and a Texas resident, are registered to vote, and have not been adjudged mentally incompetent or been convicted of a felony (unless they completed their sentence or received a pardon). Texas Elec. Code ("TEC") § 11.002(a); Tex. Const. art. VI § 2(a). It is long-held Texas policy to count votes cast by qualified voters. *E.g.*, *Walker v. Thetford*, 418 S.W.2d 276, 292 (Tex. Civ. App. 1967) ("The courts of this state have uniformly held that ballots cast by legally qualified voters should be given effect").

To register to vote, Texans must provide all information necessary to satisfy these criteria, sign a statement under penalty of perjury in wet ink affirming this information, and provide a driver's license or other identification number issued by the Texas Department of Public Safety

(*i.e.*, a "DPS number"), or else the last four digits of their social security number ("SSN4"), if they have either. ROA.13464; *see also Vote.Org*, 89 F.4th at 467-69 (discussing wet-ink signature requirement). Provided information is then stored in the Texas Election Administration Management ("TEAM") system, the state's database of registered voters.[1]

In theory, a database like TEAM could correctly capture all this information in one record for each registered Texas voter. ROA.13333 ¶¶128-129. In practice, TEAM does not do so. In TEAM, each voter record includes a Voter Unique Identification Number ("VUID"), which is sometimes associated with a DPS number, or an SSN4, or both, or neither. *Id.* ¶¶129-130.

Texas provides absentee-ballot options for certain registered voters. *See* TEC § 84.001; *see also In re State*, 602 S.W.3d 549, 558-59 (Tex. 2020). Registered voters are qualified to vote by mail if, on Election Day, they

---

[1] To facilitate the creation of a statewide voter registration database, HAVA, 52 U.S.C. § 20901 *et seq.*, provides that when registering to vote, applicants should provide either a current and valid driver's license number or the last four digits of their Social Security Number ("SSN4"). *See* 52 U.S.C. § 21803(a)(5)(A)(i). Applicants who indicate that they don't have a driver's license number or SSN4 may be assigned a unique identification number in the state's database "to identify the applicant for voter registration purposes." *Id.* § 21083(a)(5)(A)(ii). HAVA's inapplicability to this appeal is discussed below. *Infra* Argument II.B.3.

are 65 years of age or older; have a disability; expect to give birth close to Election Day; are confined in jail or civilly committed; or will be absent from their home counties for the entire in-person voting period. TEC §§ 82.001-.004, 82.007-.008. Most people who vote by mail qualify to do so based on their age or disability. ROA.15590 86:9-13. Indeed, ensuring that those who have a disability may cast a ballot has been a preeminent concern for the Legislature since absentee voting was first adopted in the early 20th Century. *E.g.*, *In re State*, 602 S.W.3d at 558-59.

Voters who qualify to vote by mail must complete an application for ballot by mail ("ABBM"). The Secretary of State creates and provides this document to the public. TEC § 84.013; ROA.13302 ¶23; ROA.15538 51:21-23. The ABBM requires applicants to provide their "name and the address at which the applicant is registered to vote"; choose a reason for voting by mail, such as "hav[ing] a sickness or" disability; give "an indication of each election for which the applicant is applying for a ballot"; and include a mailing address if it is different from the applicant's address of registration. TEC § 84.002; ROA.16709-16710. Applicants must also sign their application. TEC § 84.001. These requirements preexisted and were unaltered by the law at issue here. Falsely signing

the ABBM may subject an applicant to various criminal penalties. ROA.16709-16710 (Official ABBM from SOS).

Voters deliver their completed ABBM to their county's early-voting clerk. TEC § 84.007. If the early-voting clerk finds the ABBM defective—and the applicant could still return the ABBM before the statutory deadline—the clerk must send the voter a second ABBM and submission instructions along with a brief explanation of each identified defect. *Id.* § 86.008. Upon receiving a timely and properly completed ABBM from a voter eligible to vote by mail, the clerk will send the applicant a package of materials that includes an official ballot by mail ("BBM"), a ballot envelope in which to place the BBM, and a carrier envelope in which to place the ballot envelope. *Id.* §§ 86.001-.002, 86.012-.013. The Secretary designs these BBM materials. *Id.* §§ 86.012-.013.

After receiving and filling out their official BBM, a voter must (1) place the BBM in the official ballot envelope; (2) seal the ballot envelope; (3) place the ballot envelope in the official carrier envelope; (4) seal the carrier envelope; (5) sign a certificate that is printed on the carrier envelope which attests that the voter marked the ballot themselves or that it was marked at their direction; and (6) return the

ballot materials to their county's early voting clerk by mail, or in-person on or before Election Day.[2]  TEC §§ 86.005-.006, 86.013; ROA.16712-16714.

Once the voter submits their BBM materials, an Early Voting Ballot Board ("EVBB") determines whether to accept the mail ballot. Every Texas county convenes an EVBB to open the carrier envelopes and determine whether to accept individual BBMs based on various factors, including whether the voter's ABBM offered a valid reason for voting by mail, and whether the signature on the carrier envelope matches other signatures on file.  TEC § 87.041(b), (d)-(f).  If at any point a voter decides to instead vote in person, they can cancel their ABBM and BBM. *Id.* §§ 84.032-.033.

In September 2021, the Legislature added an additional security measure to the mail-ballot process that is not at issue here.  Through House Bill 1382, it directed the Secretary to develop an online tool for tracking ABBMs and BBMs that "must … for each carrier envelope, record or assign a serially numbered and sequentially issued barcode or

---

[2] S.B.1 requires voters submitting BBM materials in-person to present the receiving official an acceptable government issued ID.  TEC § 86.006.

tracking number that is unique to each envelope." TEC § 86.015(c)(2) (the "Ballot by Mail Tracker"). Carrier envelopes thus bear a unique number linking them to an associated voter and their ABBM. Counties are responsible for entering the information used to track ABBMs and mail ballots into the Ballot by Mail Tracker system. ROA.15539 56:12-20; ROA.15540 59:18-60:5.

In all, then, the mail-ballot process includes at least the following security measures designed to confirm a mail-ballot voter's identity, none of which are at issue in this case:

- Signature requirements on penalty of perjury in order to register to vote, TEC § 276.018;

- Signature requirements on pain of criminal penalty on the ABBM and BBM carrier envelope form, TEC §§ 84.011(a)(1), 276.013(3)(B);

- An extensive signature matching process to confirm that the BBM was completed by the voter whose ABBM was approved, TEC § 87.027(d)-(e), (i); and

- A unique ID number associated with each voter's ABBM and BBM materials that is connected to a statewide ballot-tracking system, *see supra.*

Hundreds of thousands of Texans vote by mail in each statewide election. *See* ROA.15463 (Hersh Second Suppl. Expert Report), 16268 (EAVS 2020 Report). Despite its widespread use, instances of fraud or misuse of the mail-ballot process are exceedingly rare, and when attempted are generally unsuccessful. Since 2004, the Office of Texas Attorney General has successfully prosecuted only one case of fraud related to "voting or attempting to vote by impersonation using a mail ballot." ROA.16157-16158. Evidence of fraud at the county level is similarly wanting. For example, the Harris County Election Administration Office (*i.e.*, the election officials for the State's largest county) did not identify a single instance of voter fraud in the 2022 midterm elections. ROA.15645 91:3-6.[3]

---

[3] State Appellants cite portions of a declaration from Jonathan White as record evidence regarding security concerns about mail in ballots. State Br. 33 (citing ROA.22782, 22785, 22789). The district court ultimately struck that declaration from the record as an improper disclosure. *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844-XR, Docs. 1128, 1129; *Cf. Mun. Employees' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d

**B.**   **S.B.1 Requires Mail-Ballot Voters to Handwrite a Number that Matches an Error-Riddled Database or Else Have Their Mail-Ballot Applications or Mail Ballots Rejected.**

In 2021, the Legislature made several changes to the Election Code with the Election Protection and Integrity Act, an omnibus election bill commonly referred to as S.B.1. *See* Election Integrity Protection Act of 2021, S.B.1, 87th Leg. (2021). S.B.1 changed many provisions of the Texas Election Code, including those related to 24-hour voting, drive-thru voting, the mailing out of unsolicited mail-in ballot applications, voter assistance, and ballot collection. *Id.*

This appeal concerns one change that S.B.1 wrought—the addition of a "number-matching" requirement on the ABBM and on the BBM carrier envelope for Texans who vote by mail. Notwithstanding the numerous security measures already in place as part of the mail-ballot process, *supra* 14, the new number-matching requirement forces Texans to handwrite information on both their ABBM and BBM materials that

---

424, 436 (5th Cir. 2019) (citing *Munoz v. Orr*, 200 F.3d 291, 303 (5th Cir. 2000)). A redacted copy of Mr. White's declaration without the material Appellants reference that the district court struck can be found at *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844-XR, Docs 1129-1, 1129-2.

matches their information in the TEAM database. TEC §§ 84.002(a)(1-a), 86.002(g).

Specifically, under S.B.1, voters must now write one of three pieces of information on their ABBMs: (1) a DPS number; or (2) if they have no DPS number, their SSN4; or (3) if they have neither a DPS number nor an SSN4, a statement to that effect. TEC § 84.002(a)(1-a); *see also* § 84.002(b-1). Similarly, S.B.1 also provides that, when completing BBM materials, voters must write the same number on a space on the carrier envelope form. *Id.* § 86.002(g).

If the requested number is omitted, or if it does not match what is in TEAM, the ABBM and/or BBM is rejected. TEC §§ 86.001(f); 87.041(b)(8). The S.B.1 provisions at issue here, Sections 5.07 and 5.13,[4] mandate that a voter's ABBM or BBM must be rejected if the voter-written number on either document does not match a number associated

---

[4] Plaintiffs challenged S.B.1's entire number-matching framework, which includes Sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14. ROA.15308 n.1. However, Plaintiffs did not specify Section 5.13 explicitly in the Second Amended Complaint. ROA.6471 (OCA-GH Plaintiffs' Second Amended Complaint). As a result, the district court granted OCA-GH Plaintiffs' motion for summary judgment with respect to the Section 5.07 challenge, but denied it as to Sections 5.08, 5.13, and 5.14 for not explicitly naming those provisions in the Second Amended Complaint. ROA.27046.

with "the applicant's application for voter registration." TEC §§ 86.001(f), 87.041(b)(8). In practice, and as a matter of undisputed fact, this means that the handwritten number on the ABBM or BBM must match whatever number is in the voter's record in TEAM. *Id.*; *see* ROA.13318-13330 ¶¶81, 89, 100, 115. As explained below, this new rule has resulted in tens of thousands of rejections of qualified Texans' ABBMs and BBMs since S.B.1 was enacted.

Consistent with S.B.1's text, the Secretary of State's official ABBM, instructs voters: "YOU MUST PROVIDE ONE of the following numbers … Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Department of Public Safety (NOT your voter registration VUID#)." ROA.13323-13324 ¶92; TEC § 84.011(a).



ROA.16709.

18

The Secretary's carrier envelope contains identical instructions under the envelope's flap. ROA.13324 ¶93; TEC § 86.002(g).[5]



ROA.16714.

While there is physical space to do so, neither the ABBM nor the BBM carrier envelope advises voters to provide *both* a DPS number *and* an SSN4. They instead instruct voters to provide "ONE" identification number. That is because, according to the Secretary of State, "the forms follow the law, because the forms have to follow the law." ROA.15542 70:9-11.[6]

---

[5] Section 5.10 establishes a notice-and-cure process for ABBMs and BBMs rejected based on the number-matching requirements. It requires the Secretary's Ballot Tracker to "allow a voter to add or correct information" on their ABBM or carrier envelope as required by TEC § 86.015(c)(4). Sections 5.12 and 5.14 amend the EVBB (and any SVC's, if appointed) responsibilities to include notifying a voter of any carrier envelope flagged for rejection for various reasons, including those pursuant to S.B.1's number-matching requirement. *Id.* §§ 87.0411, 87.0271.

[6] Notwithstanding this, the Secretary has "suggest[ed]" to voters— through advisories and trainings for local election officials—that they use multiple ID numbers to "increase the odds of success[fully]" having their

Following S.B. 1's text, the ABBM and BBM materials purport to demand a hierarchy for the number-matching information requested. ROA.16709, 16714. The DPS number is required first with an SSN4 acceptable only "if you do not have a" DPS number. *Id.* As a result, voters are more likely to provide a driver's license number than their SSN4, even though driver's license numbers are most prone to error in TEAM, as reflected below. *See infra* Statement of the Case II.C.

Appellants have identified no specific legislative history in the record regarding the intended function of the number-matching requirement in particular. Plaintiffs engaged in good-faith efforts to obtain discovery relevant to S.B.1's number-matching requirement from the Legislature, but State Appellants refused to produce responsive documents on legislative privilege grounds. *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844-XR, Doc. 1128, 2-3 (Order Striking Motion to Strike the Declaration of Jonathan White); *see generally also id.* Doc 1129

---

ABBM or BBM accepted. *See* ROA.15538 52:5-13, 52:8-25; ROA.15783 42:21-43:9; ROA.16497 (SOS Election Advisory No. 2022-08); ROA.16555-16571 (March 22, 2022, Instructional PowerPoint titled "Training for EVBB/SVC members on new Ballot by Mail Procedures (Primary Focused)"). But according to the Secretary's Elections Director, these suggestions did not alter S.B.1's mandate. ROA.15538 52:5-13.

(Order Regarding Renewed Motion to Strike Declaration). Nevertheless, in this appeal, State Appellants now represent that the number-matching requirement is an election-integrity measure "designed to ensure that voters submitting ballot envelopes 'actually [are] who they say they are,'" which they assert is a "'premise for all the statutory qualifications' to vote," citing a judicial decision that was issued years after S.B.1's passage. State Br. 15 (quoting *Vote.Org*, 89 F.4th at 487); *id.* at 28-29.

### C. Tens of Thousands of Texans Attempt to Vote by Mail but Are Denied Due to S.B.1's Number-Matching Requirement.

There is no dispute that the number-matching requirement has resulted in thousands of qualified voters having their ABBMs denied, or their ballots excluded from vote totals. That is in no small part because the ID information in TEAM against which voter-written numbers on the ABBM or BBM carrier envelope form must be matched is "riddled with errors." *See* ROA.33244; ROA.15314-15319; ROA.15417-15419 (Hersh First Expert Report), 15454-15455 (Hersh Second Expert Report), 15469 (Hersh Third Expert Report). Voter records in TEAM are not necessarily updated with any frequency. ROA.13336-13340 ¶¶144, 149, 151;

ROA.15318-15319.  An ID number in a voter's TEAM record may be very old, or associated with a long-expired driver's license or other ID that may have been current when a voter first registered to vote.  ROA.15410 ¶96; ROA.15955-15956 22:9-23:21.  Moreover, as explained below, many of the records in TEAM are duplicative or contain erroneous or incomplete information, such as missing ID numbers or missing SSN4s.  Thus, voters can (and often do) follow S.B.1 to the letter, supply a valid ID number that correctly identifies the voter, and still have their ABBM or BBM rejected for the number not matching their number in TEAM.

This problem was clear from the start.  Shortly after S.B.1 went into effect, the Secretary admitted that, in light of S.B.1's new number-matching requirement, incomplete records in TEAM could "impact" many qualified voters' ability to cast a mail ballot that would be counted.  ROA.14776.

And the problem's scope is extensive.  In total, it is undisputed that over 2.6 million voter files in TEAM contained missing, outdated, or incorrect ID number information.   ROA.15373-153422, 15424-15455, 15457-15482.  As of January 2023, TEAM continued to suffer from the following issues:

- Roughly 2.4 million Texas voters have multiple valid DPS numbers, but only one of them is included in TEAM. ROA.13336 ¶142. If any of those voters writes a valid DPS number on the ABBM or BBM that does not match the DPS number in TEAM, they will be rejected.

- Over 60,000 voters' DPS numbers in TEAM were inconsistent with DPS's own records. ROA.13336-13337 ¶¶143-144. If any of those voters writes the DPS number on the ABBM or BBM that does not match the DPS number in TEAM, they will be rejected.

- Almost 45,000 voters' SSN4s in TEAM were inconsistent with other DPS databases. ROA.13336-13337 ¶¶143-144. If any of those voters writes their SSN4 on the ABBM or BBM that does not match the number in TEAM, they will be rejected.

- Almost 190,000 Texans had no DPS number whatsoever affiliated with their TEAM record, despite DPS previously issuing them a DPS number. ROA.13336 ¶¶140-141. If any of those voters writes their DPS number on the ABBM or BBM as instructed, they will be rejected.

- Around 90,000 Texans had neither a DPS number nor an SSN4 associated with their TEAM record whatsoever. ROA.13336 ¶¶140-141. If any of those voters writes their DPS number or SSN4 on the ABBM or BBM as instructed, they will be rejected.

Inconsistencies and missing information with respect to TEAM's ID data have resulted in tens of thousands of Texans having their ABBMs and BBMs rejected. Bexar County and Harris County alone had over 3,000 ABBM rejections during the November 2022 General Election, of which only 1,200 were successfully cured. ROA.13338-13339 ¶152(b)-(c). With respect to mail ballots, Harris County rejected 19% for non-compliance with S.B.1's number-matching requirement in March 2022. ROA.16178. By comparison, Harris County rejected 0.02% of mail ballots it received in the March 2018 elections.[7] ROA.16178.

Across Texas during the March 2022 primary election, mismatched or missing DPS numbers or SSN4s caused about *25,000* BBM rejections,

---

[7] Travis County's mail-ballot rejection rate climbed from 1.67% in March 2018, to over 8% in March 2022 because of S.B.1's matching-number requirement. ROA.16123-16125, 16127. Bexar County's mail ballot rejection rate rose similarly, from 1.2% in all of 2018 to 22.8% in 2022. ROA.16192.

out of the 198,947 total mail ballots received.[8]   ROA.15520 ¶10;

ROA.16188. S.B.1 required another 11,000 BBMs to be rejected in

November 2022 as a direct result of the number-matching requirement.

*See* ROA.15469; ROA.15525.  Uncured rejections from 2022 more than

double the 9,377 mail ballots rejected in Texas in 2018,[9] and outnumber

the 8,304 mail ballots rejected in Texas during the high-turnout 2020

presidential election.  ROA.16274.  These increased rejection rates also

increased local officials' difficulty administering elections, with Bexar

County's election officials drawing a direct line from the increased

difficulty to S.B.1's number-matching framework.  ROA.22527.

All voters whose ABBMs or BBMs were rejected on this basis were

qualified, registered Texas voters,[10] but were denied their ability to cast

---

[8] In Harris County alone, 7,750 of the 7,794 mail ballots initially flagged for rejection were for not complying with S.B.1's number matching requirement—99.4% of the county's flagged mail ballot defects. ROA.16117-16118.

[9] *See* U.S. Election Assistance Commission, *2018 Election Administration and Voting Survey*, https://public.tableau.com/app/profile/u.s.election.assistance.commission /viz/EAVS2018DataViz-Labeld_11_25/EACDataVizTool.

[10] State Appellants suggest some of those whose mail ballots were rejected may not have been "legitimate voters."  State Br. 13.  There is no evidence in the record supporting this suggestion.  Rather, to even receive

their mail ballot and have it counted solely due to an error or omission with respect to the number-matching requirement on the ABBM or BBM carrier envelope form. For example, 77-year-old Travis County voter Roberto Benavides had his mail ballot rejected in November 2022's general election after adding his driver's license number and SSN4 on his BBM, because his driver's license number in TEAM was incorrect. ROA.15845-15852 (Benavides Dep. 6:19-24, 23:14-24:6, 27:12-24, 51:5-6). He has had the same driver's license number for thirty years. ROA.15846-15847 (Benavides Dep. 22:23-23:5). Although Mr. Benavides attempted to cure his rejection, he was unsuccessful and therefore unable to have his ballot counted. ROA.15850-15851 (Benavides Dep. 31:18-32:4).

### D. Plaintiffs Sue and the District Court Determines that the Number-Matching Requirement Violates the Materiality Provision.

Foreseeing the chaos S.B.1 would sow into Texas's vote-by-mail system, Plaintiffs OCA-Greater Houston, League of Women Voters of Texas, and REVUP-Texas ("Plaintiffs") diverted resources from mail-in

_____

an ABBM, let alone have it approved to obtain BBM materials, Texans must repeatedly attest to and offer evidence of their qualifications and their eligibility to vote by mail. *Supra* II.A.

voting assistance towards encouraging members to vote in person, to better ensure their members' votes would count. ROA.16022-16026. For example, OCA-GH members Sam and Elizabeth Hwong—a couple in their eighties—changed their voting practices from mail-in voting to in-person voting because of S.B.1's number-matching requirement. ROA.16026. Plaintiffs and the United States challenged the enforcement of S.B.1's number-matching requirement against Texas voters under the Materiality Provision. ROA.6424-6501.

The discovery process revealed that the number-matching requirement did not advance any election security or administration goal—certainly none having to do with ascertaining a voter's qualifications or identity. Election officials conceded that they do not ordinarily use the handwritten numbers on the ABBMs or BBMs to look up voter records, and the Secretary does not instruct them to do so. ROA.13330-13331 ¶¶118-120. Rather, election officials look up voters using other information on their ABBMs and BBMs, like the voter's name, date of birth, and address, just as they did before S.B.1. ROA.13331 ¶120.

The Secretary of State's Director of the Elections Division also acknowledged that the DPS numbers or SSN4s that voters are required to provide on ABBM and BBM materials have "have nothing to do with" the voters' eligibility to vote under Texas law.  ROA.13301 ¶15.  It was undisputed that election officials verify mail-ballot voters' identities not using the handwritten ID numbers, but using their signatures on their attestation as to their identity and eligibility, just as they did before S.B.1.  TEC § 87.041(b)(2); ROA.13314 ¶65.  It was also undisputed that neither the Secretary of State nor county election officials considers a DPS number or SSN4 mismatch or omission to be evidence of fraud.  ROA.13345-13346 ¶¶187-191.

Plaintiffs and the United States sought summary judgment, and the district court granted those motions.  ROA.27041-27048, 33215-33267.  The Court concluded that enforcing the number-matching requirement on pain of rejecting a voter's ABBM or BBM violated the Materiality Provision because "a voter's ability to provide the ID number associated with her voter registration record on TEAM is not material to her voter qualifications under Texas law."  ROA.33247, 33266.

The district court further explained, based on undisputed testimony from election officials, that "the DPS numbers and SSN4s required by S.B.1 are not used to ensure that voters are qualified to vote or to cast a mail ballot under Texas law, to identify voters, or to flag potential fraud." ROA.33224. The undisputed facts also "confirm[ed] that election officials do *not* use the ID numbers on ABBMs and BBMs to confirm voters' identities but to reject their voting materials." ROA.33245. The court issued a permanent injunction enjoining the Secretary and other Defendants from enforcing S.B.1's number-matching requirement. ROA.33213-33214.

This appeal followed.[11]

## SUMMARY OF THE ARGUMENT

S.B.1's number-matching requirement violates the Materiality Provision's plain text. There is no dispute that since its enactment, the number-matching requirement has "den[ied] the right … to vote" to tens of thousands of otherwise eligible Texans "because of an error or

---

[11] A motions panel of this Court later granted a stay pending appeal of the district court's decision, which came down during local runoff elections in a number of counties across the state. Order Granting Stay at 3-4, *United States v. Paxton*, No. 23-50885 (5th Cir. Dec. 15, 2023), Dkt. No. 80-1.

omission" on a "record or paper" that was "not material" to whether they were "qualified … to vote[.]"  52 U.S.C. § 10101(a)(2)(B).  The relevant "error or omission" was Texans inputting information on their ABBM or the BBM carrier envelope form that mismatched their information in TEAM.  *Id.*  And it is undisputed that this information was "not material" for determining whether a voter is qualified under state law.

Appellants cannot escape the plain text and undisputed record. They argue that the statute only applies to voter registration, contrary to the text.  They try and fail to create ambiguity with interpretive canons like *ejusdem generis*.  They oppose a plain-text reading on policy grounds, arguing that federalism itself is at stake, but cannot point to any commonsense election rule that the Materiality Provision would threaten.  Their constitutional avoidance argument fails because there is nothing to avoid.   And their jurisdictional arguments conflict with precedent and the undisputed facts in the record.

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo.  Nationwide Mut. Ins. Co. v. Baptist*, 762 F.3d 447, 449 (5th Cir.

2014).  Summary judgment is proper where "there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56(a).

This Court may affirm on any basis in the record.  *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998).

## II.  THE MATERIALITY PROVISION APPLIES TO THE NUMBER-MATCHING REQUIREMENT.

### A.  The Materiality Provision Applies to Immaterial Errors or Omissions on Voting-Related Paperwork.

#### *1. The statute applies as a matter of plain text.*

Statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous."  *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018) (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (Rehnquist, J.)).

The Materiality Provision comprises two parts or clauses.  In full, it reads:

> [1] No person acting under color of law shall … deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting,

> [2] if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election

52 U.S.C. § 10101(a)(2)(B). The main clause sets forth the general prohibition on disenfranchisement based on paperwork errors and specifies the paper forms "on" which such errors might be made, namely "any record or paper relating to any application, registration, or other act requisite to voting[.]" *Id.* A subordinate "if" clause then specifies *which* errors or omissions on such forms cannot serve as a basis for disenfranchisement. A paperwork error or omission cannot be the basis to deny the right to vote "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]" *Id.*

Every element of the statute is met on the record here.

*First*, the undisputed facts showed that under S.B.1, thousands of Texas voters have been "den[ied] the right … to vote," which the statute itself capaciously defines as including any "action required by State law prerequisite to voting." 52 U.S.C. §§ 10101(a)(2)(B), (a)(3), (e). Under the Materiality Provision, then, the right to vote "by definition includes not only the registration and eligibility to vote, but also the right to have that vote counted." *E.g.*, *Ford*, 2006 WL 8435145, at *11. S.B.1 requires elections officials to reject voters' ABBMs, or reject their mail ballots

altogether, such that they are not counted. TEC §§ 86.001(f), 87.041(b)(8). And there is no dispute that thousands of ABBMs and BBMs were in fact rejected pursuant to the challenged number-matching requirement. *See supra* Statement of Case II.C. That is an actionable denial of the right to vote as the statute defines it.

Appellants suggest (GOP Br. 29-35; State Br. 23-25) that no "right to vote" is denied here because a mail-ballot voter can simply vote in person instead. That is wrong on many levels. For one, it is wrong because the text, and especially the definition of voting that Congress chose, will not bear it. *E.g.*, *Cargill v. Garland*, 57 F.4th 447, 460 (5th Cir.) (en banc), *aff'd*, 602 U.S. 406 (2024); *see also, e.g.*, *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 697 n.10 (1995). Congress expressly defined voting in the statute as including "all action necessary to make a vote effective," not just those actions necessary to successfully vote in person. 52 U.S.C. § 10101(e).

For another, and consistent with Texas law as well as evidence in the record, mail-ballot voters frequently have disability or age-related mobility issues that mean they cannot simply vote in person. *E.g.*, *In re State*, 602 S.W.3d at 558-59.

And for a third, even voters who might otherwise theoretically be able to get to the polls in person despite age or disability may not receive notice of some problem with their paperwork until it is too late to correct the issue.  ROA.15846-15852.[12]  All of this is why this Court in *Vote.Org* rejected the suggestion that there was no denial of the right to vote under the Materiality Provision merely because some "alternative means" or some cure process remains available.  89 F.4th at 487.[13]

*Second*, the undisputed facts showed (and Appellants do not contest) that these rejections occurred "because of an error or omission," 52 U.S.C. § 10101(a)(2)(B), namely a failure to write an ID number on the

---

[12] This case is therefore different from *Crawford v. Marion County Election Board*, where elderly voters who might have had trouble obtaining a photo ID to vote at the polls could decide *ex ante* to vote absentee instead.  553 U.S. 181, 201 (2008) (discussed in GOP Br. 1, 33, 36, 51 and State Br. 1, 2, 3, 34).  Here, voters with mobility issues cannot decide *ex ante* to vote at the polls—and by the time they learn their votes were rejected due to the immaterial number-matching provision, it may be too late for any cure.

[13] The *Vote.Org* panel's passing description that applying the Materiality Provision to "vote counting" would be "possibly overbroad," 89 F.4th at 479 n.7, is irrelevant.  *E.g.*, State Br. 22-23.  This case doesn't involve "vote counting," and even if it did, *Vote.Org* expressly declined to consider that question.

required form (an "omission") or else writing a number that does not successfully match the number in the voter's TEAM record (an "error").

*Third*, the error or omission is "on [a] record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). Both the ABBM and the BBM carrier envelope form are physical paper forms that voters must complete (*i.e.*, a "paper"). TEC §§ 84.011, 86.002. The ABBM is—literally—an "application" form. ROA.16709-16710; TEC § 84.011. And the BBM carrier envelope form is another paper whose completion is an "act requisite to voting" for voters who have been approved to vote by mail. *See* ROA.16712-16714; *see also* TEC § 86.002(g). *See also Martin*, 347 F. Supp. 3d at 1308-09; *Thurston*, 2023 WL 6446015, at *16. Errors on paperwork relating to "registration," on paperwork relating to a voting-related "application" (such as the ABBM), *and* on papers relating to "other act[s]" that are required steps in the voting process (like completing the carrier envelope form) are all potentially subject to the Materiality Provision as a matter of plain text.

This reading gives meaning to every part of the relevant text, including Congress's repeated use of the term "any" (as in, "*any* record or paper relating to *any* application, registration, or other act requisite to

voting," 52 U.S.C. § 10101(a)(2)(B) (emphasis added))—"expansive" language that "naturally" reads as "referring to all" acts requisite to voting. *E.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997). And it also results in a rule that is not easily circumvented by new pieces of trivial paperwork, consistent with Congress's overriding aim. *See supra* Statement of the Case I.

Collapsing the statutory language to just "registration," on the other hand, would mean that voters could be required to complete polling place questionnaires and ballot applications, asking them to state their age in days or other irrelevant, error-generating questions, with no protection from the Materiality Provision. This is exactly what Congress sought to avoid with the text it chose.

*Fourth*, as discussed *infra* Statement of the Case II.C, the error or omission at issue, namely failing to write a number that matches the number in the voter's TEAM record, is "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). Whether the voter can provide a number that matches whatever number might be contained in the spotty, error-prone TEAM database has little bearing on whether they are

qualified to vote in Texas, and in fact, the number-matching process is not used to ascertain voter qualifications. TEC §§ 86.001, 87.041.

Step back and notice what this straightforward reading of the statute does and does not do. All rules of grammar and syntax are observed. Words are given their natural meaning. Statutory definitions are respected. No text is rendered superfluous or meaningless. The Materiality Provision reaches instances where (as here, and as Congress intended) a voter's path to an effective vote is blocked by some trivial paperwork mistake on some required, voting-related paper form that has no bearing on whether they are qualified to vote in the election. It extends no further than that.

### 2. *Appellants misread the text.*

Now consider the reading Appellants proffer. They suggest that the paper forms at issue—the ABBM form and the BBM carrier envelope form—are categorically outside of the Materiality Provision's ambit because the statute applies "only to paperwork used in the registration process." *E.g.*, GOP Br. 45. The text cannot bear that reading. *See, e.g.*, *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021) ("[T]he text of § 10101(a)(2)(B) isn't limited to … voter registration.").

Appellants would shrink the phrase "any application, registration, or other act requisite to voting" down to just the word "registration." *See* GOP Br. 45-46; *see also* GOP Br. 23-26; State Br. 22-23.[14] But limiting the statute's scope to records or papers relating to "registration" only, when the text applies to "*any* record or paper relating to any application, registration, *or other act requisite to voting*," 52 U.S.C. § 10101(a)(2)(B) (emphasis added), would effectively delete text that Congress chose to include. It would also ignore the statutory definition of voting as including "registration ..., casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(a)(3)(A), (e). Appellants thus ask the Court to violate the "cardinal rule" of statutory interpretation that *all* words in the statute be given meaning. *E.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *accord Tesfamichael v. Gonzales*, 411 F.3d 169, 175 (5th Cir. 2005) ("[C]ourts should strive to give operative meaning to every word in a statute."). *Compare Pa. State Conf. of*

_____

[14] To advance an alternative reading of the Materiality Provision, GOP Appellants argue (at 23) that the terms "registration" and "application" are "interchangeable." But collapsing two different words into one does not "give operative meaning to every word in a statute." *Tesfamichael v. Gonzales*, 411 F.3d 169, 175 (5th Cir. 2005).

*NAACP*, 97 F.4th at 138 (admitting that Appellants' reading would create "redundancies").

Because the statutory language is clear, the *ejusdem generis* canon cannot be used to erase the statute's catchall "other act requisite to voting" language (as Appellants wrongly suggest, GOP Br. 24-25). *Ejusdem generis* only helps to "ascertain[] the correct meaning of words when there is uncertainty." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588-89 (1980) (citation and quotation omitted). Where (as here) Congress has used general terms of clear application to the subject at issue, *ejusdem generis* does not limit the statute as written. *Id.*; *see also, e.g.*, *Ali v. Fed. Bureau of Prisons,* 552 U.S. 214, 226-27 (2008) (courts should not "create ambiguity where the statute's text and structure suggest none").

In any event, it wouldn't make a difference in this case if *ejusdem generis did* apply. That canon would only indicate that papers relating to "other act[s] requisite to voting" means a paper that is "similar in nature" to an "application" or "registration," *i.e.*, a voting-related form that voters are required to fill out, like the ABBM (which is, again,

literally an "application") or the required form on the BBM carrier envelope. *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).[15]

Appellants argue in varying ways that the Materiality Provision's scope is limited to voter-registration papers despite plain language to the contrary because the statute elsewhere refers to the process of "determining whether such individual is qualified under State law to vote in such election"—which they claim occurs only when a voter first registers. GOP Br. 26-27, 29-31, 45-47; State Br. 18-19, 21-23. This argument contravenes plain text in multiple ways.

First, it reads the statute in an unnatural manner contrary to the "ordinary principles of English prose." *E.g.*, *Flora v. United States*, 362 U.S. 145, 150 (1960). The language about determining a voter's qualifications is found in the statute's subordinate "if" clause, which relates to the types of *errors* that may lead to the loss of the right to vote. 52 U.S.C. § 10101(a)(2)(B) (paperwork error may not be the basis for vote

---

[15] Considering Congress's purpose to protect access to the ballot and not merely registration, statutory references to "registration" and "application" forms also provide "paradigmatic" examples of the *type* of paperwork that might be used to disenfranchise voters based on trivial mistakes. *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 164 (2012) (declining to adopt "a narrower construction" of text where Congress instructs a "broad statutory definition").

denial "if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election"); *see also Browning*, 522 F.3d at 1173 ("The text of [the Materiality Provision] prohibits denying the right to vote based on errors or omissions that are not material in determining voter eligibility."). Following basic "rules of grammar," *e.g.*, *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 494 (5th Cir. 2014), this "not material in determining" qualifications language refers to the term "error or omission," which is the "nearest reasonable referent" and sits in the same subordinate clause. *See, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012).

By contrast, the types of *paperwork* on which those immaterial errors might be made—"any record or paper relating to any application, registration, or other act requisite to voting"—are identified elsewhere, in the statute's main clause. 52 U.S.C. § 10101(a)(2)(B); *see supra* Statement of the Case I. The "not material in determining" qualifications language does *not* refer to (and thus does not limit) the scope of the term "record or paper," a more distant referent located in the separate, main clause. *Compare Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584

(1994) (specification in dependent clause of statute could not "swallow" the broader meaning of the main clause).

Appellants' entire argument thus hinges on a bizarre reading of the text, where a snippet from the subordinate clause is used to override the main clause's express language, limiting it to registration paperwork alone even though Congress explicitly enumerated other types of papers as well. The central case that Appellants rely on for their reading, the Third Circuit's split ruling in *Pennsylvania State NAACP*, makes vividly clear how unnatural this construction is, explaining that it turns "the 'in determining' phrase" from the subordinate clause into "the tail that wags the dog." *Pa. State Conf. of NAACP*, 97 F.4th at 136. The tail wagging the dog is, to put it mildly, not a natural occurrence.[16] This Court need not—and ought not—adopt the Third Circuit's unnatural reading of the statute's text.

---

[16] Indeed, the joke in the play from which the idiom originates is that the tail wagging the dog is *physically impossible*. *See* Tom Taylor, *Our American Cousin* (1858) ("Why does a dog waggle his tail[?] … Because the tail can't waggle the dog! Ha ha!"), https://www.google.com/books/edition/Our_American_Cousin/hLsxG-jt0p4C?hl=en&gbpv=1.

Even if the wag-the-dog reading was right, moreover, the premise that voters' qualifications are determined solely and exclusively when they first register (*e.g.*, GOP Br. 26-29) would still be wrong. It is wrong, for one, because the Materiality Provision plainly encompasses the type of paperwork that may be required of a voter each *discrete* election, as evidenced by the repeated references to the right "to vote in any election" and qualifications "to vote in any election." 52 U.S.C. § 10101(a)(2)(B). This "in any election" language would be made superfluous if the statute only referred to a person's initial voter registration.[17] *E.g.*, *RadLAX*, 566 U.S. at 645; *Tesfamichael*, 411 F.3d at 175.[18]

---

[17] The text also forecloses the argument (GOP Br. 29, 34-35; State Br. 9, 25-26) that the statute only applies to permanent disqualification or removal. The Materiality Provision applies not just to a voter's placement on the rolls, but to "all action necessary to make a vote effective," including "registration," but also any "action required by State law prerequisite to voting, casting a ballot, and having such ballot counted" in the election. 52 U.S.C. §§ 10101(a)(3)(A), (e).

[18] GOP Appellants argue (at 48-49) that the "in any election" language accounts for the fact that, in certain local utility elections, jurisdictions may have property requirements. This hyper-obscure explanation doesn't make sense: The inclusion or omission of the "in any election" language would not change the substantive qualifications to vote in any specific jurisdiction to which a paperwork error must relate for it to be a valid basis for denying the right to vote.

And Appellants' initial-registration-only premise is also wrong because under Texas law and as a matter of undisputed evidence, counties in fact *do* confirm a voter's qualifications at various points, such as when they submit an ABBM (although not by using the DPS numbers or SSN4s written on ABBMs or BBM envelopes). ROA.15638-15641 (Colvin Dep. 49:11-57:25); *see also* ROA.13330-13331 ¶¶118-120.[19] Indeed, Appellants' own argument for why voters' errors in completing the number-matching requirement are material (with which Plaintiffs disagree, *infra* Argument II.C) is because the number match "is material to determining whether an already-registered voter is entitled to vote by mail." State Br. 15. In their own telling, then, voters' qualifications are assessed not only when they initially registered, but at various points in the mail-ballot process.

---

[19] State Appellants argue (State Br. 9) that "[n]othing in S.B.[1] requires early-voting clerks … to determine whether an individual is qualified to vote." (emphasis omitted); *see also Id.* at 15. That is inconsistent with their assertion—pages later—that counties do use the number to determine a voter's entitlement to vote by mail. State Br. 15. It's also irrelevant; the point is only that the *papers at issue* (namely the ABBM and the BBM carrier envelope, which exist regardless of S.B.1) contain information like signatures used in confirming voters' qualifications (in the limited sense that they require voters to attest to their qualifications, *see infra*), and thus are covered papers even under Appellants' own reading of the statute.

The statutory provisions surrounding the Materiality Provision do not support Appellants' registration-forms-only reading (*e.g.*, GOP Br. 27-28, 47), either. Appellants' argument is that these provisions are "limited to 'qualification' determinations." *Id.* at 28. But even if that were right, it would just highlight the Materiality Provision's comparatively broader scope. For example, subsection 10101(a)(2)(A) focuses on the use of non-uniform practices to "determin[e] whether any individual is qualified under State law or laws to vote in any election." By contrast, the Materiality Provision applies more broadly, whenever immaterial paperwork errors are used to "deny the right of any individual to vote in any election." With such "differing language" comes differences in meaning. *E.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983); *accord Vote.Org*, 89 F.4th at 486 n.10.

Nor does the special remedy available to the Attorney General in special pattern-or-practice cases under subsection 10101(e) of the statute somehow "reinforce[]" the supposed "qualification-and-registration focus of § 10101(a)." GOP Br. 28. Under that special remedy scheme, if the Attorney General succeeds on the merits, then federal courts and federal registrars working with them supplant recalcitrant local election

officials, essentially taking over the workings of the election system. 52 U.S.C. § 10101(e). Under the special scheme, a person who has been denied the right to vote may obtain "an order declaring him qualified to vote." *Id.* Moreover, though—and here is the part Appellants omit—"an applicant so declared qualified to vote *shall be permitted to vote in [the] election.*" *Id.* (emphasis added). Subsection 10101(e), and especially the language in it that Appellants leave out of their brief, thus strongly *confirms* that Congress wanted to broadly protect the right to vote (including to "cast[] a ballot, and hav[e] [it] counted," 52 U.S.C. §§ 10101(a)(3), (e)), and not merely the right to register. *See supra* Statement of the Case I.

### 3. Appellants ask the Court to ignore the text.

Because the Materiality Provision applies to paperwork like the ABBM and the BBM carrier envelope form by its plain terms, there is no more interpretive work to do. This Court's job "is at an end." *E.g.*, *Bostock*, 590 U.S. at 674.

Appellants argue that legislative history supports limiting the Materiality Provision to voter registration forms (*e.g.*, GOP Br. 23-25) but that is wrong on multiple levels. For one, Appellants never claim (let

alone show) that the Materiality Provision is ambiguous, so resorting to legislative history to alter the meaning of the text would be improper. *E.g.*, *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992); *see also, e.g.*, *Bostock*, 590 U.S. at 675; *United States v. Key*, 599 F.3d 469, 480 (5th Cir. 2010).

For another, the Materiality Provision's history *supports* its application to immaterial paperwork requirements. Congress was certainly concerned with voter registration, but its aim was to secure and protect the franchise. *See supra* Statement of Case I. It drafted a broad statute to overcome creative resistance by state and local governments. *E.g.*, *Vote.Org*, 89 F.4th at 486. If Congress had wholesale omitted the "receipt and casting of ballots" (GOP Br. 33) from the Materiality Provision's protections (a result that is, again, flatly inconsistent with text), it would not have achieved its goals. Jim Crow jurisdictions could have simply allowed Black citizens to register, and then presented them at the polls with "ballot applications" containing immaterial paperwork requirements. *Cf. Ford*, 2006 WL 8435145, at *11.

It does not matter that mail-ballot voting was comparatively "rare" in 1964 (*e.g.*, GOP Br. 47).  What matters is text.[20]  Where the text is clear, it is no argument to suggest that, "because few in 1964 expected today's *result*, we should not dare to admit that it follows ineluctably from the statutory text." *Bostock*, 590 U.S. at 675-76.

Indeed, the fact that the language Congress chose has led to new applications over the decades is unsurprising.  With the Civil Rights Act and the Voting Rights Act, Congress enacted "major piece[s] of federal civil rights legislation," *Bostock*, 590 U.S. at 680, designed to succeed where prior legislation had failed, and to stymie even not-yet-invented, "ingenious" forms of vote denial. *Katzenbach*, 383 U.S. at 309.  In service of that goal, Congress defined voting in broad terms, as including "all action necessary to make a vote effective," 52 U.S.C. § 10101(a)(3)(A), (e),

---

[20] Appellants' reliance (GOP Br. 30; State Br. 23) on *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), for the proposition that the term "right to vote" should be interpreted "with reference to 'history'" conflates ordinary statutory interpretation with the inquiry into the scope of the constitutional right to keep and bear arms under the Second Amendment.  They are (obviously) different—and nothing in *Bruen* even hints that "history" may override the plain text of a federal statute.  Nor did any aspect of the Court's analysis in *Brnovich v. DNC*, 594 U.S. 647 (2021) (cited in GOP Br. 30, 32; State Br. 24) involve overriding unambiguous, statutorily defined terms because of "history."

and it placed within the ambit of the Materiality Provision all manner of voting-related paperwork, *id.* § 10101(a)(2)(B); *see also supra* Statement of the Case I.

Congress's decision to broadly define the right to vote and to use catch-all language in describing the covered forms of paperwork— reasonable responses to the policy problem it faced—"virtually guaranteed that unexpected applications would emerge over time." *Bostock*, 590 U.S. at 680. And so here we are. "'[T]he fact that [a statute] has been applied in situations not expressly anticipated by Congress' does not demonstrate ambiguity; instead, it simply 'demonstrates [the] breadth' of a legislative command." *Id.* at 674. (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)). A statute's application even in situations that might not have been initially expected thus reflects the "presumed point…to produce general coverage," not any intent "to leave room for courts to recognize ad hoc exceptions." Scalia & Garner, *Reading Law* at 101.

## B. The Materiality Provision Is Limited in Scope and Affirming Here Does Not Change That.

Appellants' other arguments sound in policy and consequentialism, which cannot overcome plain text. *E.g.*, *Germain*, 503 U.S. at 253-54

(Thomas, J.) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  In any case, the arguments fail on the merits.

### 1. Affirming will not create any new right to vote by mail.

Appellants' various arguments about the "right to vote" fail for a simple reason:  The right to vote at issue *here* is simply the one guaranteed by statute in the Materiality Provision, which extends to instances where a person is stymied from the effective exercise of the franchise due to some immaterial mistake on voting-related paperwork, 52 U.S.C. § 10101(a)(2)(B); *see supra* Statement of the Case I—nothing more and nothing less.

Affirming is therefore entirely consistent with constitutional cases like *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), and *Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) ("*TDP*"), on which Appellants rely (GOP Br. 30-31, 45; State Br. 23-24).[21]  In those cases, plaintiffs sought to extend mail-ballot voting to new

---

[21] Appellants also wrongly rely on a hodge-podge of inapposite constitutional cases that don't involve mail-ballot voting or voting-related paperwork at all.  *See Clingman v. Beaver*, 544 U.S. 581, 587-88 (2005)

classes of persons for whom it was unavailable under state law. For example, *McDonald* involved a challenge to an Illinois law which extended absentee voting to some persons based on need, but not others. 394 U.S. at 803-04. In that context, the Court held that voters for whom the State had not made mail-ballot voting available had no constitutional right to vote by mail. *Id.* at 807-08; *see also TDP*, 978 F.3d at 194 (rejecting constitutional challenge to age restriction for mail-ballot voting).[22] This case, by contrast, is about whether, to *whatever* extent

_____

(semi-closed primary law) (cited in GOP Br. 35 & State Br. 31); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997) (fusion voting) (cited in GOP Br. 20 & State Br. 18); *Anderson v. Celebrezze*, 460 U.S. 780, 790-92 (1983) (early candidate filing deadline) (cited in GOP Br. 21, 26 & State Br. 19); *Rosario v. Rockefeller*, 410 U.S. 752, 754 (1973) (constitutional challenge to party registration deadline) (cited in GOP Br. 33, 35 & State Br. 25-26); *Smiley v. Holm*, 285 U.S. 355, 364-66 (1932) (congressional districting) (cited in GOP Br. 21, 36 & State Br. 19).

[22] Appellants rely repeatedly on a stay-panel decision in *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020), as well as other non-precedential, superseded stay panel opinions, such as the one in this case and in *Vote.Org*. GOP Br. 2, 7, 17, 22, 23, 31; State Br. 2, 3, 19, 24, 25, 29, 30, 31, 35. But these are "written in sand with no precedential value." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 244 (5th Cir. 2020) (Higginbotham, J., concurring). Appellants also rely to similar effect on non-precedential, stay-related opinions like Justice Alito's dissent from the denial of a stay in *Ritter v. Migliori*, 142 S. Ct. 1824 (2022), and Justice Kavanaugh's concurrence in the denial of a motion to vacate a stay in *DNC v. Wisconsin State Legislature*, 141 S. Ct. 28 (2020).

Texas makes mail-ballot voting available to voters, it must do so in compliance with the terms of a federal statute. The district court went no further, explaining that, "[h]aving made mail-ballot voting available, Texas is not permitted to refuse to count mail ballots solely because of an insignificant paperwork error." ROA.33256.[23]

Appellants argue (*e.g.*, GOP Br. 32-33) that "mandatory election-administration and ballot-casting rules" can *never* deny the right to vote, but even if that were true in constitutional cases (and it isn't), the right at issue here is defined and delineated by statute: the statute protects the right to "cast[] a ballot [*and*] hav[e] *it counted*." *See* 52 U.S.C. §§ 10101(a)(3), (e) (emphasis added). It breaks no new ground to conclude that impediments to the exercise of the franchise may impinge on the *statutory* right to vote as Congress defined it in the Materiality Provision. This Court has already interpreted materially identical language in Section 208 of the Voting Rights Act as extending well beyond "the

---

[23] *Accord Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1052 (D.N.D. 2020) ("[A] state that creates a system for absentee voting must administer it in accordance with the Constitution.") (internal quotation marks omitted); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) (similar); *Zessar v. Helander*, No. 05-cv-1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006) (same); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990) (same).

mechanical act of filling out the ballot sheet." *OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 614-15 (5th Cir. 2017); *see also Vote.Org*, 89 F.4th at 486-87.[24]

Nor does it help to contrive (as Appellants do through sheer repetition, GOP Br. 2, 21, 32, 34, 35, 36, 42) some category called "ballot-casting" rules—a litigation-driven distinction nowhere found in the statutory text. Whether or not it is labeled a "ballot-casting" rule, requiring (for example) an in-person voter at the polls to fill out a paper form listing their exact age in months and days, or some other trivial information, on pain of being turned away, would violate the Materiality Provision. *See supra* Statement of Case I. The same requirement would be equally unlawful on some paper form made requisite to mail ballot voting, too.

_____

[24] State Appellants suggest (at 25) that, because some voters may be able to cure an issue with their ABBM or BBM carrier envelope, the right to vote is not denied. But the denial of any application or other required form is sufficient to trigger the statute in light of the expansive definition of voting, which includes "all action necessary to make a vote effective." *Supra* Statement of Case I; *see also Vote.Org*, 89 F.4th at 487 ("set[ting] aside" stay panel's suggestion that the right to vote might not be violated where there is an opportunity to cure a paperwork error). And in the end, there is no dispute that many voters were unable to cure and thus had their right to vote denied because their ABBMs or their BBM envelope forms were ultimately rejected for purposes of the election.

Nor can the rejection of votes purely because of irrelevant paperwork mistakes be reframed as "declin[ing] to accept noncompliant applications or to count noncompliant ballots," such that a voter has merely "forfeit[ed]" their own rights. GOP Br. 33-34. By that logic, any paperwork mistake, no matter how irrelevant, could be used to disenfranchise a voter, with no limitation, which would render the Materiality Provision a dead letter. *Cf. Vote.Org*, 89 F.4th at 487 ("We reject that States may circumvent the Materiality Provision by defining all manner of requirements, no matter how trivial, as being a qualification to vote and therefore 'material.'")

## 2. *Affirming will not implicate federalism.*

GOP Appellants fret that an affirmance would implicate the "federalism canon" (GOP Br. 35-39).[25] This argument falls with the false premise that a plain-text reading of the Materiality Provision might somehow "jeopardize[] many longstanding election-administration and ballot-casting rules nationwide." GOP Br. 35. It would do no such thing. Rather, the Materiality Provision's scope is self-limiting, extending only

---

[25] Notably, State Appellants do not appear to join in this argument.

and specifically to denials of the right to vote due to immaterial errors on voting-related paperwork.

Appellants list sundry election rules that they wrongly claim would be implicated by Plaintiffs' plain-text approach (GOP Br. 37-38). But almost all of these involve signature requirements on various forms or poll books that are not at issue here, and that typically *are* material to determine a person's qualifications where (as in the examples GOP Appellants cite) they attest that a voter is qualified to vote. 52 U.S.C. § 10101(a)(2)(B). *Cf. Vote.Org*, 89 F.4th at 490-91. The ABBM here is case in point: In signing the ABBM, a voter attests "that the information given in th[e] application is true" and that they "understand that giving false information on th[e] application is a crime." ROA.16709. At least where they are not unnecessarily duplicative, failure to sign a required attestation that a voter is qualified to vote may be a valid reason to deny the right to vote, consistent with the Materiality Provision.[26]

The small handful of non-signature-related "paper-based" rules to which GOP Appellants point (GOP Br. 37-38) are also not implicated.

---

[26] *See, e.g., Ford*, 2006 WL 8435145, at *11 (duplicative signatures on polling place forms were immaterial basis to deny right to vote).

Prohibitions on overvoting (*i.e.*, "voting for more candidates than there are offices," *Id.* at 38), are not implicated because that error is not on a "paper" made "requisite to voting," but rather in marking *the ballot itself*.[27] And requirements to place a mail ballot in a secrecy envelope are not implicated because that is not "an error or omission *on* any record or paper"—*i.e.*, some error or omission in writing something *on* a required piece of paperwork, 52 U.S.C. § 10101(a)(2)(B) (emphasis added).[28]

---

[27] If there were ambiguity as to the statute's operation on this point (which is not raised in this appeal), then *ejusdem generis* would help resolve it. The statute's reach is limited to errors on required papers that are like an "application" or "registration," *i.e.*, ancillary paperwork that must be filled out at some point to be able to cast a ballot and have it counted. *See Circuit City*, 532 U.S. at 115. Voters aren't required to complete their ballot (they can leave it blank) or input individualized information as with a required form. Indeed, voted ballots are not even necessarily paper.

[28] Indeed, if a voter has not properly used a required secrecy envelope, then their vote won't count for failure to vote in secret, *not* "because of an error or omission" on some required form. 52 U.S.C. § 10101(a)(2)(B). *Friedman v. Snipes*, on which Appellants repeatedly rely (GOP Br. 6, 22, 36; State Br. 5, 22, 30) is inapposite for similar reasons; that case involved a challenge to the *deadline* to submit absentee ballots, not any paperwork error on voting-related paperwork. 345 F. Supp. 2d 1356, 1371-72 (S.D. Fla. 2004). Voters there were denied the right to vote for failure to timely submit their ballots, and not because of any error or omission on any voting-related paperwork.

Appellants overstate the supposed alteration in the balance of federal-state power on which their invocation of the "federalism canon" depends. The canard that the Materiality Provision jeopardizes "*all* paper-based voting requirements*" (*e.g.*, GOP Br. 1) is false. The only practice the statute prohibits is disenfranchising voters because of an immaterial error on some required piece of voting-related paperwork. Indeed, the Materiality Provision doesn't even prohibit *asking* for immaterial information on election-related paperwork, so long as voters are not blocked from the effective exercise of the franchise because of minor mistakes in responding to such requests.

As written, the statute is a precise and limited intervention into the States' administration of elections. It prohibits a defined set of practices by state actors—not a significant or unheralded alteration of the federal-state balance. GOP Appellants rely on inapposite cases—*e.g.*, stay opinions involving emergency expansions of agency authority in response to the COVID-19 pandemic. GOP Br. 35, 39 (citing *NFIB v. OSHA*, 595 U.S. 109 (2022), and *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021)). And to the extent a "clear statement" was needed, Congress gave it: In plain terms, it prohibited those "acting under color of law" from denying

the franchise, broadly defined, based on irrelevant paperwork mistakes. *See* 52 U.S.C. § 10101(a)(2)(B); *see supra* Statement of the Case I. The suggestion that the Civil Rights Act of 1964 is an obscure "mousehole" in which Congress is unlikely to have spoken to the federal-state balance (GOP Br. 39) is unserious—and, if serious, discrediting. *Cf. Bostock*, 590 U.S. at 680. After all, "few pieces of federal legislation rank in significance" with the 1964 Act. *Id.* at 650-51.

### 3. Affirming will not implicate HAVA.

State Appellants wrongly suggest (State Br. 36-37) that, because HAVA calls for voters to provide an ID number when they first register to vote in service of building a uniform voter registration database, *see supra* n.1, the ID numbers that voters provided are *per se* material to determine voter eligibility. The materiality of these ID numbers in light of the catastrophically flawed TEAM database is addressed below, *infra* Argument II.C. And any suggestion that HAVA is otherwise implicated is mistaken.

HAVA concerns only voter registration, not procedures for voting by mail. HAVA instructs states to assign voters unique identification numbers for purposes of constructing an electronic voter registration

database, 52 U.S.C. §§ 21083(a)(5)(A)(i)-(ii)—not to use those numbers to determine voters' eligibility to vote.  As one court explained in a decision applying the Materiality Provision:

> HAVA's matching requirement was intended as an administrative safeguard for "storing and managing the official list of registered voters," and not as a restriction on voter eligibility.  This is evidenced by the requirement that a person who has no driver's license or social security number be given a unique identifying number, but not be matched, prior to registering to vote.

*Reed*, 492 F. Supp. 2d at 1268-69.  Moreover, although HAVA requires individuals to submit identification numbers when registering to vote, nothing in HAVA "require[s] that states authenticate these numbers by matching them against existing databases."  *Browning*, 522 F.3d at 1174 & n.21.  HAVA, in other words, does not require or otherwise allow the use of these ID numbers for any purpose other than constructing the registration database, nor does it anticipate such use.  *See* ROA.33243-33244 (noting that HAVA's lack of an authentication requirement is "manifest in the thousands of errors in TEAM").  HAVA certainly doesn't speak to the question here, namely whether voters may be required, on pain of disenfranchisement, to write on a form some number that exactly matches their record in the state voter-registration database, even where

the voter's identity and qualifications are independently validated, and even where the database is shoddily maintained and unreliable.

### 4. Affirming will not implicate other constitutional concerns.

Appellants' call for "constitutional avoidance" (GOP Br. 39-43; *see* State Br. 26-28) lacks merit not only because their proffered reading of the statute is implausible, but because there is nothing to avoid.

When Congress enacted the Materiality Provision in 1964, it relied largely (though not exclusively) on the Elections Clause's delegation of "broad authority to Congress to control the substantive and not merely the mechanical aspects of elections." *See, e.g.*, H.R. Rep. No. 88-914 (1963), *reprinted* 1964 U.S.C.C.A.N. 2391, 2492 (Rep. McCulloch).[29] The Elections Clause provides that "[t]he Times, Places and Manner of holding" federal elections "shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl.1.

---

[29] *See also, e.g.*, *Civil Rights Act of 1964: Hearings on H.R. 7152*, 88th Cong. 2653-54 (1963) (Oct. 15, 1963 Stmt. of AG Kennedy) (discussing limitation of the 1964 Act to federal elections).

Congress's "comprehensive" power to regulate federal elections pursuant to the Elections Clause "'is paramount, and may be exercised at any time, and to any extent which it deems expedient.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). While Appellants skip right to the Fifteenth Amendment, the Elections Clause separately supplies Congress enough authority to prohibit disenfranchisement of voters for immaterial paperwork mistakes in elections where federal candidates are on the ballot.

Nor is Congress's authority to enact the Materiality Provision under the Reconstruction Amendments subject to doubt. Those Amendments authorize Congress to enact prophylactic legislation to protect the right to vote. *E.g.*, *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727-28 (2003). Indeed, the voting-rights measures in the 1964 Civil Rights Act and 1965 Voting Rights Act, which include the Materiality Provision, are paradigmatic examples of valid remedial legislation, as the Supreme Court explained in *City of Boerne v. Flores*. 521 U.S. 507, 518 (1997) (noting validity of Congress's "suspension of literacy tests and similar voting requirements" as well as "other measures protecting

voting rights" and collecting cases); *see also, e.g., Hibbs*, 538 U.S. at 738 (VRA was "valid exercise[] of Congress' § 5 power"); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 (2001) (similar).

Just last year, this Court applied *City of Boerne*'s "congruent and proportional" analysis with respect to the Materiality Provision and concluded that "prohibit[ing] those acting under color of law from using immaterial omissions, which were historically used to prevent racial minorities from voting, from blocking any individual's ability to vote … is a congruent and proportional exercise of congressional power." *Vote.Org*, 89 F.4th at 487; *see Boerne*, 521 U.S. at 519-20.[30] It doesn't matter that *Vote.Org* involved voter-registration forms, since nothing about the Court's constitutional analysis turned on that fact. And the suggestion that Congress was unconcerned with ensuring the franchise for Black Americans beyond their initial registration to vote is ahistorical, in any case. Congress in 1964 and 1965 sought to ensure the

---

[30] And that is assuming *City of Boerne*, a standard applicable to the exercise of *Fourteenth Amendment authority*, even applies here. "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting" in the Fifteenth Amendment. *Katzenbach*, 383 U.S. at 324; *see also Vote.Org*, 89 F.4th at 486 n.11.

right to *vote*, not just to register—and it had a massive record before it that States and localities persistently used facially neutral rules like immaterial paperwork requirements to exclude Black Americans. *E.g.*, *supra* Statement of the Case I.[31]

State Appellants' avoidance-style argument that the Materiality Provision applies only to denials of the right to vote that are racially discriminatory (State Br. 26-28) is similarly meritless. The text couldn't be clearer: The statute protects "the right of *any individual* to vote" if "such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Accordingly, *Vote.Org* expressly rejected the same racial-discrimination-only argument that the State Appellants now advance. 89 F.4th at 485-87.[32]

---

[31] GOP Appellants assert (at 44 n.3) that *Vote.Org*'s rejection of the constitutional challenge to the Materiality Provision was "dicta." That is wrong. The court couldn't have reached the conclusion it did (namely, that the Materiality Provision applied to the challenged requirement but that the error or omission at issue was material) without considering and rejecting the constitutional-avoidance-based argument that the Materiality Provision didn't apply in the first place.

[32] State Appellants misplace reliance on *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009). *Broyles* mistakenly relied on *Kirksey v. City of Jackson*, 663 F.2d 659 (5th Cir. 1981), to support its understanding that the Materiality Provision requires showing intentional racial discrimination. But *Kirksey* involved claims under Section 2 of the

## C. On This Record, the Materiality Provision Prohibits Enforcement of the Number-Matching Requirement.

Because Appellants' various arguments for ignoring the Materiality Provision are wrong, the only remaining question is whether the "error or omission" at issue here—namely, failure to meet the number-matching requirement on the ABBM or the BBM carrier envelope form—is in fact "not material in determining whether such individual is qualified under State law to vote in [the] election." 52 U.S.C. § 10101(a)(2)(B); *Vote.Org*, 89 F.4th at 487-89. As this Court has held, the issue is whether the number-matching requirement "meaningfully … corresponds" to a "substantial state interest," and whether the connection between the number-matching requirement and that interest is "strong enough … to overcome" the potential disenfranchisement of thousands of Texans. *Id.*; *see also id.* at 485.

Because *Vote.Org* was decided after the district court's decision, the court did not expressly apply that standard. But on the undisputed material facts in the record, the number matching requirement does not

Voting Rights Act, which were then subject to an intentional discrimination requirement under *City of Mobile v. Bolden*, 446 U.S. 55, 60-61 (1980). *City of Mobile* was then abrogated by Congress, a fact *Broyles* overlooks. *See Milligan v. Allen*, 599 U.S. 1, 13 (2023).

meaningfully correspond to a substantial state interest in a manner that justifies the disenfranchisement of thousands of voters. Accordingly, this Court can and should apply *Vote.Org* and affirm.[33]

The Materiality Provision "refers to matters that are material in deciding whether an 'individual is qualified under State law to vote.'" *Vote.Org*, 89 F.4th at 487. In Texas, the relevant qualifications are "age, citizenship, residency, capacity, and criminal history." *Id.* (citing TEC § 11.002). Possessing (or knowing, or remembering) any particular ID number is not a qualification to vote in Texas; indeed, the State's own Elections Division director testified that these "individual eligibility criteria" to vote "have nothing to do with a DPS number." ROA.13301 ¶15.[34]

---

[33] It could also be reasonable to remand to allow the district court to apply the correct standard at the summary judgment phase—or, if summary judgment is not appropriate under that standard, to advance the case to trial. *Cf. Vicknair v. Formosa Plastics Corp. La.*, 98 F.3d 837, 839 (5th Cir. 1996).

[34] State Appellants suggest (at 35) that having a matching number *is* a qualification to vote by mail because the number-matching requirement makes it so. But *Vote.Org* rejected the idea "that States may circumvent the Materiality Provision by defining all manner of requirements, no matter how trivial, as being a qualification to vote." 89 F.4th at 487.

The State asserts that the number-matching requirement is justified because it somehow helps determine whether persons who are voting by mail or applying to vote by mail are "actually who they say they are." ROA.13301 ¶15; *see* State Br. 16, 28. There is *no* specific evidence in the form of legislative debate, history, or documentation to show that the number-matching requirement is meant to accomplish that end. *See supra* Statement of the Case II.A-B, D. Regardless, on this record, the policy as designed does not "fit" that end—the connection between the two is accordingly "tenuous." *Vote.Org*, 89 F.4th at 485, 487. This is because as a practical matter, the undisputed facts in the record demonstrate that the number-matching requirement is not used for this purpose and *cannot* be used for this purpose.

Appellants don't contest the district court's record-based conclusion that "the DPS numbers and SSN4s required by S.B.1 are not used to ensure that voters are qualified to vote or to cast a mail ballot under Texas law, to identify voters, or to flag potential fraud." ROA.33224. Nor do they dispute the record-based conclusion "that election officials do *not* use the ID numbers on ABBMs and BBMs to confirm voters' identities but to reject their voting materials." ROA.33245. Nor do they dispute

that, just as before S.B.1, election officials use *other* information on mail-ballot materials—such as name, date of birth, and address—to look up voters; and that officials verify a voter's identity using the signatures by which the voter attests to their identity and eligibility. *Id.* (citing TEC § 87.041(b)(2)). Indeed, on the undisputed facts, the number-matching requirement *cannot* be used to ascertain a voter's identity, because "to compare the DPS number or SSN4 on mail ballot materials with a voter's registration record … officials must have *already discerned* the identity of the voter identified on [their voter-registration application]. ROA.33245 (citing TEC §§ 86.001(f), 87.041(b)(8) (emphasis added)). There is thus a "total disconnect" between the State's asserted, generalized interest in making sure voters "are who they say they are" and the specific policy action the number-matching requirement represents. *Vote.Org*, 89 F.4th at 485, 489 (quoting *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc)).

And even if some non-tenuous connection were apparent, the number-matching requirement would still fail the *Vote.Org* test because it does not advance legitimate and substantial state interests "without imposing pointless burdens." 89 F.4th at 485.

*First*, the State's interest in this number-matching requirement (*i.e.*, in the specific "'requisite to voting' in which some 'error or omission' exists") is not particularly "substantial." *Vote.Org*, 89 F.4th at 485. There are numerous other mechanisms to ensure the security of mail-ballot voting in Texas, including signature matching, unique digital identifiers, criminal penalties, and more. *See supra* Statement of the Case II.A. There is no record evidence that mail ballots are a source of fraud, and Appellants' own witnesses admitted that the failure of a voter to write a matching number is not indicative of potential fraud. ROA.13345-13346 ¶¶187-191; *see also supra* Statement of Case II.B, D. And this requirement, because it is built rigidly atop the unreliable TEAM database, would not be capable of accurately matching voters with their ID numbers even if there was value in doing so.

It isn't enough to point, as Appellants do (GOP Br. 51-55; State Br. 32-36), to generalized election-integrity interests or needs to ascertain voters' identities. Under the second part of the *Vote.Org* analysis, the question is whether there is some interest *in the number-matching requirement in particular*. 89 F.4th at 485. And the record here shows that, with or without the number-matching requirement, counties

already can and do use robust methods to ensure that voters are "who they say they are." *Id.* at 487.

*Second*, whatever interest might exist in the number-matching requirement doesn't relate to "determining whether such individual is qualified under State law to vote in such election," 52 U.S.C. § 10101(a)(2)(B). *See Vote.Org*, 89 F.4th at 487. As noted, *supra* Statement of Case II.A, an ID number is not a qualification to vote, and the number-matching requirement is not and—because of the flaws in TEAM—cannot be used to accurately confirm that voters are "actually who they say they are," *id.*, which is the only arguable connection between this error-prone paperwork requirement and actual voter qualifications.

*Third*, considering the totality of the circumstances, the number-matching requirement can only be characterized as imposing "pointless burdens" in violation of the Materiality Provision. *Vote.Org*, 89 F.4th at 485. It foists paperwork on elections officials and voters. It results in errors that disenfranchise thousands, including in instances where voters follow directions perfectly. *E.g.*, ROA.13344 ¶181. And it adds little if anything to the existing tools available to elections officials to

ensure that voters are who they say they are—tools that do not suffer from documented, systemic database failures. ROA.13302 ¶20. Unlike *Vote.Org*, where the wet-signature requirement served a particular function that would otherwise have been lost, 89 F.4th at 488, there is no non-duplicative, non-error-prone function played by the number-matching requirement. Rather, its chief impact is to impose "pointless burdens" on voters, thousands of whom are denied opportunity to vote by mail despite their age or disability, or whose ballots are not counted altogether as a result. This is what the Materiality Provision forbids. *Id.* at 485, 487-89.

## III. THE DISTRICT COURT HAD JURISDICTION AS TO THE SECRETARY OF STATE

### A. The Secretary Is Not Entitled to Sovereign Immunity.

The Secretary isn't entitled to sovereign immunity because Plaintiffs' claims are proper under *Ex parte Young*, which "permits plaintiffs to sue a state officer in [her] official capacity for an injunction to stop ongoing violations of federal law." *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). *Ex parte Young* applies on a showing that "the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that

duty.'" *TDP*, 978 F.3d at 179 (citation omitted). A "scintilla of enforcement by the relevant state official with respect to the challenged law will do." *Id.* (cleaned up) (citation omitted).

Plaintiffs have previously argued before this Court that *Ex parte Young* permits their Materiality Provision claims against the Secretary. Resp. Br. for Pls.-Appellees at 27-39, *OCA-Greater Houston v. Nelson*, No. 22-50778 (5th Cir. Feb. 8, 2023). Specifically, the Secretary enforces the challenged provisions by prescribing the design and content of both the ABBM and BBM carrier envelope, both of which local elections officials "are required to use." *See TDP*, 978 F.3d at 180; *see also* TEC § 31.002(a), (d); ROA.10840 (holding that the Election Code "makes clear that it is the Secretary who is responsible for prescribing the design and content" of ABBMs and carrier envelopes"); TEC § 31.003 (the Secretary "shall obtain and maintain uniformity in the application, operation, and interpretation" of the Election Code, including of mail voting forms).

In other words, the Secretary's duties include designing ABBMs and BBM carrier envelope forms to contain space for voters to include the numbers that S.B.1's number-matching scheme requires. The Secretary cannot enforce this scheme with the challenged provisions enjoined.

Texas law also empowers the Secretary to "prescribe any procedures necessary to implement" the ways voters may cure their rejected mail ballots, and also requires local elections officials to send those voters "a notice of the defect and a corrective action form developed by the [S]ecretary." TEC §§ 87.0411(b), (f) (early voting ballot board), 87.0271(f) (signature verification committee). Her enforcement duties are therefore "particular" and needed "to enforce the statute[s] in question," providing "at least a scintilla of enforcement authority" with respect to the challenged provisions. *See TDP*, 978 F.3d at 179-80; ROA.10836-10846.

The suggestion that Plaintiffs have not "identified any action of the Secretary[] that might constitute enforcement" of Sections 5.07 and 5.13 of S.B.1 (State Br. 41) is wrong. Again, the Secretary prescribes the design of ABBM and carrier-envelope forms with "space for the voter's personal identification number," ROA.16777, before disseminating the materials to county elections officials. She commands local officials that the new forms "MUST be used for elections." *Id.* And she distributes ABBM rejection, mail-ballot rejection, corrective action forms, and instructions on implementing the number-matching process to local officials as well, all to enforce Sections 5.07 and 5.13. ROA.16777-16778.

The Secretary's claim that her role in this process is merely advisory (State Br. 40-41) is therefore inaccurate. [35]

## B. The Secretary Has Waived Any Argument That the District Court Should Not Have Reached the Merits.

For the first time either in this Court or below—and in a footnote—the Secretary argues (State Br. 40 n.9) that it was improper for the district court to rule on Plaintiffs' summary judgment motion because her interlocutory appeal on sovereign immunity was pending before this Court. The Secretary waived that argument multiple times over.

_____

[35] The State also contests Plaintiffs' standing as to the traceability and redressability of Plaintiffs' claims challenging Sections 5.07 and 5.13 of S.B.1. *See* ROA.10876-10882; *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844-XR, Doc 1143 (OCA Plaintiffs' Briefing on Supplemental Authority); *cf.* ROA.33663-33668. "This court has acknowledged that [its] Article III standing analysis and *Ex parte Young* analysis 'significant[ly] overlap.'" *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)).

As explained, "[t]he Secretary would need to correct" the "required application form for absentee ballots" and the design of her office's officially prescribed carrier envelope "should the judiciary invalidate" S.B.1's matching-number requirement. *See TDP*, 978 F.3d at 178. "Thus, the Secretary of State ha[s] a role in causing the claimed injury and is in a position to redress it at least in part." *See id.*; TEC § 31.002(a), (d); ROA.15340-15342; Resp. Br. for Pls.-Appellees at 27-39, *OCA-Greater Houston v. Nelson*, No. 22-50778 (5th Cir. Feb. 8, 2023). The district court correctly found Plaintiffs possess Article III standing against the Secretary to enjoin Sections 5.07 and 5.13 of S.B.1.

First, "arguments subordinated in a footnote are waived." *Matter of PetroQuest Energy, Inc.*, 54 F.4th 299, 306 n.13 (5th Cir. 2022) (cleaned up).

Second, the Secretary never raised sovereign immunity anywhere in her opposition to Plaintiffs' summary-judgment motion. In fact, the Secretary joined Intervenor-Defendants and actively *sought* summary judgment on those claims' merits. *Cf. Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 720 n.4 (5th Cir. 2004) (holding state entity waived immunity by seeking summary judgment on the merits); ROA.13127-13164, 15299-15300.

Third, at no point in the year between docketing her appeal,[36] and the district court's summary-judgment decision did the Secretary request a stay of the proceedings. Instead, she actively participated in the litigation, including in extensive and wide-ranging discovery,[37] and

---

[36] The Secretary docketed her interlocutory appeal of the district court's denial of sovereign immunity on August 30, 2022, ROA.163, and filed her consolidated brief on December 9, 2022. *See* Defs.-Appellants' Br., *OCA-Greater Houston v. Nelson*, No. 22-50778 (5th Cir. Dec. 9, 2022), Dkt. 43.

[37] For example, the Secretary propounded discovery requests on Plaintiffs on January 18, 2023, and participated in the depositions of local elections officials noticed by Plaintiffs during the spring of 2023 and cited throughout Plaintiffs' motion for summary judgment.

ultimately sought summary judgment as to all of Plaintiffs' claims. ROA.13127-13164, 15299-152300, 17764-17793. The Secretary's actions—especially pursuing a ruling on the merits in her favor—cannot be squared with the claim that the district court had no power to reach the merits in the first place. *Cf. Neinast v. Texas*, 217 F.3d 275, 279 (5th Cir. 2000) (state entity cannot "monitor how the suit [is] proceeding on the merits but have any adverse ruling set aside on [immunity] grounds"). The Secretary either affirmatively waived her argument that the district court lacked jurisdiction or else is stopped by her litigation conduct from asserting it.

Fourth, even had the Secretary not waived this argument, an appeal on the "decision of immunity, not liability on the merits" does "not divest the district court of jurisdiction over the merits." *Kilty v. Weyerhaeuser Co.*, 758 F. App'x 530, 533 (7th Cir. 2019) (citing *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)). Because the Secretary chose to fully litigate Plaintiffs' claims, Plaintiffs were able to obtain the information necessary to proceed to summary judgment and to allow the district court to determine the issue of liability.

Finally, as the Secretary admits, the United States brought the same Materiality Provision claim as Plaintiffs, and sovereign immunity does not run against the federal government. *See* State Br. 43 (citing *United States v. Texas*, 143 U.S. 621 (1892)). There is therefore no question that the district court had jurisdiction to reach the merits and enter judgment on these claims.

## CONCLUSION

The district court's judgment should be affirmed.

Dated: August 12, 2024           Respectfully submitted,

*/s/ Ari J. Savitzky*
Ari Savitzky
Dayton Campbell-Harris
Sophia Lin Lakin
**AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2681
asavitzky@aclu.org
dcampbell-harris@aclu.org
slakin@aclu.org

Adriel I. Cepeda Derieux
**AMERICAN CIVIL
LIBERTIES UNION
FOUNDATION**
915 15th Street NW
Washington, DC 20005
(202) 457-0800

acepedaderieux@aclu.org

Zachary Dolling
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
zachary@texascivilrightsproject.org

Ashley Harris
Thomas Buser-Clancy
Edgar Saldivar
Savannah Kumar
**ACLU FOUNDATION OF TEXAS, INC.**
1018 Preston Street
Houston, TX 77002
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Peter Hofer
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
phofer@drtx.org

Jerry Vattamala
Susana Lorenzo-Giguere
**ASIAN AMERICAN LEGAL**

**DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org

Jessica Ring Amunson
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

*COUNSEL FOR PLAINTIFFS OCA-GREATER HOUSTON, ET AL.*

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limits of Fed. R. App. P. 27(d)(2) because it contains 15,631 words, excluding parts exempted by the Rules.

This document complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Ari J. Savitzky*
Ari Savitzky

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2024, a true and correct copy of the foregoing document was served on all counsel of record by filing with the Court's CM/ECF system.

*/s/ Ari J. Savitzky*
Ari Savitzky