# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-50885

UNITED STATES OF AMERICA; OCA-GREATER HOUSTON, LEAGUE OF
WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

*Plaintiffs-Appellees,*

– v. –

KEN PAXTON, Attorney General, State of Texas; JANE NELSON, in her
official capacity as Texas Secretary of State; STATE OF TEXAS; HARRIS
COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN
PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE;
NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE,

*Defendants-Appellants*

REPUBLICAN NATIONAL COMMITTEE,

*Movant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS, SAN ANTONIO IN CASE NO. 5:21-CV-844
HONORABLE XAVIER RODRIGUEZ, U.S. DISTRICT JUDGE

## BRIEF FOR *AMICUS CURIAE* THE PROTECT DEMOCRACY PROJECT IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

AARON CROWELL
ALEXANDER D. BERNSTEIN
DAVID KIMBALL-STANLEY
CLARICK GUERON REISBAUM LLP
*Attorneys for Amicus Curiae*
220 Fifth Avenue, 14th Floor
New York, New York 10001
(212) 633-4310

## **SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that—in addition to the persons and entities listed in the Appellants' Certificate of Interested Persons—the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

***Amici Curiae***

The Protect Democracy Project

***Attorneys for Amici Curiae***

Aaron Crowell
Alexander D. Bernstein
David Kimball-Stanley
Clarick Gueron Reisbaum LLP

August 22, 2024                        Respectfully submitted,


                                       /s/Aaron Crowell_____
                                       Aaron Crowell
                                       Alexander D. Bernstein
                                       David Kimball-Stanley
                                       Clarick Gueron Reisbaum LLP
                                       220 Fifth Avenue, 14th Floor
                                       New York, NY 10001
                                       Tel.:  (212) 633-4310
                                       acrowell@cgr-law.com
                                       abernstein@cgr-law.com
                                       dkimballstanley@cgr-law.com

                                       *Attorneys for Amicus Curiae The*
                                       *Protect Democracy Project*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTEREST OF AMICUS CURIAE .......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................3

ARGUMENT ...................................................................................6

I.   Congress Enacted the Materiality Provision to Secure Voting Rights for All in the Face of Intractable and Ever-Evolving Resistance..............................6

    A.  Reconstruction and Retreat........................................................6

    B. Initial Modern Reform Efforts: Civil Rights Acts of 1957 and 1960......7

    C. The 1957 and 1960 Acts Fall Short .............................................9

    D. The Civil Rights Act of 1964 ..................................................11

    E. The Voting Rights Act of 1965.................................................14

II.  Congress Had Constitutional Authority to Enact a Materiality Provision Reaching All Stages of the Voting Process..................................................17

    A.  Congress's Findings Were Not Limited to "Discrimination During In-Person Voter Registration"...............................................17

    B.  Congress Had At Least Three Sources of Constitutional Authority to Enact the Materiality Provision ...........................................21

        i.  The Elections Clause ..................................................21

        ii.  The Fifteenth Amendment...........................................23

        iii.  The Fourteenth Amendment.......................................26

CONCLUSION ...............................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) .........................................................................22, 23

*Baker v. Carr*,
369 U.S. 186 (1962) ...........................................................................27

*Bd. of Trs. of Univ. of Ala. v. Garrett*,
531 U.S. 356 (2001) ......................................................................26, 29

*Bostock v. Clayton Cty., Ga.*,
590 U.S. 644 (2020) ...........................................................................21

*Burroughs v. United States*,
290 U.S. 534 (1934) ...........................................................................22

*Bush v. Gore*,
531 U.S. 98 (2000) .......................................................................26, 28

*Chan v. Korean Air Lines, Ltd.*,
490 U.S. 122 (1989) ...........................................................................12

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ...........................................................................16

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ...........................................................23, 24, 25, 26

*City of Rome v. United States*,
446 U.S. 156 (1980) ...........................................................................26

*Fla. State Conference of N.A.A.C.P. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ...........................................................25

*Harrison v. PPG Indus., Inc.*,
446 U.S. 578 (1980) ...........................................................................20

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ........................................................................27

*Moskal v. United States*,
   498 U.S. 103 (1990) ...................................................................20, 25

*Nev. Dep't of Human Res. v. Hibbs*,
   538 U.S. 721 (2003) ...............................................................24, 26, 29

*Nixon v. Herndon*,
   273 U.S. 536 (1927) ........................................................................28

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ..........................................................................20

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) ........................................................................22

*Shelby County v. Holder*,
   570 U.S. 529, 556 (2013) .................................................................24

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ................................................................*passim*

*United States v. Original Knights of Ku Klux Klan*,
   250 F. Supp. 330 (E.D. La. 1965) ....................................................22

*Vote.Org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) ............................................................29

**Statutes**

52 U.S.C. § 10101(a)(2)(B) .............................................................*passim*

52 U.S.C. § 10101(e) .........................................................................12

Civil Rights Act of 1957, Pub. L. No. 85-315, 71 Stat. (1957) ................8

Civil Rights Act of 1960, Pub. L. No. 86-449, 74 Stat. (1960) ................9

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. (1964) ........*passim*

Civil Rights Act of 1965, Pub. L. No. 89-110, <u>79 Stat. (1965)</u>.......................*passim*

**Legsislative History**

110 Cong. Rec. 1,593 (1964) ....................................................28

110 Cong. Rec. 1,610 (1964) ....................................................13

110 Cong. Rec. 1,693–94 (1964) .............................................12

110 Cong. Rec. 6,646 (1964) ....................................................13

110 Cong. Rec. 6,650 (1964) ....................................................28

111 Cong. Rec. 15,645 (1965) ..................................................14

111 Cong. Rec. 15,652 (1965) ..................................................27

111 Cong. Rec. 15,653 (1965) ..................................................19

111 Cong. Rec. 15,660 (1965) ..................................................16

H.R. Rep. No. 88-914 (1964), *reprinted in* 1964 U.S.C.C.A.N. .................11, 13, 14

H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. .................14, 15, 16

Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights
     1961, Book 1: Voting (1961)
     https://www.crmvet.org/docs/ccr_61_voting.pdf.......................................*passim*

Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights
     1963, https://www.crmvet.org/docs/ccr_63_civil_rights.pdf..............................5

Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights
     1959,
     https://www2.law.umaryland.edu/marshall/usccr/documents/cr119
     59.pdf .................................................................................................5

Comm'n on Civil Rights, Voting in Mississippi (1965),
     https://www2.law.umaryland.edu/marshall/usccr/documents/cr12v
     94.pdf ...............................................................................................14

Statement by Att'y Gen. Robert F. Kennedy on H.R. 7152 before H.
     Jud. Comm., at 5–6 (Oct. 15, 1963),
     https://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/10
     -15-1963.pdf.................................................................................................13

Pres. Lyndon B. Johnson, Special Message to the Congress: The
     American Promise (Mar. 15, 1965) ("The American Promise"),
     https://www.presidency.ucsb.edu/documents/special-message-the-
     congress-the-american-promise....................................................4, 16, 17, 18, 19


**Other Authorities**

Eric Foner, *Freedom's Lawmakers: A Directory of Black
     Officeholders during Reconstruction* (1996).......................................................6

Kevin Coleman, Cong. Research Serv., R43626, *The Voting Rights
     Act of 1965: Background and Overview* (2015)....................................................7

U.S. Const. amend. XIV ...............................................................*passim*

U.S. Const. amend. XV................................................................*passim*

U.S. Const. art. I, § 4, cl. 1.................................................................*passim*

## INTEREST OF AMICUS CURIAE[1]

The Protect Democracy Project files this brief to assist the Court in evaluating the Appellants' assertion that, prior to enacting 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision"), Congress made findings regarding problems with voting registration only, and thus interpreting the statute to apply to later stages of the voting process would raise "serious doubt[s]" about its constitutionality. The voluminous record compiled by Congress during an eight-year struggle to protect voting rights demonstrates that Appellants are mistaken; there should be no "doubt," much less a "serious" one, that Congress had the authority and justification to enact the Materiality Provision to ensure that voters would not lose their rights, at any stage of the voting process, due to immaterial paperwork errors.

Protect Democracy is a nonpartisan, nonprofit organization dedicated to preventing our democracy from declining into a more authoritarian form of government. As part of that mission, Protect Democracy works to ensure that American elections are free and fair. In connection with that objective, Protect Democracy has an interest in ensuring that the Materiality Provision is not

---

[1] No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No such monetary contributions were made by anyone other than *amicus* and its counsel. Counsel for all parties have consented to the filing of this amicus brief.

artificially narrowed so that it cannot prohibit unreasonable, unlawful, and/or

discriminatory disenfranchisements.

## INTRODUCTION AND SUMMARY OF ARGUMENT

"The constitutional propriety of the Voting Rights Act of 1965 must be judged with reference to the historical experience which it reflects." *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966).  Contravening this basic principle, Appellants offer an inaccurate and incomplete account of the history of federal voting rights legislation in an attempt to limit the Materiality Provision's application to voter-registration.  ECF 136 ("App. Br.") 39–44.[2]  A review of the origins, intent, and legislative history of the Materiality Provision refutes this cramped understanding.

Appellants try to tell a simple story.  Citing a single House Report issued before the passage of the Civil Rights Act of 1964, they maintain Congress passed the Materiality Provision to remedy a narrow problem: "unscrupulous officials discriminating during in-person voter registration."  App. Br. 41.  By this account, the 1964 Congress invoked its power under the Fifteenth Amendment to enact a discrete "remedy" to "fit[] the violation," specifically, "forbidding registrars to deny applications based on immaterial mistakes."  *Id.*  Appellants thus conclude the Materiality Provision cannot apply to any act "*beyond* qualification

---

[2] "ECF" citations are to the docket in this matter.  The State of Texas Appellants ignore the Provision's legislative history entirely.  *See generally* ECF 137 ("Tex. Br.").

determinations during voter registration," *id.* at 43, because the Materiality

Provision might then no longer be a congruent and proportional remedy to the

specific injury targeted by Congress, *id.* at 41, potentially leaving its

constitutionality infirm, *id.* at 44.

Appellants are wrong. To begin, Congress's findings and motives regarding

the Materiality Provision cannot be cabined to the 1964 Congress or one House

Report: the Materiality Provision in the 1964 Act was limited to federal elections,

but the Voting Rights Act of 1965 expanded the provision to all elections. More

fundamentally, between 1957 and 1965, Congress engaged in an eight-year cycle

of factfinding and lawmaking regarding discrimination in elections. Among other

things, Congress created the Civil Rights Commission, which cataloged the myriad

techniques used to keep Black Americans from voting, and presented Congress

with a factual record demonstrating that certain localities were prepared to use, as

President Lyndon Johnson put it, "[e]very device of which human ingenuity is

capable . . . to deny [the] right [to vote]."[3] Accordingly, the Commission

repeatedly recommended that Congress pass a law to "prohibit *any* arbitrary action

or . . . inaction which deprives or threatens to deprive any person of the right to

---

[3] Pres. Lyndon B. Johnson, Special Message to the Congress: The American
Promise (Mar. 15, 1965) ("The American Promise"), *available at*
https://www.presidency.ucsb.edu/documents/special-message-the-congress-the-
american-promise.

*register, vote, and have that vote counted in any Federal election*." U.S. Comm'n on Civil Rights, Civil Rights '63 at 248 (1963) ("1963 CRC Report") (emphasis added)[4]; *see also* U.S. Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights 1959, at 138–39 (1959) ("1959 CRC Report").[5]

After years of frustration and failure—including passing multiple statutes that failed to stem the tide of voting discrimination—Congress did not adopt a remedy limited to a narrow problem, as Appellants suggest, but rather appropriately acted to ensure no person would be "den[ied] the right . . . to vote" in "any election" because of, among other things, an immaterial "error or omission on *any* record or paper relating to *any* application, registration, *or other act requisite to voting*." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

Given Congress's voluminous record demonstrating persistent efforts to disenfranchise, Congress's enactment and expansion of the Materiality Provision was a proper exercise of its powers under the Elections Clause, the Fourteenth Amendment, and the Fifteenth Amendment. Affirming the District Court's application of the Materiality Provision to mail-in ballots (and mail-in ballot applications) raises no constitutional problems.

---

[4] Available at: https://www.crmvet.org/docs/ccr_63_civil_rights.pdf.

[5] Available at: https://www2.law.umaryland.edu/marshall/usccr/documents/cr11959.pdf.

# **ARGUMENT**

I. **Congress Enacted the Materiality Provision to Secure Voting Rights for All in the Face of Intractable and Ever-Evolving Resistance**

In the Civil Rights Act of 1964, Congress, *inter alia*, barred disenfranchisement because of immaterial errors in voting paperwork in "any Federal election." Pub. L. No. 88-352, § 101(a), 78 Stat. 241, 241 (1964). A year later, in the Voting Rights Act, Congress struck the word "Federal," thereby extending the provision's reach to state and local elections. Pub. L. No. 89-110, § 15, 79 Stat. 437, 445 (1965). Congress's detailed factual findings confirm it had good reason to enact a Materiality Provision that reached every stage of the voting process.

A. **Reconstruction and Retreat**

After the ratification of the Thirteenth, Fourteenth, and Fifteenth Amendments, equal voting rights briefly became a reality in the United States. Hundreds of Black officials were elected to local, state, and federal offices, and registered Black voters outnumbered registered white voters in parts of the South. *See generally* Eric Foner, *Freedom's Lawmakers: A Directory of Black Officeholders during Reconstruction* (1996).

This achievement was short-lived. Ex-Confederates retook control of many state and local governments, and "the years passed and fervor for racial equality

waned." *Katzenbach*, 383 U.S. at 310.  Southern states then unleashed a tidal wave

of constitutional and statutory reforms "to deprive [Black Americans] of the right

to vote." *Id.* at 311.  The hallmark of these efforts was their "variety and

persistence." *Id.*  Poll taxes, literacy tests, "grandfather," "old soldier," and "good

character" clauses, "white primaries," and property requirements were

accompanied by renewed violence and voter intimidation, including an estimated

2,500 lynchings from 1884 to 1900.  *See* Kevin Coleman, Cong. Research Serv.,

R43626, *The Voting Rights Act of 1965: Background and Overview* 8–10 (2015).

These efforts had their intended effect: Black voter registration and

participation plummeted, falling in many Southern counties from Reconstruction

highs to near zero, where they languished for decades.  *See id.* at 9–10 & n.47;

U.S. Comm'n on Civil Rights, Report of the U.S. Comm'n on Civil Rights 1961,

Book 1: Voting, at 40–41 (1961) ("1961 CRC Report") (describing decline of

Black voting rights in Louisiana from 1877—when Black voters were a

"substantial[]" majority state-wide—to 1910-1944, when less than one percent of

registered voters were Black).[6]

### B. Initial Modern Reform Efforts: Civil Rights Acts of 1957 and 1960

Congress did not return to the issue of voting rights until 1957.  At that time,

Congress "was disturbed by allegations that some American citizens were being

---

[6] Available at: https://www.crmvet.org/docs/ccr_61_voting.pdf.

denied the right to vote . . . because of their race, color, creed, or national origin."
1959 CRC Report at ix.  In response, Congress passed the Civil Rights Act of
1957.  Pub. L. No. 85-315, 71 Stat. 634.  The 1957 Act banned intentional voter
intimidation in federal elections, *id.* § 131(c), 71 Stat. at 637; empowered the
Attorney General to enforce this ban and existing laws barring disenfranchisement,
*id.*; created the Civil Rights Division within the Department of Justice, *id.*; and
established the U.S. Commission on Civil Rights, which was directed to
"investigate" discrimination in elections and report to Congress and the President,
*id.* §§ 101–06, 71 Stat. at 634–36.

The Commission issued its initial report in 1959.  The report detailed the
history of voting rights—particularly the "ingenious and sometimes violent
methods" employed to limit the franchise since the Civil War, 1959 CRC Report at
30; *see id.* at 19–106—and surveyed Congress's constitutional authority to protect
voting rights, *id.* at 107–27, 135.

The Report's conclusion was clear: "Many Americans, even today, are
denied the franchise because of race."  *Id.* at 134.  Although the U.S. Constitution
and existing federal law barred such discrimination, racial disenfranchisement was
"accomplished through the creation of legal impediments, administrative obstacles,
and positive discouragement engendered by fears of economic reprisal and
physical harm."  *Id.*  The Commission informed Congress and the President: "The

history of voting in the United States shows . . . that where there is will and opportunity to discriminate against certain potential voters, ways to discriminate will be found." *Id.* at 133.

Congress responded with the Civil Rights Act of 1960. Pub. L. No. 86-449, 74 Stat. 86. That Act required federal election records be preserved and produced in response to a demand from the Attorney General, *id.* §§ 301–06, 74 Stat. at 88–89; extended the term and expanded the powers of the Commission on Civil Rights, *id.* § 401, 74 Stat. at 89; and created alternative federal mechanisms for voter registration, *id.* § 601, 74 Stat. at 90–92. In addition, the 1960 Act gave the word "vote" a broad definition to ensure that voting rights laws protected each step in the voting process:

> [T]he word 'vote' includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast . . . .

*Id.* § 601, 74 Stat. at 91.

### C. **The 1957 and 1960 Acts Fall Short**

Although the 1957 and 1960 Acts provided some "effective tools to deal with discrimination in voting," they remained "limited in scope." *See* 1961 CRC Report at 73–78, 100. Meanwhile, "[e]fforts to deny the right to vote" continued to "take many forms," including "economic reprisals," "discriminatory purges . . .

from the registration rolls," "restrictive voter qualification laws," and, "[t]he most

prevalent form of discrimination[,] . . . arbitrary registration procedures." *Id.*

at 133.  The Commission concluded there was still "no widespread remedy to meet

what is still widespread discrimination," *id.* at 100, and reiterated its earlier

recommendation that federal law be amended "to prohibit any arbitrary action

or . . . inaction, which deprives or threatens to deprive any person of the right to

register, vote, and have that vote counted in any Federal election," *id.* at 141; *see*

*also* 1959 CRC Report at 138–39 (same).

Matters had still not meaningfully improved by 1963, when the Commission

again found "that present legal remedies for voter discrimination are inadequate,"

and that "the promise of the 14th and the 15th amendments to the Constitution

remains unfulfilled."  1963 CRC Report at 13, 26.  Between 1956 and 1963,

despite "two civil rights acts, the institution of 36 voting rights suits by the

Department of Justice, and the operation of several private registration drives," the

Commission found that Black voter registration in the 100 counties in which

voting discrimination was most prevalent had increased from 5 percent "only to 8.3

percent." *Id.* at 14–15.

The 1963 Report observed that the "techniques of discrimination" used to

"subvert the constitution of the United States" remained "diverse." *Id.* at 15, 22–

23.  Among the most "common" and effective tactics remained the "use of plainly

arbitrary procedures" by certain officials, including (1) the "requirement of vouchers or some other unduly technical method of identification," (2) the "rejection for insignificant errors in filling out forms," (3) the "failure to notify applicants of rejection," (4) the "imposition of delaying tactics," and (5) the "discrimination in giving assistance to applicants." *Id.* at 22; *see also* 1961 CRC Report at 137 (arbitrary application of legal requirements, such as having "to calculate [one's] age to the day," is "[a] common technique of discriminating against would-be voters on racial grounds").

### D. The Civil Rights Act of 1964

Congress responded yet again in the Civil Rights Act of 1964, which sought to remedy "problems encountered in the operation and enforcement of the Civil Rights Acts of 1957 and 1960." H.R. Rep. No. 88-914, title I (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2394. The legislation included the initial version of the Materiality Provision, which was limited to federal elections:

> No person acting under color of law shall . . . deny the right of any individual to vote in any Federal election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

11

Pub. L. No. 88-352, § 101(a), 78 Stat. 241, 241 (1964).  The 1964 Act also re-incorporated the broad definition of "vote" from the 1960 Act.  *See id.* § 101(a)(3)(a), 78 Stat. at 241.[7]

Supporters of the 1964 Act pointed to the "ample evidence" of "rank discrimination" collected by Civil Rights Commission,[8]  including the abuse of "trivial,"[9] "immaterial,"[10] or "highly technical"[11] errors to deny the right to vote.[12] For constitutional authority, supporters noted that the Act was supported not only by (1) the Elections Clause, which grants Congress "broad authority" to regulate both the "substantive" and "mechanical aspects" of federal elections; but also by (2) the Fifteenth Amendment, given the "wide-ranging evidence . . . produced before Congress . . . that literacy tests and other State voter-qualification standards

---

[7] These statutes' definition of "vote" distinguishes between two steps in the process: (1) "registration or other action . . . *prerequisite* to voting," and (2) "casting a ballot, and having such ballot counted." 52 U.S.C. § 10101(e) (emphasis added).  The Materiality Provision, however, applies to "any application, registration, or other act *requisite* to voting." *Id.* § 10101(a)(2)(B). Interpreting the phrase "requisite to voting" as limited to registration would give that phrase the same meaning as "prerequisite to voting" as used elsewhere in the same statute, which should be avoided.  *See Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 133 (1989).

[8] 110 Cong. Rec. 1,693–94 (1964) (statement of Rep. Celler).

[9] *Id.* at 1,593 (statement of Rep. Farbstein).

[10] *Id.* at 6,715 (statement of Sen. Keating).

[11] *Id*. at 6,741 (statement of Sen. Hart).

[12] *See also id.* at 6,530 (statement of Sen. Humphrey).

and procedures have been regularly used by some States to deny people the right to vote because of their race or color"; and by (3) the Fourteenth Amendment, given State officials' well-documented unequal and arbitrary application of voting "tests and standards." H.R. Rep. No. 88-914, *reprinted in* 1964 U.S.C.C.A.N. at 2492–93.

Members of Congress and the Department of Justice agreed that these three constitutional provisions authorized Congress to enact the Materiality Provision and apply it to all elections. *See* 110 Cong. Rec. 1,610 (1964) (statement of Rep. Shriver);[13] Statement by Att'y Gen. Robert F. Kennedy on H.R. 7152 before H. Jud. Comm., at 5–6 (Oct. 15, 1963) ("1963 Kennedy Statement").[14] Nevertheless, to minimize opposition, *see* 1963 Kennedy Statement, the final version of the 1964 Act limited the voting rights provisions to "Federal elections" only, *see* Pub. L. No. 88-352, § 101(a), 78 Stat. at 241. The ranking member of the House Judiciary Committee noted, however, "[t]he fact that . . . Congress is limiting its action to Federal elections can only be interpreted to mean that it has not chosen to exercise

---

[13] *See also* 110 Cong. Rec. 6,646 (1964) (statement of Sen. McIntyre) (same); *id.* at 6,530–31 (statement of Sen. Humphrey) (same); *id.* at 6,741 (statement of Sen. Hart) (same); *id.* at 1,642 (statement of Rep. Ryan) (Fifteenth and Fourteenth Amendments); *id.* at 12,837 (statement of Sen. Williams (N.J.)) (Fifteenth Amendment); *id.* at 6,650 (statement of Sen. Javits) (same); *id.* at 1,593 (statement of Rep. Farbstein) (Fourteenth Amendment).

[14] *Available at* https://www.justice.gov/sites/default/files/ag/legacy/2011/01/20/10-15-1963.pdf.

its full authority in the field of voting at this time." H.R. Rep. No. 88-914, *reprinted in* 1964 U.S.C.C.A.N. at 2492 (additional views of Rep. McCulloch et al.); *see also id.* at 2410 (additional views of Rep. Kastenmeier) ("No serious constitutional difficulty is presented by applying the [voting rights] provisions . . . to State and local elections . . . .").

**E. The Voting Rights Act of 1965**

Congress was soon required to act again. "[T]he provisions of the 1957, 1960, and 1964 Civil Rights Acts to eliminate discriminatory voting practices [were] shown to be clearly inadequate," 111 Cong. Rec. 15,645 (1965) (statement of Rep. Celler), and "[p]rogress" remained "painfully slow," H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2441. In 1965, the Civil Rights Commission found that Congress's efforts had "failed to produce any significant increase in [Black] registration and voting." U.S. Comm'n on Civil Rights, Voting in Mississippi, at 49 (1965).[15]

Among other issues, potential voters were still disenfranchised due to immaterial errors in their applications. *See id.* at 14–15, 60; *Katzenbach*, 383 U.S. at 312. And when specific discriminatory practices were banned, "some of the States affected . . . merely switched to discriminatory devices not covered by the

---

[15] Available at:
https://www2.law.umaryland.edu/marshall/usccr/documents/cr12v94.pdf.

federal decrees," "enacted difficult new tests," "defied and evaded court orders," or "simply closed their registration offices to freeze the voting rolls." 383 U.S. at 314.

Thus, a year after passing the 1964 Civil Rights Act, Congress passed the Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437, seeking "to banish the blight of racial discrimination in voting," *Katzenbach*, 383 U.S. at 308, with a bill "designed primarily to enforce the 15th amendment to the Constitution," but "also designed to enforce the 14th amendment and article I, section 4 [the Elections Clause]," H.R. Rep. No. 89-439, *reprinted in* 1965 U.S.C.C.A.N. at 2437.

The 1965 Act "marshalled an array of potent weapons against the evil" of voting discrimination, *Katzenbach*, 383 U.S. at 337, but among the first proposals—ultimately reflected in Section 15 of the Act, *see* 79 Stat. at 445—was to strike the word "Federal" from the Materiality Provision, thereby expanding the 1964 Act's ban on "deny[ing] the right of any individual to vote" due to an immaterial "error or omission" in "any record or paper relating to any . . . act requisite to voting" in "any election." *See* 52 U.S.C. § 10101(a)(2)(B). This "ma[d]e up for the deficiency in the 1964 civil rights bill," which had "omitted . . . any embracement of non-Federal elections—local and State elections—where the

chief agony has been in this country for so long." 111 Cong. Rec. 15,660 (1965) (statement of Rep. Lindsay).

The Act also, again, adopted the broad definition of "vote," this time not merely incorporating it by reference, but reiterating it in full. *See* Pub. L. No. 89-110, §§ 14(c)(1), 15(a), 79 Stat. at 445.[16] As the related House Report makes clear, this "definition of the term 'vote'" applies to "all sections of the act," and "makes it clear that the act extends to . . . all actions connected with registration, voting, or having a ballot counted in such elections." H.R. Rep. No. 89-439 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2464.[17]

Throwing his support behind the legislation, President Johnson declared that "[e]very American citizen must have an equal right to vote," but lamented that "[e]very device of which human ingenuity is capable has been used to deny this right" to Black Americans.[18] The purpose of this legislation, he stated, was

---

[16] That reiteration again distinguished between "requisite" (in the definition of "vote") and "prerequisite" (in the Materiality Provision), *see supra* n. 7.

[17] This broad purpose, driven by Congress's detailed findings of persistent discrimination against Black voters, counsels strongly against Appellants' argument, App. Br. 24–25, that the canon *ejusdem generis* limits the Act's reach to voter registration. *See Christopher v. SmithKline Beecham Corp.*, <u>567 U.S. 142, 163</u> (2012) ("*ejusdem generis* cannot be employed to 'obscure and defeat the intent and purpose of Congress' or 'render general words meaningless'") (quoting *United States v. Alpers*, <u>338 U.S. 680, 682</u> (1950)).

[18] The American Promise, *available at* https://www.presidency.ucsb.edu/ documents/special-message-the-congress-the-american-promise.

nothing less than "to eliminate illegal barriers to the right to vote," including by "establish[ing] a simple, uniform standard which cannot be used, however ingenious the effort, to flout our Constitution," and "ensur[ing] that properly registered individuals are not prohibited from voting."[19]

On August 6, 1965, the president signed the Act into law.

## II.     Congress Had Constitutional Authority to Enact a Materiality Provision Reaching All Stages of the Voting Process

Appellants assert that (1) "Congress enacted the Materiality Provision using its Fifteenth Amendment enforcement authority," App. Br. 41; but (2) only made findings about "discriminati[on] during in-person voter registration," *id.*; and thus, (3) the "Materiality Provision can only be justified as prophylactic legislation," if it is "limited to voter registration," *id.* at 41.   The Court should reject this argument because both (A) the factual premise is false, and (B) Appellants' constitutional analysis is incomplete and incorrect.

### A. Congress's Findings Were Not Limited to "Discrimination During In-Person Voter Registration"

Citing a single 1963 House Report, Appellants contend that, in the legislative history of the 1964 Civil Rights Act, there was "not even [a] hint at any findings implicating laws *beyond* qualification determinations during voter registration."  *Id.* at 43.  That is wrong.

---

[19] *Id.*

Congress did, of course, compile a detailed record of the abuse of "immaterial" errors and omissions during voter registration, *see supra* at 7–17, and it did target that problem in its remedial legislation. But, by 1964 and 1965, Congress had also received detailed findings demonstrating that voting discrimination persisted because the "ingenious," 1959 CRC Report at 30, and "diverse," 1963 CRC Report at 15, methods used to disenfranchise Black Americans had "take[n] many forms," 1961 CRC Report at 133. As President Johnson put it, experience had shown that "[e]very device of which human ingenuity is capable has been used to deny" Black Americans the right to vote.[20] *See also Katzenbach*, 383 U.S. at 309, 311 (noting "variety and persistence" of disenfranchisement methods and "voluminous legislative history" of "unremitting and ingenious defiance of the Constitution").

Thus, Congress was not presented merely with evidence of discrete "techniques of discrimination" during voter registration, *see* 1963 CRC Report at 22, requiring one-by-one elimination. Rather, the totality of the evidence compelled a broader conclusion: "where there is will and opportunity to discriminate against certain potential voters, ways to discriminate will be found." 1959 CRC Report at 133. Congress's goal was not simply to reform voting

---

[20] The American Promise, *available at* https://www.presidency.ucsb.edu/ documents/special-message-the-congress-the-american-promise.

registration, but rather to protect Black Americans' voting rights "regardless of the manner by which any attempt is made to deny or abridge [them] on account of race or color." 111 Cong. Rec. 15,653 (1965) (statement of Rep. McCulloch). Thus, Congress had every reason to conclude from the factual record that, to eliminate voter discrimination, it had to establish "a simple, uniform standard which cannot be used, however ingenious the effort, to flout our Constitution."[21]

To that end, the Civil Rights Commission had repeatedly recommended that Congress pass a law to "prohibit *any* arbitrary action or . . . inaction which deprives or threatens to deprive any person of the right to *register, vote, and have that vote counted in any Federal election*." 1963 CRC Report at 248 (emphasis added); *see also* 1959 CRC Report at 138–39. In 1964, Congress did just that by enacting the Materiality Provision, barring disenfranchisement based on immaterial errors in voting paperwork in "any Federal election," Pub. L. No. 88-352, § 101(a), 78 Stat. 241, 241 (1964)—and, in 1965, in the face of unstinting resistance, Congress expanded that ban to "any election," Pub. L. No. 89-110, § 15, 79 Stat. 437, 445 (1965).

Finally, in contrast to the ample evidence of Congress' intent to act broadly to protect the right to *vote*—not merely register—there is no affirmative support in

---

[21] The American Promise, *available at* https://www.presidency.ucsb.edu/documents/special-message-the-congress-the-american-promise.

the legislative history for limiting the Materiality Provision's application to voter registration. While Congress was aware that "arbitrary registration procedures" were the "most prevalent" of the "many forms" of discrimination employed by Southern voting officials, 1961 CRC Report at 133, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) (Scalia, J.), and "nothing in [the Materiality Provision's] statutory language nor its legislative purpose indicates that Congress chose to *allow*" the rejection of votes based on immaterial paperwork errors "at other stages in the process." ROA.33253. Indeed, the Supreme Court has warned, "[i]n ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark." *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592 (1980); *see Moskal v. United States*, 498 U.S. 103, 111 (1990) ("This Court has never required that every permissible application of a statute be expressly referred to in its legislative history."). Particularly where, as here, Congress has legislated in broad terms— reaching "*any* record or paper relating to *any* application, registration, or *other act requisite to voting*," 52 U.S.C. § 10101(a)(2)(B) (emphasis added)—"the fact that [a statute] has been applied in situations not expressly anticipated by Congress . . . simply demonstrates [the] breadth of [the] legislative command," and is no reason

to narrow its scope, *Bostock v. Clayton Cty., Ga.*, 590 U.S. 644, 674 (2020) (Gorsuch, J.) (citations and quotation marks omitted).

In sum, to the extent Appellant's "constitutional avoidance" argument is based on the supposed lack of factual support in the congressional record for ascribing to the Materiality Provision its plain meaning—reaching every stage of the voting process—that argument should be rejected. Doing otherwise would reopen precisely the kind of loopholes Congress deliberately closed.

### B. <u>Congress Had At Least Three Sources of Constitutional Authority to Enact the Materiality Provision</u>

Appellants' argument is also based on an incomplete account of the sources of constitutional authority for the Materiality Provision. App. Br. 41. As the Provision's proponents made clear, *see supra* at 12–15, there were at least three: the Elections Clause, the Fifteenth Amendment, and the Fourteenth Amendment.

### i. <u>The Elections Clause</u>

Appellants, unlike the District Court, *see* ROA.33260, ignore the Elections Clause. *See* U.S. Const. art. I, § 4, cl. 1. The initial version of the Materiality Provision in the 1964 Civil Rights Act was limited to "Federal elections," in part to take advantage of Congress's undisputed Elections Clause powers, *see supra* at 12–14; supporters of the 1965 Voting Rights Act, extending the Materiality Provision to all elections, likewise invoked this authority, *see supra* at 15.

The Elections Clause gives Congress "broad" authority to "provide a complete code for congressional elections." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013) (quotation marks omitted). This power "is paramount, and may be exercised at any time, and to any extent which [Congress] deems expedient." *Id.* at 9 (quotation marks omitted). Congress's Article I powers reach beyond congressional elections, too: it is "the prerogative of Congress to oversee the conduct of presidential and vice-presidential elections," *Oregon v. Mitchell*, 400 U.S. 112, 124 (1970) (opinion of Black, J.); *see, e.g.*, *Burroughs v. United States*, 290 U.S. 534, 544–48 (1934), as well as state and local elections, to the extent such laws are necessary and proper to prevent interference with federal elections, *see United States v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 353 (E.D. La. 1965).[22]

Thus, Congress's power to set standards for processing voting paperwork, at any stage of the voting process, is clear with respect to the vast majority of elections. As the Supreme Court has held, "there is no compelling reason not to read Elections Clause legislation simply to mean what it says," *Inter Tribal Council*, 570 U.S. at 15. As the Materiality Provision was enacted pursuant to

---

[22] This authority stems in part from the Necessary-and-Proper Clause, which "augments" Congress's powers over federal elections. *Oregon*, 400 U.S. at 120. Congress's exercise of its Necessary-and-Proper Clause powers and its choice between various means and ends are questions "primarily addressed to the judgment of Congress." *Burroughs*, 290 U.S. at 547–48.

Congress's authority under that Clause (among others), the Materiality Provision

passes constitutional muster.[23]

### ii. <u>The Fifteenth Amendment</u>

Appellants concede the Materiality Provision is a proper exercise of

Congress's authority under the Fifteenth Amendment.  App. Br. 41.  However, the

Provision need not be "limited to voter registration" to remain within the scope of

Congress's authority, as Appellants argue.  *Id*.

Appellants maintain that laws enforcing the Fifteenth Amendment must

demonstrate "congruence and proportionality between the injury to be prevented or

remedied and the means adopted to that end."  *City of Boerne v. Flores*, <u>521 U.S.

507, 520</u> (1997) (quoted at App. Br. 40).  But the Supreme Court has previously

suggested that "Congress may use any rational means to effectuate the

constitutional prohibition of racial discrimination in voting."  *Katzenbach*, <u>383</u>

---

[23] Appellants contend that this Court should interpret the Materiality Provision with a presumption against "alter[ing] the balance between federal and state power." App. Br. 35 (quoting *Ala. Ass'n of Realtors v. HHS*, <u>594 U.S. 758, 764</u> (2021)). The Supreme Court expressly rejected this proposition in *Inter Tribal Council*, <u>570 U.S. at 14</u>, stating that "[t]he assumption that Congress is reluctant to pre-empt does not hold when Congress acts under [the Elections Clause], which empowers Congress to 'make or alter' state election regulations."  Indeed, Congress extended the Materiality Provision to state and local elections in the 1965 Act in order to limit states' ability to disenfranchise.

U.S. at 324.[24]  This Court need not decide which test applies, however, as the Materiality Provision is constitutional under either.

*First*, as the "voluminous legislative history" compiled by Congress shows, *Katzenbach*, 383 U.S. at 309; *see supra* at 7–17, the "injury to be prevented" was not merely the misuse of a particular form or process, but rather the relentless disenfranchisement by officials determined to take advantage of any available technicality to disenfranchise Black Americans.  Thus, the "means" adopted by Congress to prevent that injury, *i.e.*, a rule outlawing the use of immaterial paperwork errors to deny voting rights at any stage, was not just "congruen[t] and proportional[]," *City of Boerne*, 521 U.S. at 520, it was urgently necessary.

*Second*, even if Congress's findings *were* limited to a narrow problem with registration paperwork, the statute is not rendered constitutionally infirm because it reaches later steps in the voting process.  Congress indisputably has power to enact "prophylactic legislation . . . to prevent and deter unconstitutional conduct," *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727–28 (2003), including when "protecting voting rights," *City of Boerne*, 521 U.S. at 518.  Having found overwhelming evidence of discrimination in voter registration, Congress could permissibly enact "prophylactic legislation" to prevent that discrimination *as well*

---

[24] *Shelby County v. Holder* does not resolve the question; it invalidated the re-enactment of the Voting Rights Act's coverage formula only after determining Congress's justification was "irrational."  570 U.S. 529, 556 (2013).

*as* foreclose the opportunity for functionally identical discrimination later in the voting process. *See Moskal v. United States*, 498 U.S. 103, 111 (1990) ("This Court has never required that every permissible application of a statute be expressly referred to in its legislative history."); *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) ("[W]e recognize that Congress in combating specific evils might choose a broader remedy.").

Given Congress's detailed findings regarding the relentless, multi-faceted efforts to disenfranchise Black Americans, it strains credulity to conclude that, despite Congress's "broad" enforcement powers, *City of Boerne*, 521 U.S. at 517–18, it was required to leave obvious loopholes allowing discrimination in precisely the same manner later in the process.[25] *See* ROA.33253–54 (identifying Congress's "broader rule" as "rational" because it need not proceed "form-by-form" and "limit[]" itself "to crafting a solution" with "obvious loophole[s]").

---

[25] Appellants ignore the all-too-obvious reason Congress obtained a comparative plethora of evidence of discrimination during registration: officials were so effective at stopping Black Americans from registering that there were fewer opportunities to discriminate against them when casting ballots. It defies both common sense and constitutional law to suggest that Congress—having obtained voluminous evidence that officials would use any excuse to disenfranchise Black Americans—could not act until these odious schemes manifested in ballot-casting.

### iii.  **The Fourteenth Amendment**

Finally, Appellants never mention that—as many members of Congress emphasized, *see supra* at 12–13 & n.13—Congress's authority to enact the Materiality Provision also emanates from the Fourteenth Amendment.

Like the Fifteenth Amendment, Congress's Fourteenth Amendment authority is "broad," *City of Rome v. United States*, 446 U.S. 156, 176–77 (1980), and Congress may act pursuant to this authority to prohibit even practices that are not themselves unconstitutional, provided there is "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," *City of Boerne*, 521 U.S. at 520; *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365, 368–74 (2001) (determining scope of constitutional right and "examin[ing] whether Congress identified a history and pattern of unconstitutional" actions).  The Voting Rights Act is a paradigmatic exercise of Congress's Fourteenth Amendment powers.  *See Hibbs*, 538 U.S. at 737–38.

Both the due process and equal protection clauses of the Fourteenth Amendment support the Materiality Provision:

*First*, arbitrary disenfranchisement violates the Due Process Clause and gives rise to a cognizable constitutional injury.  *See Bush v. Gore*, 531 U.S. 98, 104–05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over

that of another."). Such arbitrary action is unconstitutional even absent racial

motion. *See Baker v. Carr*, 369 U.S. 186, 208 (1962) ("A citizen's right to a

vote free of arbitrary impairment by state action has been judicially recognized as a

right secured by the Constitution . . . .").

Congress compiled a detailed record of the many arbitrary factors—

misspellings, missed signatures, and erroneous dates—used to deny citizens' rights

to vote. *See supra* at 8–16. Members of Congress expressly invoked the Due

Process Clause while debating the Materiality Provision, drawing on this extensive

record. As Representative Emanuel Celler, a manager of the Voting Rights Act,

explained:

> [I]t is a plain violation of due process to [disenfranchise] a
> person for making an immaterial error on an application
> form, and this, too, is as true with respect to local and State
> [as] well as Federal elections. Hence the due process
> clause and section 5 of the 14th amendment . . . sustain
> this extension.

111 Cong. Rec. 15,652 (1965).

In sum, it is difficult to imagine an enactment better tailored to enforce

citizens' undisputed "right to a vote free of arbitrary impairment by state action,"

*Baker*, 369 U.S. at 208, than the Materiality Provision.

*Second*, election laws that racially discriminate, or that are applied

discriminatorily, violate the Equal Protection Clause. *See Hunter v. Underwood*,

471 U.S. 222, 231–33 (1985); *Nixon v. Herndon*, 273 U.S. 536, 541 (1927).

Further, "[e]qual protection applies" not only to the "initial allocation of the franchise," but also "to the manner of its exercise." *Bush*, <u>531 U.S. at 104</u>–05.

With respect to the Materiality Provision, Congress amply satisfied any requirements to identify a constitutional wrong and remedy it via a "congruent and proportional" response. The congressional record is replete with findings about racially discriminatory voting laws and/or racially discriminatory application of facially neutral voting laws.[26] Again, members of Congress invoked the equal protection clause as a constitutional basis for voting rights legislation. *E.g.*, 110 Cong. Rec. 1,593 (1964) (statement of Rep. Farbstein) (referencing need to "implement[]" "[t]he clear mandate of the 14th amendment which secures to all Americans equal protection of the laws"); *id.* at 6,531 (statement of Sen. Humphrey) (highlighting constitutional authority "to legislate with respect to . . . denial[s] of equal protection of the laws guaranteed by the 14th amendment").

Thus, after "Congress documented a marked pattern of unconstitutional action by the States" and had first tried more limited legislation that made insufficient progress, the Materiality Provision represented a "limited remedial

---

[26] *E.g.*, 110 Cong. Rec. 6,650 (1964) (statement of Sen. Javits).

scheme designed" to alleviate—*finally*—the systematic, discriminatory denial of

Black Americans' voting rights.  *See Bd. of Trs. of Univ. of Ala.*, <u>531 U.S. at 373</u>.[27]

    *Third*, and finally, statutes that allow a state to reject voters' submissions on

immaterial grounds are not outside the reach of the Materiality Provision merely

because they are "neutral" and "generally applicable."  *See* App. Br. at 32.  If that

were a defense, legislatures could adopt modern versions of the same "neutral"

requirements Congress unquestionably banished with the Materiality Provision—

*e.g.*, requiring those applying for or submitting a mail-in ballot to write (i) an

interpretation of the state constitution, *see* 1959 CRC Report at 59, (ii) a list of

prior employers, *see id.* at 74, or (iii) their age in years, months, and days, *see* 1961

CRC Report at 56.  By Appellants' logic, these, too, would be mere "ballot-casting

rules" that "govern how registered voters request and cast a ballot," App. Br. 2,

and outside the reach of the Materiality Provision.  The text of the Materiality

Provision—and the painful history that preceded it—demands this argument be

rejected.

---

[27] Indeed, this Court recently held that the Materiality Provision is "a congruent and proportional exercise of congressional power" that applies "irrespective of racial animus."  *Vote.Org v. Callanen*, <u>89 F.4th 459, 487</u> (5th Cir. 2023).  Congress' extensive findings justified enacting "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct."  *Nevada Dep't of Hum. Res. v. Hibbs*, <u>538 U.S. 721, 728</u> (2003).  This Court should reject the State of Texas Appellants' invitation to reverse course on this point.  *See* Tex. Br. at 26–28.

## CONCLUSION

The Materiality Provision was a congruent and proportional response to decades of voting officials' relentless, ingenious, and opportunistic discrimination. This Court need not harbor any "doubt" that the Materiality Provision is constitutional under the Elections Clause and the Fourteenth and Fifteenth Amendments, or that the decision below can be affirmed in full.

Respectfully submitted,

Dated:  New York, New York      CLARICK GUERON REISBAUM LLP
August 19, 2024

By: /s/  Aaron Crowell
Aaron Crowell
Alexander D. Bernstein
David Kimball-Stanley
220 Fifth Avenue, 14th Floor
New York, NY 10001
Tel.:  (212) 633-4310
acrowell@cgr-law.com
abernstein@cgr-law.com
dkimballstanley@cgr-law.com

*Attorneys for Amicus Curiae The Protect Democracy Project*

## CERTIFICATE OF SERVICE

I hereby certify that this brief was electronically filed with the Court using the CM/ECF system, which will provide notice to and service on all counsel of record.

Dated:  New York, New York          Respectfully submitted,
        August 19, 2024

                                             CLARICK GUERON REISBAUM LLP

                                             By: /s/  Aaron Crowell
                                                Aaron Crowell
                                                Alexander D. Bernstein
                                                David Kimball-Stanley
                                                220 Fifth Avenue, 14th Floor
                                                New York, NY 10001
                                                Tel.:  (212) 633-4310
                                                acrowell@cgr-law.com
                                                abernstein@cgr-law.com
                                                dkimballstanley@cgr-law.com

                                             *Attorneys for Amicus Curiae The Protect Democracy Project*

## COMBINED CERTIFICATIONS

In accordance with applicable Federal and Local Rules, I certify as follows:

1. I am a member in good standing of the Bar of this Court.

2. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,499 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

3. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

4. The text of the electronic brief is identical to the text in the paper copies.

5. The electronic file containing the brief was scanned for viruses using Vipre Virus Protection, version 3.1, and no virus was detected.

Dated:  New York, New York
        August 19, 2024

Respectfully submitted,

CLARICK GUERON REISBAUM LLP


By: /s/  Aaron Crowell
    Aaron Crowell
    Alexander D. Bernstein
    David Kimball-Stanley
    220 Fifth Avenue, 14th Floor
    New York, NY 10001
    Tel.:  (212) 633-4310
    acrowell@cgr-law.com
    abernstein@cgr-law.com
    dkimballstanley@cgr-law.com

    *Attorneys for Amicus Curiae The*
    *Protect Democracy Project*