# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-50885

UNITED STATES OF AMERICA; OCA-GREATER HOUSTON,
LEAGUE OF WOMEN VOTERS OF TEXAS, REV UP-TEXAS,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, Attorney General, State of Texas; JANE NELSON, in her
official capacity as Texas Secretary of State; STATE OF TEXAS; HARRIS
COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN
PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE;
NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE,

*Defendants-Appellants*,

REPUBLICAN NATIONAL COMMITTEE,

*Movant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS, SAN ANTONIO DIVISION
IN CASE NO. 5:21-CV-00844

## BRIEF OF *AMICI CURIAE* NEW DISABLED SOUTH AND disABILITYsa IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

COREY STOUGHTON
ELIZABETH H. SNOW
SELENDY GAY PLLC
*Attorneys for Amici Curiae*
1290 Avenue of the Americas
New York, New York 10104
(212) 390-9000

CP COUNSEL PRESS     (800) 4-APPEAL • (332198)

## <u>SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that—in addition to the persons and entities listed in the Appellants' Certificate of Interested Persons—the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### *Amici Curiae*

New Disabled South
New Disabled South Rising
disABILITYsa

### *Attorneys for Amici Curiae*

Corey Stoughton
Elizabeth Snow
Selendy Gay PLLC

August 19, 2024                    Respectfully submitted,

                                   /s/    Corey Stoughton

                                   Corey Stoughton
                                   Elizabeth H. Snow
                                   SELENDY GAY PLLC
                                   1290 Avenue of the Americas
                                   New York, NY 10104
                                   Tel: 212-390-9000
                                   cstoughton@selendygay.com
                                   esnow@selendygay.com

                                   *Counsel for Amici Curiae New Disabled South and disABILITYsa*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ................................................................... 1

ARGUMENT .............................................................................................. 2

I.    Mail Ballots are Particularly Important to the Ability of Texans with
      Disabilities to Vote ........................................................................... 4

II.   S.B. 1 Impedes the Ability to Vote by Mail, Disenfranchising
      Numerous Texans with Disabilities .................................................. 8

      A.    S.B. 1's Onerous Requirements Result in Wrongful Rejections of
            the Applications to Vote By Mail and Mail-Ballots of Texans
            with Disabilities ....................................................................... 10

      B.    The Option to Cure is Insufficient to Restore Texans with
            Disabilities' Ability to Vote ..................................................... 20

CONCLUSION ........................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*La Union del Pueblo v. Abbott*,
  No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023) ..........*passim*

*Schwier v. Cox*,
  340 F.3d 1284 (11th Cir. 2003) ................................................................. 4

**Statutes**

42 U.S.C. § 1971(a)(2)(B) ............................................................................ 4

52 U.S.C. § 10101(a)(2)(B) ........................................................ 3, 4, 12, 25

Election Protection and Integrity Act of 2021 ("S.B. 1") ....................*passim*

Tex. Elec. Code § 61.003 ............................................................................ 7

Tex. Elec. Code § 63.0015 .......................................................................... 6

Tex. Elec. Code § 82.002(a)(1) .................................................................. 8

Tex. Elec. Code § 84.002(a)(1-a) .............................................................. 11

Tex. Elec. Code § 84.007(c) ...................................................................... 23

Tex. Elec. Code § 86.001(f) ...................................................................... 11

Tex. Elec. Code § 86.002(g) ...................................................................... 11

Tex. Elec. Code § 86.015(c)(4) .......................................................... 11, 20

Tex. Elec. Code § 87.041(b)(8) ................................................................ 11

**Internet Sources**

*2022 Elections*, RUTGERS-NEW BRUNSWICK SCH. OF MGMT. AND LAB.
  RELS. 1,
  https://smlr.rutgers.edu/sites/default/files/Documents/Centers/Progr
  am_Disability_Research/Fact_Sheet_Disability_Voter_Turnout_202
  2_Elections.pdf (last visited Aug. 18, 2024) ........................................ 9

*2022 Elections*, RUTGERS-NEW BRUNSWICK SCH. OF MGMT. AND LAB.
RELS. 5 (July 2023), https://www.eac.gov/sites/default/files/2023-
07/EAC_2023_Rutgers_Report_FINAL.pdf .............................................................. 5

*Disabilities*, U.S. VOTE FOUND.,
https://www.usvotefoundation.org/closing-gap-voters-disabilities
(last visited Aug. 18, 2024) ....................................................................................... 7

*Mission and History*, THE ARC OF TEXAS,
https://www.thearcoftexas.org/who-we-are/mission-and-history/
(last visited Aug. 18, 2024) ..................................................................................... 18

*Texas Identification Card*, TEX. DEP'T OF PUB. SAFETY,
https://www.dps.texas.gov/section/driver-license/how-apply-texas-
identification-card (last visited Aug. 18, 2024) ..................................................... 11

*'They're Taking us Backwards': Tightened Regulations Interfere with
Voting for People with Disabilities*, FORT WORTH REP. (Mar. 24,
2022), https://fortworthreport.org/2022/03/24/texas-voting-
disability/ ................................................................................................................ 10

*Voting Battles,* AP NEWS (April 2, 2023, 8:17 AM EDT),
https://tinyurl.com/8ujpkvrc ...................................................................................... 5

*Voting is Already Hard for People with Disabilities. Voter ID Laws
Make it Even Harder,* VOX (Apr. 1, 2016, 2:10 PM),
https://www.vox.com/2016/4/1/11346714/voter-id-laws-disabilities .................... 17

## Other Authorities

Fed. R. App. P. 29(a)(2) ............................................................................................. 1

Fed. R. App. P. 29(a)(4)(E) ........................................................................................ 1

Fed. R. App. P. 29(a)(4)(G) ...................................................................................... 27

Fed. R. App. P. 29(a)(5) ............................................................................................ 27

Fed. R. App. P. 32(a)(5) ............................................................................................ 27

Fed. R. App. P. 32(a)(6) ............................................................................................ 27

Fed. R. App. P. 32(f) ................................................................................................. 27

## <u>INTEREST OF AMICI CURIAE</u>

Amici curiae disABILITYsa, headquartered in San Antonio, Texas, and New Disabled South are both 501(c)(3) charitable organizations that advocate on behalf of people with disabilities in the southern part of the United States. disABILITYsa works to educate, advance, and engage people with disabilities in the greater San Antonio area. New Disabled South's mission is to improve the lives of people with disabilities and build strong disability justice and rights movements across the South, including Texas. As detailed in this brief, people with disabilities frequently encounter barriers to voting in Texas. Amici's members, many of whom are Texans, faced the same and similar barriers. To address these concerns, both organizations advocate for the rights of people with disabilities to vote and educate their members on available voting accommodations and voting processes. Amici are devoted to ensuring their members and all Texans with disabilities are not disenfranchised by laws such as S.B. 1.

All parties consented to the filing of this amicus brief. *See* Fed. R. App. P. 29(a)(2). Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici affirm that no counsel for a party authored this brief in

whole or in part and that no person other than amici and their counsel made a monetary contribution to its preparation or submission.

## **<u>ARGUMENT</u>**

For nearly a century, Texans with disabilities have enjoyed the ability to vote by mail—a recognition by the State that the act of in-person voting poses unique challenges to people with disabilities and that their right to vote must be protected. This protection of a most sacred right for people with disabilities has been supported across Republican and Democratic control of the legislature and governorship. The message was as clear as it was enduring: the votes of Texans with developmental and physical disabilities count as much as those of their fellow citizens.

In 2021, however, Texas took a significant step away from this promise with the enactment of the Election Protection and Integrity Act of 2021 ("S.B. 1"). S.B. 1 requires voters seeking to exercise their right to vote by mail to complete a series of steps that create unnecessary risk of disenfranchising voters with disabilities. Voters must find and document certain forms of identification, ensure that specific form of identification matches the one they provided upon registering to vote, and legibly write

the ID number in the correct places—including one place that is not immediately apparent under the flap of the envelope. S.B. 1 assumes that voters will have easy access to driver's license numbers and other forms of state ID, but voters with disabilities are less likely than other voters to have those forms of identification and, even if they have them, less likely to be able to access them. Voters' ability to meet the statute's requirements is further hampered by complex, inaccessible instructions and by provisions that deter caregivers from providing assistance. Voters must flawlessly follow those instructions twice—once on the application to receive a mail ballot and a second time on the ballot itself. If there is an error at any stage either on the voter's part or on the part of any official reviewing the material, S.B. 1's mechanisms for correcting the error present the same challenges over again, and additionally require either an in-person or internet-based appointment that presents additional barriers to people with disabilities.

The district court recognized this peril when it held that S.B. 1 denies Texans the statutory right to vote protected by Section 101 of the Civil Rights Act of 1964, which prohibits state officials from denying "the right of any individual to vote" based on "an error or omission . . . on any

act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote." *See* 52 U.S.C. 10101(a)(2)(B). The purpose of this provision was to remove irrelevant barriers used to disenfranchise certain voters. *See Schwier v. Cox,* 340 F.3d 1284, 1294 (11th Cir. 2003) (discussing 42 U.S.C. § 1971(a)(2)(B), which was "editorially reclassified" as 52 U.S. Code § 10101(a)(2)(B), and stating that it "was intended to address the practice of requiring unnecessary information . . . [that] would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters."). S.B. 1's requirements, as the district court held, are immaterial to whether voters with disabilities (and other voters) are eligible to vote. Amici ask this Court to affirm the district court's order for all the reasons offered by Appellees and particularly because S.B. 1 hampers the ability of Texans with disabilities to exercise their right to vote.

## I.    Mail Ballots are Particularly Important to the Ability of Texans with Disabilities to Vote

Voting is often a difficult enterprise for Americans with disabilities. A survey issued by the U.S. Election Assistance Commission ("EAC")

4

found that one in seven voters with disabilities reported facing difficulties voting in the 2022 midterms.[1] The Department of Justice found that since 2016 more than three dozen cities and counties have violated the Americans with Disabilities Act by providing poor accessibility at polling locations.[2]

Voting in person is especially challenging.[3] Voters with disabilities often struggle to travel to polling places.[4] One New Disabled South member reported needing to travel forty-five minutes to her nearest polling place when she never received the mail ballot she requested. This was particularly difficult because she is unable to drive. Problems of distance intersect with the scarcity of critical accommodations: members of disABILITYsa who are Deaf and vote in Bexar County, Texas have reported

---

[1] Lisa Schur et al., *Disability and Voting Accessibility in the 2022 Elections*, RUTGERS-NEW BRUNSWICK SCH. OF MGMT. AND LAB. RELS. 5 (July 2023), https://www.eac.gov/sites/default/files/2023-07/EAC_2023_Rutgers_Report_FINAL.pdf.

[2] *See* Ayanna Alexander, *Voters with Disabilities Often Overlooked in Voting Battles*, AP NEWS (April 2, 2023, 8:17 AM EDT), https://tinyurl.com/8ujpkvrc.

[3] Schur et al., *supra* note 1 at 5.

[4] *See id.* at 28.

that they must travel thirty to forty minutes to one of only two available polling locations where ASL Interpreter Services are made available.

Voters with disabilities who are able to find transportation to polling places, sometimes far from their homes, often encounter barriers to voting in those locations, despite legal rules requiring accommodations. A New Disabled South member reported finding her polling place was wheelchair inaccessible; yet another member was refused curbside voting when poll workers did not believe she had a disability even though she uses a wheelchair. When voting inside the polling place, that same member found the voting machine was well above her head because she was in her wheelchair; she needed a poll worker to stand next to her and hold the machine down to use it. When a different disABILITYsa member requested an accommodation under Section 63.0015 of the Texas Election Code, which requires election officers to allow a person whose mobility is inhibited to vote before other voters, they were told to ask every person in line ahead of them for permission to enter the polling location first. Another member of disABILITYsa found that the accessible ramps they needed to use to enter the polling place were located outside the 100-foot parameter inside which other voters are protected from electioneering

pursuant to Section 61.003 of the Texas Election Code. Stories like these emerged at trial in this case, which produced evidence that voters with disabilities may struggle to wait in line, get inside polling places, operate polling machines, or receive effective assistance from untrained or poorly trained poll workers. *See* Trial Transcript, *La Union del Pueblo v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023) (No. 944) ("T. Tr.") 3286:03-3287:04, 3755:24-3756:06.[5]

The impact of barriers to voting for people with disabilities is massive. Nationwide, if people with disabilities voted at the same rate as people without disabilities, there would be about 2 million more voters.[6]

Challenges like these make the option of voting by mail especially important to voters with disabilities. *See* T. Tr. 3351:01-06, 3756:20-3757:01. S.B. 1 aside, voters with disabilities are far less likely to report issues with mail-in voting than they are for in-person voting.[7] This is

---

[5] *See also* Schur et al., *supra* note 1 at 10-11, 29.

[6] *Closing the Gap on Voters with Disabilities*, U.S. Vote Found*.,* https://www.usvotefoundation.org/closing-gap-voters-disabilities (last visited Aug. 18, 2024).

[7] Schur et al., *supra* note 1 at 9.

hardly surprising: consider the great convenience and privacy of voting from home for those who are reliant on wheelchairs for mobility, are visually impaired, or need to protect their weakened immune systems. At home, voters with disabilities can take their time, avoid travel and potential exposure to disease and the elements, and control their environments in ways that may be necessary because of specific aspects of their disability.

## II.  S.B. 1 Impedes the Ability to Vote by Mail, Disenfranchising Numerous Texans with Disabilities

In recognition of the fact that exercising the right to vote poses unique difficulties for citizens with disabilities, Texas has allowed people with disabilities to vote by mail since 1935—almost a century. Tex. Elec. Code ("TEC") § 82.002(a)(1) (permitting vote by mail if the voter "has a sickness or physical condition that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health"). About 32% of people in Texas who vote by mail are people with disabilities, including 398,000 who cast votes by mail in the 2020 election. T. Tr. 3758:03-18.

Many of these voters have been disenfranchised by S.B. 1 and will remain so while S.B. 1 remains in effect. There was a decline of 200,000 votes by mail in Texas, from 550,000 to 350,000 between the 2018 and 2022 midterm elections, even as the number of registered voters increased. *Id.* at 2741:01-2742:05 (testifying that the percentage of individuals with disabilities did not decrease over this time and citing S.B. 1 as the cause of the precipitous drop in voting by mail). It follows that a disproportionally large number of these "missing" Texas voters were those with disabilities who were disenfranchised by S.B. 1. *See id.* at 25:06-10 (stating that voters with disabilities are three times more likely to vote by mail, so "restriction on voting by mail disproportionately fall on them, including SB 1's onerous identification requirements"). This was even as turnout among voters with disabilities nationally—where the overwhelming majority of voters are not subject to onerous requirements like S.B. 1's—actually *increased.*[8]

---

[8] *See* Lisa Schur et al., *Disability and Voter Turnout in the 2022 Elections*, RUTGERS-NEW BRUNSWICK SCH. OF MGMT. AND LAB. RELS. 1, https://smlr.rutgers.edu/sites/default/files/Documents/Centers/Program_Disability_Research/Fact_Sheet_Disability_Voter_Turnout_2022_Elections.pdf (last visited Aug. 18, 2024).

One disenfranchised Texas voter was Charlotte Stewart who, at age 70 in March 2022, missed her first election in nearly half a century when she never received a mail ballot despite applying.[9] Ms. Stewart, who is physically disabled and requires a scooter to travel, cannot easily navigate inaccessible polling stations; vote by mail is the best option for her to exercise her most fundamental right as an American.[10] The ways in which S.B. 1 disenfranchises Texans with disabilities like Ms. Stewart are detailed below.

### A. S.B. 1's Onerous Requirements Result in Wrongful Rejections of the Applications to Vote By Mail and Mail-Ballots of Texans with Disabilities

S.B. 1 erects a complex system for voters seeking to exercise their right to vote by mail. First, voters must write one of the following on their application for a ballot by mail ("ABBM"): (1) either the applicant's Texas Driver's License or their Personal Identification number—a number issued by the Texas Department of Public Safety ("DPS") for a fee after a

---

[9] Emily Wolf, *'They're Taking us Backwards': Tightened Regulations Interfere with Voting for People with Disabilities*, FORT WORTH REP. (Mar. 24, 2022), https://fortworthreport.org/2022/03/24/texas-voting-disability/.

[10] *Id.*

potential voter has appeared at a local office for an appointment[11] (collectively, a "DPS Number"); (2) if the applicant "has not been issued" a driver's license or Personal Identification number, the last four digits of his or her Social Security number; or (3) if the applicant lacks any of these ID numbers, a statement to that effect. TEC § 84.002(a)(1-a). Second, once they receive their mail ballot, voters must enter the same information on the carrier envelope of the ballot. TEC § 86.002(g). If the information on either the ABBM or the envelope does not exactly match the information on the voter's application for voter registration, officials must reject the voter's ABBM or ballot. TEC §§ 86.001(f), 87.041(b)(8). The voter thus will be disenfranchised unless they can manage to cure in-person or via a website, where they must provide an ID number for a third time, and again ensure it exactly matches the information on their voter registration application. TEC § 86.015(c)(4). S.B. 1 further requires anyone who assists Texans with voting to "swear or affirm under penalty of perjury" that (1) the voter they are assisting represented that they are

---

[11]*See How to Apply for a Texas Identification Card*, TEX. DEP'T OF PUB. SAFETY, https://www.dps.texas.gov/section/driver-license/how-apply-texas-identification-card (last visited Aug. 18, 2024).

eligible to receive assistance under the law, (2) they will not suggest how the voter should vote, and (3) they will not "pressure or coerce" the voter into choosing themselves as an assistant. T. Tr. 2438:23-2440:07, 2441:01-15. This "oath of assistance" requirement has had the effect of intimidating and deterring people who previously assisted voters with disabilities. *Id.* at 26:08-14, 2440:04-07, 2440:21-2442:05*, 3205:16-3207:04, 3319:03-20.

This scheme presents a number of challenges to voters with disabilities and threatens their right to vote based on a possible "error or omission" that is immaterial in determining whether they are qualified to vote. *See* 52 U.S.C. 10101(a)(2)(B).

*First*, often voters with disabilities will have difficulty writing ID numbers legibly. T. Tr. 1300:11-19, 3306:12-19, 3569:01-06. For example, one voter, Laura Halvorson, who has muscular dystrophy and chronic muscular respiratory failure, testified at trial that after her personal care attendant was not comfortable signing the oath of assistance, she attempted completing her mail ballot on her own. *See id.* at 3319:03-20. Filling out her ID number on her mail ballot was "very painful and time-

consuming." *Id.* at 3320:11-12. She explained that trying to hold a pen sufficient to use enough pressure to make a mark with her pen was very difficult because she has "very little muscle movement and strength." *Id.* at 3320:07-09. Halvorson testified that it took her two days to complete the mail ballot, working 10- to 15-minutes at a time. *Id.* at 3320:19-25. Even getting the ballot in the envelope was difficult for Halvorson. *Id.* at 3321:02-04. Halvorson was worried her ID number might not be legible because of her mobility issues and weakness. *Id.* at 3320:13-18.

As this story demonstrates, the requirement that the voter herself fill out the ballot in ink raises difficulties for those with physical impairments. *See id.* at 1300:3-19; *see also id.* at 3320:7-12.

*Second,* some voters with disabilities will have difficulty reading or understanding S.B. 1's complex instructions and procedures. *Id.* at 3761:07-11, 3356:01-02. For example, during the trial, Jeniffer Miller testified that her daughter, who has autism, dyslexia, and dysgraphia (a writing disorder), would have difficulty understanding the instructions for inputting her ID numbers without assistance. *Id.* at 3203:14-17, 3205:11-15. Ms. Miller testified that her daughter struggled to remember

13

her ID numbers and needed assistance to ensure her writing was legible. *Id.* at 3203:05-13. She believed the S.B. 1 procedures "absolutely" impacted her daughter's ability to successfully vote by mail. *Id.* at 3210:18-20.

Additionally, Teri Saltzman, who is legally blind, struggled to read the ABBM and her mail ballot during the March 2022 election. *Id.* at 3347:04-05, 3354:20-3355:10, 3356:02. Saltzman does not drive and votes by mail ballot because it is easier for her to manage with her disabilities. *Id.* at 3347:11-12, 3351:01-06. She was determined to continue voting by mail once S.B. 1 was passed, preparing for the March 2022 election by attending a "training class" with the League of Women Voters to ensure that she understood the new requirements. *Id.* at 3351:14-20. Nevertheless, both her ABBM and mail ballot were rejected. *Id.* at 3352:04-05, 3356:17-18. As described below, *see* Section II.B, Ms. Saltzman struggled to cure her ballot and still does not know whether her vote was counted. *Id.* at 3358:13-19.

Saltzman received conflicting reasons why her ABBM was rejected. She was told that she had completed the identification section

incorrectly, she was not registered to vote, and she used an out-of-date ABBM. *Id.* at 3352:04-07, 3352:22-3353:02, 3354:10-13. Saltzman was sure that she had entered the correct numbers, and she had her voter registration proving she was registered. *Id.* at 3352:07-12, 3352:25-3353:02. When she completed a replacement ABBM, she was worried about filling in the correct numbers, so she brought it into work to view the ABBM with her CCTV, a kind of "super magnifier" to verify the ID numbers she wrote were correct. *Id.* at 3354:20-3355:10. Finally, her ABBM was accepted, and she received a mail ballot. *Id.* at 3355:19-24.

Unfortunately, she found the ballot "almost impossible to read." *Id.* at 3356:01-02. She took her time completing the ballot and had her husband review it for her as "[she] knew that it had to be perfect." *Id.* at 3356:04-14. It was not. Saltzman failed to fill out a section under the flap of the ballot envelope, *see id.* at 3356:15-19, a section that asks for voters' ID numbers, *see id.* at 3656:07-21. Her ballot was rejected. *Id.* at 3356:17-18. Saltzman believes that her disability "absolutely" prevented her from seeing the instructions regarding the section under the flap of the envelope. *Id.* at 3356:22-24. She explained that, "[e]ven with my glasses and

15

all my technology and all the people in the world to help me, I still couldn't see one area." *Id.* at 3357:02-04.

*Third*, voters with disabilities are less likely to have standard forms of identification, may have difficulty remembering whether they in fact have any of the sufficient forms of identification, and face particular challenges retrieving that information. *Id.* at 3762:04-16 (Douglas Kruse, an expert witness, explained that even though S.B. 1 allows voters to submit ABBMs and ballots without ID numbers by stating that they have not been issued any of the permissible ID numbers, people with disabilities may not be certain if they have such ID numbers).

For instance, Texans with disabilities often do not have driver's license numbers because their disability precludes them from driving. *Id.* at 1281:23-1282:15 (Isabel Longoria, the former Elections Administrator of Harris County, Texas and former special advisor for voting rights and access at the Harris County clerk's office, testified that people with "cognitive disabilities, folks with maybe dementia or Alzheimer's" are less likely to have a driver's license on file and even though "Texas allows for an ID number, . . . in our experience if you're not driving then you

probably don't have an ID number").[12] A 2012 Pew Charitable Foundation study found that 7.2% of registered voters with disabilities lacked photo identification, compared to 4.5% of voters without disabilities.[13]

Further, some people with disabilities may have difficulty retrieving their ID numbers, especially if they live in supported living centers where they do not have ready access to such information. *Id.* at 3504:06-3505:01 (Jennifer Martinez, the CEO of The Arc of Texas,[14] testified that people with intellectual and developmental disabilities ("IDD") who live in group homes or state-supported living centers may not have access to their ID numbers and may experience difficulty getting them); 3760:17-

---

[12] *See also id.* at 2851:02-08 (J. Morgan Kousser, an expert witness and a doctor of political history, specializing in elections, stated that there was concern that S.B. 1 would especially disenfranchise voters with disabilities partly because "[if] you're disabled, you might not drive, you might not have a driver's license number[.]"); 3299:23-3300:02 (Amy Litzinger, a Texas voter with Cerebral Palsy, testified that, "One of [her] big concerns [about the voter ID requirements] is for those of us with a disability who don't drive it may be harder for us to obtain the state ID.")

[13] S.E. Smith, *Voting is Already Hard for People with Disabilities. Voter ID Laws Make it Even Harder*, VOX (Apr. 1, 2016, 2:10 PM), https://www.vox.com/2016/4/1/11346714/voter-id-laws-disabilities.

[14] The Arc of Texas is a statewide advocacy and membership organization that supports and advocates for the rights of Texans with intellectual and developmental disabilities. *See Mission and History*, THE ARC OF TEXAS, https://www.thearc-coftexas.org/who-we-are/mission-and-history/ (last visited Aug. 18, 2024).

24 (Kruse testified that people with disabilities who live in a congregate setting can "have a hard time retrieving that information" especially when their parents keep their IDs for them); 3761:19-3762:03 (Kruse explained that research shows people in congregate settings may struggle to access their IDs depending on the helpfulness of the staff). Voters with disabilities may also struggle to remember where they keep their identification information, if they have it at all. *Id.* at 3761:07-18 (Kruse explained further that voters with disabilities may struggle to remember where they stored ID numbers or who may have them).

*Fourth*, some voters with disabilities may find it especially difficult to remember which ID number they used during voting registration, particularly if they are reliant on alternative forms of identification. *Id.* at 2849:22-2850:08 (J. Morgan Kousser, an expert witness and a doctor of political history, explained that when a voter is required to include an ID number "they may not know, they may not correctly remember which identification they had used[.]"); 3504:06-11 (Martinez testified that people with IDD may struggle to "recall" which ID number they used to register to vote); 3569:07-13 (Cathy Cranston, who works with people with disabilities as a personal care assistant, stated that some of the people

she served "had difficulty remembering where they located their personal ID"); 3760:06-16 (Kruse testified that people with disabilities often "don't remember what number they put down" to register several years ago).

Each of these effects of S.B. 1 individually has or is likely to disenfranchise voters with disabilities, *see, e.g.*, *id.* at 3210:18-20, 3352:04-05, 3356:17-18, but taken together, they pose an insurmountable hurdle for many voters with disabilities.

Moreover, even if a voter with disabilities overcame each of these challenges, understood the instructions, remembered which ID number they registered with, located their identification, and wrote their ID number correctly and legibly in the right places, their ballot or ABBM could still be rejected because Texas's database of ID numbers is riddled with errors.[15] Thus, whether due to the intersection of disability and the statute's unnecessarily onerous requirements or due to the substantial

---

[15] As of January 2023, "over 60,000" DPS Numbers and "nearly 45,000" social security numbers in the Texas Election Administration Management ("TEAM") database were different from the same voters' DPS and social security numbers in the DPS database. *See* Record on Appeal ("ROA") 33223; United States' Statement of Undisputed Facts in Support of its Motion for Summary Judgment, *La Union del Pueblo v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, ¶¶ 143-144 (W.D. Tex. Nov. 29, 2023) (No. 609-1).

probability of human error, S.B. 1 will require many voters with disabilities to take on the system for curing purported errors, to avoid disenfranchisement. As described below, the process to cure also poses specific challenges for voters with disabilities.

## B.    The Option to Cure is Insufficient to Restore Texans with Disabilities' Ability to Vote

S.B. 1 disenfranchises voters whose ABBMs or mail ballots are found to contain errors, or do not match the data in the TEAM database, unless they cure those errors in-person or via a website, where they must again attempt to provide their correct ID number and again ensure it exactly matches the information on their voter registration application. TEC § 86.015(c)(4); T. Tr. 3357:10-20. In addition to replicating the challenges for voters with disabilities that are likely to generate errors in the first place, this process presents many additional barriers to those voters. T. Tr. 1304:3-5. Both the online route and the in-person route for curing errors present barriers to voters with disabilities.

Online curing is difficult because people with disabilities are three times more likely to live in a house without internet access and twice as likely not to use internet themselves. *Id.* at 3764:13-16. Even when voters

with disabilities do have web access, 98 percent of websites are not fully accessible, limiting voters' resources to educate themselves on the ballot curing procedure. *Id.* at 3764:17-20. Further, the "Ballot Tracker" website on which voters can cure is itself inaccessible to the visually impaired. *Id.* at 3357:15-3358:02. Finally, the Ballot Tracker requires voters to enter both their DPS number and the last four digits of their social security number to log in. *Id.* at 1020:07-12. If voters do not have one of those numbers or cannot remember or access one of them, they cannot cure online.

Even if voters with disabilities have internet access, encounter no problems with accessing the Ballot Tracker, and are able to access both their social security number and DPS number, curing online may be impossible due to failures of the TEAM database. A voter "cannot log in to the tracker" if their record in TEAM "is missing either a DPS ID number or [the last four digits of the voter's social security number] or if TEAM has incorrect information for either of those numbers." ROA.33256 n.30; Plaintiffs OCA-Greater Houstin, Legue of Women Voters of Texas, and REVUP-Texas's Motion for Partial Summary Judgment, *La Union del Pueblo v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, 20-21 (W.D.

21

Tex. Nov. 29, 2023) (No. 611). And this is far from some remote possibility. As of the beginning of 2023, almost 190,000 Texas voters who have been issued DPS identification still did not have a DPS number in TEAM records and more than 90,000 had neither a DPS number nor the last four digits of their social security number affiliated with their voting registration record. *La Union del Pueblo*, No. 5:21-CV-0844-XR, 2023 WL 8263348, at *5. For those who do, the numbers are often inaccurate. *Id.* On top of all of that, about 2.4 million Texas voters have only one of their multiple DPS numbers in TEAM—leaving them to guess the correct one or have their ballot rejected. *Id.*

Curing in person presents a different set of barriers. As described in Part I, *supra*, people with disabilities are more likely to live alone, less likely to be able to drive and face accessibility issues. T. Tr. 3765:02-08. Forcing voters with disabilities to cure in person defeats the purpose of voting by mail: Voters may be exposed to numerous people despite potentially compromised immune systems, they may have to travel and move in ways that are inaccessible, painful or dangerous, or they may need to ask for help that may not be available or may come from someone untrained to provide it. *See id.*

The stories of individual voters presented at trial illustrated and expanded upon these barriers, including by demonstrating how, in practice, the procedures for curing errors are implemented inconsistently and arbitrarily. For example, Saltzman was given two options to cure, but neither option was accessible to her given her blindness: She was first directed to drive to an election office to cure an immaterial numbering error on her ballot. *Id.* at 3356:15-19, 3357:13-14. When she explained that, as a blind person, that was not possible, she was then directed to a website that is not accessible to the visually impaired. *Id.* at 3357:15-24. Despite her ample efforts and repeated calls, it was never clear whether Saltzman's ballot was ultimately accepted. *Id.* at 3358:18-19.

Halvorson would have been unable to cure her ballot had it been rejected because she only received a notification about the decision on the validity of her mail ballot "well after" the election ended. *Id.* at 3321:05-21. The cure deadline is 11 days before Election Day. TEC § 84.007(c). In fact, at a later election, Halverson decided to vote in person despite her concern for her safety arising from heightened risks connected to COVID, because she was worried that her vote may not be counted if she voted by mail. *Id.* at 3321:22-3322:10.

For all these reasons, S.B. 1's curing procedures are insufficient and simply magnify the disenfranchising effect of the statute.

## **CONCLUSION**

S.B. 1 makes it unacceptably difficult for Texans with disabilities to exercise their right to vote and thus denies their right to vote based on an "error or omission" that is immaterial in determining whether they are qualified to vote. *See* 52 U.S.C. 10101(a)(2)(B). S.B. 1 poses challenges when Texans with disabilities apply for mail ballots, when they complete the ballots and when they attempt to correct rejected ABBMs or ballots. One witness described the issue this way: "People with disabilities are a part of our community and the fabric of our lives for real. They need to be heard and why are you making it so hard for people with disabilities to vote? I really don't understand." T. Tr. 3218:22-3219:02.

For the foregoing reasons, this Court should affirm the District Court's order and uphold the injunction.

August 19, 2024                    Respectfully submitted,

                                   /s/    Corey Stoughton

                                   Corey Stoughton
                                   Elizabeth H. Snow
                                   SELENDY GAY PLLC
                                   1290 Avenue of the Americas
                                   New York, NY 10104
                                   Tel: 212-390-9000
                                   cstoughton@selendygay.com
                                   esnow@selendygay.com

                                   *Counsel for Amici Curiae New Disabled South and* disABILITYsa

## **CERTIFICATE OF COMPLIANCE**

Under Federal Rule of Appellate Procedure 29(a)(4)(G), I certify that: This brief complies with Rule 29(a)(5)'s type-volume limitation because it contains 4,840 words, as determined by the Microsoft Word word-processing system used to prepare the brief, excluding the parts of the brief exempted by Rule 32(f).

This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

August 19, 2024                    Respectfully submitted,

                              /s/    Corey Stoughton
                              Corey Stoughton
                              Elizabeth H. Snow
                              SELENDY GAY PLLC
                              1290 Avenue of the Americas
                              New York, NY 10104
                              Tel: 212-390-9000
                              cstoughton@selendygay.com
                              esnow@selendygay.com

                              *Counsel for Amici Curiae New Disabled South and* disABILITYsa

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused this document to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on August 19, 2024. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

August 19, 2024                     Respectfully submitted,

                                         /s/    Corey Stoughton
                                    Corey Stoughton
                                    Elizabeth H. Snow
                                    SELENDY GAY PLLC
                                    1290 Avenue of the Americas
                                    New York, NY 10104
                                    Tel: 212-390-9000
                                    cstoughton@selendygay.com
                                    esnow@selendygay.com

                                    *Counsel for Amici Curiae New Disabled South and* disABILITYsa