No. 23-50885

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA; OCA-GREATER HOUSTON, LEAGUE OF WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

*Plaintiffs-Appellees,*

v.

KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE; STATE OF TEXAS; REPUBLICAN NATIONAL COMMITTEE; HARRIS COUNTY REPUBLICAN PARTY; DALLAS COUNTY REPUBLICAN PARTY; NATIONAL REPUBLICAN SENATORIAL COMMITTEE; NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE,

*Defendants-Appellants.*

**On Appeal from the United States District Court for the Western District of Texas, San Antonio Division**

## INTERVENOR-APPELLANTS' REPLY BRIEF

John M. Gore
    *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

*Counsel for Intervenor-Appellants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.....................................................................................1

ARGUMENT .........................................................................................2

I.    S.B. 1'S IDENTIFICATION REQUIREMENTS DO NOT
      EVEN IMPLICATE THE MATERIALITY PROVISION. ..............2

      A.    *The Provision's Plain Text Requires Reversal.* ......................*2*

            1.    S.B. 1's Identification Requirements Do Not
                  Apply To A "Record Or Paper" Related To An
                  "Application, Registration, Or Other Act
                  Requisite To Voting." ....................................................2

            2.    The Identification Requirements Are Not Used
                  "In Determining" Any Individual's
                  Qualifications To Vote.....................................................9

            3.    The Identification Requirements Do Not "Deny
                  The Right Of Any Individual To Vote." .......................14

      B.    *The Federalism Canon Bars Extending The Provision
            To The Identification Requirements.....................................18*

      C.    *The District Court's Interpretation Renders The
            Provision Unconstitutional.* ...............................................*23*

II.   THE PANEL DECISION IN VOTE.ORG II APPLIES ONLY
      TO VOTER REGISTRATION, BUT THE IDENTIFICATION
      REQUIREMENTS EASILY SATISFY IT....................................27

CONCLUSION .....................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) (per curiam) ........................................ 19

*Ali v. BOP,*
    552 U.S. 214 (2008) ............................................................. 7

*Allen v. Milligan,*
    599 U.S. 1 (2023) .......................................................... 24, 25

*Ball v. Chapman,*
    289 A.3d 1 (Pa. 2023) ......................................................... 10

*Ball v. James,*
    451 U.S. 355 (1981) ............................................................ 11

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ............................................................. 7

*Brnovich v. DNC,*
    594 U.S. 647 (2021) ...................................................... 28, 29

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ............................................................. 6

*Cir. City Stores v. Adams,*
    532 U.S. 105 (2001) ............................................................. 6

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ........................................................... 24

*Corley v. United States,*
    556 U.S. 303 (2009) ............................................................. 5

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) ..................................................................... 28, 29

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ......................................................................... 5, 7

*Fla. State Conf. of NAACP v. Browning*,
   522 F.3d 1153 (11th Cir. 2008) ........................................ 18, 27, 33, 34

*Ford v. Tenn. Senate*,
   2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) .................................... 20

*Husted v. A. Philip Randolph Inst.*,
   584 U.S. 756 (2018) ........................................................................... 30

*In re Ga. Senate Bill 202*,
   2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ...................................... 22

*In re Sinclair*,
   870 F.2d 1340 (7th Cir. 1989) .............................................................. 4

*Jennings v. Rodriguez*,
   583 U.S. 281 (2018) ........................................................................... 24

*Liebert v. Millis*,
   2024 WL 2078216 (W.D. Wis. May 9, 2024) ...................... 6, 11, 19, 22

*Marks v. Stinson*,
   1994 WL 146113 (E.D. Pa. Apr. 26, 1994) ......................................... 11

*McBoyle v. United States*,
   283 U.S. 25 (1931) ............................................................................... 6

*McDonald v. Bd. of Election Comm'rs*,
   394 U.S. 802 (1969) ..................................................................... 16, 17

*Minn. All. for Retired Ams. Educ. Fund v. Simon*,
    A24-1134, 2024 WL 3841815
    (Minn. Ct. App. Aug. 13, 2024) .................................................... 22, 32

*Pa. Democratic Party v. Boockvar*,
    238 A.3d 345 (Pa. 2020) ............................................................. 21, 32

*Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*,
    97 F.4th 120 (3d Cir. 2024) ....................................................... *passim*

*Polselli v. IRS*,
    598 U.S. 432 (2023) ............................................................................ 5

*Reynolds v. Sims*,
    377 U.S. 533 (1964) .......................................................................... 15

*Ritter v. Migliori*,
    142 S. Ct. 1824 (2022) ................................................................. 10, 14

*Rucho v. Common Cause*,
    588 U.S. 684 (2019) .......................................................................... 23

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ................................................... 17, 18

*Seminole Tribe of Fla. v. Florida*,
    517 U.S. 44 (1996) ............................................................................ 26

*Shelby Cnty. v. Holder*,
    570 U.S. 529 (2013) .......................................................................... 25

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) .......................................................................... 24

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ............................................................ 17

*Thrasher v. Ill. Republican Party*,
 2013 WL 442832 (C.D. Ill. Feb. 5, 2013) ........................................... 18

*United States v. Mosley*,
 238 U.S. 383 (1915) ............................................................................. 15

*Veasey v. Abbott*,
 830 F.3d 216 (5th Cir. 2016) (en banc) ....................................... 29, 31

*Vote.Org v. Callanen*,
 39 F.4th 297 (5th Cir. 2022) ........................................................... 2, 4

*Vote.Org v. Callanen*,
 89 F.4th 459 (5th Cir. 2023) ....................................................... 25, 27

*Vote.Org v. Ga. State Election Bd.*,
 661 F. Supp. 3d 1329 (N.D. Ga. 2023) ............................................... 22

*Wash. State Dep't of Social and Health Servs. v.*
 *Guardianship Est. of Keffeler*,
 537 U.S. 371 (2003) .......................................................................... 6, 7

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

U.S. Const. Article I, § 4, cl. 1 ................................................................ 20

U.S. Const. Article IV, § 4 ......................................................................... 3

25 P.S. § 3150.14 ...................................................................................... 13

25 P.S. § 3150.16 ...................................................................................... 13

52 U.S.C. § 10101 ............................................................................. *passim*

52 U.S.C. § 10501 ...................................................................................... 12

52 U.S.C. § 21083 ............................................................................... 28, 33

Ill. Rev. Stat. Chapter 46 § 4-22 (1961) .................................................... 4

Tex. Elec. Code § 13.002.................................................................. 9

Tex. Elec. Code § 64.009.................................................................. 16

Tex. Elec. Code § 86.008.................................................................. 32

Tex. Elec. Code § 87.0411................................................................ 32

**OTHER AUTHORITIES**

Act of May 29, 2023, 88th Leg. R.S., H.B. 357, § 2................................. 33

D. Chin, *A Deep Dive Into Absentee Ballot Rejection Rates in
the 2020 General Election*, MIT Elections Blog
(Dec. 16, 2021)....................................................................... 32

H.R. Rep. No. 88-914 (1963).............................................................. 26

H.R. Rep. No. 914, 88th Cong., 1st Sess. 18 (1963)................................ 26

A. Samuels, *Carrollton mayoral candidate arrested on
suspicion of fraudulently obtaining mail-in ballots*,
Tex. Tribune (Oct. 8, 2020)...................................................... 30

Lawrence B. Solum, *Originalist Methodology*,
84 U. CHI. L. REV. 269 (2017)..................................................... 3

# INTRODUCTION

Appellees ask the Court to achieve their preferred policy outcome by rewriting the Materiality Provision and splitting with the Third Circuit. To shoehorn S.B. 1's identification requirements into the Provision's ambit, Appellees must delete several of the Provision's operative terms and write in words that Congress neither contemplated nor enacted. They thus invite the Court to set aside what Congress *actually said* in favor of what they *wish* Congress had said as reflected in this redline:

> (2) No person acting under color of law shall-
>
> (B) ~~deny the right of any individual to vote~~ **decline to count a ballot** in any election because of an error or omission on any record or paper relating to ~~any application, registration, or other act requisite to~~ voting, if such error or omission is not material ~~in determining~~ **to** whether such individual is qualified under State law to vote**, or permitted under State law to vote by mail,** in such election.

*Compare* 52 U.S.C. § 10101(a)(2)(B).

This Court should adhere to the Provision's plain text—and, in so doing, avoid a circuit split, federalism problems, constitutional errors, and electoral chaos. The Court should decline Appellees' invitation to redline the Materiality Provision and reverse.

1

## ARGUMENT

## I.   S.B. 1'S IDENTIFICATION REQUIREMENTS DO NOT EVEN IMPLICATE THE MATERIALITY PROVISION.

Plain statutory text establishes that S.B. 1's identification requirements do not even implicate, much less violate, the Materiality Provision.  If any doubt remains, legislative context, caselaw, and canons of construction confirm this result.   Appellees' contrary construction contravenes the plain text, runs headlong into the Third Circuit's decision, and must be rejected.

### A.   *The Provision's Plain Text Requires Reversal.*

#### 1.   **S.B. 1's Identification Requirements Do Not Apply To A "Record Or Paper" Related To An "Application, Registration, Or Other Act Requisite To Voting."**

SB 1's identification requirements cannot violate the Provision because they do not apply to any "application, registration, or other act requisite to voting."   52 U.S.C. § 10101(a)(2)(B).   "[R]egistration" and "application" were both originally understood to refer to documents used to decide "*who* is qualified to vote." *Pa. State Conf. of NAACP v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 130, 139 (3d Cir. 2024); *see Vote.Org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022) (*Vote.Org I*); Opening Br. 23-26.  Because these first two items in the statutory list have clear

meanings, the *ejusdem generis* canon and presumption against surplusage counsel that the residual clause—"other acts requisite to voting"—also refers to voter-qualification documents used in voter registration. Opening Br. 24-25.

The various efforts of the OCA Appellees and the United States (together, "Appellees") to stretch the Provision to all "required steps in the voting process," OCA Br. 35, fail. Appellees first point to "application" and argue that because an application for ballot by mail ("ABBM") is "literally [] an application," it must be covered by the Provision. *Id.*; *see* U.S. Br. 23.

This hyper-literal argument rips "application" from its statutory context. *See* Opening Br. 23-24. That a document is "literally" an "application" does not bring it within the Provision's cabined scope. OCA Br. 35. After all, the Provision obviously cannot regulate college "applications," just as no one believes the Constitution's guarantee of "Republican" government, U.S. Const. art. IV, § 4, ensures government controlled by elected Republicans, *see, e.g.*, Lawrence B. Solum, *Originalist Methodology*, 84 U. CHI. L. REV. 269, 281 (2017). Wordplay aside, Appellees do not dispute Intervenor-Defendants' showing that the

Provision's legislative history uses the words "registration" and "application" interchangeably to refer to "voter registration specifically." *Vote.Org I*, 39 F.4th at 305 n.6; Opening Br. 5, 17-18; *see also Pa. State Conference of NAACP*, 97 F.4th at 132-33. Indeed, this consistent use of "application" probably helps explain why Appellees did not even contest its meaning below. *See In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir. 1989) (Easterbrook, J.) (confirming legislative history can be used this way).[1] And this legislative history underscores that extending the Provision beyond voter registration would divorce it from the legislative findings and render it unconstitutional. *See infra* 23-26.

Appellees next contend that "other act requisite to voting" must be read to reach all "steps in the voting process." OCA Br. 35-36, 38; U.S. Br. 27-28. This contention fails at the threshold because it makes "application" and "registration" superfluous. The United States's suggestion that "registration" would not be superfluous because it would

---

[1] On appeal, the United States belatedly notes Illinois once required in-person voters to complete an "application" at polling places. U.S. Br. 26-27. That "application," however, was used to confirm the voter's "identity," not qualifications. Ill. Rev. Stat. ch. 46 § 4-22 (1961). At most, this lone example shows that "application" may have many meanings, not that Congress captured all such meanings in the Provision.

confirm the Provision's coverage of registration makes no sense because, even on the United States's view, registration is "a[] stage of the voting process." *Id.* at 27-28, 47. Time and time again, courts reject interpretations of residual phrases that render the prior terms in the list superfluous. *See, e.g.*, *Polselli v. IRS*, 598 U.S. 432, 441-42 (2023); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 512-13, 520-22 (2018).

Appellees' various other attempts to escape *ejusdem generis* fail. *First*, Appellees point to the statutory definition of "vote" to assert that "other act requisite to voting" must refer to non-registration steps in the voting process. OCA Br. 38: U.S. Br. 18. But if Congress had wanted that result, it would have omitted the terms "any application, registration, or other acts requisite to" and simply extended the Provision to "an error or omission on any record or paper relating to ~~any application, registration, or other acts requisite to~~ voting." *Compare* 52 U.S.C. § 10101(a)(2)(B), *with supra* at 1. Congress used narrowing language instead—a decision that must be given effect. *See Corley v. United States*, 556 U.S. 303, 315 (2009). That effect is to limit the Provision to the voter-registration process. *See* Opening Br. 23-26.

*Second*, Appellees insist that the use of "any" requires their broad reading of "other act requisite to voting." OCA Br. 35, 38. But *ejusdem generis* is frequently applied to catchalls using "any." *See Cir. City Stores v. Adams*, 532 U.S. 105, 109 (2001); *McBoyle v. United States*, 283 U.S. 25, 26 (1931) (Holmes, J.); A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 200-02 (2012). Moreover, "any" is paired with the word "other," which is a strong indicator of the canon's applicability because it refers back to the enumerated terms "registration" and "application." *See Wash. State Dep't of Social and Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 383-85 (2003); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 164 (2012) (applying canon to "catchall phrase" "other disposition").

*Third*, Appellees argue that *ejusdem generis* renders "other acts requisite to voting" superfluous. OCA Br. 38, U.S. Br. 30-31. Not so: This phrase "prevents government officials from creating a new voter qualification process and avoiding the requirements of the Materiality Provision simply by calling the process something besides 'registration' or 'application.'" *Liebert v. Millis*, 2024 WL 2078216, at *15 (W.D. Wis.

May 9, 2024). And the phrase may cover forms citizens must submit to remain registered to vote. *See* Opening Br. 25.

*Fourth*, the OCA Appellees assert that *ejusdem generis* applies only in cases of ambiguity, OCA Br. 39, but it is a "traditional tool[] of statutory construction" that applies *regardless* of any ambiguity. *Epic Sys. Corp.*, 584 U.S. at 521 (applying canon to find statute not ambiguous). For example, the Supreme Court applied the canon to limit the catchall "other legal process," even though it found no ambiguity and a broader construction was possible. *Keffeler*, 537 U.S. at 383-85. And *ejusdem generis* undoubtedly applies here because the Provision features a "list of specific items separated by commas and followed by a general or collective term." *Ali v. BOP*, 552 U.S. 214, 225 (2008).

*Fifth*, the OCA Appellees fault Intervenor-Defendants' citation of legislative history, *see* OCA Br. 46-49, but even absent statutory ambiguity, legislative history can shed light on "the understandings of the law's drafters" and "the law's ordinary meaning at the time of enactment." *Bostock v. Clayton County*, 590 U.S. 644, 674-75 (2020).

The Provision unambiguously forecloses Appellees' reading, as the Third Circuit held. *See Pa. NAACP*, 97 F.4th at 130. But if the Court

finds the Provision ambiguous, it can consult legislative history, as even Appellees concede legislative history is relevant to resolve "ambigu[ity.]" OCA Br. 47.   And that history "shows the enacting Congress was concerned with discriminatory practices during voter registration, thus in line with what the text reflects." *Pa. NAACP*, 97 F.4th at 133; *see* Opening Br. 4-5, 23-24.

Appellees offer nothing from the legislative history to refute that point, and entirely ignore the legislative history cited by the Third Circuit and Intervenor-Defendants' opening brief. *See* OCA Br. 47.  The OCA Appellees claim the legislative history supports their interpretation, but ironically fail to cite any legislative history in the three pages making that argument. *Id.* at 47-49.  The United States conspicuously avoids discussing the Provision's most relevant legislative history, like the committee reports, committee statements, and floor debates.  Instead, in its fact section, it cites vague and irrelevant snippets of legislative history focused on *different provisions* in the Civil Rights Act.  U.S. Br. 6-7 (statements discussing the Civil Rights Commission).  Unsurprisingly, the United States eventually concedes that "Congress's primary aim in enacting the Provision was to eliminate racially discriminatory barriers

to voter registration." U.S. Br. 46; *see also* Protect Democracy Project Am. Br. 7-18 (citing no example from legislative history to support broader construction of Provision).

*Finally*, Appellees warn that limiting the Provision to registration will allow States to impose arbitrary requirements at other stages of the voting process. *See* OCA Br. 36. But Appellees' assumption that the Provision must foreclose all unreasonable voting restrictions is false. Their own construction proves as much, since it would not prohibit requiring in-person voters to *orally recite* "their age in days" before voting. *Id.* The Provision, on anyone's reading, cannot solve all potential voting problems. That does not permit the Court to rewrite it.

>       **2.      The Identification Requirements Are Not Used "In Determining" Any Individual's Qualifications To Vote.**

As the District Court confirmed, the voter-identification requirements are not used to determine any individual's qualifications to vote. ROA.33244, 33246. Indeed, Texas "determin[es] whether [] individual[s] [are] qualified . . . to vote" during the voter-registration process, *see* Tex. Elec. Code § 13.002; ROA.33217, where the

identification requirements are inapplicable. For that reason too, they do not implicate the Provision. Opening Br. 26-29.

Appellees again attempt to avoid this result by rewriting the Provision. They contend that "in determining" sets the standard for assessing materiality rather than referring to the act of determining qualifications. OCA Br. 40, U.S. Br. 31-32. But if Congress had intended that result, it would have substituted "to" for "in determining" so that the Provision read "not material **to** ~~in determining~~ whether such individual is qualified under State law to vote." *Compare* 52 U.S.C. § 10101(a)(2)(B), *with supra* at 1; *Ritter v. Migliori*, 142 S. Ct. 1824, 1825-26 (2022) (Alito, J., dissental); *Ball v. Chapman*, 289 A.3d 1, 38 (Pa. 2023) (opinion of Brobson, J.). Congress's use of "*in determining*" cabins the Provision to rules applied *when* determining qualifications. Opening Br. 26-29. As the Third Circuit explained, these words "describe a process—namely, determining whether an individual is qualified to vote." *Pa. NAACP*, 97 F.4th at 131; *accord Ball*, 289 A.3d at 38 (opinion of Brobson, J.).

Appellees' other efforts to construe the Provision are equally unavailing. Appellees note that "in determining" appears in a "subordinate," OCA Br. 32, or "conditional" clause, U.S. Br. 31, of the

Provision.  But the identical "in determining" formulation appears in a subordinate or conditional clause in Section 10101(a)(2)(A), which applies only to qualification determinations.  *See* Opening Br. 27.

Appellees also attempt to bootstrap their preferred construction upon the Provision's use of the term "such election."  OCA Br. 43.  That phrase, however, merely refers back to "any election," and further recognizes that States can establish different qualifications for particular elections, as was common when the Provision was enacted.  *See, e.g.*, *Ball v. James*, 451 U.S. 355, 360-62 (1981); Opening Br. 48.

Unable to construe the Provision in their favor, Appellees next try and fail to recast neighboring statutory sections, but those sections reinforce the Provision's exclusive focus on documents used to determine voter qualifications.  *See* Opening Br. 27-28; *accord Pa. NAACP*, 97 F.4th at 131; *Liebert*, 2024 WL 2078216, at *13.  The United States suggests that Section 10101(a)(2)(A) applies "in the post-voter-registration context," citing only an unpublished district court decision that did not even consider whether the Provision applies only to voter registration.  U.S. Br. 38 (citing *Marks v. Stinson*, 1994 WL 146113, at *34 (E.D. Pa. Apr. 26, 1994)).  Meanwhile, the OCA Appellees *agree* with Intervenor-

Defendants that Section 10101(a)(2)(A) applies only to qualification determinations. OCA Br. 45 (insisting that Section 10101(a)(2)(A)'s "qualification determination[]" focus somehow "highlight[s] the Materiality Provision's comparatively broader scope").

Appellees display similar confusion with respect to Section 10101(a)(2)(C). The United States again suggests that Section 10101(a)(2)(C) applies outside voter registration, but agrees it applies only to the act of determining qualifications. *See* U.S. Br. 39. OCA Appellees do not contest it is limited to qualification determinations. Congress apparently agreed that Section 10101(a)(2)(C) is limited to qualification determinations, which is why it later enacted a separate prohibition on literacy tests covering "voting." 52 U.S.C. § 10501.

Appellees also contend it does not matter that the only remedy in Section 10101(e) is a declaration of eligibility because Section 10101(e) says that individuals declared "qualified to vote" must then be "permitted to vote." OCA Br. 45-46; U.S. Br. 39-40. That point is both obvious and irrelevant: Everyone agrees that someone "qualified to vote" must have an opportunity to vote. But Section 10101(e) says nothing about having a right to vote in a particular way, or a right to insist officials count

ballots that violate ballot-casting rules. Yet *those* are the rights Appellees try (and fail) to root in the Provision, so it is telling that Section 10101(e) does not remedy failures to honor those non-existent rights.

Finally, Appellees retreat and insist that the ABBMs and mail-ballot outer envelopes to which S.B. 1's identification requirements apply *are* voter-qualification documents because the voter must sign a statement confirming their eligibility to vote. OCA Br. 44; U.S. Br. 24-25. But that is most obviously incorrect when it comes to ABBMs: The voter attests not to being qualified to vote in the election, but instead to meeting the requirements to vote *by mail*. ROA.16709. Qualifications to vote and the requirements to vote by mail *differ*, and the Provision addresses only determinations whether the voter qualifies "to vote in such election," not whether he satisfies the requirements to vote by mail. *See supra* at 1. Thus, the United States is incorrect that the Provision encompasses "applications for mail ballots" in Texas. U.S. Br. 30.

Regardless, this same argument about post-registration documents was made to and rejected by the Third Circuit, and for good reason. Many States require voters, after registering, to confirm they are qualified to vote. *E.g.*, 25 P.S. §§ 3150.14, 3150.16 (requiring voters to sign and date

declaration on mail-ballot envelope confirming "qualifications").   The point of these requirements is not to determine qualifications, but to confirm that the person is the person *already* "deemed qualified to vote" in registration.  *Pa. NAACP*, 97 F.4th at 137.  The same is true in Texas; as the District Court found, those subject to the identification provisions have "already been . . . found qualified."  ROA.33246.

### 3.   The Identification Requirements Do Not "Deny The Right Of Any Individual To Vote."

The voter-identification requirements also do not "deny the right of any individual to vote."  52 U.S.C. § 10101(a)(2)(B).  The "right to vote" guarantees access to *a* method of voting, not any particular method.  *See* Opening Br. 29-35.  It also guarantees only "access to the polls," not immunity from ordinary ballot-casting rules.  *Pa. NAACP*, 97 F.4th at 133; *see Ritter*, 142 S. Ct. at 1825-26 (Alito, J., dissental).

Appellees do not dispute those points with respect to the *constitutional* right to vote.  *See* U.S. Br. 34.  They insist the Provision's right is broader, relying solely on the statutory definition of "vote."  OCA Br. 33; U.S. Br. 34-35.  And that definition, Appellees point out, refers to "hav[ing] [one's] vote counted."  OCA Br. 32-33, 52.

But the Provision's operative phrase is "*right . . . to vote*," 52 U.S.C. § 10101(a)(2)(B) (emphasis added), not "vote." And in the 1960s, "right to vote" had a specialized meaning that guaranteed only the right to register and cast a ballot on equal terms. *See* Opening Br. 31.

In any event, the statutory definition of "vote" and the right to have one's ballot "counted" do not get Appellees very far. The definition also references a voter's obligation to "make [his] vote effective." 52 U.S.C. § 10101(e). A voter who does not follow non-discriminatory ballot-casting rules had the right to vote but has no right to have his ballot counted because he did not "make [his] vote effective." *Id.* Indeed, the "right to vote" in 1964 *did* include the "right to have one's vote counted," *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (quoting *United States v. Mosley*, 238 U.S. 383, 386 (1915)), but only when the voter made his ballot "lawful[,] regular" and "entitled to be counted," *Mosley*, 238 U.S. at 385-86. The Provision likewise protects *that* right, not some non-existent right to have a ballot "counted" where the voter did not make it "effective." 52 U.S.C. § 10101(e).

Appellees' reading thus requires striking the Provision's use of "right" and recognition that voters must "make [their] vote effective."

15

*Compare* 52 U.S.C. §§ 10101(a)(2)(B), 10101(e)*, with supra* at 1. Their attempt to transform the Provision into a right to have an ineffective ballot "counted," OCA Br. 56 n.27, fails.

Appellees also insist the Provision established a statutory "right to vote" by mail. *Id.* at 33-34, 50-52; U.S. Br. 30. Of course, the Provision says nothing about voting "by mail." *Compare* 52 U.S.C. §§ 10101(a)(2)(B), 10101(e)*, with supra* at 1. Instead of statutory text, Appellees rely on concerns about how some citizens will struggle to vote without mail voting. *See* OCA Br. 33-34, 70. But Texas has taken considerable steps to make in-person voting easy for everyone, including by promoting voter assistance and permitting curbside voting. *See* Tex. Elec. Code § 64.009(a), (a-2). More importantly, the Supreme Court already held that States have no obligation to offer mail voting, even when not offering it may make voting "extremely difficult, if not practically impossible," for some people. *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 810 (1969).

Appellees next suggest that, because Texas has *chosen* to offer mail voting, the Provision bars it from enforcing its mail-ballot election-administration rules. OCA Br. 51-52. Of course States must act "in

accordance with the Constitution" and the right to vote, *id.* at 52 n.23, but nothing in the Constitution exempts voters from non-discriminatory rules governing their chosen method of voting. Moreover, Texas's mail-voting program *does* satisfy the Constitution and the right to vote. Any voter who fears he cannot comply with S.B. 1's voter-identification rules can avoid those rules by voting in person, which "is the exact opposite of" the State "'absolutely prohibiting'" *anyone* from voting. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020) (quoting *McDonald*, 394 U.S. at 808 n.7).

Congress enacted the Provision in an era when many States barred African-American citizens from voting *in any way* through discriminatory voter-registration rules. *See Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). Its "right to vote" protects against *those* efforts at "wholesale disenfranchisement." U.S. Br. 36. It does not create a right to vote in a particular way or immunize citizens from election-administration rules necessary to "make a vote effective." 52 U.S.C. § 10101(e).

\* \* \*

"Step back and notice what [Intervenor-Defendants']
straightforward reading of the statute does and does not do." *Cf.* OCA
Br. 37. Whereas Appellees' reading redlines the Provision, *see supra* at
1, Intervenor-Defendants have given independent and sensible meaning
to every statutory word. Intervenor-Defendants' approach harmonizes
the text with statutory context and Congress's clear aim: targeting voter-
registration rules that "disqualify[] potential voters for their failure to
provide information irrelevant to determining their eligibility to vote."
*Schwier*, 340 F.3d at 1294; *see Fla. State Conf. of NAACP v. Browning*,
522 F.3d 1153, 1173 (11th Cir. 2008); *Thrasher v. Ill. Republican Party*,
2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013). It also accords with how
*every* appellate precedent—save one the Third Circuit disavowed—has
understood the Provision. *See Pa. NAACP*, 97 F.4th at 127-28. The
Court should reject Appellees' contrary and unsupported construction.

## B. *The Federalism Canon Bars Extending The Provision To The Identification Requirements.*

The federalism canon bars extending the Provision outside the
qualification determinations in the voter-registration context covered by
its plain text. *See* Opening Br. 35-39. Ruling otherwise would unleash

electoral chaos by imperiling paper-based voting rules across the country. *See Pa. NAACP*, 97 F.4th at 134-35; *Liebert*, 2024 WL 2078216, at *14.

Appellees nonetheless contend that the Provision "prohibits . . . preventing a voter from casting a ballot or having it counted in any election, due to an error or omission on a required, voting-related form or paper, *if* the error or omission is not material in ascertaining the voter's qualifications to vote in the election." OCA Br. Br. 4; *compare supra* at 1. This standard would improperly "tie state legislatures' hands in setting voting rules unrelated to voter eligibility," like anti-fraud measures. *Pa. NAACP*, 97 F.4th at 134; *see Liebert*, 2024 WL 2078216 at *14 ("[A] broader interpretation of the Materiality Provision would mean that numerous rules related to vote casting would be invalid.").

Unsurprisingly, Appellees point to no "exceedingly clear language" in the Provision to support such a significant displacement of state law—because none exists. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764-65 (2021) (per curiam). They therefore cannot defeat application of the federalism canon. *See id.*; Opening Br. 35-39.

Appellees try anyway—and fail. *First*, Appellees suggest that the federalism canon does not apply because Congress enacted the Provision

under the Elections Clause.  U.S. Br. 41; OCA Br. 60.  But the Elections

Clause empowers Congress to regulate *only* Congressional elections, *see*

U.S. Const. art. I, § 4, cl. 1, so it cannot justify the Provision's application

to "any election" States or localities conduct, *see* U.S. Br. 7 (Provision

"applicable to state and local elections").  Indeed, the District Court's

order is not limited to Congressional elections.  ROA.33271-72.  The only

constitutional basis for Congressional regulation of state and local

elections is the Fifteenth Amendment, which forecloses extending the

Provision beyond voter registration, *see infra* 23-27.

*Second*, resisting the sweeping implications of their approach,

Appellees try to minimize the fall-out, but their responses are hardly

convincing.  Appellees insist "signature requirements on various forms or

poll books" could be safe because, under their open-ended balancing

approach, such requirements might be "material."  OCA Br. 55: U.S. Br.

42 ("signature requirements . . . may be material").  But they immediately

undercut their own reassurance, suggesting that "unnecessarily

duplicative" signature requirements are illegal and favorably citing an

unpublished district court opinion that wielded the Provision against a

signature requirement.  OCA Br. 55 (citing *Ford v. Tenn. Senate*, 2006

WL 8435145, at *11 (W.D. Tenn. Feb. 1, 2006)). Under Appellees' approach, then, the multitude of signature requirements in state election codes exist at the mercy of open-ended judicial "materiality" examinations.

Appellees next insist that overvote prohibitions are safe because the ballot is "not on a paper made requisite to voting." OCA Br. 56. But that is clearly wrong under Appellees' approach, because filling out the ballot is a necessary step to "having [one's] vote[] counted." *Id.* at 1. Appellees also claim that secrecy-envelope requirements do not involve an error "on" a paper or record, *id.* at 56, but such requirements frequently *do* prohibit writing anything "on" a secrecy envelope, *see, e.g.*, *Pa. Democratic Party v. Boockvar*, 238 A.3d 345, 378 (Pa. 2020). In Appellees' world, such rules must go, too.

Notably, Appellees do *not* dispute that at least some of the election rules cited by Intervenor-Defendants must go under their approach. They offer no defense of witness requirements, dating requirements, mandatory poll-book recording rules, or mandatory voter assistance forms. *See* U.S. Br. 42-43 (arguing only that, in some States, these rules are not mandatory). Nor could they: There are efforts around the country

to wield the Provision against such rules, and Appellees' lawyers are involved in some of them.  *See, e.g.*, *Pa. NAACP*, 97 F.4th 120 (dating rule); *Minn. All. for Retired Ams. Educ. Fund v. Simon*, A24-1134, 2024 WL 3841815 (Minn. Ct. App. Aug. 13, 2024) (witness requirement); *Liebert*, 2024 WL 2078216, at *11 (same); *In re Ga. Senate Bill 202*, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) (dating rule); *Vote.Org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1334 (N.D. Ga. 2023) (signature requirement).

*Third*, Appellees assert "Congress gave" a "clear statement" in their favor, effectively arguing that the Third Circuit's interpretation is not just wrong, but clearly so.  OCA Br. 57; U.S. Br. 40.  Their only basis for this brazen assertion is that the 1964 Civil Rights Act is an important statute.  OCA Br. 58; U.S. Br. 44.  Of course it was.  But "[u]ntil recently," *the Provision* "received little attention from federal appellate courts" and, "[w]hen it did, the challenged state law prescribed rules governing voter registration."  *Pa. NAACP*, 97 F.4th at 127.  Indeed, even the OCA Appellees acknowledge the Provision was only "recently" applied to "mistakes on mail-ballot-related paper forms."  OCA Br. 7-8.  So yes,

22

"Congress is unlikely to have spoken to the federal-state balance" over all paper-based election rules in the Provision. *Id.* at 58.

Election disputes are some of the most sensitive cases the Judiciary must referee. Doing so with open-ended balancing tests shifts substantial power from the States to the federal courts, all while forcing judges to make judgments that appear "political, not legal." *Rucho v. Common Cause*, 588 U.S. 684, 707 (2019). This Court should reject Appellees' invitation to transform the long-obscure Provision into newly discovered open-ended federal judicial supervision of state election laws.

## C. *The District Court's Interpretation Renders The Provision Unconstitutional.*

Extending the Provision beyond qualification determinations during voter registration exceeds Congress's Fifteenth Amendment enforcement authority. *See* Opening Br. 39-44. The legislative record shows the enacting Congress compiled evidence of, and addressed, discriminatory practices in voter registration, but not in other election-administration rules. *Id.* at 4-5, 41. Even the United States agrees "Congress's primary aim in enacting the Provision was to eliminate racially discriminatory barriers to voter registration." U.S. Br. 46.

Appellees offer various arguments resisting this conclusion, but none succeeds. *First*, the OCA Appellees argue the Provision can be justified under the Elections Clause, *see* OCA Br. 60, but the Elections Clause is entirely irrelevant to enactments under the *Fifteenth Amendment*, the only source of Congressional authority to extend the Provision to "any election" at the state or local level, 52 U.S.C. § 10101(a)(2)(B). Regardless of the Elections Clause, the Provision *must* be read narrowly to avoid unconstitutional applications to state and local elections. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

*Second*, the United States argues that the congruence-and-proportionality test from *City of Boerne v. Flores*, 521 U.S. 507 (1997), does not delineate Congress's Fifteenth Amendment enforcement authority, but that a "deferential" "rationality standard" governs instead. U.S. Br. 45. Its primary authority is *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), which the Supreme Court in *Boerne* relied upon in articulating the congruence-and-proportionality test. *See* 521 U.S. at 530-32. Its citation to *Allen v. Milligan*, 599 U.S. 1 (2023), *see* U.S. Br. 45, does no work because the *Allen* petitioners asked the Supreme Court to overrule, rather than apply, *Katzenbach*, and never argued that

24

Congress failed to assemble an adequate record to justify the law at issue in *Allen*. *See* 599 U.S. at 33.

In any event, even if something other than congruence-and-proportionality governs Fifteenth Amendment enforcement statutes, the governing test has considerable force. *See Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) (striking down preclearance coverage formula). Indeed, "while any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions." *Id.* at 557. Thus, that the enacting Congress compiled no record to justify extending the Provision to ballot-casting rules forecloses federal courts from doing so now. *See id.*

*Third*, Appellees suggest an expanded Provision would satisfy the congruence-and-proportionality test, citing *Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) (*Vote.Org II*). *See* OCA Br. 62. But *Vote.Org II* addressed a registration rule and noted that extending the Provision to ballot-casting rules was "possibly overbroad." 89 F.4th at 479 n.7. *Vote.Org II* thus does nothing to salvage Appellees' and the District Court's application of the Provision to a scenario Congress neither contemplated nor addressed. And *Vote.Org II*'s discussion of the

congruence-and-proportionality test was dicta because it was not "necessary to [the] result," *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996): *rejecting* the Materiality Provision challenge to a wet-signature requirement, *see infra* 27.

*Fourth*, the United States asserts there is evidence that Congress considered discrimination outside the voter-registration context when enacting the Provision. U.S. Br. 45-46. It invokes only *one* piece of such alleged evidence—a statement objecting to "obstacles to the exercise of the right to vote"—in an introduction to the House Report on the *entire* Civil Rights Act of 1964. *Id.* (quoting H.R. Rep. No. 914, 88th Cong., 1st Sess. 18 (1963)). But the same House Report's summary of the Provision confirms the Provision was "designed to insure nondiscriminatory practices in the registration of voters." H.R. Rep. 88-914, pt. 1 at 19 (1963) (emphasis added); *id.*, pt. 2 at 3-4. As the Third Circuit explained, the Provision's legislative history is one-sided and demonstrates that Congress did not consider or discuss rules outside the voter-registration context. *See Pa. NAACP*, 97 F.4th at 132-33. The Court should avoid the constitutional problem inherent in Appellees' and the District Court's construction and reverse.

## II.  THE PANEL DECISION IN *VOTE.ORG II* APPLIES ONLY TO VOTER REGISTRATION, BUT THE IDENTIFICATION REQUIREMENTS EASILY SATISFY IT.

*Vote.Org II* applies only to voter-registration rules like the wet-signature requirement at issue in that case.  Opening Br. 50-51.  This Court should decline to split with the Third Circuit and clarify *Vote.Org II*'s limited domain.

Although Appellees are apparently eager to extend *Vote.Org II* to all paper-based election-administration rules, *see* OCA Br. 64; U.S. Br. 47-48, S.B. 1's voter-identification requirements easily satisfy it. Opening Br. 51-59.   Indeed, this Court must defer to Texas's "considerable discretion in deciding what is an adequate level of effectiveness to serve [the] important interest" of protecting "voter integrity."  *Vote.Org II*, 89 F.4th at 485.

S.B. 1's identification rules, just like in-person voter-identification requirements, are obvious means to prevent fraud and ensure voters are "actually who they say they are."  *Id.* at 487.  The materiality of the identification numbers S.B. 1 uses is especially obvious because Congress deemed them "material," *Browning*, 522 F.3d at 1174, and envisioned they would be recorded in States' voter-registration databases, when it

27

enacted the Help America Vote Act (HAVA). *See* 52 U.S.C. § 21083(a)(5)(A).

Appellees offer several contrary arguments, but all fail. *First*, Appellees question whether "voter integrity concerns" can justify S.B. 1's voter-identification provisions. U.S. Br. 50 (cleaned up); *see* OCA Br. 68 (asserting Texas's interests are "not particularly substantial"). The United States, for example, insists that "the risk of fraud in voting is exceedingly rare" and that Texas could deter fraud by means other than voter-identification rules. U.S. Br. 50 (cleaned up). And the OCA Appellees (falsely) claim "[t]here is no record evidence that mail ballots are a source of fraud." OCA Br. 68.

The Supreme Court has already rejected this argument: Preventing election fraud is a "compelling" state interest, and States can enact voter-identification rules to deter and detect fraud. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190-91 (2008). States may even "take action to prevent election fraud without waiting for it to occur and be detected within [their] own borders." *Brnovich v. DNC*, 594 U.S. 647, 686 (2021). As the stay panel explained, the same reasons that justify Texas's voter-identification rule for in-person voting justify S.B. 1's

requirements for mail voting. Stay Opinion at 6. If anything, voter-identification rules are *more* justified for mail voting than for in-person voting, as courts have long recognized that mail voting is *more* vulnerable to fraud. *See Crawford*, 553 U.S. at 195-96; *Brnovich*, 594 U.S. at 685; *Veasey v. Abbott*, 830 F.3d 216, 239, 256 (5th Cir. 2016) (en banc).

*Second*, the OCA Appellees assert it is "undisputed" that S.B. 1's voter-identification requirements "*cannot* be used to ascertain a voter's identity" or "flag potential fraud." OCA Br. 66-67. That is wrong. Denton County Election Administrator Frank Philips explained how those requirements make confirming identity easier and committing mail-ballot fraud harder, ROA.22627-22628, 22634-22635, and how they would have hindered a mail-ballot fraud scheme he discovered in 2020, *see* ROA.22627-22628, 22634-22635.

Ignoring that testimony entirely, the OCA Appellees insist that election officials already know the identity of a person applying for and casting a mail ballot because "officials must have *already discerned* the identity of the voter." OCA Br. 66. But that is a *non sequitur*. Texas's concern is that the person requesting a mail ballot *might not* be the same person who registered, or that the person submitting the mail ballot

might not be the same person who requested it. *See* ROA.22632. These things have happened before in Texas, and they received substantial publicity in 2020, causing the Legislature to act. *See* ROA.22627-22628, 22634-22635; A. Samuels, *Carrollton mayoral candidate arrested on suspicion of fraudulently obtaining mail-in ballots*, Tex. Tribune (Oct. 8, 2020), https://perma.cc/S6PG-Y438.

*Third*, Appellees assert that errors in the Texas Election Administrative Management System ("TEAM") mean that Texas is not meaningfully advancing its anti-fraud interests. OCA Br. 69; U.S. Br. 48-50. But there is no dispute that TEAM is complete and accurate for the vast majority of Texas voters. Moreover, database errors are certainly not unique to Texas, *see, e.g., Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 760 (2018), and Appellees point to *zero* authority suggesting that such inevitable mistakes violate any right to vote. In any event, Appellees' catastrophizing makes little sense considering that, in the 2022 general election, Texas's rejection rate for mail ballots was similar to pre-S.B. 1 rejection rates. ROA.22600. And since then, Texas has taken substantial steps to improve TEAM, including importing vast amounts of identification numbers from the Department of Public Safety

(which issues drivers' licenses). *See* ROA.22650-22651. Any limitations in TEAM will therefore only continue to diminish.

In any event, any problems with TEAM do not detract from Texas's anti-fraud interest. As the stay panel explained, Texans voting in person must show identification as an anti-fraud measure, Stay Order 6, and Appellees do not dispute that mail voting is *more* vulnerable to fraud than in-person voting, *see, e.g.*, *Veasey*, 830 F.3d at 239, 256. S.B. 1's voter-identification provisions guard against such fraud by helping to ensure that the same person registered, requested a mail ballot, and then cast it. The fit between that interest and the identification requirements is a close one, since the numbers S.B. 1 uses are unique to each voter, were specified at voter registration, and are not available to third parties. *See* ROA.22620-22621, 22629; Opening Br. 52-53. And if there were any doubt on that score, Administrator Philips testified that a 2020 mail-ballot fraud scheme would have been harder to pull off under S.B. 1. *See* ROA.22627-22628, 22634-22635.

*Fourth*, Appellees grossly exaggerate the burdens imposed by S.B. 1's identification requirements. OCA Br. 24-25; 69-70; U.S. Br. 50-51. They focus on the rejection rate in the 2022 primary election, during

which election administrators had to quickly implement the requirements. Since then, rejection rates have dropped precipitously, and the mail-ballot rejection rate in Texas is lower than in some other States. *See, e.g.*, D. Chin, *A Deep Dive Into Absentee Ballot Rejection Rates in the 2020 General Election*, MIT Elections Blog (Dec. 16, 2021). As former Texas Elections Director Keith Ingram explained, Texas's mail-ballot rejection rate in the 2022 general election was "back in the zone" of pre-S.B. 1 rejection rates. ROA.22600. The rejection rate will likely drop further as election officials and voters continue to become more familiar with S.B. 1's requirements.

*Fifth*, Appellees complain about putative problems with Texas's procedures for curing mail-ballot errors, U.S. Br. 51-52, but these procedures only highlight S.B. 1's reasonableness. Not every State allows voters to cure mail-ballot errors. *See, e.g.*, *Pa. Democratic Party*, 238 A.3d at 372-74 (no right to cure in Pennsylvania). Yet S.B. 1 created cure processes to fix *all* errors—not just those related to S.B. 1 requirements. *See* Tex. Elec. Code §§ 86.008, 87.0411. In the 2022 general election, nearly half of those who submitted defective mail ballots successfully cured them. ROA.13203-13205. And Texas is continuing to improve

those cure processes.  In 2023, for example, the Legislature passed a bill making it easier to cure online.  *See* Act of May 29, 2023, 88th Leg. R.S., H.B. 357, § 2.

*Finally*, Appellees twist themselves into knots trying to explain how the same identification numbers Congress deemed material in HAVA somehow become immaterial here.  U.S. Br. 52-53; *see also* 52 U.S.C. § 21083(a)(5)(A).  The United States speculates that HAVA's instruction that its requirements apply "notwithstanding any other provision of law" somehow suggests the Provision might otherwise bar States from requiring the very same identification numbers.  U.S. Br. 53 (quoting 52 U.S.C. § 21083(a)(5)(A)(i)).  But that random shot in the dark makes little sense; Congress judged those numbers "material" in ensuring reliable voter-registration databases.  *Browning*, 522 F.3d at 1174.

As the Eleventh Circuit already held, Congress's decision that such numbers are material means that States can insist voters supply them without violating the Provision.  *See id.*  The United States quotes *Browning* for the proposition that States "need not match the numbers against existing databases."  U.S. Br. 54 (quoting *Browning*, 522 F.3d at

33

1174 n.21).  But regardless whether States choose to match the numbers at voter registration, Congress deemed the numbers "material to determining eligibility to register and to vote." *Browning*, 522 F.3d at 1174.  Texas's decision to treat those numbers as material to mail voting therefore comports with, rather than violates, federal law and the Provision.

## CONCLUSION

The Court should reverse.

Dated:  September 17, 2024

Respectfully submitted,

*/s/* John M. Gore
John M. Gore
(D.C. Bar No. 502057)
 *Counsel of Record*
E. Stewart Crosland
Louis J. Capozzi, III
JONES DAY
51 Louisiana Ave. NW
Washington, DC  20001
(202) 879-3939
jmgore@jonesday.com
scrosland@jonesday.com
lcapozzi@jonesday.com

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and the Local Rules of this Court, I hereby certify the following:

1.      I am  a member in good standing of the Bar of this Court.

2.      This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6,462 words, excluding the parts exempted by Fed. R. App. P. 32(f).

3,       This Brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared using Microsoft Word in a proportionally spaced 14-point font (namely, Century Schoolbook Standard) in the text and the footnotes.

4.      The text of the electronic Brief is identical to the text in the paper copies.

5.      The electronic file containing the Brief was scanned for viruses using the most recent version of a commercial virus scanning program, and no virus was detected.


Dated: September 17, 2024                    */s/* John M. Gore
                                            John M. Gore
                                            *Counsel for Intervenor-*
                                            *Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2024, this brief was electronically filed with the Clerk of Court using the appellate CM/ECF system. Service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.

Dated: September 17, 2024      */s/* John M. Gore

                                   John M. Gore
                                   *Counsel for Appellants*